1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

ROBERT FRANKLIN,

11

Petitioner,                    No. CIV S-05-304 FCD KJM P

12

vs.

13

JAMES WALKER, Acting Warden,

14

Respondent.              <u>ORDER</u>

15

_____/

16

Petitioner is a state prison inmate proceeding with counsel on a petition for a writ

17

of habeas corpus challenging his Plumas County conviction for the murder of his wife, Ronna

18

Franklin.  Counsel has filed a motion for leave to conduct discovery, which respondent has

19

opposed.

20

/////

21

/////

22

/////

23

/////

24

/////

25

/////

26

/////

I. <u>Background</u>

Portions of the state Court of Appeal's decision upholding the conviction help illuminate some of the issues raised by the instant motion.[1]

On December 28, 1996, Ronna's 38th birthday, she and defendant went for a ride on a snowmobile defendant had purchased. . . . . It was raining, causing the snow on the ground to turn slushy. As a result of what defendant asserted was an accident, the snowmobile came to rest along the side of a road where there was a three-foot-deep puddle of slushy water.

Deborah and Eric Ingvoldsen were traveling on their snowmobiles when they noticed the Franklins' snowmobile, upright, with the motor still running and the headlight on, stopped in the slushy water at the edge of the road. Just behind the snowmobile, defendant was sitting, immersed in the water up to his chest, leaning back against the snow bank. His head was straight, not leaning to either side. Mrs. Ingvoldsen got off her snowmobile and approached the Franklins' snowmobile on foot. Although defendant was wearing a helmet, she could see that defendant's eyes were closed and his face was flushed. After she yelled to defendant, with no response, Mrs. Ingvoldsen saw a yellow slicker under the water and a helmet floating in the water. Upon closer inspection, she saw Ronna under the water, her eyes wide open and her lips blue. With the help of her husband and Jeff Wisecarver, who had just arrived on the scene from the opposite direction, Mrs. Ingvoldsen pulled Ronna out of the water.

Defendant's color was good, and steam was rising from his chest. Jay Grubbs arrived on the scene, and the three men pulled defendant from the water. . . . It appeared that defendant was conscious but slipping into unconsciousness.

Defendant was taken by sled to a cabin at Grubbs Cow Camp, which was about a quarter-mile from where he was found. En route, defendant's leg slipped off the sled and bent back. Although it appeared to be painful, defendant did not react. Defendant was carried inside the cabin and his clothes were removed. There were no injuries. He mumbled and asked about his wife. Defendant was at the cabin for more than two hours, over which time his mental condition appeared to improve markedly. . . .

. . . . An autopsy revealed Ronna's cause of death was drowning. Several ribs had been broken during administration of CPR, but there were no other signs of trauma to the body.

---

[1]  By referencing these portions of the decision, the court is not making any findings of fact.

1    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3    Defendant was taken to the hospital and arrived after Ronna had
     been pronounced dead. He had no obvious injury, but tests were
4    ordered because he said his abdomen was slightly tender. When
     told that Ronna died, defendant cried. X-rays and a CAT scan
5    revealed no abnormalities. The attending physician saw no injury
     that would explain a loss of consciousness. Defendant was
6    admitted to the hospital for an overnight stay because he said he
     lost consciousness.
7
     While still in the hospital, defendant initially told a California
8    Highway Patrol officer he did not remember anything about the
     snowmobiling incident. He remembered having lunch, during
9    which he and Ronna both consumed alcohol. They went for a ride
     on the snowmobile with Ronna riding in front and driving, he told
10   the officer. Defendant believed they hit something but did not
     remember anything further.
11
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
12
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
13
14   The brakes and clutch on the snowmobile were working normally.
     The tracks of the snowmobile were consistent with someone
15   simply pulling over and stopping. There were no obstructions in
     the path of the snowmobile that would have caused an accident.
16   Normally, if someone is in a snowmobiling accident, that person
     falls off to the side or goes over the handlebars. Defendant and
17   Ronna, however, were found behind the snowmobile.

18   The tracks left by the snowmobile were straight, indicating the
     snowmobile had not suddenly turned one way or the other. The
19   snowmobile was found upright and there was no indication the
     front skis on the snowmobile had left the ground, causing a loss of
20   control. Also, if defendant and Ronna had come around the last
     curve at an excessive speed, they and the snowmobile would have
21   gone off the other side of the road. It did not appear, from the
     physical evidence at the scene, that there had been a snowmobiling
22   accident.

23   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

24   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

25   /////

26   /////

An accident reconstruction expert, Garrison Kost, conducted tests using a snowmobile. Although he did not attempt to duplicate the exact conditions that existed for the Franklins, the expert concluded from the evidence given to him that the snowmobile was not traveling fast prior to stopping where defendant and Ronna were found. Consequently, the G-forces applied to the riders would not have been strong. A biomechanical engineer, Lawrence Thibault, testified as a prosecution expert that, if defendant had fallen off the snowmobile and struck his head on the snow with his helmet on, the impact would not have been sufficiently strong to cause a concussion. A defense expert testified, however, that the conclusion of the prosecution's expert was unreliable because it did not take into account whether defendant was ejected from the snowmobile.

People v. Franklin, 2003 WL 21518916 at 3-6.

After the conclusion of direct review in the state courts, petitioner filed his habeas petition in this court, raising the issues exhausted through the direct appeal process along with some that were concededly unexhausted. This court granted petitioner's requests for the appointment of counsel and a stay of the proceedings.

During the proceedings on a state habeas petition filed in Plumas County Superior Court, petitioner sought discovery based on California Penal Code section 1054.9, seeking twelve categories of information. Request seven asked for, among other things, materials concerning this case given to the prosecution by lawyers, insurance companies, the decedent's family, law enforcement agencies in Santa Clara and Sacramento Counties, and from Exponent, also known as Failure Analysis Associates. Lodg. Doc. 6, App. 7 at 3-4.

At the initial hearing in superior court, the court found no right to "free floating discovery" and suggested that petitioner should first determine whether the material was available from trial counsel as a foundation for the motion. Lodg. Doc. No. 8, App. 15 at 4-5. The court ultimately denied the motion without prejudice. Id., App. 15 at 10.

Petitioner then renewed his motion for discovery, providing additional information in support of his requests. Id., App. 8. In his discussion of request seven (e), petitioner noted that at trial, both counsel referred to a number of articles written by Dr. Thibault,

4

the prosecution's expert witness, but that these articles were not among the documents petitioner's current counsel received from trial counsel.  Id., App. 8 at 4.  In his response, the prosecutor provided several articles his "diligent search" identified as responsive to request seven (e).  He also averred that his search had not yielded other discovery materials.  Id., App. 23 at 2-3.

The superior court held a further hearing on this request on May 23, 2005.  Id., App. 16.  The prosecutor noted that his file had become "somewhat unorganized" during the lengthy trial.  He described the file as consisting of "a dozen book boxes with various, previously-discovered items mixed together horizontally with many attorney notes on them and in the margins and what not. [¶] I'm not prepared to let Mr. Bacon look through this, what appears to be attorney work-product, but in terms of facilitating getting copies of things that were discovered in the case, I'd be happy to do that. [¶] There's really nothing else to show him other than the evidence that I believe the Court still has from the trial."  Id., App. 16 at 3.   The court said:

> . . . Mr. Bacon, I don't read the Steele decision quite as expansively as you do, and I would be the first to admit that probably in terms of ease of both sides' preparation for any further hearings with regard to writs, they might be the easiest to simply have the District attorney allow you to go through all those dozen boxes . . . . .
>
> However, the law does not require that that be the case.  And Mr. Cunan has indicated good reason to believe that this could very well be a violation of his rights to privacy of attorney work-product. . . . .
>
> . . . . [W]ith exception of request No. 5.  I'll go ahead and make a finding that it does appear that the People have responded sufficiently to your request for information and discovery.

Id., App. 16 at 3-4.  The court then considered request number five, which concerned a list of women with whom petitioner allegedly had had affairs during the course of his marriage that had been discussed during an in camera proceeding; this matter is not at issue here.  Id., App. 16 at 4-8.  The court directed that petitioner be provided with a list of the names of women with whom

1  petitioner allegedly had affairs but found that the prosecutor had adequately responded to

2  petitioner's other requests.  Id., App. 16 at 10.

3        Petitioner filed a petition for a writ of mandate in the Court of Appeal, which

4  denied it by noting that "a blanket request for discovery is insufficient."  Id., App. 18.  The

5  California Supreme Court denied review of this issue.  Id., App. 19.

6        Petitioner filed his amended petition in this court on September 10, 2007, raising

7  twenty-two grounds.

8        Petitioner has now filed a motion for discovery in this court.  In broad outline, he

9  seeks the following categories of information:

10        A.  Materials from the prosecution's expert witnesses regarding calculations and

11  simulations regarding the snowmobile;

12        B.  Access to the snowmobile itself for dynamic testing; and

13        C.  Materials from the prosecutor's files about contacts from a variety of sources

14  relating to the prosecutor's alleged conflict of interest.

15  II.  Discovery In Habeas Cases And The AEDPA

16        According to respondent, in addition to determining whether petitioner has shown

17  good cause for the requested discovery, this court must review any state discovery ruling "under

18  the highly deferential standard" of 28 U.S.C. § 2254(d) and must consider the "presumptive

19  correctness of state court findings" under 28 U.S.C. § 2254(e)(1).  In supplemental briefing,

20  respondent argues that petitioner must also satisfy the requirements of 28 U.S.C. § 2254(e)(2) in

21  order to proceed with discovery.

22        Petitioner counters that the deferential standards are applicable only to claims

23  relating to the ultimate merits of the action and also argues that even if this court must defer to

24  the state court, there are no findings entitled to deference.  He also argues he has demonstrated

25  good cause for the discovery sought, as that term has been interpreted by the courts.

26  /////

The statute provides in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

    (A) the claim relies on–

        (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or

        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254.

/////

1    As the Ninth Circuit has recognized, AEDPA has created "a complex yet

2  indisputably deferential system of federal habeas review," which nevertheless does not apply to

3  all matters to be resolved in federal habeas proceedings.  Lambert v. Blodgett, 393 F.3d 943, 965,

4  978 (9th Cir. 2004).  Neither the Supreme Court nor the Ninth Circuit has explicitly addressed

5  whether a federal court's deference extends to decisions that are not dispositive of the habeas

6  petition.

7    Respondent relies on two cases to argue that the deferential standard applies to

8  discovery determinations.  The first is Pham v. Terhune, 400 F.3d 740 (9th Cir. 2005).  In that

9  case, petitioner raised a Brady claim in his habeas petition and then sought discovery of the

10  laboratory notes he claimed had been withheld by the prosecution.  The district court denied the

11  motion for discovery, believing it owed deference to the state court's refusal to order production

12  of the notes.  Pham, 400 F.3d at 742-43.  The Ninth Circuit found deference was not warranted

13  because there was no discovery ruling from the state court; rather, counsel had used informal

14  channels to seek the material.  Id. at 743.  The court did not go so far as to say, as respondent

15  suggests, that had there been a state court ruling on a discovery motion it would have been

16  entitled to deference for purposes of Rule 6 habeas discovery.

17    The second case is Hodges v. Bell, 548 F.Supp.2d 485, 497 (M.D. Tenn 2008).  In

18  that case, the court rejected a habeas petitioner's request for discovery, noting with little analysis

19  that the state court's factual determinations on discovery questions are entitled to a presumption

20  of correctness and that a habeas court's review is constrained by the evidence presented in the

21  state court proceeding.  Hodges cites no case law supporting its conclusion that section 2254(d)

22  applies to discovery determinations and quotes language purporting to be from subdivision (d),

23  but which does not appear in the current version of the statute.  This court declines to rely on the

24  result embraced by the Hodges court.

25  /////

26  /////

8

1          Instead, the guiding law in this context, to the extent applicable, is contained in

2   subsections (d)(2) and (e)(1), which constrain a district court from granting a federal habeas

3   petition unless it finds the state court's adjudication of legal or factual issues was unreasonable.

4   See Lambert, 393 F.3d at 971 (section 2254 (d) & (e) "address whether, and to what extent, a

5   federal district court is bound by state court findings on any of the dispositive factual questions

6   presented in the habeas corpus petition").  These subsections establish standards for and apply to

7   "the granting of habeas relief" rather than to the resolution of "separate proceeding[s], . . .

8   distinct from the merits."  Miller-El v. Cockrell, 537 U.S. 322, 342-43 (2003) (certificate of

9   appealability is separate determination, distinct from underlying merits); see also McFarlane v.

10  Gillis, 2007 WL 4373065 at 5 (E.D. Pa. 2007) (exhaustion requirement does not apply to Rule 6

11  discovery request because it "is not a claim unto itself . . . .").

12         Respondent also argues this court must presume any factual determinations made

13  by the state court are correct in accordance with section 2254(e)(1).  He relies again on Hodges,

14  which engages in little analysis but relies in turn on Byrd v. Collins, 209 F.3d 486 (6th Cir.

15  2000), a pre-AEDPA case, and Moen v. Czerniak, 2004 WL 1293920 (D. Or. 2004).  Neither of

16  these cases is determinative.  In Byrd, the court relied on the pre-AEDPA version of section

17  2254(d), which directed a federal habeas court to presume that a state court's factual findings

18  were correct unless the petitioner fell within one of eight exceptions in the statute.  Byrd, 209

19  F.3d at 511.  Moreover, the court in Byrd found the petitioner had not taken advantage of

20  discovery proceedings in the state court and so had not developed information to rebut the

21  presumption of correctness.  Because petitioner had not developed the facts necessary to rebut

22  the presumption of correctness as to the merits of his habeas petition, the court rejected

23  petitioner's request to conduct federal habeas discovery.  Id. at 516-17.  It did not apply the

24  habeas presumption of correctness, whether pre-AEDPA or AEDPA versions, to state court

25  findings on discovery requests.  In Moen v. Czerniak, 2004 WL 1293920 (D. Or. 2004), the court

26  did not discuss section 2254(e)(1), but rather relied on section 2254(e)(2).

1    As with subdivision (d), this court declines to apply section 2254(e)(1)'s

2  presumption of correctness to discovery proceedings.  As noted above, subsections 2254(d) and

3  (e) establish standards to guide the resolution of the habeas action itself.  Miller-El, 537 U.S. at

4  342-43.  The Ninth Circuit, as well, has interpreted these two provisions as governing the way in

5  which a district court evaluates a state court's factual determinations in resolving a habeas

6  petition: it must apply the unreasonableness standard of section 2254(d) to an "intrinsic" review

7  based solely on the record of the state court proceedings and then turn to subsection (e)(1)'s

8  presumption of correctness in determining whether evidence presented for the first time in

9  federal court demonstrates that the state court findings were in error.  Taylor v. Maddox, 366

10  F.3d 992, 1000 (9th Cir. 2004).  Given the manner in which these two sections operate, and their

11  relationship to the ultimate determination of the merits of the habeas action, neither applies to the

12  resolution of a Rule 6 discovery motion.

13    In his supplemental points and authorities, respondent argues that section

14  2254(e)(2) also bars petitioner from seeking discovery in this court because he "failed to

15  develop" his discovery requests themselves in the state proceedings.  Here again, neither the

16  Supreme Court nor the Ninth Circuit has decided whether subsection (e)(2) applies to a habeas

17  petitioner's discovery requests.  Some courts have found this provision to govern habeas

18  discovery proceedings.  For example, the Eleventh Circuit upheld the denial of a habeas

19  petitioner's request to conduct discovery because he had not diligently pursued discovery in the

20  state court.  Arthur v. Allen, 452 F.3d 1234, 1248 (11th Cir. 2006).  However, the Third Circuit

21  /////

22  /////

23  //////

24  /////

25  /////

26  /////

has found that section 2254(e)(2) did not apply to evidentiary hearings exploring the reasons for procedural default:

> AEDPA's use of the word "claim" uniformly comports with Cristin's more limited definition of a "cause of action" or "means by or through which a claimant obtains . . . enjoyment of a privilege.  For example, the term "claim" is used in § 2254(d), also added by AEDPA, in the following sentence.  "An application for a writ of habeas corpus . . . shall not be granted with respect to any *claim* that was adjudicated on the merits in State court proceedings . . . ." 28 U.S.C. § 2254(d).  By stating that an "application for a writ of habeas corpus" can be granted "with respect to any claim," the sentence clearly implies that Congress used the term "claim" as a substantive request for the writ of habeas corpus.  This is the same definition of the term "claim" used in the pleading requirements of Federal Rule of Civil Procedure 8(a) . . .

Cristin v. Brennan, 281 F.3d 404, 418 (3d Cir. 2002) (emphasis in original; some internal quotes & citations omitted).   This reading of the word "claim" fits with the tenor of the entire subsection, for the showing a petitioner must make to secure a hearing in federal court, despite his lack of diligence below, includes a requirement that he demonstrate the facts underlying the claim would have caused the trier of fact to find him not guilty.  Requiring such a showing in connection with a discovery request makes little sense.

As one district court has commented in rejecting another warden's argument similar to that of respondent's on this motion:

> [I]t is premature to address respondent's argument because, at this point, petitioner has not sought (and may never seek) to present new evidence in support of his claims.  At this point, he has asked only for leave to conduct discovery that may lead to new evidence.  The Court will address any arguments regarding whether § 2254(e)(2) precludes petitioner from introducing new evidence in support of his claims when and if he seeks to present that new evidence.

Hill v. Mitchell, 2007 WL 2874597 at 3 (S.D. Ohio).

This court is aware that the Supreme Court and the Ninth Circuit have found the restrictions of § 2254(e)(2) applicable to requests to expand the record under Rule 7 of the habeas rules.  In Holland v. Jackson, 542 U.S. 649, 653 (2004), the Supreme Court found that

section 2254(e)(2) applies "when a prisoner seeks relief based on new evidence *without* an

evidentiary hearing." See also Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005).

In those cases, however, the petitioners asked the courts to consider evidence supporting claims

for relief they had not presented to the state courts and that they failed to pursue with the

diligence required by Williams v. Taylor, 529 U.S. 420 (2000).  In this case, as in Hill, petitioner

has not yet asked this court to consider any evidence he seeks in support of his claim.

Finally, even if section 2254(e)(2) applies to discovery proceedings, it does not

bar petitioner in this case, at least not as to the portion of the request the court ultimately grants

as explained below.  A petitioner will be charged with a "failure to develop" the facts if "there is

lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

Williams, 529 U.S. at 432.  The petitioner must have "made a reasonable attempt, in light of the

information available at the time, to investigate and pursue claims in state court." Id. at 435.

"Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary

hearing in the state court in the manner prescribed by state law." Id. at 437.

In this case, petitioner filed a state habeas petition in which he sought the

discovery available to him under California Penal Code section 1054.9.  See In re Steele, 32

Cal.4th 682 (2004).  Only one of his discovery requests is included in the instant discovery

motion.  Respondent argues petitioner did not diligently pursue discovery, however, because the

habeas petition did not state a prima facie case, which in turn means "he forfeited the opportunity

for an evidentiary hearing" because he failed to submit "the actual evidence proving the truth of

the facts asserted in the petition."  Suppl. Opp'n at 4.

/////

/////

/////

/////

/////

1    The California Supreme Court has established pleading requirements for state

2  habeas petitions:

> The petition should both (I) state fully and with particularity the
> facts on which relief is sought, as well as (ii) include copies of
> reasonably available documentary evidence supporting the claim,
> including pertinent portions of trial transcripts and affidavits or
> declarations. Conclusory allegations made without any explanation
> of the basis for the allegations do not warrant relief, let alone an
> evidentiary hearing.

7  People v. Duvall, 9 Cal.4th 464, 474 (1995) (citations omitted).  The state habeas petitions

8  submitted in this case were supported by over twenty exhibits; they were not the kind of

9  "conclusory allegations" the Duvall court would find wanting.  See Lodg. Doc. 8.  Because the

10  state courts denied the petitions without issuing an order to show cause, the case never reached

11  the stage at which petitioner could request an evidentiary hearing.  People v. Romero, 8 Cal.4th

12  728, 739 (1994) (only after the order to show cause has issued and the return and traverse have

13  been filed will the court determine whether unresolved factual issues require an evidentiary

14  hearing).

15    Respondent also argues that petitioner could have asked for the raw data during

16  pretrial discovery proceedings and his failure to do so shows lack of diligence.  However, part of

17  petitioner's claim is that counsel was ineffective in failing to secure the material needed for an

18  effective cross-examination of the prosecution's experts.  Petitioner has satisfied the diligence

19  requirement of section 2254(e)(2) for the purpose of this motion.

20  II.  Discovery In Habeas Cases

21    Rule 6 of the Rules Governing Section 2254 cases provides in pertinent part:

> (a) Leave of Court Required. A judge may, for good cause,
> authorize a party to conduct discovery under the Federal Rules of
> Civil Procedure and may limit the extent of discovery. . . .

> (b) Requesting Discovery. A party requesting discovery must
> provide reasons for the request.  The request must also . . . specify
> any requested documents.

26  /////

Habeas petitioners are not entitled to discovery as a matter of course, but only when specific allegations show reason to "believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-09 (1997).  This inquiry is informed by the essential elements of the claims for which petitioner seeks discovery. Id. at 904.

III.  Raw Data

Petitioner asks leave to serve a subpoena on Exponent, Inc. and on Dr. Lawrence E. Thibault seeking "the electronic input file for each computer simulation conducted in this case, and all derivations, assumptions, calculations and raw data gathered or generated in connection with this case."  Pet'r's Mot. for Discovery (Mot.) at 6.  He argues that this material is relevant to claims ten and eleven of the petition.

As noted in the brief factual summary above, at trial the prosecution and defense presented expert witnesses on the question whether the snowmobile incident could have occurred in the manner described by petitioner and whether petitioner could have been injured in the manner he appeared to be injured by a snowmobile accident.  The prosecution relied on testimony from Garrison Kost, an accident reconstruction specialist, and Lawrence Thibault, a biomechanical engineer.  Kost, employed by Exponent, conducted some braking and coast-down tests with a snowmobile from the Plumas County Sheriff's fleet.  RT 7002-7005.  Kost did not use the Franklin's snowmobile because it had been sitting for some time and "we could not be certain that we wouldn't somehow alter the machine."  RT 7029.  Kost's testimony on direct was based on his own experiments with the snowmobile supplied by Plumas County authorities and on his review of studies of snowmobile accidents as reported in a number of publications.  RT 7163.  On redirect, Kost mentioned that some engineering colleagues at Exponent, Drs. Kelkar and Thibault, had been involved in the case on the "biomechanics issues. . . ."  RT 7166.  Neither of these assisted Kost in determining how the snowmobile functioned.  RT 7167.

/////

1          The second of the prosecution's experts, Dr. Lawrence Thibault, addressed the

2   amount of head trauma a person might sustain in a fall or in other traumatic situations.  RT 7382.

3   He testified that a fall from the snowmobile under circumstances similar to those present in the

4   case would create an impact velocity of 20g's.  RT 7388.  A lateral force to the head of 80g's

5   would create stupor, disorientation and confusion and that a purely lateral force of 150g's to the

6   head would create unconsciousness.  RT 7385.  If the force was applied to the forehead, it would

7   take 320g's to cause unconsciousness.  RT 7440.  A force sufficient to cause unconsciousness

8   would also produce other injuries to the body.  RT 7393-7394.

9          On cross-examination, Dr. Thibault testified that he said he reviewed computer

10  simulations prepared by Exponent and that he relied on "facts and figures and conclusions

11  presented to [him] by Dr. Kelkar and Dr. Kost."  RT 7396, 7405.  Dr. Thibault testified that these

12  figures related to "snowmobile velocity," not to head impact.  RT 7406.  He also testified that he

13  accepted the opinions of Drs. Kelkar and Kost, that he himself did not perform any accident

14  reconstruction, and would not offer "any opinion whatsoever to reconstruct the dynamics" of the

15  snowmobile "event."  RT 7409.  Instead, he testified all he was relying on was a "fall from a seat,

16  the height, into either snow or water."  RT 7410.  He said his "handwritten calculations agreed

17  completely with those by Doctors Kelkar and Kost, agreed completely with those that he

18  [petitioner] fell off one side."  RT 7413.

19         On direct appeal from his conviction, petitioner argued that the trial court erred in

20  admitting Kost's testimony, because it was based on tests performed under conditions dissimilar

21  to those at Buck's Lake on December 28, 1996, and in admitting Thibault's testimony because it

22  was based on Kost's conclusions.  Lodg. Doc. No. 4 at 67-70.  In his state habeas petitions, he

23  argued he was unable to confront Thibault because the prosecution failed to turn over some of

24  Thibault's publications that contradicted his testimony and failed to correct the testimony that

25  was contrary to his published writings; because the trial court allowed Thibault to testify to

26  opinions outside the scope of what the court had previously agreed should be admitted; and

1    because defense counsel was ineffective in failing to secure Thibault's publications before cross-

2    examining him.  See, e.g., Lodg. Doc. 8 ¶¶ 75-117.  He argued that trial counsel's failure to

3    secure Thibault's papers "prevented him from properly preparing Dr. Sean Shimada, the defense

4    expert witness" and from "properly cross-examining other prosecution experts," including

5    radiologist Alisa Gean.  Id. ¶¶ 115-116.

6            In claim ten of the amended petition in this case, petitioner alleges that the trial

7    court erred in overruling his foundational objections to Kost's and Thibault's testimony.  Am.

8    Pet. ¶¶ 309-318.  In claim eleven, he argues that the prosecution's failure to disclose Thibault's

9    publications and to correct his testimony and defense counsel's failure to obtain Thibault's

10   publications violated petitioner's rights.  Specifically he argues that counsel failed "to adequately

11   inform himself of the relevant science. . . and to understand the DAI[2] tolerance tests that could

12   have been done and the possible inferences."  Id. ¶ 350.  He also argues that this failure "to read

13   and grasp the significance of Thibault's publications . . . prevented him from properly preparing

14   Dr. Sean Shimada. . . ."  Id. ¶ 353.

15           In his traverse, petitioner expands on these arguments and adds:

16       Dr. Devinder Grewal summarizes . . . 'both Dr. Thibault and Dr.
         Kelkar opine that riders falling from a snowmobile at 11 mph onto
17       snow while helmeted cannot sustain a loss-of-consciousness
         (LOC).   They support this opinion by various mathematical
18       calculations and anecdotal examples from Dr. Thibault's research.
         Unfortunately, the assumptions for the calculation are incorrect and
19       there are contradictions in Dr. Thibault's testimony and previous
         published research.'

20

21   Traverse at 109.  Later, he argues that trial counsel could have more "effectively confront[ed] the

22   prosecution's expert testimony" had he secured the raw data underlying the prosecution's

23   MADYMO computer simulations," among other things.  Traverse at 117.  He provides

24   /////

25   _____

26       [2]  DAI stands for diffuse axonal injury.  See Am. Pet. ¶ 324.

1    declarations from Dr. Grewal, attached to the traverse and to the discovery motion.  Dr. Grewal

2    says:

3              In the pre-trial testimony, Dr. Thibault relied on resultant head
               acceleration levels performed by Exponent that used a
4              computational program, Mathematical Dynamic Modeling
               (MADYMO).  These simulations were used to determine the forces
5              generated on body in this accident.  There are many parameters and
               assumptions that go into these models.  This includes such items as
6              the force-deflection curve of the head to snow surface interface that
               is essential to determining the head accelerations due to an impact.
7              The Exponent MADYMO model calculated the head accelerations
               of someone falling off this snowmobile to range from 12 to 20 g's
8              (1 g is the acceleration of gravity).

9              During trial testimony Dr. Thibault had done his own calculations
               that showed the resultant head accelerations from someone falling
10             off a snowmobile were at most 20 g's.  His calculations were only
               based on the fall height and the stopping distance of the head. . . .
11             In his analysis, he calculated a maximum head acceleration based
               on a minimum stopping distance of 3 inches.  It would have been
12             essential to understand how he came up with his minimum
               stopping distance since as the distance decreases the head
13             accelerations increase.  He further explains this by stating that
               falling on a hard surface like an anvil would result in much higher
14             acceleration levels, near 150 to 170 g's (page 7456).

15             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17             . . . . Exponent's MADYMO model, per Dr. Kelkar's testimony,
               showed that increased forward velocity would increase the
18             resultant head acceleration.

19   Traverse, App. 25 at 4-5.

20             During its consideration of the pending motion, this court asked the parties to

21   address the question whether this change of focus in the traverse renders claim eleven

22   unexhausted and means that a new claim is being presented in the traverse.  Petitioner argues that

23   the court's inquiry is premature because he has made no determination whether to seek to amend

24   the petition.  Pet'r's Suppl. Brief at 1.  This argument does not acknowledge, however, the

25   somewhat different formulation of the claim in the traverse.

26   /////

                                                    17

Because this court cannot grant habeas relief on an unexhausted claim and because "a Traverse is not the proper pleading to raise additional grounds for relief," Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), an initial consideration of these issues is necessary to inform the court's exercise of its discretion whether to grant the pending request for discovery.  Rucker v. Norris, 563 F.3d 766 (8th Cir. 2009) (no showing of good cause for discovery when claim is procedurally barred); Williams v. Bagley, 380 F.3d 932 (6th Cir. 2004) (same); Sherman v. McDaniel, 333 F.Supp.2d 960, 967-68 (D. Nev. 2004) (no showing of good cause for discovery when claim is not exhausted); but see Beets v. McDaniel, 2007 WL 602229 (D. Nev. 2007) (court has discretion to permit discovery on unexhausted claim); see also Calderon v. U.S. District Court (Thomas), 144 F.3d 618, 621-22 (9th Cir. 1998) (permitting pre-petition discovery when petitioner had satisfied the requirements of Fed. R. Civ. P. 27).

A petitioner satisfies the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting them to the federal court.  Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1986).  The state court has had an opportunity to rule on the merits when the petitioner has fairly presented the claim to that court.  This "fair presentation" requirement is met where the petitioner has described the operative facts and legal theory on which his claim is based.  Picard, 404 U.S. at 277-78.  To exhaust, a petitioner must provide the "state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."  Anderson v. Harless, 459 U.S. 4, 6 (1982).  A habeas petitioner may reformulate his claim legally and factually "somewhat, so long as the substance of his argument remains the same."  Boyko v. Parke, 259 F.3d 781, 789 (7th Cir. 2001).

Although petitioner raised a claim of ineffective assistance of counsel in the state court, he did not allege that counsel was ineffective for failing to secure and use Exponent's raw data in examining Thibault and possibly Kost, and did not otherwise show how use of that material could have undercut the prosecution's expert witnesses.

1          The Supreme Court has considered the question whether additional evidentiary

2   support for a habeas claim could render it unexhausted.  In <u>Vasquez v. Hillery</u>, 474 U.S. 254

3   (1986), the district court ordered the record expanded with statistical analyses of the composition

4   of the Kings County grand jury over time in connection with its consideration of a claim of racial

5   discrimination in the convening of the grand jury that had indicted the petitioner.  The

6   Supreme Court found that the district court's order had not rendered the claim unexhausted

7   because the affidavits echoed material already in the record and the statistical analysis "added

8   nothing to the case that this Court has not considered intrinsic to the consideration of any grand

9   jury discrimination claim."  <u>Id</u>. at 259.

10          The Courts of Appeals also have considered whether a change of focus or

11  evidentiary support for a claim renders it unexhausted.  In <u>Pinholster v. Ayers</u>, 525 F.3d 742, 765

12  (9th Cir. 2008), for example, the petitioner alleged counsel had been ineffective at the penalty

13  phase of his capital trial for failing to present mitigating evidence.  The Court of Appeal found

14  his claim exhausted even though "Pinholster relied on different experts with differing mental

15  impairment theories" because "the evolving theories have not significantly changed the

16  evidentiary basis for his arguments" and the "experts relied on the same background information

17  Pinholster presented to the state court."  <u>Id</u>.

18          Similarly, in <u>Conner v. Quarterman</u>, 477 F.3d 287 (5th Cir. 2007), petitioner

19  alleged his lawyer was ineffective for failing to discover a medical condition that would have

20  rendered it impossible for him to run away from the robbery and assault, as witnesses testified

21  the robber had done.  In state habeas proceedings, petitioner provided medical records and an

22  affidavit from a nurse regarding petitioner's condition.  At the hearing on the federal habeas

23  petition, petitioner offered testimony from a neurologist, who described petitioner's nerve

24  damage, and his medical records.  The Court of Appeal found the claim exhausted because much

25  of the information from the medical records was contained in the nurse's affidavit and because

26  the supplemental evidence did not "'fundamentally alter the legal claim already considered by the

1    state courts.'" <u>Id</u>. at 292; <u>see also</u> <u>Boyko</u>, 259 F.3d at 789 (ineffective assistance of counsel

2    claim exhausted even though petitioner presented additional evidence when it is evidence trial

3    counsel could have found if his investigation had been adequate); <u>Ford v. Cockrell</u>, 315

4    F.Supp.2d 831 (W.D. Tex. 2004) (additional report from expert did not rise to the level of a "180

5    degree turn" in the claim and did not render it unexhausted).

6              In contrast, in <u>Demarest v. Price</u>, 130 F.3d 922, 932-39 (10th Cir. 1997), the Court

7    of Appeals found petitioner's ineffectiveness claim unexhausted in a number of ways.  First, he

8    argued a failure to investigate in state court and then presented affidavits from two witnesses he

9    had not listed in the state court petition, whose testimony would have substantially strengthened

10   the defense at trial.  Second, in the state habeas proceedings, he alleged that counsel had failed to

11   challenge the qualifications of the state's expert, failed adequately to cross-examine another of

12   the state's experts, and neglected to hire his own expert.  In the federal habeas proceedings, he

13   presented evidence from his own expert, challenging the basis of the state's expert testimony,

14   none of which had been presented to the state court.  Similarly, in <u>Smith v. Quarterman</u>, 515 F.3d

15   392, 401-02 (5th Cir. 2008), the court found that a habeas petitioner's claim that counsel was

16   ineffective was not exhausted when the state writ relied on counsel's failure to secure a

17   biophysical life history, but the federal petition added claims that counsel should have

18   investigated a temporary insanity defense, interviewed additional witnesses for the penalty phase,

19   and secured prison records to show his adjustment to prison life.  The court found that petitioner

20   "changed the focus of his federal claims to substantive areas not previously raised in the state

21   courts." <u>Id</u>. at 402.

22             Two additional cases inform the resolution of this question.  In <u>Aiken v. Spalding</u>,

23   841 F.2d 881 (9th Cir. 1988), petitioner challenged his conviction in state court on the ground

24   that police ignored his invocation of his <u>Miranda</u> rights during interrogation.  Although a

25   transcript of the interrogation showed that petitioner had asked for counsel, the officers testified

26   they had not heard the request.  On federal habeas, petitioner presented the affidavit of an expert,

1  who conducted decibel-level studies of the tape.  The Court of Appeal found this rendered the

2  claim unexhausted because the evidence placed the claim in a "significantly different and

3  stronger evidentiary posture" than it had been in the state court.  Id. at 883.

4          In Weaver v. Thompson, 197 F.3d 359 (9th Cir. 1999), petitioner alleged that the

5  bailiff attending his state jury told the jury it could not adjourn for the night without reaching a

6  verdict.  In the federal habeas proceedings, the petitioner uncovered evidence that the bailiff had

7  told the jury it must reach a verdict on all counts.  Respondent argued this change in the factual

8  basis rendered the claim unexhausted.  The Ninth Circuit disagreed, noting that even though the

9  precise factual predicate for the claim changed, because the "factual basis for the claim remained

10  rooted in the same incident: the bailiff's contact with the jury after it sent out its note."  Id. at

11  364.  Moreover, the state court had refused to grant him an evidentiary hearing to explore the

12  incident, so any lapse was other than from any failure of diligence on his part.  Finally, the legal

13  basis of the claim remained the same.  Id. at 364-65.

14          Without prejudging the question of exhaustion in the context of a decision on the

15  merits, the court concludes that for purposes of this discovery motion, petitioner's claim that trial

16  counsel was ineffective in failing to secure the MADYMO data does not substantially alter the

17  basis of the claim presented to the state courts, which was in essence that counsel was ineffective

18  in failing to deal with the prosecutions's expert witnesses and specifically in failing to cross-

19  examine Thibault adequately.  As in Weaver, Conner and Boyko, it appears that the evidence will

20  not fundamentally alter the nature of the claim.  Moreover, the court cannot determine at this

21  point that any reformulated claim will be significantly stronger than that currently pending in

22  claim eleven.

23          Similarly, again without reaching the final merits determination, it appears the

24  traverse did not so expand claim eleven as to render it a new claim; petitioner's initial allegation

25  that trial counsel failed to understand the science essential to effective examination of the

26  /////

21

1    prosecution's experts and preparation of his own experts is broad enough to encompass the

2    characterization in the traverse.  Am. Pet. ¶ 350.

3              Finally, petitioner has made a sufficient showing of good cause through the

4    affidavit of Dr. Grewal, who opines that the raw data underlying Exponent's calculations might

5    show that Dr. Thibault's conclusions were open to attack.  To establish a claim of ineffective

6    assistance of counsel, petitioner must be able to show not only that trial counsel's performance

7    was deficient in some manner but also the possibility that, but for the deficiency, the result of the

8    proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).

9     In order to demonstrate prejudice in this case, petitioner must be able to show that the raw data

10   would have given counsel powerful tools for cross-examination.  Discovery to establish the

11   prejudice prong of a claim of ineffective assistance of counsel is appropriate.  Jones v. Wood,

12   114 F.3d 1002, 1009 (9th Cir. 1997).

13   IV.  Dynamic Testing Of The Snowmobile

14             In claim twelve, petitioner challenges the trial court's refusal to give the defense

15   access to the snowmobile to restore it to running condition and then to attempt to replicate the

16   incident.  Am. Pet. ¶¶ 356-377.  He also alleges that if the motion was not made in a proper

17   manner in the trial court, then counsel was ineffective in failing to pursue it.  In his discovery

18   motion, he seeks access to the snowmobile for dynamic testing.  He supports his request with the

19   declaration of Richard DeRosa, who built the snowmobile, who declares he would be able to

20   restore it to running condition, recreate and videotape the incident, and thus show that rapid

21   acceleration of the snowmobile with a heavy person on the back would cause the front end to lift

22   into the air and the passengers to fall off, but then return to a normal resting position.  Mot., App.

23   1, Decl. of Richard DeRosa.

24             In light of petitioner's claim that counsel failed to pursue a motion for testing in

25   an appropriate manner, the court asked the parties to address the question whether the state court

26   would have granted such a motion.  The court also asked the parties to address the question

1    whether dynamic or destructive testing is available in habeas actions and whether it is required at

2    the trial level by the Sixth Amendment.  The parties agreed generally that the state court might

3    have granted a properly supported motion, but disputed whether dynamic testing is a component

4    of the Sixth Amendment right to present a defense or is available in habeas proceedings.  Pet'r's

5    Suppl. Brief at 8-11; Resp't's Suppl. Brief at 9-12.

6           The court need not resolve these questions definitively, for it finds petitioner has

7    not shown that even if he is given access to the snowmobile for restoration and testing, he will be

8    entitled to relief.

9           Both of petitioner's habeas claims implicated by this discovery request – that the

10   trial court denied him his Sixth Amendment right to present a complete defense or that counsel

11   was constitutionally ineffective in failing to make an adequately supported motion for access to

12   the snowmobile – have prejudice components.  When a claim of ineffectiveness rest on a claim

13   that counsel failed to litigate a motion competently, a petitioner must show not only that the

14   motion was meritorious but also that "there is a reasonable probability that the verdict would

15   have been different" had the motion been granted.  Kimmelman v. Morrison, 477 U.S. 365, 375

16   (1987).  When a petitioner alleges that a ruling infringed upon his right to present a complete

17   defense, he must show not only that the rules excluding evidence are "'arbitrary' or

18   'disproportionate to the purposes they are designed to serve,'" United States v. Scheffer, 523

19   U.S. 303, 308 (1998), but also that the exclusion of the evidence had a "substantial and injurious

20   effect on the verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Giving petitioner

21   access to the snowmobile would not help him show that counsel failed to act competently or that

22   the state court relied on an arbitrary evidentiary rule to deny him access to the machine; giving

23   him access to the snowmobile would, potentially, give him a means of showing that the alleged

24   /////

25

26

1    errors prejudiced the presentation of his defense.[3]  He has not made a sufficient showing to

2    warrant the discovery sought, as explained below.

3            At petitioner's trial, the defense presented the testimony of Richard DeRosa who

4    had custom-built the Franklins' snowmobile, which he dubbed the Yamalaris because it was

5    created from Yamaha and Polaris parts.  RT 8316.  With the jury gathered around the

6    snowmobile in the parking lot, DeRosa explained how he assembled the machine and described

7    the parts he had created himself and the modifications he made to the ready-made components.

8    RT 8333-8334.

9            In addition to building the snowmobile, DeRosa, a snowmobile racer, had ridden

10   the machine and had "a pretty good idea how fast" it could go.  RT 8320, 8325.  He knew that the

11   Yamalaris was as fast or faster than the newest snowmobiles, which can run at speeds up to 120

12   to 130 miles per hour.   RT 8329-8330.

13           De Rosa told the jury he had designed the snowmobile as a racing sled and so

14   designed it to carry one person.  RT 8336.  He also built it with wider skis "so it had better

15   flotation" and with carbide runners, which improved the steering.  RT 8334.  With the jury

16   watching, De Rosa manipulated the snowmobile and explained he had designed it so it would not

17   tip over on its side, even at high speeds.  RT 8337.

18           He was able to weigh the Yamalaris and found the weight still fairly well balanced

19   among the skis.  RT 8367.  He then weighed it with people approximating the size of the

20   Franklins seated on the snowmobile and found "it went from having almost perfect 1 to 1 balance

21   to a 3 to 1 balance," with the majority of the weight on the back.  RT 8369.  In that situation, "if

22   you gave it the throttle, [it] would want to kick the skis off the ground and go straight.  It would

23

24           [3]  The standard for permitting destructive testing under the Federal Rules of Civil
     Procedure also requires a showing of prejudice; it is not available "merely to bolster an expert
25   opinion. . . . The evidence sought must be integral to proving the movant's case and do more than
     strengthen an already established claim or defense."  Mirchandani v. Home Depot, U.S.A., Inc.,
26   235 F.R.D. 611, 615 (D. Md. 2006); Guerrero v. General Motors Corporation, 2007 WL 3203014
     at 3 (E.D. Cal. 2007).

1   be very difficult to turn." RT 8370.  In addition, with too much weight on the back of the

2   snowmobile, it would not steer well.  RT 8345.  With two riders, if one "snapped the throttle

3   quickly, chances are they would fall off the back."  RT 8335-8336, 8427.  It would have been

4   better to have the heavier person in front because the more weight on the back, "the more

5   unbalanced the sled is."  RT 8388.

6          DeRosa last inspected the snowmobile a year before petitioner bought it and it

7   was "in perfect shape."  His inspection of the machine after it was in police custody showed that

8   the wear bar was bent outward and there was "a tremendous amount of play in this front end."

9   RT 8338.  In addition, the front ski was cracked, like it "hit something real hard. . . ."  RT 8339.

10  In addition, a lot of the "hooker plates," were broken off, probably from running on asphalt.

11  RT 8339-8340.  Also, there were indications that the studs had hit the bottom of the snowmobile,

12  probably from too much weight on the back.  RT 8340.  The loose front end and the bent ski

13  would have made driving the snowmobile difficult.  RT 8414.

14         Petitioner thus presented testimony from the person who knew the Yamalaris

15  better than any of the experts, prosecution or defense, and who described more than theoretical

16  snowmobile dynamics:  that person's unshakeable opinion was that the snowmobile had become

17  unbalanced by petitioner's riding behind his wife and that under these conditions, acceleration

18  would have caused the front of the machine to rise into the air and the passengers to tumble off

19  the back.  While a videotaped recreation may have added to this testimony, petitioner has not

20  made a sufficient showing that its absence had a substantial and injurious effect on the verdict

21  and so has not shown good cause for this request for access to the snowmobile.

22  V.  Materials Relating To The District Attorney's Impartiality

23         In claim seven of the amended petition, petitioner argues he was denied his right

24  to an impartial prosecutor.  Am. Pet. ¶¶ 243-253.  Specifically, he alleges that the District

25  Attorney's Office shared experts from Exponent with the insurance companies, who were

26  interested in denying payment on the insurance policies on Ronna Franklin's life and that by the

time Plumas County contracted with Exponent, Margie Lariviere, counsel for the insurance

companies, had paid Exponent about $55,000 for accident reconstruction.  Am. Pet. ¶ 245;

RT 345.

In addition, as a result of the publicity about Ronna Franklin's death, Paula O.

reported to Ronna's family that petitioner had raped her in San Jose.  RT 558-561.  She later got

in touch with Plumas County authorities and eventually became romantically involved with an

investigator from the Plumas County District Attorney's Office.  RT 589-590.  Santa Clara

County eventually filed rape charges against petitioner, but the case did not proceed after

petitioner was arrested on the Plumas County murder charges.  RT 670–671.  Petitioner argues

pretrial coordination between the prosecutors' offices was influenced by Plumas County's

conflicts.

The Plumas County District Attorney's Office convened a "task force" with

members from Plumas, Sacramento and Santa Clara District Attorneys' offices, and also

including Lariviere, for mutual assistance in dealing with the permutations of the civil and

criminal cases involving petitioner.  RT 527-529.

At a hearing on the motion to recuse the District Attorney's Office, Ms. Lariviere

produced documents showing the contacts between her firm and Plumas County law

enforcement; these revealed more contacts than those she had previously described on the stand.

See, e.g., RT 494-498.

In his discovery motion and the amended petition, petitioner speculates that "there

is reason to believe that the evidentiary hearing on the motion to recuse . . . did not reveal the full

extent of the coordination and collaboration."  Mot. at 17; Am. Pet. ¶ 250.  He relies on

Lariviere's apparent reluctance to produce documents from her files showing the extent and

nature of the contacts and from her professed inability, and then ability, to recall certain

meetings.  See, e.g., RT 410-412, 494-496.  He thus seeks to issue a subpoena to the District

Attorney's Office, directing it to produce documents obtained from a number of people,

1   including the life insurance companies and their counsel, the decedent's family, lawyers working

2   on behalf of the decedent's family, and the law enforcement communities of Sacramento and

3   Santa Clara Counties.

4          Petitioner has not shown good cause for this discovery.  Although he has the

5   transcript of the hearing on the motion to recuse and the documentary evidence secured during

6   the course of the proceedings, he has provided no internal analysis of the documents or the

7   testimony suggesting that there are any gaps in the material produced.  Indeed, although he has

8   relied on Lariviere's apparent reluctance to produce material, he has not otherwise shown that the

9   other people and entities whom he believed provided material were not forthcoming about what

10  they provided.  Petitioner cannot use one witness's reluctance to demonstrate good cause for any

11  additional materials she may have provided, much less to show good cause for materials that

12  have nothing to do with her.

13         For the forgoing reasons, IT IS THEREFORE ORDERED that petitioner's motion

14  for discovery (docket no.  59) is granted as to request one, but denied in all other respects.

15  DATED:  December 15, 2009.

16

17

18  _____

19  U.S. MAGISTRATE JUDGE

20

21

22

23

24

25  2

26  fran0304.dsc