1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   MICHAEL E. FRANKLIN,

13              Petitioner,                    No. CIV-S-05-0304 KJM P

14        vs.

15   TIM VIRGA, Acting Warden,

16              Respondent.                    <u>ORDER</u>

17   _____/

18              On March 16, 2011, the court heard argument on petitioner's motion for an

19   evidentiary hearing and expansion of the record.  Robert D. Bacon appeared for petitioner;

20   Catherine Tennant Nieto, Deputy Attorney General, appeared for respondent.  Following

21   hearing, the court invited supplemental briefing in light of the Supreme Court decision in *Cullen*

22   *v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388 (2011).  For the reasons set forth below, the court

23   grants the motion in one respect but otherwise denies it.

24   I.  <u>Background</u>

25              Petitioner is a state prison inmate challenging a conviction for the murder of his

26   wife Ronna Franklin.  Portions of the state Court of Appeal's decision upholding the conviction,

1

set forth below, illuminate some of the issues raised by the instant motion.  By referencing these

portions of the decision, the court is not making any findings of fact.

> On December 28, 1996, Ronna's 38th birthday, she and defendant went for a ride on a snowmobile defendant had purchased. . . . . It was raining, causing the snow on the ground to turn slushy. As a result of what defendant asserted was an accident, the snowmobile came to rest along the side of a road where there was a three-foot-deep puddle of slushy water.
>
> Deborah and Eric Ingvoldsen were traveling on their snowmobiles when they noticed the Franklins' snowmobile, upright, with the motor still running and the headlight on, stopped in the slushy water at the edge of the road. Just behind the snowmobile, defendant was sitting, immersed in the water up to his chest, leaning back against the snow bank. His head was straight, not leaning to either side. Mrs. Ingvoldsen got off her snowmobile and approached the Franklins' snowmobile on foot. Although defendant was wearing a helmet, she could see that defendant's eyes were closed and his face was flushed. After she yelled to defendant, with no response, Mrs. Ingvoldsen saw a yellow slicker under the water and a helmet floating in the water. Upon closer inspection, she saw Ronna under the water, her eyes wide open and her lips blue. With the help of her husband and Jeff Wisecarver, who had just arrived on the scene from the opposite direction, Mrs. Ingvoldsen pulled Ronna out of the water.
>
> Defendant's color was good, and steam was rising from his chest. Jay Grubbs arrived on the scene, and the three men pulled defendant from the water. . . . It appeared that defendant was conscious but slipping into unconsciousness.
>
> Defendant was taken by sled to a cabin at Grubbs Cow Camp, which was about a quarter-mile from where he was found. En route, defendant's leg slipped off the sled and bent back. Although it appeared to be painful, defendant did not react. Defendant was carried inside the cabin and his clothes were removed. There were no injuries. He mumbled and asked about his wife. Defendant was at the cabin for more than two hours, over which time his mental condition appeared to improve markedly. . . .
>
> . . . .   An autopsy revealed Ronna's cause of death was drowning. Several ribs had been broken during administration of CPR, but there were no other signs of trauma to the body.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant was taken to the hospital and arrived after Ronna had been pronounced dead. He had no obvious injury, but tests were ordered because he said his abdomen was slightly tender. When told that Ronna died, defendant cried. X-rays and a CAT scan revealed no abnormalities. The attending physician saw no injury that would explain a loss of consciousness. Defendant was admitted to the hospital for an overnight stay because he said he lost consciousness.

While still in the hospital, defendant initially told a California Highway Patrol officer he did not remember anything about the snowmobiling incident. He remembered having lunch, during which he and Ronna both consumed alcohol. They went for a ride on the snowmobile with Ronna riding in front and driving, he told the officer. Defendant believed they hit something but did not remember anything further.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The brakes and clutch on the snowmobile were working normally. The tracks of the snowmobile were consistent with someone simply pulling over and stopping. There were no obstructions in the path of the snowmobile that would have caused an accident. Normally, if someone is in a snowmobiling accident, that person falls off to the side or goes over the handlebars. Defendant and Ronna, however, were found behind the snowmobile.

The tracks left by the snowmobile were straight, indicating the snowmobile had not suddenly turned one way or the other. The snowmobile was found upright and there was no indication the front skis on the snowmobile had left the ground, causing a loss of control. Also, if defendant and Ronna had come around the last curve at an excessive speed, they and the snowmobile would have gone off the other side of the road. It did not appear, from the physical evidence at the scene, that there had been a snowmobiling accident.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

An accident reconstruction expert, Garrison Kost, conducted tests using a snowmobile. Although he did not attempt to duplicate the exact conditions that existed for the Franklins, the expert concluded from the evidence given to him that the snowmobile was not traveling fast prior to stopping where defendant and Ronna were found. Consequently, the G-forces applied to the riders would not have been strong. A biomechanical engineer, Lawrence

3

1

2

3

4

> Thibault, testified as a prosecution expert that, if defendant had fallen off the snowmobile and struck his head on the snow with his helmet on, the impact would not have been sufficiently strong to cause a concussion. A defense expert testified, however, that the conclusion of the prosecution's expert was unreliable because it did not take into account whether defendant was ejected from the snowmobile.

5 *People v. Franklin*, 2003 WL 21518916, at *3-6 (Cal. App. 3 Dist. 2003).

6         After the conclusion of direct review in the state courts, petitioner filed his habeas

7 petition in this court, raising the issues exhausted through the direct appeal process along with

8 some that were concededly unexhausted.  This court granted petitioner's requests for the

9 appointment of counsel and a stay of the proceedings.

10         During the proceedings on a state habeas petition filed in Plumas County Superior

11 Court, petitioner sought discovery based on California Penal Code section 1054.9, requests that

12 were largely denied.

13         After exhausting additional issues, petitioner returned to this court on September

14 10, 2007, filing an amended petition, that raised twenty-two grounds for relief.  He thereafter

15 filed a motion for an order permitting him to conduct discovery relating to Dr. Thibault's

16 testimony and calculations concerning the snowmobile incident; to undertake dynamic testing of

17 the snowmobile; to seek materials from the prosecutor's file concerning the prosecutor's

18 relationship with an insurance company that paid for some accident reconstruction and the

19 relationship between an investigator and a witness; and the alleged coordination with Santa Clara

20 County concerning the timing of the filing of a rape charge against petitioner.  The court granted

21 the motion as to the first request, but denied it as to all others.

22         After conducting discovery, petitioner filed the instant motion, seeking  an

23 evidentiary hearing on the following claims in the petition:  the prosecutor used his peremptory

24 challenges to remove men from the jury (claim four); multiple instances of jury misconduct

25 deprived petitioner of a fair trial (claim six); trial counsel was ineffective by failing to object to

26 the prosecutor's misleading chart or the prosecutor committed misconduct by using the chart

(claim nine); counsel was ineffective by failing to undertake the necessary investigation to allow

him adequately to cross-examine the prosecution's biomechanical engineering expert (claim

eleven); and petitioner was denied a fair trial because he was not permitted to conduct dynamic

testing on the snowmobile (claim twelve).

While this motion was pending, the Supreme Court decided *Cullen v. Pinholster*,

___ U. S. ___, 131 S.Ct. 1388 (2011), which addressed the scope of a court's analysis under

§ 2254(d)1); the parties have submitted supplemental briefs on the impact of *Pinholster* on

petitioner's motion.  ECF Nos. 105, 106.

Also while this motion was pending, petitioner returned to state court with a

habeas petition based on the discovery he obtained in this court.  He has lodged a copy of the

writ and the state court's denial.  ECF No. 107, 108.

II.  <u>Standards For An Evidentiary Hearing Under The AEDPA</u>

The decision whether to grant a hearing is grounded in the Antiterrorism and

Effective Death Penalty Act (AEDPA), which provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim–
>> (1) resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the
>> Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an
>> unreasonable determination of the facts in light of
>> the evidence presented in the State court
>> proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of
> habeas corpus by a person in custody pursuant to the judgment of a
> State court, a determination of a factual issue made by a State court
> shall be presumed to be correct. The applicant shall have the
> burden of rebutting the presumption of correctness by clear and
> convincing evidence.

/////

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

    (A) the claim relies on–

    (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254.

In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" because that review "focuses on what a state court knew and did." 131 S.Ct. at 1398, 1399. The Court reiterated that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id*. at 1400. It recognized that "not all federal habeas claims . . . fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in the State court proceedings.'" *Id*. at 1401; *Stokley v. Ryan*, 659 F.3d 802, 808 (9th Cir. 2011) ("*Pinholster* also held that this bar on new evidence is coterminous with the scope of § 2254(d). If a petitioner presents a claim that was *not* adjudicated on the merits . . . federal review is not necessarily limited to the state record." (emphasis in original)), *cert. denied,* __ U.S. __, 133 S.Ct. 134 (2012). When the state court's ruling is a summary denial, a petitioner "can satisfy the 'unreasonable application prong of § 2254(d)(1) only by showing that 'there was no reasonable basis'" for the decision. *Pinholster*, 131 S. Ct. at 1402 (quoting *Harrington v. Richter*, ___ U.S. ___ , 131 S.Ct. 770, 784 (2011)).

1           A state court's decision is not entitled to deference under § 2254(d)(1) if its ruling

2    is "contrary to" clearly established federal law, that is, if it applied a rule different from the

3    governing law defined by Supreme Court authority or if its decision is different from Supreme

4    Court authority on a set of materially indistinguishable facts.  Under the second prong of

5    § 2254(d)(1), a state court decision is an "unreasonable application" of federal law if it correctly

6    identified the governing legal principle but unreasonably applied it to the facts of the particular

7    case. The focus of the latter inquiry is on whether the state court's application of clearly

8    established federal law is objectively unreasonable, whether or not it is correct.  *Waddington v.*

9    *Sarausad*, 555 U.S. 179, 190 (2009); *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Sessoms v.*

10   *Runnels*, 691 F.3d 1054, 1058 (9th Cir. 2012), *pet. for cert. filed*, 81 USLW, Dec. 13, 2012).  As

11   the Ninth Circuit has observed, "defining the precise contours of the 'contrary to' and

12   'unreasonable application' prongs of § 2254(d)(1)" is often difficult.  *Id*.

13          *Pinholster* restricts the consideration of evidence that was not before the state

14   court under § 2254(d)(2) as well as under (d)(1), so to determine whether there has been an

15   unreasonable determination of fact, this court must consider the record before the state court.

16   *Pinholster*, 131 S.Ct. at 1400 n.7 (noting the "additional clarity" in (d)(2), which specifically

17   provides that review is limited to the state record); *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir.

18   2011), *cert. denied* 133 S.Ct. 105 (2012); *Lor v. Felker*, No. CIV S–08–2985 GEB DAD P, 2012

19   WL 1604519, at *5 (E.D. Cal. May 7, 2012), *aff'd*, 2012 WL 3201961 (E.D. Cal. Jul. 31, 2012).

20          In *Hibbler v. Benedetti*, 693 F.3d 1140 (9th Cir. 2012), *cert. denied* 133 S.Ct.

21   1262 (2013), the Ninth Circuit examined the concept of an unreasonable determination of fact

22   within the meaning of § 2254(d)(2), recognizing that if the state court's determination of fact

23   was objectively unreasonable it is not entitled to deference under (d)(2).  The court in *Hibbler*

24   said there are two main categories of challenges: "First, a petitioner may challenge the substance

25   of the state court findings and attempt to show that those findings were not supported by

26   substantial evidence in the state court record.  Second, a petitioner may challenge the fact-

finding process itself on the ground that it was deficient in some material way." *Id.* (internal

citation omitted).   Unreasonableness is a higher standard than incorrectness:

> [I]f a petitioner challenges the substance of the state court findings,
> it is not enough that we would reverse in similar circumstances if
> this were an appeal from a district court decision.  Rather, we must
> be convinced that an appellate panel, applying the normal
> standards of appellate review, could not reasonably conclude that
> the finding is supported by the record.  Similarly, when the
> challenge is to the state court's procedure, mere doubt as to the
> adequacy of the state court's finding of fact is insufficient; we
> must be satisfied that *any* appellate court to whom the defect [in
> the state court's fact-finding process] is pointed out would be
> unreasonable in holding that the state court's fact-finding process
> was adequate.

*Id.* (internal quotation marks & citations omitted; emphasis in original).  If the state court

summarily rejects a petition that presents a prima facie claim of ineffective assistance of counsel

without any fact finding, such a rejection constitutes an unreasonable determination of facts.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.  2004);  *Nunes v. Mueller*, 350 F.3d 1045, 1054-

55 (9th Cir. 2003).

If the restrictions in subdivision (d) are surmounted, either because the state court

did not address a particular claim on the merits or because its decision is contrary to or an

unreasonable application of federal law or an unreasonable determination of fact, a court must

then consider the application of subdivision (e).  *See Williams v. Woodford*, 859 F. Supp. 2d

1154, 1161 (E.D. Cal. 2012).  Although the *Pinholster* court found "no need to address the

proper application of § 2254(e)(2)," it nevertheless recognized that "[s]ection 2254(e)(2)

continues to have force where § 2254(d)(1) does not bar federal habeas relief" by restricting the

district court's discretion to consider new evidence when the state court did not adjudicate

claims on the merits.   *Pinholster*, 131 S.Ct. at 1401 & n.8.

Before this court may consider holding a hearing under subdivision (e), it must

determine whether petitioner failed to develop his claims in the state court.  A petitioner will

only be charged with a "failure to develop" the facts if "there is lack of diligence, or some

greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). The petitioner must have "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id*. at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in the state court in the manner prescribed by state law." *Id*. at 437.  "'A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim and therefore satisfies § 2254(e)(2).'" *Runningeagle v. Ryan*, 686 F.3d 758, 783 (9th Cir. 2012) (quoting *Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010)), *petn for cert. filed* 81 USLW 3429 (Nov. 15, 2012).

Even if petitioner has been diligent in the state court, this court is not required to hold a hearing, but may do so in its discretion.  In deciding whether to hold a hearing, the court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. . . .  Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Stokley v. Ryan*, 659 F.3d at 811. The Court in *Schriro* clarified that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Landrigan*, 550 U.S. at 474.

III.   Ineffective Assistance Of Counsel (Claim 11)[1]

Petitioner argues that an evidentiary hearing is required on his claim that counsel was ineffective for his failure to secure the raw data that informed the opinions of those prosecution expert witnesses who testified about the snowmobile incident.

/////

---

[1]  The court addresses the issues in the order they are presented in the motion.

1       At trial the prosecution and defense presented expert witnesses on the question

2   whether the snowmobile incident could have occurred in the manner described by petitioner and

3   whether petitioner could have been injured in the manner he described by a snowmobile

4   accident.  The prosecution relied on testimony from Garrison Kost, an accident reconstruction

5   specialist, and Lawrence Thibault, a biomechanical engineer.  Kost, employed by Exponent,

6   conducted some braking and coast-down tests with a snowmobile from the Plumas County

7   Sheriff's fleet.  RT 7002-7005.  Kost did not use the Franklins' snowmobile because it had been

8   sitting for some time and "we could not be certain that we wouldn't somehow alter the machine."

9   RT 7029.  Kost's testimony on direct was based on his own experiments with the snowmobile

10  supplied by Plumas County authorities and on his review of studies of snowmobile accidents as

11  reported in a number of publications.  RT 7163.  Kost mentioned that some engineering

12  colleagues at Exponent, Drs. Kelkar and Thibault, had been involved in the case on the

13  "biomechanics issues . . . ."  RT 7166.

14      The second of the prosecution's experts, Dr. Lawrence Thibault, addressed the

15  amount of head trauma a person might sustain in a fall or in other traumatic situations.  RT 7382.

16  He testified that a fall from the snowmobile under circumstances similar to those present in the

17  case would create an impact velocity of 20g's.  RT 7388.  A lateral force to the head of 80g's

18  would create stupor, disorientation and confusion and a purely lateral force of 150g's to the head

19  would create unconsciousness.  RT 7385.  If the force were applied to the forehead, it would take

20  320g's to cause unconsciousness.  RT 7440.  A force sufficient to cause unconsciousness would

21  also produce other injuries to the body.  RT 7393-7394.

22      On cross-examination, Dr. Thibault testified that he reviewed computer

23  simulations prepared by Exponent and that he relied on "facts and figures and conclusions

24  presented to [him] by Dr. Kelkar and Dr. Kost."  RT 7396, 7405.  Dr. Thibault testified that these

25  figures related to "snowmobile velocity," not to head impact.  RT 7406.  He also testified that he

26  accepted the opinions of Drs. Kelkar and Kost, that he himself did not perform any accident

1   reconstruction, and would not offer "any opinion whatsoever to reconstruct the dynamics" of the

2   snowmobile "event."  RT 7409.  Instead, he testified all he was relying on was a "fall from a seat,

3   the height, into either snow or water."  RT 7410.  He said his "handwritten calculations agreed

4   completely with those by Doctors Kelkar and Kost, agreed completely with those that he

5   [petitioner] fell off one side."  RT 7413.

6          In claim eleven of the amended petition, petitioner argues that the prosecution's

7   failure to disclose Thibault's publications and defense counsel's failure to obtain Thibault's

8   publications for use in cross-examination violated petitioner's rights.  Specifically, he argues that

9   counsel failed "to adequately inform himself of the relevant science. . . and to understand the

10  DAI [diffuse axonal injury] tolerance tests that could have been done and the possible

11  inferences."  Am. Pet.  ¶ 350.  He also argues that counsel's failure "to read and grasp the

12  significance of Thibault's publications . . . prevented him from properly preparing Dr. Sean

13  Shimada. . . ."  *Id.* ¶ 353.

14         In his traverse, petitioner expands on these arguments and adds:

15         Dr. Devinder Grewal summarizes . . . 'both Dr. Thibault and Dr.
           Kelkar opine that riders falling from a snowmobile at 11 mph onto
16         snow while helmeted cannot sustain a loss-of-consciousness
           (LOC).  They support this opinion by various mathematical
17         calculations and anecdotal examples from Dr. Thibault's research.
           Unfortunately, the assumptions for the calculation are incorrect
18         and there are contradictions in Dr. Thibault's testimony and
           previous published research.'
19

20  Traverse at 109.  Later, he argues that trial counsel could have more "effectively confront[ed] the

21  prosecution's expert testimony" had he secured the raw data underlying the prosecution's

22  MADYMO [ Mathematical Dynamic Models] computer simulations," among other things.

23  Traverse at 117.

24         This court granted petitioner's request for discovery of the raw data from

25  Exponent's MADYMO computer simulations.  ECF No. 76.  In support of his request for an

26  evidentiary hearing, petitioner has attached a new declaration from Dr. Grewal, who avers that

the materials he received "do not include the input variables and assumptions supporting the calculations and computer modeling relied on at trial.  They do not include the data I stated in my August 2008 declaration that I would need to test the analysis and opinions of these experts."  Motion For An Evidentiary Hearing (MEH), Appendix 29 at 6.  Dr. Grewal also describes his analysis of records of snowmobile accidents from Wisconsin from a period of 2005 through 2010, which yielded information about seven snowmobile accidents in which a helmeted rider or passenger lost consciousness and opines that records from 1996 through 1999, which would have been available to trial counsel, would have produced similar results.  This information, petitioner argues, would have undercut Dr. Thibault's testimony that petitioner would not have lost consciousness in any fall from the snowmobile.  *Id*. at 5-6.

Finally, petitioner also argues that trial counsel failed to secure copies of Dr. Thibault's publications, which he could have used in cross-examination of Thibault and Dr. Alisa Gean and for preparation of his own expert Sean Shimada.  MEH at 11.

Respondent argues, in contrast, that no evidentiary hearing is necessary because trial counsel successfully attacked the prosecution's experts through cross-examination and through presentation of his own experts, because the MADYMO data were not helpful, and because Dr. Thibault relied on his own calculations during his trial testimony.  Opp'n at 10-11.

In his most recent state habeas petition, petitioner argued that counsel was ineffective for failing to secure Exponent's raw data for use in cross-examining the prosecution's experts; as he argues in this court, he argued to the California Supreme Court that although "Thibault testified that he relied on simulations conducted by Exponent, Inc. . . . [t]he raw data which Exponent produced in 2010 does not adequately support the conclusions to which the experts testified at trial."  ECF No. 108-1 ¶ 51.  He also argued that counsel's failure to secure Dr. Thibault's publications, some of which appeared to contradict his testimony regarding a fall from the snowmobile and unconsciousness, undercut his ability to examine the expert

/////

effectively.  *Id.*  Petitioner supported the state petition with several declarations from his expert,

Dr. Grewal, including one that provided the following information:

> Neither Dr. Kelkar nor Dr. Thibault produced the underlying math,
> assumptions, derivations or data that could be used to check the
> validity of their results and challenge the assumptions they used
> . . . .
>
> Dr. Kelkar used a computer simulation program called Madymo to
> simulate a fall from a snowmobile. . . .  There are hundreds of
> variables and assumptions that go into that particular model.  Dr.
> Kelkar did not provide any of these input variables so that their
> validity and consistency with Dr. Thibault's assumptions could be
> checked . . . . .
>
> In order for me. . . to check the assumptions used by Dr. Kelkar
> and Dr. Thibault in their analyses, they need to provide the backup
> data for all of their work. . . .

ECF No. 108-4 at 16-17.  In another declaration, Dr. Grewal said that "[t]he range of variation

is so great in the human population that it is difficult to conclude that a particular injury is

impossible."  ECF No. 108-4 at 29.  The doctor also described how he evaluated information on

snowmobile accidents maintained by the state of Wisconsin from the years 2005 to 2010,

eliminating those involving impact with an object other than the ground, and found twenty

involving a fatality or loss of consciousness to a helmeted rider.  ECF No. 108-4 at 30.  He

acknowledged that the reports generally do not include the speed of the snowmobile, but noted

that Dr. Thibault testified that it is the speed at which the head hits the ground that is important.

ECF No. 108-4 at 30.  Finally, Dr. Grewal said that he received the material counsel received

from Exponent in discovery and said that "[t]hese documents do not include the input variable

and assumptions supporting the calculations and computer modeling relied on at trial.  They do

not include the data . . . that I would need to test the analysis and opinions of these experts."

ECF No. 108-4 at 31.

The court denied this petition in a "postcard" denial.   ECF No. 107 at 4.

The federal law on claims of attorney ineffectiveness is clear:

/////

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  *Id*. at 688.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id*. at 690.  The court must presume that counsel acted effectively and evaluate strategic decisions to determine whether they were "reasonable at the time."  *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 788, 789 (2011).

It also is petitioner's burden to establish prejudice:  "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

In *Harrington*, the Supreme Court emphasized the deference that *Strickland* requires, noting that a court must presume that counsel acted effectively and reiterating that "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Harrington*, 131 S.Ct. at 788.  The Court stated further that when a district court considers a claim of ineffective assistance of counsel under § 2254(d), the combination of the two deferential standards renders review doubly deferential.  *Id*. at 788.

Petitioner argues that double deference is not warranted because the state court's summary denial of the IAC claim amounts to an unreasonable determination of fact under § 2254(d)(2).  Reply, ECF No. 93 at 8.  However, the question whether a petitioner received effective assistance of counsel is a mixed question of law and fact, evaluated under § 2254(d)(1).  *Strickland*, 466 U.S. at 698 (stating "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact"); *Tong Xiong v. Felker*, 681 F.3d

1  1067, 1074 (9th Cir. 2012) (mixed questions evaluated under § 2254(d)(1)), *cert. denied* 133

2  S.Ct. 989 (2013).  It is true that the determination whether counsel's particular action was

3  strategic is a factual question, *Wood v. Allen*, 558 U.S. 290, 130 S.Ct. 841, 849 (2010), and that

4  strategic decisions include "which avenues to investigate" or decisions about cross-examination.

5  *Id*. at 850 n.3; *United States v. Crawford*, 680 F. Supp. 2d 1177, 1194 (E.D. Cal. 2009) (stating

6  failure to cross examine witnesses is not necessarily ineffective assistance so long as decision is

7  reasonable); *see Carpenter v. Kernan*, No. C 06-7408 JSW (PR), 2009 WL 3681684, at *13

8  (N.D. Cal. Nov. 2, 2009) (stating "trial counsel's strategic decision to forgo calling an expert

9  witness and to instead rely on cross-examination of the prosecution's witness does not render

10  counsel ineffective").   Nevertheless, in denying the petitioner's claim, the California Supreme

11  Court did not make factual findings, but rather determined that petitioner had not established a

12  prima facie case of ineffectiveness.  *In re Clark*, 5 Cal. 4th 750, 770 (1993) (stating "[w]hen a

13  habeas corpus petition is denied on the merits, the court has determined that the claims made in

14  that petition do not state a prima facie case entitling petitioner to relief"); *People v. Romero*, 8

15  Cal. 4th 728, 737 (stating court must determine "whether the petition states a prima facie claim

16  for relief–that is, whether it states facts that, if true, entitle the petitioner to relief"; if it does not,

17  "the court will deny the petition outright, such dispositions being commonly referred to as

18  'summary denials").  These summary denials are rulings on the merits, entitled to deference

19  under § 2254(d).  *Harrington*, 131 S.Ct. at 784-85.

20          *Harrington* further instructs that when a claim has been decided on a summary

21  denial:

22          a habeas court must determine what arguments or theories
         supported or, as here, could have supported, the state court's
23          decision; and then it must ask whether it is possible fairminded
         jurists could disagree that those arguments or theories are
24          inconsistent with the holding in a prior decision of this Court.

25  *Id*. at 786.  In the context of claims of attorney ineffectiveness, "[w]hen § 2254(d) applies, the

26  /////

1   question is not whether counsel's actions were reasonable.  The question is whether there is any

2   reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 788.

3   At trial in this case, the prosecution and defense presented expert witnesses on the

4   question whether the snowmobile incident could have occurred in the manner described by

5   petitioner and could have caused petitioner's apparent and claimed injuries.  As noted above, Dr.

6   Thibault addressed the amount of head trauma a person might sustain in a fall or in other

7   traumatic situations and concluded that the snowmobile event could not have created sufficient

8   force.  RT 7382, 7393-7394.

9   Trial counsel cross-examined Dr. Thibault about the bases for his conclusions,

10   which included Exponent's computer simulations as well as calculations and information from

11   Dr. Kelkar and Dr. Kost relating to snowmobile velocity, as well as his own calculations.  RT

12   7396, 7405, 7406, 7413.[2]

13   Trial counsel did not rely solely on cross-examination of Dr. Thibault, however,

14   but also presented his own expert, Dr. Sean Shimada, who criticized Dr. Thibault's conclusions

15   about the head acceleration of someone falling from a snowmobile, saying there are "numerous

16   variables that go into determining the acceleration, deceleration or force a person [is] exposed to

17   in an instance like this.  And again, how they all interact would be, you know, a limitless amount

18   of answers to this question," all of which means it would be "very, very difficult" to give an

19   opinion on "how much force acceleration Mr. or Mrs. Franklin was exposed to in this accident."

20   RT 8767-8768.

21   In light of trial counsel's extensive examination of Dr. Thibault, Dr. Thibault's

22   testimony that he relied on his own calculations as well as Exponent's MADYMO material, and

23   Dr. Shimada's testimony about the "limitless amount of answers" to the question of the force

24   _____

25   [2] Petitioner claims that Dr. Grewal "is prepared to testify" that Dr. Thibault's
    calculations are not a substitute for Exponent's raw data, citing to the declaration that Dr. Grewal
    submitted in connection with the motion for discovery.  Reply at 4; ECF No. 59 at 32

26   (declaration).  He overstates Grewal's declaration.

1    with which petitioner's head could have struck the ground, the state court could have accepted

2    Dr. Grewal's conclusion that Exponent's raw data was essentially meaningless as a way to

3    measure the testimony derived from Exponent's tests; at the same time, the court could have

4    found that counsel's failure to obtain this information, whether as a matter of strategy or

5    negligence, was not ineffective in light of Dr. Shimada's testimony that the large number of

6    variables that could have been used rendered Dr. Thibault's testimony meaningless.  This also

7    could have led the court to conclude that any failure to secure the raw data was not prejudicial in

8    light of the concerted attack on Dr. Thibault's conclusions.  The court also could have concluded

9    that had counsel secured the raw data and used it to examine the prosecution's experts, the

10   prosecution would have been able to rehabilitate and strengthen its expert testimony through

11   evidence about the manner in which the MADMYO simulation was undertaken in this case.

12          Petitioner also claims that counsel was ineffective for failing to research

13   snowmobile accidents involving loss of consciousness recorded in Wisconsin's database of

14   snowmobile accidents.  ECF No. 108-2 at 24-25 ¶¶ 54-56.  In finding that petitioner had not

15   established a prima facie case of ineffectiveness in failing to seek information from the

16   Wisconsin database, the state court could have relied on the fact that petitioner had provided no

17   information from 1999, the relevant time period, showing helmeted riders' loss of consciousness

18   or death from snowmobile accidents; the court could have concluded that petitioner's argument

19   about the unchanging nature of snowmobile accidents suggested that even if such data existed it

20   was an insufficient basis for his claim.

21          This court cannot conclude that fairminded jurists would find these reasons

22   supporting the state court's conclusion inconsistent with federal law.  First, even if obtaining the

23   material from Exponent would have allowed counsel to frame a different attack on Dr. Thibault,

24   using it might give the prosecution's experts an opportunity to explain the basis of their

25   conclusions in greater depth, which might have buttressed rather than undercut Thibault's

26   testimony.  Dr. Grewal's brief paragraph about the paucity of data does not foreclose such a

1    possibility.  *See Harrington*, 131 S.Ct. at 789 (noting the possibility that using forensic testimony

2    might undercut the defense case).  Second,

3               [r]are are the situations in which the 'wide latitude counsel must
              have in making tactical decisions' will be limited to any one
4               technique or approach.  It can be assumed that in some cases
              counsel would be deemed ineffective for failing to consult or rely
5               on experts, but even that formulation is sufficiently general that
              state courts would have wide latitude in applying it.

6

7    *Id.* (quoting *Strickland*, 466 U.S. at 689)).  The state court's rejection of petitioner's attack on his

8    lawyer's handling of expert witnesses does not run afoul of this broad principle.   Second,

9    petitioner presented nothing but Dr. Grewal's speculation that the Wisconsin data would have

10   yielded useful comparisons; denying a speculative claim does not offend Supreme Court

11   authority.  *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (stating it is improper to grant a habeas

12   petition "on the basis of little more than speculation").

13          Petitioner also claims that trial counsel was ineffective for failing to secure Dr.

14   Thibault's publications and use them in cross-examination; he appended a number of those

15   publications to the latest state habeas petition.  *See* Lodg. Doc. No. 108-2 at 2.  In his state

16   habeas petition, petitioner quotes several of Dr. Thibault's articles suggesting that a loss of

17   consciousness might result from the fall petitioner allegedly sustained without leaving

18   observable injury in the brain and that more complex models were available for determining the

19   force necessary to cause unconsciousness.  ECF No. 108 ¶¶ 67-76.  He says, "[i]n short, [Dr.

20   Thibault's] testimony was impeachable on many grounds by reference to his publications." *Id.*

21   ¶ 76.  Petitioner also presented trial counsel's declaration stating he "did not have available  . . .

22   to read any of Dr. Thibault's articles prior to my cross-examination of him in front of the jury."

23   ECF No. 108-2 at 24 ¶ 13.

24          This court need not determine whether the state court's rejection of this claim

25   violated subdivision (d), as counsel here has not explained how an evidentiary hearing would

26   /////

1   augment the articles he provided to the state court and now to this court.  The articles speak for

2   themselves, and this court can read them and compare them to Dr. Thibault's testimony.

3   IV.   Denial Of Access To The Snowmobile For Testing (Claim 12)

4           As part of the discovery motion in this court, petitioner sought access to the

5   Franklins' snowmobile in order to restore and test it in an attempt to show that it could have

6   tipped and ejected the Franklins.  This court denied the request because petitioner failed to show

7   that giving him access to the snowmobile would enable him to establish the prejudice prong of

8   his claim that counsel was ineffective for failing to make a proper request for testing or that the

9   state court erred in refusing to direct the prosecution to make the snowmobile available to

10  petitioner's experts.  ECF No. 76 at 23-25.  In the instant motion, petitioner argues that this

11  court's prior finding does not bar a hearing on the question because of the relationship between

12  dynamic testing of the snowmobile and counsel's failure to obtain Dr. Thibault's publications

13  and the raw data underlying the prosecution's computer simulations.  MEH at 17.  Counsel does

14  not explain why the court will be unable to rely on the declarations of Richard DeRosa and Dr.

15  Grewal, which are already in the record, or even what additional evidence he could develop

16  during an evidentiary hearing, given his inability to test the snowmobile.  Whether or not a

17  hearing on this issue would be barred by the restrictions in sections (d)(1) and (d)(2), petitioner

18  has not shown that an evidentiary hearing on this subject will allow him to establish anything

19  entitling him to relief.

20  V.   The Denial Of Petitioner's *Batson* Challenge (Claim 4)

21          In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that a

22  criminal defendant's constitutional rights are violated when a prosecutor systematically uses

23  peremptory challenges to remove members of a cognizable group because of their group

24  /////

25  /////

26  /////

1  association.  The Court established a three step process to guide a court's evaluation:

> First, the defendant must make out a prima facie case by showing
> that the totality of the relevant facts gives rise to an inference of
> discriminatory purpose.   Second, once the defendant has made out
> a prima facie case, the burden shifts to the State to explain
> adequately the racial exclusion by offering permissible race-
> neutral justifications for the strikes.   Third, [i]f a race-neutral
> explanation is tendered, the trial court must then decide . . .
> whether the opponent of the strike has proved purposeful
> discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotations omitted).  Males are a

cognizable group for *Batson* purposes.  *J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994).  The

ultimate burden of showing discrimination in jury selection remains with the petitioner, whatever

the nature of the prosecution's explanations.  *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir.

2000). In this case, however, the trial court determined that petitioner had not made out a prima

facie case.  Petitioner argues that the state court's finding is not entitled to deference because it is

based on an error of law; respondent argues that petitioner cannot overcome the factual

determination, which is entitled to deference under AEDPA.

After the lawyers had exercised a series of peremptory strikes, trial counsel

complained that  the prosecutor's "exclusion of the males on the jury . . . [was] forcing me to use

all my peremptories to try to find other men . . . .  He's only excused one woman."  RT 4348.

Counsel and the court then debated whether men were a cognizable class for *Batson* purposes

and eventually took a break to check the law.  RT 4350.

When they returned, the parties determined that sixteen males and fifteen females

had been called and that the total panel consisted of 44 females and 56 males.  RT 4353-54.

Trial counsel stated that the prosecutor had exercised eight challenges, only two of which were

against women.  RT 4350.  The prosecutor argued, however, that men were not a cognizable

group and noted that "the current jury panel, as a count, is 8 males and 4 females.  So I've been

unsuccessful in meeting my goal . . . ."  RT 4355-4356, 4357.  He also observed that the defense

had used challenges against several women he had planned to challenge.  RT 4357.

1         The trial court said:

2         The Court finds that no prima facie case has been established.  The
3         excluded members, or the so-called excluded members are not part
            of a cognisable [*sic*] group; and it's not likely at this time that the
4         challenges are based on group association.

5 RT 4358-59.

        Somewhat later, trial counsel made a second *Batson* motion, noting that "I want to
6
make the record that the last two challenges have been male, again, and renew my motion."
7
RT 4360.  He then discussed another potential problem with jury selection and said he "wanted
8
to make [his] record also" about that issue.  The court said "you have."  RT 4360.  On direct
9
appeal, petitioner argued that the trial court had simply ignored the second motion, but when
10
respondent argued that the court's comment equaled a ruling, petitioner addressed the substance
11
of the ruling in his reply brief.  MEH at 45.  The state Court of Appeal found that the interaction
12
between trial counsel and the trial court was in fact a ruling and declined to reach the merits of
13
any second *Batson* motion because the issue was not properly raised or argued in the opening
14
brief.  Lodg. Doc. 8 at 36-37 (opinion); *id.* at 1-2 (order modifying the opinion).  Respondent
15
argues that this default prevents this court from reaching the merits; petitioner counters that the
16
purported default is not based on an applicable rule of state law and is a discretionary policy
17
rather than a rule.  MEH 23-24.

18         The Court of Appeal upheld the trial court's first *Batson* ruling:
19
        Despite the court's misperception . . . the court expressly found it
20         was unlikely the challenges were based on that group association.
            Accordingly, it found, factually, that defendant had not established
21         a prima facie case of challenges based on group association.

22         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . .. . . . .

23         [D]efendant argued the prosecutor challenged six men based on
            group association.  The prosecutor denied it and responded
24         factually.   The court, having seen jury selection to that point,
            found there was no factual basis for the motion.  The trial court's
25         factual finding there was no prima facie showing was proper.

26 Lodg. Doc. 4 at 35.

1    As noted above, petitioner claims that because the trial court made an error of law

2    in determining that males are not a cognizable group, this finding must be renewed de novo

3    rather than deferentially; respondent does not dispute the point.  *See Cooperwood v. Cambra*,

4    245 F.3d 1042, 1047 (9th Cir. 2001) (stating that when state court applies the wrong legal

5    standard, the decision is reviewed de novo rather than deferentially).  Nevertheless, even if the

6    court reviews this claim de novo rather than deferentially, it does not find that an evidentiary

7    hearing is warranted in this case.

8    Petitioner relies on the statistical disparity to argue that he established a prima

9    facie case; he cites some information from the jury questionnaires and from the questioning,

10   which he believes shows there was no coherent theory for the prosecution's strikes except for

11   group bias.  He does not engage in any comparative analysis but merely asserts, without

12   comparing, that the challenged men "were, except for their sex, as heterogeneous as the jury pool

13   as a whole."  MEH at 21.

14   As the Supreme Court and the Ninth Circuit have recognized, "a prima facie case

15   of discrimination can be made out by offering a wide variety of evidence, so long as the sum of

16   the proffered facts gives 'rise to an inference of discriminatory purpose.'"  *Johnson*, 545 U.S. at

17   169 (internal quotation omitted); *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006).  A

18   showing of statistical disparity in the challenges may be sufficient, but may also be rebutted by

19   the record.  *Id*. at 1107, 1108, 1110 (stating prosecutor's use of three of his first four challenges

20   to excuse African-Americans raised an inference of bias, not refuted by the fact that he did not

21   use a subsequent challenge against an African-American); *see Williams v. Woodford*, 384 F.3d

22   567, 584 (9th Cir. 2004) (stating that while a pattern of strikes supports an inference of

23   discrimination a defendant "must point to more facts" than the number stricken).

24   In this case, the prosecutor used six of eight challenges against men, but

25   complained that the defense had excused "several women" the prosecutor also wanted to strike, a

26   factor that dilutes petitioner's statistical showing.  Petitioner has pointed to nothing in the record

1  to undercut this explanation.  It also is significant that at the time of the motion, the panel was

2  composed of eight men and four women.

3            In addition, petitioner has not undertaken any comparative analysis.  Although he

4  claims that such an analysis is appropriate only at the third step of the *Batson* inquiry, he is

5  wrong:  "comparative juror analysis may be employed at step one to determine whether the

6  petitioner has established a prima facie case of discrimination."  *Crittenden v. Ayers*, 624 F.3d

7  943, 956 (9th Cir. 2010).  Even conducting a de novo review of the state court's finding, this

8  court finds petitioner has not made a sufficient showing that the trial court's error in response to

9  the first *Batson* motion justifies an evidentiary hearing.

10           The court also declines to order an evidentiary hearing as to the second *Batson*

11  motion.  Even assuming the issue has been properly preserved, petitioner has not made a

12  showing sufficient to justify an evidentiary hearing.  As noted above, petitioner provides none of

13  the "relevant circumstances" of the second *Batson* motion except to note that the prosecutor used

14  the next two peremptory challenges after the first motion to excuse two more men.  MEH at 20.

15  He has pointed this court to nothing in the transcript that offers more information than that:

16  there is nothing in his motion to show whether the venire members put in the jury box after the

17  first motion was denied were men or women or anything else that could illuminate the bare

18  numbers.  Petitioner has not shown that the state courts' implicit rejection of the second

19  *Batson* motion was incorrect and has not borne his burden of demonstrating the need for an

20  evidentiary hearing.

21  VI.  Jury Misconduct

22           Petitioner requests an evidentiary hearing to explore several instances of alleged

23  jury misconduct, raised in a motion for a new trial, on appeal and in a state habeas petition.

24           A criminal defendant has a Sixth Amendment right to be tried by an impartial jury

25  that reaches a verdict on the basis of the evidence produced at trial, rather than on outside

26  influences.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Estrada v. Scribner*, 512 F.3d 1227,

1238 (9th Cir. 2008).  "'[E]ven a single partial juror violates a defendant's constitutional right to

a fair trial.'"  *Davis v. Woodford*, 384 F.3d 628, 652 (9th Cir. 2004) (quoting *United States v.*

*Angulo*, 4 F.3d 843, 848 (9th Cir. 1993)).  Although a court should "undertake an investigation

of the relevant facts and circumstances," *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998),

the Ninth Circuit has said that a district court is not always required to hold an evidentiary

hearing to explore allegations of jury misconduct or bias.  *Tracey v. Palmateer*, 341 F.3d 1037,

1045 (9th Cir. 2003).

        A.   Juror Number Three

        In support of his motion for a new trial, petitioner submitted declarations from

Mark Delizio, who reported having a conversation with Juror No. 3 during the trial; during that

conversation, Juror No. 3 said he believed petitioner was guilty.  CT 1674.  In a declaration

submitted in connection with the opposition to the motion for a new trial, Juror No. 3 denied

saying this.  CT 1749.  However, in connection with the state habeas petition, Juror No. 3

conceded he may have said something about his belief that petitioner was guilty based on the

testimony he had heard so far.  Lodg. Doc. No. 6, Appx. 2; CT 1780-1781.  He also reported that

he read articles about the trial in the weekly publication, *Feather River Bulletin*.  *Id.*  However,

his declaration submitted in opposition to the state writ claimed that he only skimmed the

headlines and did not learn anything that he had not  heard during trial.  Lodg. Doc. 9, Ex. A.

Petitioner submitted copies of the articles, which provide some factual reporting but also

characterize the proceedings in ways that might have had some impact on the way a juror

evaluated the case.  *See, e.g.,* Lodg. Doc. No. 6, unnumbered exhibit ("Judge will not allow key

witness to testify").  Petitioner was not given a hearing on either his motion for a new trial or his

state habeas petition, but the trial court rejected petitioner's claims.  Lodg. Doc. No. 6.

        The state Court of Appeal determined the trial court had properly decided that

Juror No. 3's statement was more reliable than DeLizio's.  That court also determined that even

/////

1   if Juror No. 3 had expressed his opinion about guilt, he also said he had not made up his mind

2   until deliberations and so found no prejudice.  Lodg. Doc. No. 4 at 101.

3       Petitioner claims that the fact-finding process was unreasonable because the trial

4   court and Court of Appeal resolved credibility questions on declarations.  Respondent counters

5   that petitioner has shown only that Juror No. 3 said that petitioner may be guilty and that a

6   juror's early statements about the merits of a case are not necessarily improper so long as the

7   juror keeps an open mind, as Juror No. 3 said he did in this case.  However, respondent's

8   argument is based on an acceptance of only one of Juror No. 3's declarations, a risky proposition

9   after the juror initially denied saying anything about the trial.  *Compare* CT 1749 ¶¶ 3-4 ("I was

10   very conscious not to discuss the details of the trial with anyone, including my wife") *with* Lodg.

11   Doc. No. 6, unnumbered page ("I may have said . . . that based on the testimony I had heard to

12   that point, Michael Franklin may be guilty".).

13       "To determine whether the state court's failure to hold an evidentiary hearing

14   rendered its factual findings unreasonable, [the court] may first consider whether a similarly

15   situated district court would have been required to hold an evidentiary hearing," although the

16   "ultimate question . . . is whether an appellate court would be *unreasonable* in holding that an

17   evidentiary hearing was not necessary in light of the state court record."  *Hibbler*, 693 F.3d at

18   1148 (emphasis in original).  In *Earp v. Ornoski*, 431 F.3d 1158, 1169 (9th Cir. 2005), the Ninth

19   Circuit found the district court had erred in failing to hold a hearing and thereafter resolving

20   disputed issues of fact and making credibility decisions on declarations only.  In this case, a

21   district court, confronted with conflicting declarations and no other way to resolve the conflict

22   between them or otherwise determine credibility, would be required to hold an evidentiary

23   hearing.  The state court's failure to do so here renders its factual determination unreasonable

24   within the meaning of § 2254(d).  As petitioner has made a colorable showing of juror bias, he is

25   entitled to an evidentiary hearing on this claim.  *Ortiz v. Stewart*, 149 F. 3d 923, 934 (9th Cir.

26   1998); *Crist v. Hall*, No. CV 06-4906-ODW (JTL), 2008 WL 5453424, at *6 (C.D. Cal. Dec. 29,

1  2008) (holding that misconduct occurred when juror expressed her belief defendant was guilty

2  before case submitted to the jury for decision).

3          The court need not determine whether petitioner has surmounted the § 2254(d)

4  barrier as to his claim that Juror No. 3 read newspaper coverage of the trial.  As respondent

5  observes, petitioner has presented copies of the articles; the court can read them and evaluate

6  their prejudicial impact without hearing from Juror No. 3.  *United States v. Montes*, 628 F.3d

7  1183, 1187 (9th Cir.) (concluding that a hearing was not necessary to explore claim that juror

8  read online article relating to trial; court read article to determine whether its content could have

9  influenced verdict), *cert. denied*, 132 S.Ct. 52 (2011).

10          B. <u>Extraneous Information</u>

11          During deliberations, two jurors claimed that people who die traumatically or

12  violently die with their eyes open.  Lodg. Doc. 6, Declaration of Juror No. 4, ¶¶ 9-10.  This is

13  significant, petitioner argues, because Ronna Franklin's eyes were open when she was found.

14          Petitioner has not shown that further development of this claim will lead to relief.

15  Even if it was improper for the jurors to consider this information, it was not prejudicial:  Ronna

16  Franklin did die traumatically and violently, whether the trauma was accidentally or intentionally

17  inflicted.  The court need not consider whether § 2254(d) restricts a hearing on this issue, as no

18  additional information will be relevant to a determination whether the statement was prejudicial.

19  *See Bayramoglu v. Estelle*, 806 F.3d 880, 887 (9th Cir. 1986) (stating that ultimate question is

20  whether extrinsic evidence contributed to the verdict).

21          C. <u>Extraneous Information Supporting The Defense</u>

22          Juror No. Four reported that when she described an experience of a friend who

23  might have drowned after being thrown from a horse absent the Juror No. Four's intervention,

24  other jurors told her she could not consider this as it was extraneous information.  Lodg. Doc. 6,

25  Declaration of Juror No. 4 ¶ 7.  Petitioner makes a somewhat opaque argument that this incident

26  was improper, in light of the jurors' consideration of the information described above.  Because

1   the basis of petitioner's argument is not clear, he cannot show that development of this claim

2   will lead to relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

3   D. Alternate No. 1's Reference To Providence

4   When Alternate No. 1 was seated, he told some other jurors that God meant him

5   to be there so the verdict would go the right way.  He also said that the jury had to go down the

6   right path and that some people were not going down the right path.  CT 1676-1677; Lodg. Doc.

7   No. 6, Decl. of Juror No. 4 ¶ 6.  The Court of Appeal rejected petitioner's claim of error, noting

8   that the "statement did not indicate a bias toward a guilty verdict as opposed to a not guilty

9   verdict."  Lodg. Doc. No. 4 at 101.

10   Petitioner has not shown either that the Court of Appeal's resolution of this

11   question was unreasonable or that further factual development will lead to relief. *Cf. Fields v.*

12   *Brown*, 503 F.3d 755, 780 (9th Cir. 2007) (holding that juror's reliance on Bible for making a list

13   of factors for and against death penalty had no substantial and injurious effect on the verdict

14   because list of factors was not one sided, among other things).  This juror's belief that

15   providential forces placed him on the jury does not, without more, clearly suggest the juror was

16   biased in a particular manner.

17   E. Visits To Bucks Lake

18   Several jurors visited Bucks Lake once or twice during trial but before

19   deliberations, during summer months, but did not know whether they found the scene of the

20   accident.  Lodg. Doc. 6, Decl. of Juror No. 4 ¶ 3.  Although the visits were improper, petitioner

21   has not suggested how developing this issue will lead to relief.  In this case, there were no

22   questions about what could or could not have been observed or heard from a particular vantage

23   point and petitioner has not suggested what a juror could learn from a drive to Bucks Lake in the

24   summer -- to consider an offense that occurred in the winter -- that would constitute prejudicial

25   extraneous information.  Petitioner has not shown that further development of this issue would

26   entitle him to relief. *Jeffries v. Wood*, 114 F.3d 1484 (9th Cir. 1997), *overruled on other*

*grounds, Gonzalez v. Arizona*, 677 F.3d 383, 390 n.4  (9th Cir. 2012) (whether jury misconduct is prejudicial depends on nature of the extraneous information).

VII.  <u>Failure To Object To The Prosecutor's Use Of A Chart</u> (Claim 9)

Petitioner argues that during closing argument, the prosecutor relied on a misleading chart about petitioner's extra-marital affairs and that use of the chart was misconduct or, in the alternative, that counsel was ineffective for failing to object to the chart.  Although the original chart was in color, a full size copy of the chart in black and white has been lodged with the court.

Once again the court need not determine whether petitioner has overcome § 2254(d): the court has the chart and can independently determine whether its use constituted misconduct or whether counsel's failure to object was prejudicial.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding that to prevail on a claim of prosecutorial misconduct, petitioner must show that the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); *Wood v. Ryan*, 693 F.3d 1104, 1119 (9th Cir. 2012) (stating that habeas petitioner must show result of proceeding would have been different had counsel objected to alleged misconduct); *Baldwin v. Adams*, ___ F. Supp. 2d ___, 2012 WL 3763653, at *9 (N.D. Cal. Aug. 29, 2012) (stating that failure to object not ineffective if prosecutor did not commit misconduct).

IT IS THEREFORE ORDERED THAT:

1.  Petitioner' s motion for an evidentiary hearing (ECF No. 90) is granted as to the claim that Juror No. 3 prematurely decided petitioner's guilt but denied in all other respects.

2.  Within twenty-one days of the date of this order, the parties shall submit a joint list of dates for the hearing along with an estimated length of the hearing.

DATED:  March 30, 2013.

_____
UNITED STATES DISTRICT JUDGE