1

2

3

4

5            UNITED STATES DISTRICT COURT

6            EASTERN DISTRICT OF CALIFORNIA

7

8   MICHAEL E. FRANKLIN,                    No. 2:05-cv-0304 KJM

9            Petitioner,

10   v.                                      ORDER

11   WARDEN, Mule Creek State Prison,

12            Respondent.

13

14          Petitioner Michael Franklin, proceeding with counsel, has filed a petition for a writ

15   of habeas corpus challenging his Plumas County conviction for murder with special

16   circumstances and the resulting sentence of life without the possibility of parole. As discussed

17   below, the court denies the petition.

18   I. FACTUAL BACKGROUND

19          The state Court of Appeal's account of the facts as developed at trial comports

20   with this court's reading of the record:

21          *Leading Up to Victim's Death*

22          Defendant and Ronna met sometime before 1990 and were married
            on July 4, 1994. Defendant was six feet, seven inches tall and
23          weighed 300 pounds; Ronna was five feet, seven inches tall and
            weighed 168 pounds. At the time of their marriage, Ronna was 35
24          years old and defendant 32. They desired to have a baby, but
            Ronna, a diabetic, had difficulty getting pregnant. After becoming
25          pregnant through in vitro fertilization, Ronna spent several months
            in the hospital because of complications associated with the
26          pregnancy. During that time, defendant seldom visited her and,
            when he did, they would argue. The infrequency of his visits and
27          his apparent disinterest upset Ronna. Their son, Michael Jr., was
            born in April 1995, and was just 20 months old when his mother
28          died.

1

Just before and during his marriage to Ronna, defendant engaged in at least 12 affairs. He gave these women his pager or voice mail number and contacted them periodically. He commonly told the women he did not have a home because he traveled extensively.

Defendant told one of the women, Shelle H., whom he dated throughout his marriage, that he could not spend the Fourth of July holiday with her in 1994 because he had plans with his friends. In fact, defendant did not spend that day with her because it was the day he was marrying Ronna. Defendant also told Shelle, in June 1994, that he had gotten a woman pregnant as a result of a one-night stand. He said he did not love the woman and that she was incapable of taking care of a child. In December 1994, defendant said there was no way the woman would ever have full custody of the child and he was building a case against her as an unfit mother. In January 1995, while his wife was in the hospital because of the complications with her pregnancy, defendant told Shelle that the woman he had impregnated was a diabetic and was in the hospital. In October 1996, another woman defendant was dating, Marsha V., obtained information he was married. When she confronted defendant with that information, he said: "I will get this taken care of."

Defendant told his family and various women different stories about his employment. He worked for an engineering company. He owned several businesses, including a company that owned and rented out hospitals, a tanning salon, a company that published a magazine, and a construction company. He was an investor. He worked for the Secret Service or the military on the weekends. He did bodyguard and undercover work on the side. He flew an airplane. He was a computer engineer or consultant. He had played for the Raiders. His ambition for the future was to be president of the United States.

Credible evidence showed defendant had a construction company, which incurred considerable debt, before the marriage. During the marriage, defendant owned a computer business (PNM Associates), a magazine company (publishing Future Power), and a T-shirt business (Franklin Apparel). These businesses, however, reported large losses during the marriage. He also owned rental properties, but reported net losses from them. Ronna worked for Raley's and earned between $49,000 (in 1995, including sick pay) and $71,000 (in 1996) per year while married to defendant. Because of defendant's losses, the couple jointly reported annual taxable income for the years 1994 through 1996 varying from $0 (in 1996) to $9,000 (in 1994).

In September 1996, defendant and Ronna obtained life insurance policies from Metropolitan Life. They purchased a $1 million term policy on defendant and a $750,000 universal life policy with an additional $250,000 accidental death benefit on Ronna. Defendant's premium was $124 per month, while the semiannual premium for Ronna's coverage was $4,633.75. Defendant and Ronna also obtained life insurance from Farmers New World Life: a $750,000 universal life policy for each. The semiannual premium for this

coverage was $6,000. Defendant and Ronna named each other as the primary beneficiary of the policies. Ronna was also covered by a $120,000 life insurance policy through Raley's under which the beneficiary would receive double the amount if she died as a result of an accident. Defendant and Michael Jr. were co-beneficiaries on the policy.

Consequently, Ronna was covered by almost $2 million dollars in case of accidental death. The coverage defendant and Ronna obtained in 1996 cost $22,755.50 per year. In 1996, Ronna's wages totaled $71,000 but the couple's taxable income was $0.

Ronna told friends she and defendant were having problems in their marriage. In the summer of 1996, she was considering leaving defendant. She was frustrated over how much time defendant spent away from home. She talked to her father about the possibility of a divorce. On one occasion, Ronna's father saw Ronna hit defendant, who responded by grabbing her by the shoulders, pulling her up to his face, and warning: "Don't ever let that happen again." Ronna hesitated to go forward with divorce because she did not want to share custody of Michael Jr. As it was, the weekends were the only time she had with him.

Defendant heard a friend who had been through a divorce say that the court had ordered him to pay his ex-wife 78 percent of his gross income. Defendant said no one would ever do that to him. During this conversation, Ronna said she would just leave defendant, and defendant replied: "You ever do that to me, I'd kill you." During a similar conversation about spousal support, defendant became indignant and said he would kill anyone that did that to him. His standard response to talk about Ronna leaving him was "Nobody ever leaves me" and "There is no way you're ever going to leave me. It's not going to happen."

Ronna wanted to retire from Raley's to spend more time with Michael Jr. She believed defendant should get a regular job instead of being a business entrepreneur. She told a friend she had given defendant an ultimatum, warning him that, if they had another child, she would retire and stay home.

In December 1996, defendant planned a snowmobiling trip to Bucks Lake in Plumas County for Ronna and him. For Christmas, defendant gave Ronna a ring and a snowmobile helmet. She became upset when she opened the helmet. Defendant urged her to try it on, but she resisted and cried during their ensuing verbal exchange. She told several people she did not want to go to Bucks Lake. She did not like the cold, was afraid of storms, and did not want to leave the baby. Defendant, however, encouraged her to go by buying her rings and flowers. The day before they left, she told her mother she had not been feeling well for the past week. She was on her period, suffered from cramps, and had a yeast infection.

/////

/////

3

*Testimony Concerning Day of Victim's Death*

Defendant and Ronna stayed at Bucks Lake Lodge in Plumas County. On December 28, 1996, Ronna's 38th birthday, she and defendant went for a ride on a snowmobile defendant had purchased. Although defendant claimed Ronna was driving the snowmobile and he rode as a passenger behind her, witnesses who saw them on the snowmobile that day only saw defendant operating the snowmobile with Ronna riding as a passenger in front of him. It was raining, causing the snow on the ground to turn slushy. As a result of what defendant asserted was an accident, the snowmobile came to rest along the side of a road where there was a three-foot-deep puddle of slushy water.

Deborah and Eric Ingvoldsen were traveling on their snowmobiles when they noticed the Franklins' snowmobile, upright, with the motor still running and the headlight on, stopped in the slushy water at the edge of the road. Just behind the snowmobile, defendant was sitting, immersed in the water up to his chest, leaning back against the snow bank. His head was straight, not leaning to either side. Mrs. Ingvoldsen got off her snowmobile and approached the Franklins' snowmobile on foot. Although defendant was wearing a helmet, she could see that defendant's eyes were closed and his face was flushed. After she yelled to defendant, with no response, Mrs. Ingvoldsen saw a yellow slicker under the water and a helmet floating in the water. Upon closer inspection, she saw Ronna under the water, her eyes wide open and her lips blue. With the help of her husband and Jeff Wisecarver, who had just arrived on the scene from the opposite direction, Mrs. Ingvoldsen pulled Ronna out of the water.

Defendant's color was good, and steam was rising from his chest. Jay Grubbs arrived on the scene, and the three men pulled defendant from the water. Mr. Ingvoldsen took defendant's helmet off and tried to feel a pulse, but he was unsuccessful because his hands were too cold. Defendant appeared to be unconscious, but his skin was slightly reddish. Even though he later realized he should have known defendant was alive by his skin coloring, Mr. Ingvoldsen began performing CPR on defendant. After defendant was given several chest compressions and forced breaths, his stomach growled and he coughed; however, he was not shivering. He responded when someone asked his name, and he indicated that his wife was there. Others arrived, having been summoned by Mrs. Ingvoldsen. They loaded defendant onto a sled behind a snowmobile. It appeared that defendant was conscious but slipping into unconsciousness.

Defendant was taken by sled to a cabin at Grubbs Cow Camp, which was about a quarter-mile from where he was found. En route, defendant's leg slipped off the sled and bent back. Although it appeared to be painful, defendant did not react. Defendant was carried inside the cabin and his clothes were removed. There were no injuries. He mumbled and asked about his wife. Defendant was at the cabin for more than two hours, over which time his mental condition appeared to improve markedly. He conversed with the

people at the cabin, telling them about his wife and son. He complained of back pain.

Meanwhile, Kevin and Scott Stevens were among the first people to arrive at the scene where defendant and Ronna were found in the water. Finding Ronna was unresponsive and had no pulse, they began administering CPR. They continued for about 20 minutes, until a trailer was rigged up to take her to Bucks Lake Lodge. On the trip to the lodge, CPR was continued. Although resuscitation efforts were continued at the lodge and on the way to the hospital, Ronna never responded and was pronounced dead. An autopsy revealed Ronna's cause of death was drowning. Several ribs had been broken during administration of CPR, but there were no other signs of trauma to the body.

After defendant began to get warm at the cabin, he was cheerful, even jovial, joking that his wife would be upset if she could see him with three women rubbing his arms and legs. He complained of back pain and numbness below the waist and became concerned when told Ronna had been seriously injured.

Defendant was taken to the hospital and arrived after Ronna had been pronounced dead. He had no obvious injury, but tests were ordered because he said his abdomen was slightly tender. When told that Ronna died, defendant cried. X-rays and a CAT scan revealed no abnormalities. The attending physician saw no injury that would explain a loss of consciousness. Defendant was admitted to the hospital for an overnight stay because he said he lost consciousness.

While still in the hospital, defendant initially told a California Highway Patrol officer he did not remember anything about the snowmobiling incident. He remembered having lunch, during which he and Ronna both consumed alcohol. They went for a ride on the snowmobile with Ronna riding in front and driving, he told the officer. Defendant believed they hit something but did not remember anything further.

*Defendant's Later Actions*

On December 31, 1996, an investigator from the Plumas County Sheriff's Department interviewed defendant in Carmichael. Defendant said Ronna had been looking forward to going to Bucks Lake. The morning of the day she died, they rode the snowmobile then returned to the lodge for lunch. After lunch, they went to their room, played a board game called "For Lovers Only," made love, cleaned up the room, and went for another snowmobile ride. When asked about the nature of their relationship, defendant responded that it was special and Ronna was his best friend. Defendant told the investigator he was not involved with any other women.

In a conversation with Lea Ramsey, defendant expressed the concern that he may have contributed to Ronna's death. He said he was afraid he might have lain on her with his "big fat body." In January 1997, defendant called Barbara H., one of the women with

5

whom he had an affair, and told her he was in trouble and his parents were spending a lot of money to get him out of trouble. Defendant told Lea Ramsey's husband that he believed he may have been knocked unconscious and lain on top of Ronna. He pointed to a scratch on the top of his head and said he must have been hit there.

Two different people asked defendant if he and Ronna had any life insurance. Defendant, within two weeks after Ronna's death, told Ronna's brother they did not have any insurance because their application had been rejected due to Ronna's diabetes. He later told Ronna's brother they had some insurance. Defendant told Lea Ramsey he did not know whether they had insurance.

*Investigation and Expert Witnesses*

The brakes and clutch on the snowmobile were working normally. The tracks of the snowmobile were consistent with someone simply pulling over and stopping. There were no obstructions in the path of the snowmobile that would have caused an accident. Normally, if someone is in a snowmobiling accident, that person falls off to the side or goes over the handlebars. Defendant and Ronna, however, were found behind the snowmobile.

The tracks left by the snowmobile were straight, indicating the snowmobile had not suddenly turned one way or the other. The snowmobile was found upright and there was no indication the front skis on the snowmobile had left the ground, causing a loss of control. Also, if defendant and Ronna had come around the last curve at an excessive speed, they and the snowmobile would have gone off the other side of the road. It did not appear, from the physical evidence at the scene, that there had been a snowmobiling accident.

A search of the room defendant and Ronna had occupied at Bucks Lake Lodge revealed a towel with blood on it and feminine products with blood on them in the garbage can. Blood stains were also found on the sheets. There was no game called "For Lovers Only" as described by defendant in his statement. Shelle H., one of the women with whom defendant had an affair during his marriage to Ronna, testified that she and defendant went on a trip to San Francisco in December 1994. On that occasion, defendant brought a board game called "The Enchanted Evening," which they played before having sex.

A doctor who originally reviewed defendant's CAT scan taken while he was in the hospital concluded there was a possible hemorrhagic contusion. However, an expert on CAT scans concluded that there were no abnormalities shown in the scan. The CAT scan revealed no brain injury.

An accident reconstruction expert, Garrison Kost, conducted tests using a snowmobile. Although he did not attempt to duplicate the exact conditions that existed for the Franklins, the expert concluded from the evidence given to him that the snowmobile was not

traveling fast prior to stopping where defendant and Ronna were found. Consequently, the G-forces applied to the riders would not have been strong. A biomechanical engineer, Lawrence Thibault, testified as a prosecution expert that, if defendant had fallen off the snowmobile and struck his head on the snow with his helmet on, the impact would not have been sufficiently strong to cause a concussion. A defense expert testified, however, that the conclusion of the prosecution's expert was unreliable because it did not take into account whether defendant was ejected from the snowmobile.

A prosecution expert testified that a person has about 10 minutes in 32-degree water before he loses muscular coordination. A person defendant's size, wearing a helmet, would not lose consciousness from body cooling due to being seated in cold water up to his chest for about 15 minutes. As the body temperature drops to 93 degrees, the victim cannot stop shivering unless warmed. Shivering also stops as severe hypothermia sets in. An unconscious person submerged in cold water would not be able to hold his head up straight. Many drownings in cold water are caused by aspiration of the cold water when the victim initially enters the water. However, it takes eight to ten seconds for the aspirated water to reach the brain, which is long enough to stand up. A defense expert testified that sometimes people die from shock when immersed in cold water, especially if the victim has a weak heart. Ronna, however, showed no signs of heart disease.

Court of Appeal's Decision, Lodg. Doc. 4 at 2-13.[1]  The California Supreme Court denied review on September 24, 2003.

II. PROCEDURAL BACKGROUND

At the conclusion of direct review in the state courts, petitioner filed his habeas petition in this court, raising the issues exhausted through the direct appeal process along with some that were concededly unexhausted.  This court granted petitioner's requests for the appointment of counsel and a stay of the proceedings.  ECF Nos. 1-4, 9.

After exhausting additional issues, petitioner returned to this court on September 10, 2007, filing an amended petition raising twenty-two grounds for relief:  (1)  the trial court violated his right to a fair trial by denying the motion for a change of venue; (2) the trial court improperly denied numerous challenges for cause to members of the venire; (3) his right to an

---

[1] Respondent has lodged the state court record along with trial exhibits.  For documents such as the Court of Appeal's order, briefing and writs filed in state court, the court labels them "Lodg. Doc." and the number.   The state court transcripts are denominated "RT" for the Reporter's Transcript; "CT" for the Clerk's Transcript," and "ACT" for the Augmented Clerk's Transcript.  The transcript from this court's evidentiary hearing is "EHRT."   The court generally refers to documents in its electronic file by their ECF number and pagination.

1  impartial jury and a fair trial was denied when the trial court refused to give him additional

2  peremptory challenges; (4) the prosecutor systematically used his peremptory challenges to

3  remove men from the jury; (5) the trial court dismissed Juror No. 5 without adequate inquiry;

4  (6) multiple instances of jury misconduct impacted his right to a fair trial; (7) the Plumas County

5  District Attorney Office's financial and personal conflicts compromised its ability to prosecute

6  the case fairly; (8) there were multiple instances of prosecutorial misconduct; (9) counsel was

7  ineffective in failing to object to the prosecutor's misleading chart; (10) the court violated

8  petitioner's right to a fair trial by overruling foundational objections to expert testimony offered

9  by the prosecution; (11) a combination of errors prevented petitioner from confronting

10  prosecution expert Dr. Lawrence Thibault; (12) the denial of petitioner's request for access to the

11  snowmobile violated his right to a fair trial; (13) the redaction of a videotape showing

12  snowmobile experiments violated petitioner's right to a fair trial; (14) the admission of evidence

13  about submersion in cold water violated his right to a fair trial; (15) the exclusion of evidence

14  about drownings in shallow water violated his constitutional rights; (16) the trial court improperly

15  admitted evidence of petitioner's many extra-marital affairs; (17) admitting evidence of the

16  victim's state of mind violated petitioner's right to a fair trial; (18) the trial court erred in

17  excluding evidence that adultery is not probative of spousal homicide; (19) the rejection of

18  petitioner's proposed instructions about expert testimony violated his federal constitutional rights;

19  (20) the evidence of homicide is insufficient; (21) the judgment must be reduced to second-degree

20  murder; and (22) cumulative prejudice resulted in a fundamentally unfair trial.  Am. Pet., ECF

21  No. 25.

22      Respondent filed an answer to the petition on April 3, 2008.  Ans., ECF No. 36.

23      On August 18, 2008, petitioner filed his traverse and a motion for an order

24  permitting him to conduct discovery relating to Dr. Thibault's testimony and calculations

25  concerning the snowmobile incident; to undertake dynamic testing of the snowmobile; to seek

26  materials from the prosecutor's file concerning the prosecutor's relationship with an insurance

27  company that paid for some accident reconstruction and the relationship between an investigator

28  /////

8

1   and a witness; and the alleged coordination with Santa Clara County concerning the timing of the

2   filing of a rape charge against petitioner.  Traverse, ECF No. 58; Mot. for Disc., ECF No. 59.

3          On November 3, 2008, respondent filed a reply to the traverse.   Sur-Reply, ECF

4   No. 64.

5          On December 16, 2009, the court granted the motion for discovery as to the first

6   request, but denied it as to all others.  Order, ECF No. 76.

7          On December 30, 2009, petitioner filed a motion for reconsideration of this order.

8   Mot. for Recons., ECF No. 77.  The district court denied this request on March 10, 2010.  Order,

9   ECF No. 83.

10          After conducting discovery, petitioner filed a motion for an evidentiary hearing on

11   the following claims in the petition:  the prosecutor used his peremptory challenges to remove

12   men from the jury (claim four); multiple instances of jury misconduct deprived petitioner of a fair

13   trial (claim six); trial counsel was ineffective by failing to object to the prosecutor's misleading

14   chart or the prosecutor committed misconduct by using the chart (claim nine); counsel was

15   ineffective by failing to undertake the necessary investigation to allow him adequately to cross-

16   examine the prosecution's biomechanical engineering expert (claim eleven); and petitioner was

17   denied a fair trial because he was not permitted to conduct dynamic testing on the snowmobile

18   (claim twelve).  Mot. for Evidentiary Hr'g, ECF No. 90.

19          While this motion was pending, petitioner returned to state court with a habeas

20   petition based on the discovery he obtained in this court.  He lodged a copy of the writ and the

21   state court's denial.  ECF No. 107, 108.

22          On March 30, 2013, the court granted the motion for an evidentiary hearing on the

23   question whether Juror No. 3 committed misconduct by forming an opinion about petitioner's

24   guilt before the case was submitted to the jury, part of claim six, but denied it in all other respects.

25   ECF No. 109.  The court later denied respondent's motion for reconsideration.  ECF No. 116.

26          The evidentiary hearing was held on July 29, 2014.   The parties submitted

27   supplemental briefing on the issue explored at the hearing and, at petitioner's request, on the issue

28   of the prosecutor's use of peremptory challenges.  ECF Nos. 145-149.

1   III.  HABEAS CORPUS AND THE AEDPA

2          An application for a writ of habeas corpus by a person in custody under a

3   judgment of a state court can be granted only for violations of the Constitution or laws of the

4   United States. 28 U.S.C. § 2254(a).   In addition, under the Antiterrorism and Effective Death

5   Penalty Act (AEDPA), federal habeas corpus relief is not available for any claim decided on the

6   merits in state court proceedings unless the state court's adjudication of the claim:

7   (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established federal law, as
8   determined by the Supreme Court of the United States; or

9   (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
10  State court proceeding.

11  28 U.S.C. § 2254(d).

12          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

13  different. As the Supreme Court has explained:

14  A federal habeas court may issue the writ under the "contrary to"
    clause if the state court applies a rule different from the governing
15  law set forth in our cases, or if it decides a case differently than we
    have done on a set of materially indistinguishable facts. The court
16  may grant relief under the "unreasonable application" clause if the
    state court correctly identifies the governing legal principle from
17  our decisions but unreasonably applies it to the facts of the
    particular case. The focus of the latter inquiry is on whether the
18  state court's application of clearly established federal law is
    objectively unreasonable, and we stressed in *Williams*[2] that an
19  unreasonable application is different from an incorrect one.

20  *Bell v. Cone*, 535 U.S. 685, 694 (2002).   A district court may not grant the writ even if it believes

21  the state court applied federal law erroneously or incorrectly—the application must be

22  unreasonable.  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "As a condition for obtaining

23  habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the

24  claim being presented in federal court was so lacking in justification that there was an error well

25  understood and comprehended in existing law beyond any possibility for fairminded

26  disagreement." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786–87 (2011).

27

28  _____

    [2] *Williams v. Taylor*, 529 U.S. 362 (2000).

10

1    The court will look to the last reasoned state court decision in determining whether

2    the state courts' application of the law to a particular claim was contrary to the law set forth in the

3    cases of the United States Supreme Court or whether the state courts unreasonably applied that

4    law. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). Even if the reasoned decision does not

5    cite federal law, this does not necessarily mean the state courts unreasonably applied that law.

6    *Early v. Packer*, 537 U.S. 3, 8 (2002).

7    Petitioner argues that many of his claims must be reviewed de novo because the

8    Court of Appeal addressed only the related state law claims, while saying nothing about the

9    federal law claims. In *Johnson v. Williams*, the Supreme Court said:

> [B]ecause it is by no means uncommon for a state court to fail to
> address separately a federal claim that the court has not simply
> overlooked, we see no sound reason for failing to apply the *Richter*
> presumption in cases like the one before us. When a state court
> rejects a federal claim without expressly addressing that claim, a
> federal court must presume that the federal claim was adjudicated
> on the merits---but that presumption can in some limited
> circumstances be rebutted.

15   ___ U.S. ___, 133 S. Ct. 1088, 1096 (2013). The Court added that when the state and federal

16   claims are similar and when the defendant "treated [the] state and federal claims as

17   interchangeable," the presumption of a determination on the merits is not rebutted. *Id*. at 1098-

18   99.

19   In this case, the Court of Appeal separately addressed the merits of petitioner's

20   federal claims in a few instances, but for the most part its analysis tracked only his state law

21   arguments. *See generally* Court of Appeal Opinion, Lodg. Doc. 4. However, for the most part,

22   petitioner did not separately address federal claims before that court, generally adding only a

23   paragraph at the end of his discussion of the state law error, citing to federal authority. *See*

24   Appellant's Opening Br., Lodg. Doc. 21 at 135, 154. It appears the state court's resolution of the

25   issues is a ruling on the merits of petitioner's federal constitutional claims.

26   If a state court's finding of fact was objectively unreasonable it is not entitled to

27   deference under section 2254 (d)(2), but, as with the concept of unreasonable determinations of

28   law,   unreasonableness is a higher standard than incorrectness:

11

> [I]f a petitioner challenges the substance of the state court findings, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012), *cert. denied,* ___ U.S. ___, 133 S. Ct. 1262 (2013)  (citations, internal quotation marks omitted).  This court owes the same deference to factual determinations made by the state Court of Appeal.

IV.  VENUE (Issue One)

       Petitioner argues the extensive publicity in small, rural Plumas County denied him a fair trial.  Petitioner argues the state court decisions stemmed from an unreasonable determination of fact and were unreasonable determinations of law, in that the courts should have presumed prejudice from "an 88 percent community saturation rate" and "widespread extrajudicial knowledge" of the fact that petitioner had been charged with rape in Santa Clara County.  ECF No. 58 at 43.

     A.  Proceedings in the Superior Court

       1.  Hearing on the Motion

       During jury selection proceedings, defense counsel sought a change of venue, arguing that because of pretrial publicity and general community gossip petitioner would be unable to get a fair trial.  CT 1004-1021.

       Trial counsel presented testimony from several members of the venire who had been excused, some members of the community, and Edward Bronson, an expert witness.

       Bronson, a professor at California State University, Chico, has undertaken social science research into jury selection issues for thirty years and has been hired in over one hundred cases as an expert to design and conduct surveys to gauge community knowledge and sentiment about particular cases.  RT 4048-4050.  Dr. Bronson did not conduct a survey or even read all the jury questionnaires or the voir dire, but rather evaluated a percentage of the jury questionnaires.  RT 4063.  From this  sample, Dr. Bronson found a recognition rate of 85 percent.  RT 4116.  He /////

1    also noted the relatively large numbers of the venire excused for case specific bias.  RT 4127-

2    4128.

3              He read thirty-eight newspaper articles, three from *The Sacramento Bee* and the

4    rest from *Feather River Bulletin*, but did not see the episode of the television show Hard Copy

5    about the case.  RT 4068, 4071.  The *Feather River Bulletin* is one of a group of papers in the

6    county, which publish many of the same articles; the combined circulation is just over 10,000.

7    RT 4094.  It is a weekly paper and so might have a greater impact because there would be no

8    fresh news the next day.   RT 4094-4095.  Dr. Bronson was not aware of the *Bee*'s circulation in

9    Plumas County and acknowledged the *Bee* published the most inflammatory articles.  RT 4150.

10             He also considered the impact of "rumors, gossip, widespread, fairly aggressive

11   . . . alternative sources of information and potential bias."  RT 4071.   He said that based on the

12   pretrial publicity alone "it would have been a very close call as to whether there was enough

13   [prejudice] to justify a Change of Venue . . ."  RT 4081.  However based on information gleaned

14   from portions of the voir dire and other sources, Dr. Bronson believed people in the community

15   learned things about the snowmobile incident from first responders, with their air of expertise;

16   these people then passed this information, correct or not, on to others.  RT 4086, 4154.  The

17   population of Plumas County is just over 20,000.  RT 4095.  In small communities such as

18   Plumas County, the communication system is often informal and thus it is harder to know what

19   information is circulating and its impact.  RT 4103.  And in small communities, cases become

20   "part of the historical lure [*sic*] of that community."  RT 4104.   He believed there was a rumor

21   mill because the 85 percent recognition rate was high, given the media coverage.  RT 4143.

22        In Dr. Bronson's opinion, petitioner would not be able to get a fair trial in Plumas County.

23   RT 4123, 4137.

24             Defense counsel called several other witnesses.  Steven Jones, pastor of the

25   Christian Life Fellowship in Quincy, reported the "discussion and idle talk" about the case he had

26   heard in church and in local restaurants and stores, most of which focused on petitioner's guilt.

27   RT 4181-4184.  Some of the people Jones overheard talked about what they learned from the

28   /////

1   EMTs on the scene.  RT 4192.  Reverend Jones said the gossip "really escalate[d]" when the jury

2   summonses went out.  RT 4189.

3          Jim Weiss, the husband of an excused venire member who believed petitioner was

4   guilty, reported their daughter had communicated what she had heard from someone who had

5   carried Ronna into the lodge.  RT 4202.  Weiss had heard the case discussed all over town about a

6   year ago, but not so much recently. RT 4203, 4206-4207.

7          Barber Marion Taddei reported his clients tended to think petitioner was guilty.

8   RT 4208-4209.

9          Kenneth Prince, who had been excused from the jury, lived near Bucks Lake

10  Lodge.  RT 4213.  There was a fair amount of talk about the case at the lodge a year before, but it

11  had revived.  RT 4214.  The owners of the lodge had a video tape of the Hard Copy program

12  about the case and played it periodically.  RT 4216.

13         Another excused venire member, Marilyn Christensen, noted on her questionnaire

14  she believed petitioner was guilty, because a snowmobiler had told her the incident could not

15  have been an accident.  RT 4219, 4221, 4224.

16         Paula O.[3] testified that the case was the subject of a "daily discussion in the lunch

17  room" of the hospital where she worked.  RT 4229.  People know she is the "Santa Clara County

18  woman" and approach her to talk about the case.  RT 4230.  Paula O. called the court to report

19  she worked with a Kathy Price, a member of the venire; she said it would make her

20  uncomfortable if Price served as a juror.  RT 4233-4234.  When Price told Paula O. she was

21  uneasy at the thought of serving, Paula O. said she should tell the court about their acquaintance.

22  RT 4235.  Paula O. said she discussed the case with another venire member.  RT 4240.

23  /////

24  _____

25         [3] Although petitioner used Paula O.'s last name in the amended petition, in the traverse he
    follows the state law convention of using her last initial only.  The court follows this convention

26  as well.  *See R.P. v. Seattle Sch. Dist.*, No. C13–2218–MJP, 2014 WL 639408, at *1 (W.D. Wash.
    Feb. 18, 2014) (stating that fictitious names are allowed to protect the privacy of the victims of

27  sexual assault); *see also Doe v. Penzato*, No. CV10–5154 MEJ, 2011 WL 1833007, at *3 (N.D.
    Cal. May 13, 2011) (noting the public interest in protecting the privacy of sexual assault victims).

28

1     Kathy Price testified that Paula O. volunteered she could get Price off jury duty.

2 RT 4255.  Paula O. told Price about her relationship with petitioner and the rape allegations.  RT

3 4259-4260.

4     2.  News Coverage

5     Defense counsel supported their motion with a compendium of articles from

6 Feather Publications, a group of four newspapers under single ownership—the *Feather River*

7 *Bulletin,* the *Chester Progressive,* the *Portola Reporter,* and the *Indian Valley Herald*—and their

8 on line presence, Plumas Online News.  CT 1023-1032, 1070-1124; RT 4068, 4094.

9     The reporting began in December 1996, with an article about Ronna's death,

10 reporting a claim that her neck had been broken.  CT 1114.  A year later, the papers contained an

11 article about the civil suits against petitioner and the prosecutor's confirmation that his office was

12 still investigating Ronna's death.  CT 1116-1117.   This article described petitioner's account of

13 the events of December 28 and information from Ronna's friends and family about the state of

14 the marriage.  *Id.*

15     In January 1999, an article said petitioner was still under investigation for Ronna's

16 death and mentioned that emergency workers could not "reconcile what they saw with the terrible

17 result."  CT 1119-1120.

18     In March 1999, the Feather River papers reported petitioner was in custody on a

19 rape charge in Santa Clara County and was a suspect in two Sacramento rapes.  CT 1121-1122.

20     In June 1999, the publications said petitioner would not be coming to Plumas

21 County soon because he was being held on "two felony sexual assault allegations."  CT 1111.  In

22 September, it reported petitioner would be transported to Plumas County within a week and

23 security at the jail would be "stepp[ed] up" because petitioner's size raised some concerns and

24 mentioned briefly the "unrelated sexual assault charge in Santa Clara County."  CT 1103-1105.

25 One article described the prosecution's theory of the case and the pending rape charge in Santa

26 Clara County.  CT 1104-1105.

27     When petitioner was charged in June 1999, the papers discussed some of the

28 evidence and prosecution's theories but also mentioned that petitioner had been "charged with the

1    rape of a pregnant San Jose surrogate mother," who asked him to stop when the initially

2    consensual sex "became rough" because she feared for the fetus.  CT 1112-1113.

3           Once the proceedings began, the press reported on defense motions and rulings.

4    *See* CT 1075 (motion to set aside the decision holding petitioner to answer denied); CT 1076-

5    1077 (describing the parties' positions in the motion to set aside), CT 1078 (describing the

6    parties' estimates as to length of trial); CT 1079 (arraignment delayed); CT 1080 (petitioner held

7    to answer after preliminary hearing, discusses prosecution and defense versions of the evidence);

8    CT 1082 (preliminary hearing delayed; outlines potential defense testimony); CT 1083-1084

9    (discussing evidence at the preliminary hearing, much of which was admitted at trial); CT 1085-

10   1086 (discussing evidence at preliminary hearing, including evidence that petitioner contacted

11   former girlfriend ten days after Ronna's death and made jokes about killing people); CT 1087-

12   1088 (mentions the complexity of the evidence); CT 1023-1027 (summarizing competing

13   evidence at the preliminary hearing); CT 1028 (arraignment); CT 1030 (not guilty plea); CT 1031

14   (assigned judge disqualified on defense motion).  Many of these articles included a single

15   paragraph outlining the prosecution's theory of the case—that petitioner had killed Ronna in

16   order to collect life insurance proceeds.   Some included information about petitioner's affairs and

17   the sorry state of his marriage, but others recounted testimony suggesting petitioner and Ronna

18   had behaved like honeymooners on the visit to Bucks Lake.  Still one other, from January 5,

19   2000, reported a criminalist had testified that blood on the sheets of petitioner's cabin at Bucks

20   Lake Lodge had come from someone rubbing a "discarded feminine hygiene product[]" on the

21   sheets.  CT 1087.

22          Feather Publications also described the proceedings leading up to and the hearing

23   and ruling on the motion to disqualify the Plumas County District Attorney's Office, CT 1090-

24   1093, 1095, 1096-1097, 1098, 1100-1102, 1106, 1108-1109.   One mentioned a Michael Franklin

25   Task Force,  see issue seven, *infra*, and said defense counsel was concerned that the prosecutor

26   had released confidential information about petitioner's arrest for soliciting a prostitute, but

27   refused to provide the names of the forty women with whom petitioner had had affairs to the

28   insurance companies.   CT 1090, 1093.  Several mentioned the relationship between the

16

1    prosecution investigator Kris Beebe and Paula O., who had moved to Plumas County.  Others

2    reported the decision not to seek the death penalty, CT 1094, the schedule for the preliminary

3    hearing, CT 1099, and the defense motion to quash the arrest warrant, recounting several defense

4    theories about the accident, CT 1107.

5             Press coverage continued during jury selection, with factual reporting about the

6    number of venire members summoned, the hardship process, and challenges for cause.  CT 1071.

7    On April 26, 2000, an article discussed voir dire, noting that most of the jurors questioned said

8    they had read about or discussed the case and that the judge cautioned them not to let the

9    coverage influence them.  CT 1072.

10            Other articles discussed the "business" of the prosecution, describing the money

11   allocated by the Board of Supervisors to cover costs of the trial, CT 1074, and the additional

12   money needed to pay the fees of expert witnesses and other expenses for the preliminary hearing,

13   CT 1089.

14            At the hearing, the defense submitted three articles from *The Sacramento Bee*.

15   Lodg. Doc. 20, Def.'s Ex. D for Venue Hrg.  On December 19, 1997, the *Bee* ran an article about

16   the civil wrongful death suits against petitioner; it noted that Ronna had told family and friends

17   about the deteriorating state of her marriage but also that people at Bucks Lake described the

18   couple as acting like newlyweds.  *Id*.  In June 1999, the *Bee* reported that Plumas County had

19   filed murder charges against petitioner and quoted Ronna's father as saying petitioner refused to

20   let him or his ex-wife see their grandson after Ronna's death.  *Id*.  On December 27, 1999, the

21   *Bee* covered the hearings on the motion to disqualify the district attorney's office, mentioning

22   Beebe's relationship with the alleged victim of the Santa Clara County rape.  It described the

23   alleged attack on "a seven-months pregnant surrogate mother," but also noted Paula O.'s delayed

24   reporting of the incident.  Finally, it included a Santa Clara County Deputy District Attorney's

25   characterization of petitioner as a "very, very dangerous man."  Lodg. Doc. 20.  A third article,

26   published on February 1, 2000, after the preliminary hearing summarized the evidence about

27   petitioner's affairs, mentioned the pending Santa Clara County charges for raping a pregnant

28   woman.  *Id*.

17

1

### 3.  Voir Dire and Jury Questionnaires

2       One of the steps the court and parties took to seat a jury was to ask those not

3  excused for hardship to fill out questionnaires.   These asked the venire members if they had

4  "read or heard about this case before coming to Court" or "heard anything about the defendant"

5  or about "the alleged victim."

6       In an appendix to the amended petition, petitioner identifies venire members

7  passed for cause even though their questionnaires showed they had heard about the case through

8  the news or by word of mouth, arguing this was a high percentage.  ECF No. 25 at 132-140.

9       What these venire members had heard or knew varied wildly.  One venire member

10 on petitioner's list as being passed for cause despite his word-of-mouth knowledge said the case

11 "has been in the local paper.  A co-worker dispatched [the] investigator from our office since the

12 crime occurred on National Forest System lands."  ACT 2378.   Venire member Lou Boschee

13 said she had heard about the case because her husband had talked to one of the first responders,

14 who said "there was some funny circumstances."  RT 3811.  Another venire member described

15 what she had heard as a "minor amount of speculation/rumor about possible motive."  ACT 1072.

16 Still another, Walter Hamilton, who is listed as being passed for cause despite his knowledge of

17 the case, wrote on his questionnaire that he had heard "only that a woman died in a snowmobile

18 accident, and her husband is charged with the death."  ACT 2894.  Karen Rhodes, also listed as

19 passed for cause despite her knowledge from the newspapers and word of mouth, said she had

20 heard "that a man is accused of the murder of his wife & something about a snow-mobile

21 accident, and a life insurance policy."  ACT 5011.

22      Venire member Max Bennett, challenged for cause, had learned some basic facts

23 from the newspaper, but said his wife who reads "[e]verything she gets her hands on," had

24 concluded petitioner was guilty; Bennett said it would be difficult to avoid discussing the case

25 with his wife.   RT 3906.  This says little about community saturation and more about the family

26 dynamics of this particular venireperson.

27      Another on petitioner's list of people with knowledge about the case but who were

28 passed for cause is venireperson 50275, who said very little about what she knew about the case

18

1  but reported she had been raped and had been held at gunpoint on another occasion.  ACT 1516.

2  A friend was in prison for killing her husband.  RT 3297.  The defense challenge for cause, which

3  was denied, had nothing to do with what this venireperson had heard about the case.  RT 3306.

4           The court denied the defense challenge to venire person 39878 who said petitioner

5  looked like a killer, reported that "everybody in town says [] that he killed his wife," but also said

6  a friend who worked at the jail said petitioner did not kill his wife.  RT 3737, 3738, 3741, 3743.

7           Petitioner has also presented a chart identifying venire members "questioned for

8  cause and excused for case-specific prejudgment, acquaintance with witnesses, or the like."  ECF

9  No. 25 at 130-131.  The chart is not particularly helpful to this inquiry for several reasons:

10  petitioner does not define "or the like" or otherwise explain how this nebulous category relates to

11  the likelihood petitioner did not receive a fair trial.  In addition, that a venireperson was excused

12  because of an acquaintance with a witness does not show, without more, that the community was

13  saturated with information likely to make it impossible for petitioner to receive a fair trial.

14           Venireperson 22874 was excused for cause because of what she had heard from

15  Rod Powell, who helped pull Ronna's body out of the water and who believed petitioner was

16  guilty based on the position of the bodies, among other things.  RT 3725-3735.  Venire member

17  12250 said he had read the papers about the case, but said he knew many witnesses because he

18  had been a reserve deputy for two years; he was excused because of his acquaintance with those

19  witnesses, not because of news or rumor about the case.  RT 3205-3207.  Venireperson Thelma

20  Dyrr, 07782, acknowledged knowing something about petitioner, because her brother-in-law was

21  petitioner's college roommate and said petitioner "loved women a lot."  ACT 2087.  During

22  questioning she said her husband had talked to one of the firefighters on the scene, who said there

23  were some "funny circumstances."  RT 3811.  It is unclear whether she was removed for cause

24  because of her brother-in-law's acquaintance with petitioner or the fact that she had heard there

25  were suspicious circumstances surrounding the snowmobile event.

26           Venireperson Sharla Satterfield, 20211, said her husband, a doctor, had spoken to

27  petitioner on the phone and said petitioner seemed "unmoved by his wife's death."  RT 3390-

28  /////

1    3391.  She had also heard from other medical personnel that things did not "add up" and so had

2    an impression petitioner had killed Ronna.  RT 3393-3394.  She was excused.

3              Among the list of people identified as excused for "the like" is venire member

4    57585 (Caroline Austin), who said she believed a person charged with a crime would have "to

5    prove [his] innocence."  RT 3448.  Another was Nolan Merrifield (37665), who was friends with

6    Joe Blackwell, one of the first people on the scene.  RT 3338.   Merrifield said Blackwell said a

7    few things, but did not "go into details or nothing.  But he told me about it, what this case is

8    about."  *Id*.  Merrifield said he would give Blackwell's testimony more weight than that of  other

9    witnesses because he was aware of the training members of the Search and Rescue squad

10   received.  RT 3339-3340.  Venire person Arleta Wyman  also talked to Kelly McBride, the first

11   paramedic on the scene, but McBride did not tell her much.  RT 3767.  She agreed that "most

12   people think he's guilty," but said this would not have an impact on her service.  RT 3768.  Most

13   telling was that she was a close friend of investigator Kathie Meads and knew Meads believed

14   petitioner was guilty.   RT 3766.  Her sons lived at Meads' hotel and her husband worked with

15   Meads' boyfriend at the Evergreen Market.   RT 3769.  The court granted the challenge to her

16   service because serving would "put a burden on her that is probably unfair."  *Id*.  This ruling does

17   not say much about the community's saturation with inflammatory news, but does reflect this

18   venire person's own situation.

19             Many members of the venire did have opinions about the case.  Venire member

20   Irene Walkemeyer, 16327, wrote she believed petitioner was guilty "like O.J. Simpson," had

21   heard the insurance money was the catalyst for the murder, and that petitioner and Ronna were

22   not getting along.  ACT 6007-6008.   She was excused, however, because she was too upset to

23   serve.  RT 3780.   Donna Foos, passed for cause, said that she had talked to the wife of a first

24   responder, who had reported petitioner was conscious but dazed and unconcerned about his wife.

25   RT 3989-3990.  Alma Jinkerson said she had heard from a friend who had heard from someone

26   on Search and Rescue that "it couldn't be anything but guilty . . . ."  RT 3562.

27             Nevertheless, petitioner includes on his list of venirepersons with knowledge about

28   the case some challenged unsuccessfully for cause "for similar reasons."  One is Richard Phillips,

20

1   a friend of both Beebe and Meads and the brother-in-law of Undersheriff DeCrona; DeCrona told

2   Phillips he believed petitioner was guilty, but only as part of a joke about getting off the jury

3   because of discussions about the case.  RT 3895-3898.   Karen Rhodes, 08852, reported that

4   Paula O., a member of her Bible study group, had approached her, saying Rhodes could not be on

5   the jury because she knew Paula O.  RT 3676, 3745.   Rhodes told Paula O. not to talk to her.  RT

6   3747.  She said the incident would have no impact on her ability to serve.  RT 3748.

7               Those who served as jurors had similarly varying  degrees of knowledge about the

8   case.  Juror No. 2 (56497) had heard something about the case from "newspaper, radio, and some

9   people that were up there," RT 3189, saying petitioner may have "killed his wife for money."

10  ACT 230.  Juror No. 3 (49306) reported reading the "headlines in the local newspaper" about this

11  case,  ACT 232, and identified some of the potential witnesses he knew.   Juror No. 4 (30490) had

12  no exposure because she worked in Reno and read the Reno paper.  RT 3667-3668.   Alternate

13  No. 1, who was substituted in for Juror No. 5, said only that he was acquainted with two of the

14  witnesses, but had not heard anything about the case.  RT 3947-3948; ACT 107.  Juror No. 6

15  (07864) had not discussed the case with anybody, but had read the paper and was friends with

16  several witnesses.  ACT 266, 269-274.  Juror No. 7 (06483) had read "accounts in the F.R.

17  Bulletin," ACT 248, but would be able to set anything from the paper aside.  RT 3205.  Juror

18  No. 8 (05039)  read articles in the *Indian Valley Record* and *The Sacramento Bee*.  RT 3846,

19  ACT 341.  Juror No. 9 (00445) wrote that when he told co-workers he had been summoned, they

20  asked "if it was the BIG ONE.  I said I didn't know and what's the BIG ONE?"  The snowmobile

21  accident at Bucks Lake."  ACT 305; RT 3200.  On her questionnaire, Juror No. 10 answered the

22  question whether she had heard anything about the case by noting "not sure if it was a snowmobil

23  [*sic*] accident or not." ACT 117.  Juror No. 11 wrote he had read reports in the *Bee* and the

24  *Chester Progressive*.  ACT 153.  He said he had formed an opinion based on what he read, but

25  "would not convict or acquit anyone based on what's in the newspaper."  RT 3646.  Finally Juror

26  No. 12 (57113) said she had no firsthand knowledge and did not read newspapers, ACT 394,

27  though she coached Kathie Meads' child and knew Meads slightly.  ACT 403.

28  /////

21

4. Further Proceedings

The trial court denied the motion for a change of venue.  RT 4281-4289.  In the course of ruling, the court said 1600 people had been summoned and of those, the jury commissioner had excused two or three hundred.  RT 4286.  Four hundred people were left after the challenges for cause were granted, and of those, 114 said they could follow the law, believed in the presumption of innocence, and could put anything they had heard out of their minds.  RT 4286-4287.  The judge rejected Dr. Bronson's claim of the psychological difficulty of a juror's disregarding what he or she had heard, noting it went beyond Dr. Bronson's expertise.  RT 4289.

The defense renewed the motion several times and each time it was denied.  RT 4342, 4364-4365, 4376-4378.

B. Court of Appeal's Decision

"Pursuant to [Penal Code] section 1033, subdivision (a), the court must grant a motion for change of venue if 'there is a reasonable likelihood that a fair and impartial trial cannot be had in the county.' The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not,"' and 'something more than merely "possible."' (*People v. Bonin* (1988) 46 Cal.3d 659, 673, 250 Cal.Rptr. 687, 758 P.2d 1217.) In ruling on such a motion, as to which defendant bears the burden of proof, the trial court considers as factors the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. (*People v. Edwards* (1991) 54 Cal.3d 787, 807, 1 Cal.Rptr.2d 696, 819 P.2d 436; *People v. Cooper* (1991) 53 Cal.3d 771, 805, 281 Cal.Rptr. 90, 809 P.2d 865; *People v. Bonin, supra*, 46 Cal.3d 659, 672-673, 250 Cal.Rptr. 687, 758 P.2d 1217.)

"'On appeal after a judgment following the denial of a change of venue, the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was not in fact had. [Citations.]' (*People v. Edwards, supra*, 54 Cal.3d 787, 807, 1 Cal.Rptr.2d 696, 819 P.2d 436, italics added; *People v. Cooper, supra*, 53 Cal.3d 771, 805-806, 281 Cal.Rptr. 90, 809 P.2d 865.)

"With regard to the first part of the showing required of a defendant on appeal, we employ a standard of de novo review of the trial court's ultimate determination of the reasonable likelihood of an unfair trial. (*People v. Edwards, supra*, 54 Cal.3d 787, 807, 1 Cal.Rptr.2d 696, 819 P.2d 436; *People v. Cooper, supra*, 53 Cal.3d 771, 805-806, 281 Cal.Rptr. 90, 809 P.2d 865; *People v. Bonin, supra*, 46 Cal.3d 659, 676-677, 250 Cal.Rptr. 687, 758 P.2d 1217.)

22

This requires our independent determination of the weight of the five controlling factors described above. (*People v. Bonin, supra*, 46 Cal.3d 659, 676-677, 250 Cal.Rptr. 687, 758 P.2d 1217; *People v. Balderas* (1985) 41 Cal.3d 144, 177, 222 Cal.Rptr. 184, 711 P.2d 480.) With regard to the second part of the showing, in order to determine whether pretrial publicity had a prejudicial effect on the jury, we also examine the voir dire of the jurors. ( *People v. Howard* (1992) 1 Cal.4th 1132, 1167, 5 Cal.Rptr.2d 268, 824 P.2d 1315; *People v. Anderson* (1987) 43 Cal.3d 1104, 1131, 240 Cal.Rptr. 585, 742 P.2d 1306; *People v. Balderas, supra*, 41 Cal.3d 144, 177, 222 Cal.Rptr. 184, 711 P.2d 480.)" ( *People v. Proctor* (1992) 4 Cal.4th 499, 523-524, 15 Cal.Rptr.2d 340, 842 P.2d 1100, brackets in original.)

A. Factors in Determining Reasonable Likelihood of Unfair Trial

1. Gravity and Nature of the Offense

With respect to the gravity and nature of the offense, the trial court found that, despite the gravity of the offense, a murder with special circumstances, the nature of the offense was not particularly senseless, brutal, or pitiless. We agree. This case, which was not charged as a capital case, did not involve an offense the gravity and nature of which substantially necessitated a change of venue. (*See People v. Adcox* (1988) 47 Cal.3d 207, 231-234, 253 Cal.Rptr. 55, 763 P.2d 906.)

In *People v. Adcox*, the trial court in a capital case in Tuolumne County denied a motion for change of venue. The Supreme Court upheld the trial court's decision. (47 Cal.3d at pp. 231-232, 253 Cal.Rptr. 55, 763 P.2d 906.) The defendant in Adcox, while on a camping trip to Tuolumne County, ambushed a fisherman from behind, shooting him in the head to take his money and car keys. (*Id.* at pp. 226-228, 253 Cal.Rptr. 55, 763 P.2d 906.) The Supreme Court stated: "[T]he nature and gravity of the offense-capital murder-must weigh heavily in our determination, for we have recognized that murder is a crime of the utmost gravity. However, the sensationalism inherent in all capital murder cases will not in and of itself necessitate a change of venue. We have recognized that '[it] is ... difficult to envision an eventual capital case which will not receive extensive media coverage, at least for a short period of time. If the early publicity attendant on a capital case alone suffices to raise a doubt as to the likelihood of a fair and impartial trial, a change of venue would perforce be required in every such case.' [¶] 'The peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its "nature"....' Defendant states that 'the homicide involved in the present case, viewed broadly, was rather unremarkable....' He nevertheless asserts that, when viewed in context, the fact that the crime was committed in a 'wilderness area' generated 'extraordinarily strong feelings of fear and vulnerability' in rural Tuolumne County.... [¶] Although this 'ambush of a fisherman' was a senseless and pitiless murder, we observe that it was not unusually atrocious or as overly sensational as were the multiple and bizarre serial killings which were the object of media attention

23

in [mass or serial killing cases]. Nor was it a crime involving sensational racial or sexual overtones." (*Id*. at pp. 231-232, 253 Cal.Rptr. 55, 763 P.2d 906, italics and citations omitted.)

Although the facts of the case caused a stir in Plumas County, which in 2000 had a population of 20,824 [citation to census data omitted], the facts were not unusually atrocious or overly sensational and did not generate feelings of fear and vulnerability. The trial of a husband for killing his wife would be a newsworthy event in any county. Furthermore, this was not charged as a capital case. Accordingly, even though "murder is a crime of utmost gravity" ( *People v. Adcox, supra,* 47 Cal.3d at p. 231, 253 Cal.Rptr. 55, 763 P.2d 906), the offense in this case did not require a change of venue.

While dissenting from the judgment of death in *Adcox*, Justice Mosk noted: "It is, however, with some reluctance that I agree with the majority that the trial court did not err by denying defendant's motion for change of venue. To hold otherwise on the relatively meager showing made by defendant would be tantamount to a determination that the residents of this state's less populated counties cannot act as fair and impartial jurors in a capital trial. Such a determination would be unwarranted and unjustified." (47 Cal.3d at p. 276, 253 Cal.Rptr. 55, 763 P.2d 906, dis. opn. of Mosk, J.)

2. Nature and Extent of News Coverage

Defendant presented evidence of more than 30 news stories concerning this case, from December 1996 to May 2000 (when the defense moved for change of venue), published in the local weeklies circulated in Plumas County. Although the articles contained some misinformation (for example, that Ronna died of a broken neck) and some facts not admissible in the criminal trial (such as rape allegations against defendant in a different county), most of what may be deemed prejudicial information was contained in the earlier articles, which appeared years before jury selection. Most of the articles, especially the later articles that appeared just before and during jury selection, simply reported what was happening in the case, and many of the articles reported the contentions being made by the defense.

In addition to the articles in the local newspapers, the *Sacramento Bee* published three articles, from December 1997 to February 2000, concerning this case. An article in 1997 appeared under the headline, "Widower sued over mysterious death." A 1999 story reported the Paula O. rape allegation. The jury questionnaires revealed, however, that only about 27 percent of the 358 prospective jurors read the *Sacramento Bee* regularly.

In the hearing on the motion for change of venue, defendant presented the testimony of Dr. Edward Bronson as an expert on whether defendant was likely to receive a fair trial in Plumas County. (*See People v. Pride* (1992) 3 Cal.4th 195, 225-226,

10 Cal.Rptr.2d 636, 833 P.2d 643 [noting Dr. Bronson had been found biased in favor of change of venue].) Dr. Bronson, after reviewing the newspaper articles, concluded there was some prejudice to defendant but that, standing alone, the newspaper articles, in his opinion, presented "a very close call as to whether there was enough to justify a Change of Venue based on publicity alone."

The newspaper articles circulated in Plumas County, a small county, certainly had the effect of bringing this case to the attention of the county's residents; however, the articles were not of a nature as to lead the citizenry to prejudge the case. The small amount of misinformation and inadmissible facts appeared mainly in the earlier articles, long before jury selection, thereby reducing the potential for prejudice. (*See People v. Adcox, supra*, 47 Cal.3d at p. 232, 253 Cal.Rptr. 55, 763 P.2d 906 [passage of time reduces potential prejudice].) The later articles simply reported the progress of the case and the contentions of the parties. While the newspaper coverage was extensive, its nature was not sufficiently prejudicial to establish that it was reasonably likely defendant would not receive a fair trial.

3. Size of the Community

Plumas County, as noted above, had a population of 20,824 in 2000. Since it is one of the more sparsely populated communities in California, the size of the community weighed in favor of a change of venue. That factor, however, is not determinative. (*See People v. Adcox, supra*, 47 Cal.3d at p. 233, fn. 7, 253 Cal.Rptr. 55, 763 P.2d 906 [size of community not determinative without showing impartial panel cannot be convened].)

4. Status of the Defendant in the Community

The status of defendant in the community weighs against a change of venue. He was not a member of any group that aroused hostility in the community. Instead, "[l]ike many other nonresidents frequenting the area [for recreational purposes], defendant appears to have been relatively anonymous in the community." (*See People v. Adcox, supra,* 47 Cal.3d at p. 233, 253 Cal.Rptr. 55, 763 P.2d 906.)

5. Popularity and Prominence of the Victim

The popularity and prominence of the victim also weighed against a change of venue. As was defendant, Ronna was relatively anonymous in the community, probably known only to those who met her in connection with her visit to Bucks Lake Lodge. The fact that her death left behind a motherless little child does not weigh in favor of a change of venue because that circumstance "would have struck the same sympathetic chord in any community." (*See People v. Adcox, supra,* 47 Cal.3d at p. 234, 253 Cal.Rptr. 55, 763 P.2d 906.)

/////

25

B. Reasonable Likelihood of Unfair Trial

On balance, only the size of the community and, perhaps, the extensive newspaper coverage weighed in favor of a change of venue. The status of defendant and the prominence and popularity of the victim in the community weighed against a change of venue. While murder is a serious offense, the nature of this murder was not sensational or unusually atrocious. Accordingly, we cannot say that, at the time of the motion for change of venue, it was reasonably likely defendant would receive an unfair trial. Having so concluded, we need not determine, for the purpose of reviewing the propriety of the trial court's denial of the motion for change of venue, whether it is reasonably likely defendant was not, in fact, given a fair trial.

Without doubt, there was a high rate of familiarity with this case in the community. " '[T]he controlling cases "cannot be made to stand for the proposition that juror exposure ... to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." [Citation.] ... "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (*Irvin v. Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756].)' [Citation.]" ( *People v. Adcox, supra*, 47 Cal.3d at p. 234, 253 Cal.Rptr. 55, 763 P.2d 906.) As will be seen later in this opinion, there is no indication the jurors were unable to set aside prior impressions or opinions and render a verdict based on the facts and law. Accordingly, the trial court did not abuse its discretion in denying the motion for change of venue.

C.  Standard

In the amended petition, petitioner argues the denial of a change of venue resulted from an unreasonable determination of the facts and unreasonable application of clearly established federal law.  ECF No. 25 at 35.  He suggests some of the unreasonable factual determinations were made by the trial judge, even though the Court of Appeal issued the last reasoned decision on this issue.  *Id*. at 26.  Respondent counters that the decision is entitled to deference.  ECF No. 64 at 24.

Not until the traverse does petitioner identify facts he believes the Court of Appeal decided incorrectly.  He chides respondent for labeling his claim of unreasonable determination of facts as speculative, but the amended petition did not specifically identify the facts petitioner believed were unreasonably determined, but simply recounted what petitioner believed the evidence showed.  ECF No. 58 at 36.   However this argument is characterized, petitioner has not

/////

1    shown that the Court of Appeal's decision was based on an unreasonable determination of facts

2    and so this court will consider its decision under the deferential AEDPA standard of review.

3         D.   Analysis

4              1.   The Right to an Impartial Jury

5              "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel

6    of impartial, 'indifferent' jurors." *Irwin v. Dowd*, 366 U.S. 717, 722 (1961).  Nevertheless, jurors

7    need not "be totally ignorant of the facts and issues involved." *Id*.  The question "is not whether

8    the community remembered the case, but whether the jurors at [the] trial had such fixed opinions

9    that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025,

10   1035 (1984).

11             In considering the impact of pretrial publicity, "[a] reviewing court must

12   independently examine the exhibits containing news reports about the case for volume, content,

13   and timing to determine if they were prejudicial." *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir.

14   1989).  Even though the trial court's factual findings on the question of juror partiality are entitled

15   to a presumption of correctness, *Harris*, 885 F.2d at 1361, "the juror's assurances that he is equal

16   to this task cannot be dispositive of the accused's rights . . . ." *Murphy v. Florida*, 421 U.S. 794,

17   800 (1975).

18             There are two kinds of prejudice:  actual and presumed.  *Gallego v. McDaniel*,

19   124 F.3d 1065, 1070 (9th Cir. 1997) (citing *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir.

20   1996)).   In this case, however, petitioner alleges only that his rights were violated because of

21   presumed prejudice.

22             "Interference with a defendant's fair trial right 'is presumed when the record

23   demonstrates that the community where the trial was held was saturated with prejudicial and

24   inflammatory media publicity about the crime.'" *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir.

25   2011) (quoting *Harris*, 885 F.2d at 1361).   Town gossip may add to a mix of inflammatory

26   publicity.  *Casey v. Moore*, 386 F.3d 896, 909 (9th Cir. 2004).  However "'[a] presumption of

27   prejudice" because of adverse press coverage 'attends only the extreme case.'" *Hayes*, 632 F.3d

28

27

at 508 (quoting *Skilling v. United States*, 561 U.S. 358, 381 (2010)).[4]  As the Supreme Court has

explained, its cases have established that presumption of prejudice arises in "'a trial atmosphere

that [was] utterly corrupted by press coverage,'" not simply because of "'juror exposure to . . .

news accounts of the crime.'"  *Skilling*, 561 U.S. at 380 (quoting *Murphy*, 421 U.S. at 798-99);

*see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) ("[P]retrial publicity even

pervasive, adverse publicity does not inevitably lead to an unfair trial.").

Petitioner has not shown that the state court's rejection of this claim was an

unreasonable application of those cases finding a presumption of prejudice.

2.  Unreasonable Determinations of Fact

a.  Word of Mouth

As noted above, petitioner argues that the Court of Appeal's failure to mention

"the manner in which, and the extent to which, the jury panel was turned against Mr. Franklin by

the passage of information and misinformation by word of mouth" was an unreasonable

determination of facts.  ECF No. 58 at 34-35.  However, the Court of Appeal determined that

petitioner had not demonstrated a reasonable likelihood he had received an unfair trial, a

conclusion it would not have reached had it determined the rumor mill in Plumas County had

tainted the jury pool irreparably.  Lodg. Doc. 4 at 20-21.  This implicit finding is entitled to the

presumption of correctness.  *Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983)  (upholding an

implicit credibility determination because the trial court would not have accepted the defendant's

argument if it had believed his account); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir.

2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also

applies to those unarticulated findings which are necessary to the state court's conclusions of

mixed fact and law."); *Lee v. Comm'r, Ala. Dept. of Corrections*, 726 F.3d 1172, 1210-11 (11th

Cir. 2013) (rejecting claim that state court made an unreasonable determination of facts because it

"did not mention or discuss every relevant fact or argument . . . offered in support" of a claim),

---

[4] *Skilling* was decided long after petitioner's conviction became final.  Nevertheless, in *Hayes* the Ninth Circuit relied on *Skilling* in a similar situation, saying *Skilling* "illuminates and synthesizes the earlier Supreme Court decisions" upon which the petitioner in *Hayes* relied. *Hayes*, 632 F.3d at 508.

1  *cert. denied sub nom. Lee v. Thomas*, 134 S. Ct. 1542 (2014);  *but see Goldyn v. Hayes*, 444 F.3d

2  1062, 1065 n.5 (9th Cir. 2006) (saying it was "not convinced that we are bound by a state court's

3  implicit findings under AEDPA" but recognizing that "at least in certain circumstances" the court

4  might be "required to give deference to state court factual findings not explicitly made, but

5  nonetheless implicit in the state court's judgment").

6     Petitioner fares no better if the argument is interpreted as an attack on the implicit

7  finding that word-of-mouth did not add to or supplant the media coverage in poisoning the

8  community against petitioner.  As noted above, Dr. Bronson's conclusion about the rumor mill

9  was based only a percentage of the jury questionnaires and unidentified portions of the voir dire.

10  The Court of Appeal could have rejected Dr. Bronson's conclusions about the pervasive and

11  prejudicial impact of community gossip based on the selective nature of his sources.  It could also

12  have found the anecdotal nature of the other accounts -- ranging from the barber's assertion that

13  all his clients believed petitioner was guilty to the excused venire person who had heard from her

14  daughter who had heard from the person who carried Ronna into the lodge -- insufficient to show

15  the widespread nature of gossip and talk so inflammatory as to poison the venire.  Even if the

16  Court of Appeal had accepted petitioner's chart,[5] the chart showed that 108 out of 358

17  venirepeople who filled out questionnaires reported learning about the case through word of

18  mouth, a figure the court could have found insignificant in light of the significant number whose

19  knowledge of the case came from the newspapers.  Finally, the Court of Appeal could have found

20  petitioner's selective sampling of the venire similarly did not show pervasive community

21  sentiment in light of the variation in the level of information venire members reported.

22           b.  Rape Charge

23     Petitioner says the Court of Appeal "misstated the record by offhandedly stating

24  that newspaper articles contained 'some facts not admissible in evidence (such as rape allegations

25  against defendant in a different county),' as though the potential for prejudice from such publicity

26  was trivial."  ECF No. 58 at 35.  Although "the extent of publicity and the proximity in time to

27

28     [5] Petitioner provided the charts attached as appendices to the amended petition as
appendices to his opening brief.  Lodg. Doc. 21 at 178-186.

1    trial" are factual questions, *United States v. Hueftle*, 687 F.2d 1305, 1310 (10th Cir. 1982)

2    (en banc), petitioner has cited nothing suggesting the prejudice inquiry is a question of fact.

3    Petitioner's challenge to the Court of Appeal's characterization of the articles is better considered

4    as part of the inquiry into the state court's application of Supreme Court authority.

5           Petitioner also argues the Court of Appeal erred in saying the publicity about the

6    rape charge occurred years before jury selection.  ECF No. 58 at 35.  The articles describing the

7    alleged facts of the rape—the purported assault on a woman seven months' pregnant with a

8    surrogate child—appeared in March, June and December 1999, over a year before the beginning

9    of jury selection.  It is true that the rape allegations surfaced in the articles about the motion to

10   disqualify the district attorney's office, published close in time to trial, but those references were

11   to Investigator Beebe's relationship with the alleged rape victim, not with the details of the

12   alleged trial.  Petitioner's claim that this constitutes an unreasonable determination of facts fails.

13   *Jeffries v. Wood*, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted) (stating that an

14   unreasonable determination of the facts is one which "is so clearly incorrect that it would not be

15   debatable among reasonable jurists."), *overruled in part on other grounds by Gonzalez v. Arizona*,

16   677 F.3d 383 (9th Cir. 2012) (en banc).

17          Finally, petitioner claims the court overlooked Paula O.'s presence in the

18   community, but in light of the evidence that showed Paula O.'s contact with only two

19   veniremembers, the Court of Appeal could reasonably have concluded that her presence did not

20   add to any potential prejudice against petitioner.

21                          c.  Blood on the Sheets

22          Petitioner takes fault with the Court of Appeal's failure to mention the theory, not

23   presented at trial, that petitioner attempted to create the illusion the couple had made love by

24   rubbing a bloody tampon on the sheets.  As with the other assignments of error, the Court of

25   Appeal's failure to mention this article does not translate into an unreasonable determination of

26   facts.

27   /////

28   /////

3.  Unreasonable Determination of Clearly Established Law

In finding that petitioner had not shown presumed prejudice, the state Court of Appeal did not apply Supreme Court authority unreasonably.  In *Skilling*, the Supreme Court made clear that under its precedents, only an "atmosphere utterly corrupted" by media coverage interferes with the right to a fair trial, because "[p]rominence does not necessarily produce prejudice." 561 U.S. at 381.   It first considered *Rideau v. Louisiana*, where the local television stations broadcast the defendant's confession to the murder of a bank employee during a robbery; this broadcast "'*was* Rideau's trial—at which he pleaded guilty.'"  *Id*. at 379 (quoting *Rideau*, 373 U.S. 723, 726-27) (emphasis in original).  Then in *Estes v. Texas*, the "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom . . . ."  *Skilling*, 561 U.S. at 379-80 (citing *Estes*, 381 U.S. 532 (1965)).  The Court finished its exploration of presumptive prejudice with *Sheppard v. Maxwell*, noting that even the "'months [of] virulent publicity about Shepard and the murder'" alone did not deny Sheppard due process, but his right to a fair trial was violated by the "'carnival atmosphere'" pervading the trial.  *Skilling*, 561 U.S. at 380 (quoting *Sheppard*, 384 U.S. 333, 354, 358 (1966)).

The Supreme Court then rejected Skilling's claim that the extensive negative publicity about Enron's collapse created presumptive prejudice.  It said the "size and characteristics of the community" were significant, noting the crime in *Rideau* was committed in a rural county of 150,000 people whereas in Houston, where Skilling was tried, over 4 million people were eligible for jury service.   *Id*. at 382.  Next, it observed that even though the "news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," as opposed to Rideau's "staged admission of guilt. . . ."  *Id*. at 382-83.

The Court of Appeal's decision in this case hewed to the Supreme Court's teachings.  It agreed that the small population of Plumas County—only slightly over 20,000 people—supported a change of venue.  *See Rideau*, 373 U.S. at 724; *Hayes*, 632 F.3d at 509 (stating the population of Santa Cruz County—190,000—weighed in favor of a change of venue).

31

1    However, as the Court of Appeal observed, the reporting was, generally speaking, fact-based;

2    "[t]here was no barrage of information that would be inadmissible at trial." *Murray v. Schriro*,

3    746 F.3d 418, 445 (9th Cir. 2014).  It is true there were a few articles that mentioned the unsavory

4    rape allegations, but these occurred a year or so before trial, while the later articles mentioned

5    only that there was an outstanding rape charge, without details.  *See id*. at 444 (characterizing

6    publicity as not inflammatory even though papers had mentioned the defendants were connected

7    to a robbery/assault in Alabama and possibly linked to murders in California and New Mexico);

8    *Harris*, 885 F.2d at 1362 (finding publicity not inflammatory despite report defendant had

9    confessed to the murder published right after the homicides but then not repeated); *Casey*, 386

10   F.3d at 907 (publicity about crime lab's determination gun functioned normally, which undercut

11   defense of accident, "is not sufficient to require a venue change"); *cf. Daniels v. Woodford*,

12   428 F.3d 1181, 1212 (9th Cir. 2005) (finding coverage inflammatory when, in addition to factual

13   accounts, it included editorials and letters to the editor calling for the defendant's execution and

14   information about his past criminal offenses, including the arrest for shooting an officer); *see also*

15   *Sheppard*, 384 U.S. at 341-42 (noting the editorials and cartoons about the case).  Moreover, even

16   though the publicity and even the gossip reported the prosecution's theory of the case, that the

17   crime was motivated at least in part by the insurance on Ronna's life, evidence on this point

18   figured prominently at trial.

19           It is true there was gossip, often beginning with those who had participated in the

20   rescue efforts, but its impact on the jury pool is hard to gauge in light of the variations in what

21   people had heard and talked about.   It is also significant that none of the venire members

22   petitioner quotes about the pervasiveness of the gossip actually served on the jury. *See* ECF

23   No. 58 at 33 (quoting a "prospective juror" who wrote it would "be impossible not" to have heard

24   about the case because she "live[s] in Plumas Co."); *see Casey*, 386 F.3d at 909 n.9 (noting that

25   the jurors who said "Wenatchee is a gossip town" among other things, did not serve as jurors).

26           Petitioner also suggests the "political overtones" stemming from the defense

27   motion to recuse the Plumas County District Attorney's Office showed the prejudicial nature of

28   /////

1  the publicity.  But he has not suggested how coverage of this issue, which certainly did not favor

2  the prosecution, generated prejudice against petitioner.

3          Petitioner has not shown the state court's decision was an unreasonable application

4  of Supreme Court precedent or, on de novo review, that this is one of those extreme cases giving

5  rise to a presumption of partiality destructive of the right to a fair trial.

6  V.  CHALLENGES FOR CAUSE (Issue Two)

7          Petitioner argues the state court denied his Sixth Amendment right to an impartial

8  jury by refusing to excuse the people who ultimately served as Juror No. 10 and Alternate No. 1[6]

9  for cause.   He also argues that under state decisional law, the use of a peremptory challenge to

10  excuse a juror who should have been excused for cause is reversible error and so gives rise to a

11  state created liberty interest protected by the Fourteenth Amendment.  ECF No. 25 at 42; ECF

12  No. 58 at 44-45.   Under this principle, he argues the improper denial of nine other challenges,

13  which led to his use of peremptory challenges, violates his right to due process.

14          The court finds petitioner does not have a liberty interest in the "proper" use of his

15  peremptory challenges, as explained more fully below.  Accordingly, it examines only the state

16  court's treatment of Juror No. 10 and Alternate No. 1.

17      A.  The Challenged Jurors

18          The prospective jurors filled out extensive questionnaires, addressing a range of

19  questions from their general attitudes toward the criminal justice system to their exposure to the

20  pretrial publicity discussed in issue one above.

21          1.  Juror No. 10

22          One written question was "do you think the criminal justice process in our Court is

23  fair to all concerned?"  The woman identified as 39965, who became Juror No. 10, checked the

24  "no" box, adding "people with money seem to get away with more O.J. Simson [*sic*]."  ACT 116.

25  /////

26

27          [6] Alternate No. 1 eventually served on the jury, taking the place of Juror No. 5, who was
excused as discussed below in issue five.  The parties refer to him as Alternate No. 1 throughout;
28  to avoid confusion, this court will do so as well.

1   Trial counsel's challenge was based solely on this answer in Juror No. 10's questionnaire.   RT

2   4368-4369.

3            The court denied the challenge for cause and denied an additional peremptory

4   challenge.  *Id.*

5            2.  Alternate No. 1

6            Alternate No. 1, a youth pastor in Chester, told the court during an *in camera*

7   proceeding that he had learned from another pastor that venire member 55474 "had made some

8   pretty bad remarks about the Defendant," including his belief petitioner was guilty and was

9   "going to fry."  RT 4314-4315  Because this second pastor was unsure what he should do,

10  Alternate No. 1 said he would report this to the jury commissioner.  *Id.*  The court asked if venire

11  member 55474's comments had had any impact on Alternate No. 1, who said "oh, no."  *Id.*   The

12  court denied the defense challenge for cause.  RT 4321.

13           B.  The Court of Appeal's Decision

14              Defendant contends the trial court erred by denying his challenges
            of 11 prospective jurors for cause.  Defendant asserts he was
15          prejudiced by the denial of these challenges for cause because he
            used all of his peremptory challenges and there still remained in the
16          box two jurors whom he had challenged for cause. He additionally
            expressed his dissatisfaction with the jury as seated. (See *People v.*
17          *Morris* (1991) 53 Cal.3d 152, 184, 279 Cal.Rptr. 720, 807 P.2d 949
            [requiring use of peremptory challenges and dissatisfaction with
18          jury to claim erroneous denial of challenge for cause], disapproved
            on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830,
19          fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.) We conclude the trial
            court did not err.
20

21              "A trial court should sustain a challenge for cause when a juror's
            views would 'prevent or substantially impair' the performance of
22          the juror's duties in accordance with the court's instructions and the
            juror's oath. (*People v. Earp* (1999) 20 Cal.4th 826, 853, 85
23          Cal.Rptr.2d 857, 978 P.2d 15; *People v. Mayfield* [ (1997) ] 14
            Cal.4th [668,] 727, 60 Cal.Rptr.2d 1, 928 P.2d 485.) On appeal, we
24          will uphold a trial court's ruling on a challenge for cause by either
            party 'if it is fairly supported by the record, accepting as binding the
25          trial court's determination as to the prospective juror's true state of
            mind when the prospective juror has made statements that are
26          conflicting or ambiguous.' (*People v. Mayfield, supra*, 14 Cal.4th at
            p. 727, 60 Cal.Rptr.2d 1, 928 P.2d 485; see also *People v. Jenkins*
27          (2000) 22 Cal.4th 900, 987, 95 Cal.Rptr.2d 377, 997 P.2d 1044;
            *People v. Crittenden* (1994) 9 Cal.4th 83, 121, 36 Cal.Rptr.2d 474,
28          885 P.2d 887; *People v. Mincey* [ (1992) ] 2 Cal.4th [408,] 456-457,

                                        34

6 Cal.Rptr.2d 822, 827 P.2d 388.)" (*People v. McDermott* (2002)
28 Cal.4th 946, 981-982, 123 Cal.Rptr.2d 654, 51 P.3d 874.)

None of defendant's contentions concerning the trial court's denial
of challenges for cause has merit. Indeed, virtually all of the
contentions are frivolous.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. Juror No. 10 (Prospective Juror No. 39965)

Juror No. 10, as the designation implies, eventually sat on the jury
for defendant's trial. Defendant challenged her for cause based
solely on an answer in her questionnaire. The question was, "Do
you think the criminal justice process in our Court is fair to all
concerned?" She responded by putting an "x" on the line after
"No." Thereafter, she wrote: "people with money seem to get away
with more O.J. Simson [ sic ]." The trial court denied the challenge.

C. Alternate Juror No. 1 (Prospective Juror No. 46432)

Alternate Juror No. 1, who is a youth pastor, received a telephone
call from a minister from another church some time during the jury
selection process. The other minister informed Alternate Juror No.
1 that another prospective juror, who attended that minister's
church, had said something disturbing about the trial. When
Alternate Juror No. 1 asked what the problem was, the minister told
him that another prospective juror had said he felt defendant was
guilty and knew defendant was "going to fry." When the trial court
asked Alternate Juror No. 1 whether this would affect him in any
way, Alternate Juror No. 1 replied, "Oh, no." Alternate Juror No. 1
took a seat on the jury just before deliberations. Defendant contends
the trial court improperly denied his challenge for cause of
Alternate Juror No. 1 because this prospective juror asked the other
minister about the problem and was told that the other prospective
juror had said defendant was guilty and "going to fry." Defendant
continues: "The salient fact is that Alternate [Juror] No. 1 was not
merely passively exposed to improper information. He elicited the
information which had not been volunteered to him, and offered to
convey it to the jury commissioner."

We disagree with defendant concerning the reasonable inferences to
be drawn from the conduct of Alternate Juror No. 1. There is
nothing to suggest he was doing anything other than attempting to
help the court obtain a fair and impartial jury. The fact that he heard
about the stated opinion of another prospective juror, with no
indication that the other prospective juror knew what he was talking
about, did nothing to render Alternate Juror No. 1 unfair or partial.

Lodg. Doc. 4 at 21-22, 25-26.

/////

35

1

C.   Denial of the Challenges for Cause

2

Part of the guarantee of a fair trial is "a jury capable and willing to decide the case

3

solely on the evidence before it . . . ." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Irvin*, 366 U.S.

4

at 722.  A court must determine "whether the juror's views would prevent or substantially impair

5

the performance of his duties as a juror in accordance with his instructions and his oath."

6

*Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (footnote, quotation marks omitted); *Patton*,

7

467 U.S. at 1037 n.12  (stating that the "constitutional standard" is whether the juror "can lay

8

aside [any] opinion and render a verdict based on the evidence presented in court").

9

"Challenges for cause are the means by which partial or biased jurors should be

10

eliminated." *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000).  But "[s]o long as

11

the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to

12

achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*,

13

487 U.S. 81, 88 (1988).

14

Even though both factual and legal issues are involved in determining whether a

15

juror is qualified, the question whether a particular juror is partial is "one of historical fact,"

16

*Patton*, 467 U.S. at 1036, subject to deference because the trial court "is in a position to assess the

17

demeanor of the venire, and of the individuals who compose it, a factor of critical importance in

18

assessing the attitude and qualifications of potential jurors." *Utrecht v. Brown*, 551 U.S. 1, 9

19

(2007).[7]  The AEDPA "provides additional, and binding, directions to accord deference." *Id*. at

20

10.

21

1.  Juror No. 10

22

As noted, petitioner cites to Juror No. 10's answer to the written questionnaire and

23

then urges the Court of Appeal made an unreasonable determination of fact in agreeing with

24

respondent that petitioner was essentially penniless on December 28, 1996.

25

/////

26

27

[7] Both parties rely on *Utrecht* even though it was decided after petitioner's conviction became final; both recognize it states the law clearly established at the time of petitioner's trial

28

and appeal.  ECF No. 64 at 29; ECF No. 58 at 45.

1    This court need not determine at this juncture what the facts showed about

2    petitioner's financial status.  Juror No. 10's general belief that the rich might get away with more

3    says little, if anything, about her ability to judge petitioner's case fairly, based on the evidence

4    and the instructions.  The trial judge, who read the questionnaire and heard and evaluated her

5    answers to voir dire, concluded that this single answer did not show disqualifying partiality:  it is

6    this finding, not directly challenged by petitioner, that is entitled to deference.

7    2.  Alternate No. 1

8    As he did in the Court of Appeal, petitioner argues Alternate No. 1's

9    impartiality was demonstrated by the fact that he elicited information from the other youth pastor

10   and then reported it to the court.   ECF No. 58 at 48-49.  This suggests nothing about Alternate

11   No. 1's ability to view the evidence impartially or follow the court's instructions.  The state

12   court's rejection of this claim was not an unreasonable determination of fact or application of

13   clearly established federal law.

14   D.  State Created Liberty Interest

15   Petitioner argues he has a state created liberty interest, arising from *People v.*

16   *Bittaker*, "in using his peremptory challenges unimpaired by the need to cure erroneous rulings on

17   challenges for cause."  ECF No. 58 at 44 (citing *Bittaker*, 48 Cal. 3d 1046 1087-88 (1989),

18   *overruled by People v. Black*, 58 Cal. 4th 912 (2014)).  In *Black*, the California Supreme Court

19   rejected "the idea that a defendant's right to a fair trial and impartial jury is denied even if no

20   incompetent juror sits on the case," which it characterized as *Bittaker*'s dictum.  58 Cal. 4th at

21   919-920).   This court need not tease out the implications of the court's rejection of *Bittaker*,

22   rendered after petitioner's conviction became final.  Nor need it determine whether *Bittaker* gave

23   rise to the right petitioner claims:  petitioner has not shown this case gave rise to any state created

24   liberty interest.

25   In *Hicks v. Oklahoma*, the Supreme Court held the defendant had "a substantial

26   and legitimate expectation that he will be deprived of his liberty only to the extent determined by

27   the jury in the exercise of its statutory discretion," and recognized that this expectation was

28   "preserv[ed] against arbitrary deprivation by the State."  447 U.S. 343, 346 (1980).  In *Hicks*, a

37

1    state statute gave rise to the interest at issue.  *See also Vansickel v. White*, 166 F.3d 953, 957 (9th

2    Cir. 1999) (finding a liberty interest in the number of peremptory challenges arising from § 231 of

3    the California Code of Civil Procedure).  Petitioner has not cited to any Supreme Court authority

4    recognizing a liberty interest arising from state decisional law.

5            Moreover,

6            [i]n order to create a liberty interest protected by due process, the
             state law must contain:  (1) "substantive predicates" governing
7            official decisionmaking, and (2) "explicitly mandatory language"
             specifying the outcome that must be reached if the substantive
8            predicates have been met.

9    *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995) (citing *Ky. Dept. of Corrections v.*

10   *Thompson*, 490 U.S. 454, 460-63 (1989)).  However, "an expectation of receiving process is not,

11   without more, a liberty interest protected by the Due Process Clause."  *Olim v. Wakinekona*,

12   461 U.S. 238, 251 n.12  (1983).   "In order to contain the requisite 'substantive predicates,' the

13   state law at issue "must provide more than merely procedure; it must protect some substantive

14   end.'"  *Bonin*, 59 F.3d at 842 (quoting *Dix v. Cnty. of Shasta*, 963 F.2d 1296, 1299 (9th Cir.

15   1994), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) *as recognized in*

16   *Mitchell v. Dupnik*, 75 F.3d 517, 522 (1996)).   "The denial of state-created procedural rights is

17   not cognizable on habeas corpus review unless there is a denial of a substantive right protected by

18   the Constitution."  *Bonin*, 59 F.2d. at 842.   In *Bonin*, the court rejected a habeas petitioner's

19   claim that the state court's refusal to let both his counsel present closing argument in violation of

20   California Penal Code section 1095 was a violation of a state created liberty interest, noting that

21   the provision created a procedural right designed to protect substantive rights to the effective

22   assistance of counsel and to a reliable verdict.  *Id*.  If *Bittaker* can be read as creating any right, it

23   is a procedural right designed to preserve the right to an impartial jury.  And as just explained,

24   petitioner has not shown the jury was impartial.  Accordingly, he has not shown he was denied

25   any state created liberty interest.

26   VI.  DENIAL OF ADDITIONAL CHALLENGES (Issue Three)

27           Petitioner argues that after the improper denial of his motion for a change of venue

28   and the denial of challenges for cause, he sought additional peremptory challenges to preserve his

right to an impartial jury and the court's refusal to grant them violated his right to a fair trial.

ECF No. 25 at 52-53.  He cites only to the Constitution and to ABA standards.

> A.  The Court of Appeal's Decision

> Defendant was given 20 peremptory challenges. When he had used all of them, he asked for five more. The trial court gave him one. Later, after the jury had been sworn but a juror was excused and another drawn into the box, the court gave defendant another peremptory challenge. The defense was also given 10 peremptory challenges for the 10 alternate juror seats. After using all of them, defendant asked for three additional peremptory challenges and was given one. Alternate Juror No. 1, whom defendant had unsuccessfully challenged for cause, eventually became part of the jury. Defendant asserts the denial of his requests for additional peremptory challenges denied him a fair trial.

> The Supreme Court has stated: "We are of the opinion that to establish the constitutional entitlement to additional peremptory challenges argued for here, a criminal defendant must show at the very least that in the absence of such additional challenges he is reasonably likely to receive an unfair trial before a partial jury. (Cf. *Sheppard v. Maxwell* (1966) 384 U.S. 333, 363 [16 L.Ed.2d 600, 620] ['where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, (to protect the criminal defendant's due process rights) the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity'].)" ( *People v. Bonin, supra*, 46 Cal.3d at p. 679, 250 Cal.Rptr. 687, 758 P.2d 1217, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1, 72 Cal.Rptr.2d 656, 952 P.2d 673.)

> As discussed above, defendant has failed to show that, as a result of the denial of the motion for change of venue and the jury selection process, he was reasonably likely to receive an unfair trial. (See *People v. Bonin, supra*, 46 Cal.3d at p. 679, 250 Cal.Rptr. 687, 758 P.2d 1217.) Hence, his contention the trial court erred by not giving him additional peremptory challenges is without merit.

Lodg. Doc. 4 at 32-33.

> B.  Analysis

> In the traverse petitioner cites *United States v. Martinez-Salazar* for the

proposition that peremptory challenges can be used to cure federal constitutional violations in

jury selection.  ECF No. 58 at 58 (citing *Martinez-Salazar*, 528 U.S. 304, ___ (2000)).  However,

in *Martinez-Salazar*, the Supreme Court said that although "[t]he peremptory challenge is part of

our common-law heritage," its role is "auxiliary; unlike the right to an impartial jury guaranteed

*/////*

39

1    by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension."

2    528 U.S. at 311.  The state court did not apply federal law unreasonably in rejecting this claim.

3    VII.   THE PROSECUTOR'S USE OF PEREMPTORY CHALLENGES (Issue Four)

4       A.  Proceedings in the Trial Court

5         After the court and counsel evaluated the venire's written questionnaires,

6    questioned many members of the venire, dealt with late-arising hardships and entertained

7    challenges for cause, the court filled the jury box with twelve people.  The prosecutor's first strike

8    was against a woman, Katrina DeBoi (50643); she was replaced by Louise Whiting (57227).

9    The defense then challenged Janet Garman (08132), who was replaced by Suedee McClelland

10    (21600).  When the challenge returned to the prosecutor, he excused Eric Lund (11545), who was

11    replaced by William Henson (09299).  The defense excused William Korhuniak (11427), who

12    was replaced by George Kuhn (10982).   The prosecutor exercised his third strike against Suedee

13    McClelland (21600), who was replaced by Claudine Allison (22458).   Defense counsel's third

14    strike was against Betty Conklin (50275); the transcript does not reflect this seat was filled before

15    the prosecutor exercised his fourth strike against Robert Rowden (20075); the court replaced this

16    juror with 07864, a male, who became Juror No. 6.  The defense used its fourth peremptory

17    challenge to remove Lou Boschee (05742), a female, who was replaced by 54996, a male, who

18    became Juror No. 11.  The prosecution's fifth challenge was to Thomas Williams (15047); the

19    replacement, Kristine Zelmon (039878), was immediately excused by the defense.  Her

20    replacement was Richard Edwards (01444).  The prosecutor then accepted the jury.   RT 4346.

21         Defense counsel then used his fifth peremptory against Louise Whiting (57227);

22    her replacement, Richard Wynn (57463), was immediately excused by the prosecution, and

23    replaced by Cynthia Busselen (36051), who was in turn challenged by the defense.   The

24    replacement for this seat was Diana Angel (01107).  The prosecution then again accepted the jury.

25    RT 4346.

26         For his seventh challenge, defense counsel excused Diana Angel (01107); the

27    court called venire member Dennis Hugo (37435), who became the prosecutor's sixth challenge.

28    The next person called for seat ten was Roy Smylie (56184).  The eighth challenge exercised by

1   the defense was to Claudine Allison (22458); seat four was then filled by 30490, a female who

2   became Juror No. 4.  The prosecutor's eighth challenge unseated Smylie (56184), who had just

3   recently filled seat ten.  Smylie was replaced by Ruth Miller (12738), who was immediately

4   removed by defense counsel.   Seat ten was then filled by Susan Maddalena (08718).   The

5   prosecutor again accepted the jury.  RT 4347.

6              The defense was not satisfied, excusing Maddalena (08718), who had just taken

7   seat ten.   The new occupant of that position was Glendine Gribble (26780).  As the prosecutor

8   paused, defense counsel said, "If I could, exclusion of males on the jury by the Prosecution, he's

9   forcing me to use all my peremptories to try to find other men to sit on this thing.   He's only

10  excused one woman." RT 4348.  He added, "we have seven men."  *Id*.  The prosecutor

11  countered that men were "the most majority class you can get" and then challenged defense

12  counsel to make his showing of a prima facie case of discriminatory strikes.  *Id*.   When defense

13  counsel repeated the claim that the prosecutor was excluding men, the prosecutor retorted,

14  
15              That's because you picked a couple of women I would have
             excluded.  You did it for me.  I'll show the Judge my list of who
             I've got marked off there; half of the people are going out.

16  RT 4349.  The court suggested that, "if there's only two classes, [sic], men and women, that

17  doesn't get it."  *Id*.  The prosecutor said they "should take five and look at the law," RT 4349,

18  adding he would hate to have "a defect in the record" if males were a legitimate class.  RT 4350.

19              The court and counsel went into chambers to "make as complete a record as

20  possible on the composition of the panel and the jury box and the challenges made so far."  RT

21  4350.   Defense counsel said he would "do his best in terms of trying to make my record as to

22  what's happened."  *Id*.  Court and counsel concluded that of the first twelve venire members

23  called to the box, seven were male and five were female; as the result of the challenges exercised,

24  nine more men and eleven more women had been called, for totals of sixteen males and fifteen

25  females.  They also concluded that out of the group of 100 called for that day's selection process,

26  44 were female and 56 were male.  RT 4353-4354.

27              After the parties were satisfied with the breakdown of the jurors, the prosecutor

28  continued to argue that males were not a cognizable group.  RT 4355.   The defense said that

41

1    "every time we get a male in place . . . that person gets excluded."  RT 4357.   The prosecutor

2    countered that "the current jury panel, as a count, is 8 males and 4 females.  So I've been

3    unsuccessful in meeting my goal . . . " and in fact had "lost ground from the 7, 5 that we started

4    with."  RT 4357.  He also observed that the defense had excused several women he planned to

5    challenge.  *Id.*

6              The trial court said, "[t]he Court finds that no prima facie case has been

7    established.  The excluded members, or the so-called excluded members are not part of a

8    cognisable [sic] group; and it's not likely at this time that the challenges are based on group

9    association."  RT 4358-4359.

10             The parties returned to jury selection.  The prosecutor then exercised his ninth

11   challenge to Richard Edwards (01444), who was replaced by Terry Collins (21383), a male.  The

12   subsequent defense challenge was to Doris Sebold (55916), who was replaced by Damien Ritsch

13   (55474), who the prosecutor immediately excused.  Defense counsel asked to approach and said

14   he wanted "to make the record that the last two challenges have been male, again, and renew my

15   motion."  RT 4360.  The court and counsel then discussed the call to venire member 46432, who

16   became Alternate No. 1, a subject discussed more fully in  issue two, *supra*, and said he "wanted

17   to make [his] record also" about that issue.  The court said "you have."   RT 4360.

18             The jury seated consisted of nine men and three women.

19        B.  Proceedings in the Court of Appeal

20             The Court of Appeal upheld the trial court's first *Batson* ruling:

21             'The exercise of peremptory challenges to eliminate prospective
             jurors because of their race violates the federal Constitution (*Batson*
22           *v. Kentucky* [(1986)] 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d
             69) and the California Constitution ( *People v. Wheeler* [(1978)]
23           22 Cal.3d 258, 276-277, 148 Cal.Rptr. 890, 583 P.2d 748 ...).'
             (*People v. Williams* (1997) 16 Cal.4th 635, 663, 66 Cal.Rptr.2d
24           573, 941 P.2d 752.)  A party claiming an opponent improperly
             discriminated in the exercise of peremptory challenges must make a
25           timely objection and demonstrate a strong likelihood that
             prospective jurors were excluded because of their race or other
26           group association. (*Id.* at pp. 663-664, 66 Cal.Rptr.2d 573, 941 P.2d
             752; *People v. Arias* (1996) 13 Cal.4th 92, 134-135, 51 Cal.Rptr.2d
27           770, 913 P.2d 980.)" (*People v. McDermott, supra,* 28 Cal.4th at p.
             969, 123 Cal.Rptr.2d 654, 51 P.3d 874.)  Likewise, discrimination in
28           the exercise of peremptory challenges based on gender violates a

defendant's right to a fair trial. (*People v. Williams* (2000) 78 Cal.App.4th 1118, 1125, 93 Cal.Rptr.2d 356.)

Here, defendant made a *Batson/Wheeler* motion during the jury selection process, asserting the prosecution was using its peremptory challenges to remove men from the jury based solely on their gender. At the time, the prosecution had exercised eight peremptory challenges, six of them to remove men. The prosecutor argued, incorrectly, that male gender was not a recognizable class, but also asserted he was simply trying to select a suitable jury without regard to gender. Furthermore, the prosecutor noted that the defense had previously challenged several women that the prosecutor would also have challenged and that the panel was still weighted with eight men.

The trial court stated: "The Court finds that no prima facie case has been established. The excluded members, or the so-called excluded members are not part of a cognisable [ sic ] group; and it's not likely at this time that the challenges are based on group association."

Defendant does not assert the trial court erred in finding no prima facie case had been established; instead, he asserts that the trial court's misperception concerning whether the male gender is a cognizable group for the purpose of applying *Batson* and *Wheeler* requires reversal. We disagree. Despite the court's misperception, precipitated by the prosecution's faulty legal argument, the court expressly found it was unlikely the challenges were based on that group association. Accordingly, it found, factually, that defendant had not established a prima facie case of challenges based on group association.

Defendant disputes this conclusion, asserting the court and counsel "had not discussed anything relevant to the factual question whether or not, given that men are a cognizable class, there was an inference that the prosecutor's challenges were based on group association. So the judge's statement cannot be reviewed as though it were a factual finding on a latter [ sic ] question." (Fn. omitted.) To the contrary, defendant argued the prosecutor challenged the six men based on group association. The prosecutor denied it and responded factually. The court, having seen jury selection to that point, found there was no factual basis for the motion. The trial court's factual finding there was no prima facie showing was proper.

Defendant further argues he made a later *Batson/Wheeler* motion that the court ignored and that the failure to rule on the motion is "per se reversible error." The record shows that, moments after the trial court denied defendant's *Batson/Wheeler* motion, the following colloquy took place:

"[Defense Counsel]: I want to make the record that the last two challenges have been made, again, and renew my motion. [¶] Additionally, I have a second problem. I understand today that there was a phone call-one of the ministers got a phone call-

43

1

"[Prosecutor]: (Juror's name omitted # 46432) got a call from Mr. Finch.

2

"THE COURT: Where is he from, Quincy?

3

"[Prosecutor]: Peter Finch in Chester is the youth pastor who was on the record this morning; called (Juror's name omitted # 46432), who was a youth pastor saying, from Debbie, who I just discussed (Juror's name omitted # 46432) said (Juror's name omitted # 55474) said he's guilty and going to fry.

4

5

6

"[Defense Counsel]: Even if any of these-are any of these ministers are connected-

7

8

"[Defense Counsel]: Okay, I just-

9

"[Prosecutor]: Okay.

10

"[Defense Counsel]: I wanted to make my record also.

11

"THE COURT: All right. You have."

12

Immediately after this discussion, the court and counsel continued on with jury selection. On appeal, defendant asserts this record shows the trial court failed to rule on his second *Batson/Wheeler* motion, which requires reversal. Defendant misinterprets the record. Although the trial court did not use the word "denied," it is apparent that everyone involved understood the motion, made just moments after an identical motion, was denied. Defense counsel assumed so when he made the second motion, simply wanting "to make the record." Accordingly, we reject defendant's contention the trial court did not rule on the second motion. Since he does not assert the second motion was improperly denied, we need not discuss the merits. FN1

13

14

15

16

17

18

19

FN1. In a petition for rehearing, defendant asserts that in his reply brief he raised the issue of whether the second *Batson/Wheeler* motion was properly denied. There, defendant stated: "If the Court agrees with respondent that the judge actually ruled on the second motion, then the analysis is the same as for the first motion, and so is the remedy: at a minimum, a remand for proper consideration of the second motion." This conclusionary statement, with no reasoning or authority, was insufficient to prompt our consideration of whether the second *Batson/Wheeler* motion was properly denied. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2, 34 Cal.Rptr.2d 558, 882 P.2d 249 [issues mentioned but not developed as discrete contentions not properly raised].) Furthermore, we may treat as waived issues raised for the first time in a reply brief. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10, 66 Cal.Rptr.2d 319, 940 P.2d 906 [fairness militates against considering issues raised in reply brief].) And finally, since defendant asserts the analysis concerning the second *Batson/ Wheeler* motion is the same as the

20

21

22

23

24

25

26

27

28

44

1  analysis concerning the first, the assertion concerning the second
2  motion fails for the same reasons the assertion concerning the first
   motion failed.

3  Lodg. Doc. 4 at 33-37.

4      C.  Standard

5          In the amended petition, petitioner said the trial court's determination that men

6  were not a cognizable group was an unreasonable application of clearly established federal law.

7  ECF No. 25 at 54.   Respondent countered that the trial court's ruling was not the last reasoned

8  decision and so did not control the level of deference.   Nevertheless he conceded the Court of

9  Appeal had applied California's "substantial likelihood" standard rather than *Batson's*

10 "reasonable inference standard" in evaluating whether petitioner had established a prima facie

11 case.   ECF No. 36 at 59 (citing *Cooperwood v. Cambra*, 245 F.3d 1042, 1047 (9th Cir. 2001)

12 (stating that when state court applies the wrong legal standard, the decision is reviewed de novo

13 rather than deferentially)).   In supplemental briefing, however, respondent argues that the

14 determination is entitled to AEDPA deference because the Court of Appeal relied on *People v.*

15 *McDermott,* 28 Cal.4th 946, 969 (2002), which in turn relied on *People v. Box*, 23 Cal. 4th 1153,

16 1188 n.7 (2000), *disapproved of on other grds. in People v. Martinez*, 47 Cal. 4th 911 (2010),

17 which found the "substantial likelihood" and "reasonable inference standards" to be the same.

18 Resp't's Supplemental Br. ECF No. 147 at 44-45.

19         In his supplemental reply, petitioner says that *Box* did not cure the problems with

20 the standard applied by the California courts.   Pet'r's Supplemental Reply, ECF No. 148 at 1-3.

21 He is correct:  the Ninth Circuit has said that *Box*'s attempt at equating the federal and state

22 standards was rejected in *Johnson v. California*, 545 U.S. 162 (2005), and noted "[a] state court

23 that equates a correct standard with an incorrect standard cannot be applying the correct standard

24 in the manner required by law."  *Johnson v. Finn* (*Finn*), 665 F.3d 1063, 1068 (9th Cir. 2011).

25         Respondent next argues the challenge to the denial of the second *Batson* motion is

26 barred by petitioner's default in the state court.   ECF No. 36 at  66-67.   The court declines to sort

27 out the parties' bickering over whether a state court's denial of a claim presented in a conclusory

28

manner or for the first time in a reply brief[8] establishes a procedural default. *See Rodarte v. Diaz*, No. CV 12–3764 MWF (AN), 2013 WL 5329638, at *34 (C.D. Cal. Sep. 23, 2013) (stating that no Ninth Circuit case has found that "waiver based on failing to use a heading or raising an issue in a perfunctory manner is an independent and adequate procedural bar").

D. Analysis

In *Batson v. Kentucky*, the Supreme Court held that a criminal defendant's constitutional rights are violated when a prosecutor systematically uses peremptory challenges to remove members of a cognizable group because of their group association. 476 U.S. 79 (1986). The Court established a three step process to guide a court's evaluation, as explained in a more recent decision:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, [i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotations omitted). Males are a cognizable group for *Batson* purposes. *J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994); *see also United States v. De Gross*, 960 F.2d 1433, 1439-40 (9th Cir. 1992) (en banc) (finding the strikes on the basis of gender in a federal criminal case forbidden by the Fifth Amendment).

A prima facie case of purposeful discrimination has three components: "(1) the prospective juror is a member of a 'cognizable . . . group,' (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the circumstances raise an inference that the strike was on account of" the juror's group membership." *Crittenden v. Ayers*, 624 F.3d 943, 955 (9th Cir. 2010). "A prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives rise to an inference of discriminatory purpose"; the burden is not onerous. *Johnson*, 545 U.S. at 169 (internal quotation omitted);

---

[8] The court acknowledges petitioner's claim that he did not raise the issue for the first time in a reply brief. ECF No. 58 at 64.

1  *Crittenden*, 624 F.3d at 956 ("[C]omparative analysis may be employed at step one to determine

2  whether the petitioner has established a prima facie case of discrimination.").  A showing of

3  statistical disparity in the challenges may be sufficient to satisfy petitioner's burden, but such a

4  presumption can be dispelled by other circumstances.  *Williams v. Runnels*, 432 F.3d 1102, 1107

5  (9th Cir. 2006); *Turner v. Marshall*, 63 F.3d 807, 813-14 (9th Cir. 1995), *overruled on other grds.*

6  *by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (en banc).

7              1. State Courts' Failure to Undertake Comparative Analysis

8              Petitioner argues the state courts erroneously failed to compare the jurors

9  challenged by the prosecution with those not challenged.  ECF No. 25 at 55.  The Ninth Circuit

10  has said, however, that "*Batson* and the cases that follow it do not require trial courts to conduct a

11  comparative juror analysis."  *Murray v. Schriro*, 745 F.3d 985, 1005 (9th Cir. 2014).  The process

12  rather is a means for a federal court to review *Batson* findings.  *Id.*

13              2. The Prosecutor's Exercise of Peremptory Challenges

14              Petitioner argues the statistical disparity in challenges in this case established a

15  prima facie case that the prosecutor was using his peremptory challenges in a discriminatory

16  fashion.  He also argues the men excused by the prosecutor's peremptory challenges were

17  homogeneous, two had been challenged for cause by the defense, and several appeared to be

18  people  the prosecutor would favor as jurors.  ECF No. 25 at 54-55; ECF No. 58 at 61-63; ECF

19  No. 146 at 4.

20              Statistical disparity may sometimes be a sufficient showing to establish a prima

21  facie case.   In *Turner*, the prosecutor challenged five out of nine African-Americans on the

22  venire and used five out of nine peremptory challenges against African-Americans.  63 F.3d at

23  813.  The court noted the importance of considering "whether the percentage of prosecutorial

24  challenges made against minorities was disproportionately higher than the percentage of the

25  minority group within the venire," *id.* (citing *United States v. Alvarado*, 923 F.2d 253, 255-56 (2d

26  Cir. 1991) (stating that "[o]nly a rate of minority challenges significantly higher than the minority

27  percentage of the venire would support a statistical inference of discrimination), and found the

28  prosecution's use of a significantly higher proportion of its challenges against African-

47

1  Americans, who made up only 30 percent of those reporting for voir dire, to establish a prima

2  facie case.  *Id.*; *see also Paulino v. Castro*, 371 F.3d 1083, 1091 (9th Cir. 2004) ("[S]ample size,

3  or the time at which a statistical pattern is pointed out, may be relevant to the weight of the

4  apparent disparity").  In *Williams v. Runnels*, the Ninth Circuit found the habeas petitioner had

5  established his prima facie case by showing the prosecutor used three of his first four peremptory

6  challenges against African-Americans.  432 F.3d 1102 (9th Cir. 2006).  But the Ninth Circuit has

7  also said "[t]here is no magic number of challenged jurors which shifts the burden to the

8  government to provide a neutral explanation for its actions.  Rather, the combination of

9  circumstances taken as a whole must be considered."  *United States v. Chinchilla*, 874 F.2d 695,

10  698 (9th Cir. 1989).

11        Here the record shows that of the 100 jurors called, men were a majority and also a

12  majority of the twelve initially seated in the jury box.   The prosecutor did not initially excuse

13  men—his first and third strikes were against women—but began to challenge men as the defense

14  challenged women.  *See United States v. Murphy*, 621 F.3d 101, 110-11 (2d Cir. 2010) (saying

15  when the defense excused more women, the statistical likelihood the government would excuse

16  men increased).  This pattern continued.  Moreover, several times before defense counsel's first

17  *Wheeler/Batson* challenge, the prosecutor had accepted the panel with a majority of male jurors.

18  *See Hernandez v. Hedgpeth*, No. ED CV 12-792-JSL (RZ), 2013 WL 3449368, at *5 (C.D. Cal.

19  Jul. 8, 2013) (stating the prosecutor's accepting a jury with minority members, though not

20  dispositive, weighs against a finding of a prima facie case).  Each time the prosecutor accepted

21  the jury, men predominated.   Moreover, petitioner has not acknowledged the prosecutor's

22  statement that the defense had challenged some women the prosecutor had planned to strike, a

23  factor that undercut the statistical showing.  The statistical showing was not sufficient to establish

24  a prima facie case for either *Batson* motion.

25        Petitioner argues the predominance of men in the venire and on the panel is not

26  relevant and cites to a footnote in *J.E.B*:

27          It is irrelevant that women, unlike African-Americans, are not a
        numerical minority and there are likely to remain on the jury if each

28          side uses its peremptory challenges in an equally discriminatory

> fashion.   Because the right to nondiscriminatory jury selection procedures belongs to the potential jurors, as well as the litigants, the possibility that members of both genders will get on the jury despite intentional discrimination is beside the point.

ECF No. 146 at 4 (citing 511 U.S. at 142 n.13).  However, in *J.E.B.* the Supreme Court was not discussing the relevant circumstances establishing a *Batson* prima facie case, but rather responding to the argument that gender should not be a cognizable group.

Petitioner then turns to other factors supporting a prima facie case.  He first complains that the record is not sufficiently developed for much beyond statistical analysis, arguing "the dearth of raw material is in substantial part the fault of the state trial judge," because his error of law "cut short the making of any record of the *Batson* claim." *Id*. at 6.  He cites to *Williams v. Runnels*, where the Ninth Circuit rejected a claim that the petitioner had failed to show a reasonable inference of discriminatory strikes, saying petitioner

> having presented a statistical disparity based on the information then known to him, cannot be charged, prior to the prosecution's explanation of his challenges, with developing a record that might refute the prosecutor's possible explanations.  Instead, it appears that if there are other relevant circumstances that might dispel the inference, it was the state's responsibility to create a record to dispel this inference.

432 F.3d at 1110.  The Ninth Circuit has also said:

> Statistical facts like a high proportion of African-Americans struck and a disproportionate rate of strikes against African-Americans can establish a pattern of exclusion on the basis of race that gives rise to a *prima facie Batson* violation.  However, because Williams failed to allege, and the record does not disclose, facts like how many African-Americans (apparently men, if any) sat on the jury, how many African-Americans were in the venire, and how large the venire was, it is impossible to say whether any statistical disparity existed that might support an inference of discrimination.

*Williams v. Woodford*, 384 F.3d 567, 584 (9th Cir. 2004); *see also Newman v. Crogan*, 583 F. App'x 657, 658 (9th Cir. 2014) (unpublished) (a habeas petitioner must do more than point to the number of minority members struck to establish a pattern of discriminatory strikes).

Moreover, this argument belies the record:  as discussed above, when defense counsel raised the challenge, court and counsel retired to chambers because to ensure there was no "defect in the record" if in fact the court was wrong on the law.  While the group hashed out the numbers,

49

1   defense counsel said nothing else suggesting the strikes might be the result of bias and indeed

2   said nothing to counter the prosecutor's explanation.  In addition, as petitioner notes, each venire

3   member filled out a lengthy questionnaire, which might yield sufficient information for

4   comparative analysis or provide other relevant information, yet petitioner even now cites to these

5   documents only sparingly and selectively.  Trial counsel at the time did not ask for time to

6   evaluate the pertinent questionnaires in support of his motion.  As petitioner has not undertaken a

7   comparative analysis nor asked the court to do so, the court declines to conduct the analysis in the

8   first instance. *Crespin v. Hawes*, No. EDCV 07-1348 AG (MLG), 2008 WL 624938, at *11

9   (C.D. Cal. Mar. 5, 2008 (declining to engage in comparative analysis when it is not requested), ),

10  *aff'd by* 368 F. App'x 76 (9th Cir. 2010) (unpublished).

11          Petitioner argues the prosecutor's discriminatory intent is shown because he

12  excused two men, Ritsch and Hugo, the defense had challenged for cause.  ECF No. 58 at 62.

13  However, when the parties were discussing the defense challenge to Ritsch (055474), stemming

14  from something he had allegedly said to a youth pastor about petitioner, the prosecutor said "he's

15  on my definite kick-him-off list. . . .. He's been in trouble.  He's a troublemaker.  His brother and

16  family are troublemakers, and all the cops hate him."  RT 4315-4316.  Hugo (037435) was a

17  procurement officer at California Correctional Center and his ex-wife was a prison guard; his

18  answers to the questionnaire and during the brief voir dire were unremarkable.  ACT 3213-3223;

19  RT 3476-3479 (describing his prior jury experience and the evaluation of expert testimony); RT

20  3467-3469 (general voir dire).   The defense challenge was based on the perceived law

21  enforcement bias from Hugo's and his ex-wife's employment, RT 3531-3532, something Hugo

22  denied.  The prosecutor's challenge to a civilian employee of a prison, subject to a weak defense

23  challenge for cause, says nothing about any gender-based discrimination and indeed might have

24  been based on Hugo's prior jury experience involving the interpretation of expert testimony.

25          Petitioner then says Smylie (056184) appeared to have characteristics the

26  prosecutor might want because he said that "everyone has the right to prove their innocents [*sic*]."

27  This somewhat vague statement, which could be interpreted either as belief the defendant has a

28  burden of proof or as an endorsement of the presumption of innocence, similarly does not show

1    that Smylie was such a pro-prosecution juror that the exercise of a challenge against him

2    demonstrated bias.

3        Finally, petitioner says that the men challenged "were, except for their sex, as

4    heterogeneous as the jury pool as a whole," ECF No. 58 at 62, a statement so general it gives no

5    support to petitioner's claim.

6        Neither the statistics or the meager other circumstances petitioner discusses meet

7    his burden of showing a prima facie case of discrimination.   He is not entitled to habeas relief on

8    this ground.

9    VIII.  DISCHARGE OF JUROR NO. 5 (Issue 5)

10       A.  Proceedings in the Superior Court

11       On July 12, 2000, witness Cynthia Caballero reported she was approached by a

12   man wearing a juror badge, who looked her up and down and asked if she fooled around.  RT

13   7415, 7418.   When she said she was a witness, the juror said he would be polite and not talk to

14   her.  RT 7416.   The prosecutor noted the same juror had approached Dr. Thibault during a break

15   and asked if he had told Steve Young[9] to retire.  RT 7423.

16       The court addressed Juror No. 5 outside the presence of the other jurors,

17   expressing his concern about Juror No. 5's comments to Caballero, Dr. Thibault, and his greeting

18   one morning to defense counsel Zernich.  RT 7627-7628.   When court convened the following

19   day.  the court said he would not remove Juror No. 5, "[b]ut we have to have your assurance now,

20   beyond any question, that you'll obey the admonition that we've given you . . . ."  RT 7633.  The

21   juror said he would try the best he could.  RT 7634.

22       On August 8, 2000, Alternate No. 7 wrote a note to the court, complaining that

23   Juror No. 5 had made a comment to her "of a sexual nature.  This has not been the first time."

24   Alternate No. 7 said she did not want to go to the jury room because she did not want to hear the

25   "crude comments."  ACT 6645.

26   /////

27

28       _____

         [9] Dr. Thibault consulted with the NFL about head injuries.

<div style="margin-left:2em">

With counsel in attendance, the court interviewed Alternate No. 7, who mentioned that one other member of the panel had expressed concerns about Juror No. 5 at well.  RT 8865. The court told Alternate No. 7 that he wanted "the best rapport among the jurors so they can intelligently discuss and argue these issues without having influence from any inappropriate source such as this . . . ."  RT 8868.  The court added one of the clerks had complained that Juror No. 5 "has continually made sexual remarks to her."  RT 8869.

Defense counsel said the juror's "social demeanor" was not a proper reason to discharge the juror, particularly in light of the fact that Alternate No. 7 would almost certainly not be deliberating.  RT 8869, 8872.

After hearing more argument, the court observed he had "strongly admonished" Juror No. 5 to "watch his conduct" and so there was little point in admonishing him again.  RT 8879.  He rejected defense counsel's suggestion to question the female members of the panel and said Juror No. 5's behavior  "threatens the integrity of this whole jury."   RT 8886.

</div>

B. The Court of Appeal's Decision

> During trial, one of the jurors committed misconduct by sexually harassing other jurors, a witness, and court personnel and by disobeying the admonition not to talk to witnesses and attorneys. Finally, the trial court was compelled to dismiss this juror. Without discussing the juror's misconduct, defendant asserts the dismissal was without good cause. The assertion fails.
>
> "A trial court's authority to discharge a juror is granted by Penal Code section 1089, which provides in pertinent part: 'If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors.'" (*People v. Williams* (2001) 25 Cal.4th 441, 447-448, 106 Cal.Rptr.2d 295, 21 P.3d 1209, fn. omitted, italics omitted.) On appeal, we "review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. [Citation.] If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 843, 55 Cal.Rptr.2d 347, 919 P.2d 1280.)
>
> During the trial, one of the witnesses reported to the court that she had been sexually harassed by Juror No. 5. He asked her, "Do you

fool around?" He did not touch her but looked her up and down. The next day, Juror No. 5 made comments to some of the other witnesses and attempted to begin a conversation with defense counsel. In chambers, the court spoke to Juror No. 5 concerning his misconduct and admonished him to follow the court's instructions concerning talking to witnesses and attorneys. Juror No. 5 responded that he had a "hard time keeping [his] big mouth shut." The next day, the court again called Juror No. 5 into chambers to remind him of the admonitions.

On the last day of evidence, the court investigated a note it received from one of the jurors and discovered that Juror No. 5 had been making sexual comments to the other jurors. In addition, one of the court clerks complained that Juror No. 5 had been making sexual remarks and gestures to her. The trial court decided Juror No. 5 should be dismissed.

On this record, the trial court did not abuse its discretion in dismissing Juror No. 5. He repeatedly, over several days, failed to follow the trial court's explicit instructions not to talk to witnesses and attorneys, and he subjected the women around him to sexual harassment. He was unable to maintain even minimal civility and obedience to authority. Accordingly, he exhibited his inability to perform as a juror. (Pen. Code § 1089.)

Defendant contends this case is like *People v. Cleveland* (2001) 25 Cal.4th 466, 106 Cal.Rptr.2d 313, 21 P.3d 1225, in which the Supreme Court found it was error to dismiss a juror for failure to deliberate when the record did not establish as a demonstrable reality that the juror had so refused. Instead, it appeared the juror simply viewed the evidence differently from the rest of the jury. (*Id*. at pp. 485-486.) This case is unlike *Cleveland*. The inability of Juror No. 5 to perform as a juror arose, not because he disagreed with other jurors, but because he was subjecting them and others to harassment and he disobeyed the court's instructions.

Additionally, defendant contends the trial court erred by not questioning jurors before dismissing Juror No. 5. At trial, he suggested that the court question the female jurors to determine whether Juror No. 5's conduct impaired their ability to serve as jurors. On appeal, he contends the trial court may have determined, after questioning the female jurors, that Juror No. 5's conduct did not impair their ability to serve as jurors.

"[T]he court does have a duty to conduct reasonable inquiry into allegations of juror misconduct or incapacity-always keeping in mind that the decision whether (and how) to investigate rests within the sound discretion of the court. (See § 1120; see also § 1089; *People v. Cleveland, supra*, 25 Cal.4th at p. 476, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)" (*People v. Engelman* (2002) 28 Cal.4th 436, 442, 121 Cal.Rptr.2d 862, 49 P.3d 209.)

We reject the assertion that the trial court had to investigate further in this clear case of sexual harassment and inability to follow the court's instructions by a juror. What would the court have asked?

1

2

3

> "Will your ability to serve as a juror be impaired by continuing sexual harassment from Juror No. 5?" The trial court did not abuse its discretion in determining, without a further hearing, that Juror No. 5, who had proven he would continue with his disobedience of instructions and sexual harassment, should be dismissed.

4

Lodg. Doc. 4 at 95-98.

5

   C.  Analysis

6

   Petitioner has cited no clearly established federal law holding that dismissal of a

7

juror violates a criminal defendant's Sixth Amendment right; instead, dismissal is appropriate if it

8

"preserve[s] the 'essential feature of the jury required by the Sixth and Fourteenth

9

Amendments.'"  *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985)  (quoting *Williams v.*

10

*Florida*, 399 U.S. 78, 100 (1970)).  In *Miller*, the Ninth Circuit found that California's procedure

11

for substitution outlined in California Penal Code section 1089 met this Sixth Amendment

12

standard.  *Id*.  In determining whether a particular removal of a juror was proper, this court must

13

decide whether good cause existed for removing the juror, while affording the appropriate

14

deference to the trial court's findings about juror fitness.  *Perez v. Marshall*, 119 F.3d 1422, 1426

15

(9th Cir. 1997).

16

   Petitioner argues the Court of Appeal's determination rests on an unreasonable

17

determination of facts; specifically, he says the court believed the woman who complained was a

18

seated juror rather than an alternate, which in turn tainted the court's determination that removal

19

of a difficult juror was proper.  Petitioner suggests that the court could evaluate the impact only

20

by questioning the sitting jurors about their ability to interact with Juror No. 5.   He also argues

21

the Court of Appeal's rhetorical question shows it unreasonably determined sitting jurors had

22

been harassed.  ECF No. 58 at 67-68.

23

   Even assuming the state courts unreasonably determined these facts, it does not

24

undercut their ultimate conclusion that Juror No. 5 was properly discharged for cause.  The state

25

courts were entitled to conclude that Juror No. 5's crude comments to a witness, to Alternate

26

No. 7 and to at least one court clerk were indicative a pattern that could disrupt, even if it had

27

not already disrupted, harmonious jury relationships and so established good cause for removing

28

Juror No. 5.  In addition, the state courts could reasonably conclude that Juror No. 5's ability to

1    follow the court's instructions and to behave civilly to participants in the proceedings,

2    disqualified him.  As petitioner has not shown how removing Juror No. 5 interfered with the

3    essential features of the jury system, he has not shown there was a Sixth Amendment violation.

4    IX.  JURY MISCONDUCT (Issue 6)

5         Petitioner argues that multiple instances of juror misconduct denied him a fair trial.

6    On direct appeal he alleged that Alternate No. 1, who became Juror No. 5, suggested he was

7    turning to divine guidance in fulfilling his role as a juror, and that at a class reunion during the

8    trial, Juror No. 3 expressed his opinion that petitioner was guilty.

9         In a habeas petition filed first in the Plumas County Superior Court, petitioner

10   alleged that Juror No. 3 read newspaper articles about the trial; two jurors told the others that

11   people who die traumatically die with their eyes open, which injected "extraneous false

12   information with the aura of expertise" into the deliberations; the jury told Juror No. 4 it could not

13   consider her story about saving a drowning man by yelling at him "stand up," because this was

14   extraneous; and several jurors visited the Bucks Lake area for lunch, but did not know whether

15   they had located the area discussed during the trial.

16        Petitioner also argued the state court had improperly denied his request to develop

17   the facts underlying these claims.  This court granted an evidentiary hearing on the claim that

18   Juror No. 3 had told people he believed petitioner was guilty, but denied it as to the other

19   instances of alleged jury misconduct.  The record developed at this hearing is discussed more

20   fully below.

21        A.  Proceedings in the Superior Court

22        In support of his motion for a new trial, petitioner provided a declaration from

23   Mark Delizio, who reported he talked to Juror No. 3 sometime during the trial and Juror No. 3

24   said he believed petitioner was guilty.  CT 1674.  In a declaration submitted in opposition to the

25   motion, Juror No. 3 denied saying this.  CT 1749.  Also in support of the motion for a new trial,

26   petitioner provided a declaration from Juror No. 4, who said Alternate No. 1 told some of the

27   jurors that God had meant him to be on the jury so the verdict would go the right way.  Alternate

28   No. 1 also said the jury had to go down the right path, even though some people did not do so.

55

1    CT 1676-1677; Lodg. Doc. 6, Appendix.  Petitioner's other claims of jury misconduct were

2    included in his state habeas petition, which also provided newspaper articles Juror No. 3 may or

3    may not have read during the trial.

4              The superior court denied the motion for a new trial without holding an evidentiary

5    hearing.  It also denied the petition for a writ of habeas corpus, also without an evidentiary

6    hearing, in the last reasoned decision on some of these issues:

7              Petitioner argues that jury misconduct denied Petitioner a fair trial.
               Petitioner alleges the jurors were exposed to extraneous
8              information.  The Court has carefully reviewed the arguments of
               Petitioner as well as the exhibits attached to Petitioner's Writ.  The
9              Court is convinced that none of this material was inherently or
               substantially likely to have influenced jurors; the allegations are
10             speculative at best.

11             Petitioner likewise makes reference to other alleged acts of juror
               misconduct, which have been reviewed by the District Court of
12             Appeals [*sic*] on appeal.  This Court agrees with the Court of
               Appeal that any alleged juror misconduct is speculative at best and
13             the material does not indicate that the jurors were inherently or
               substantially improperly influenced as a result of such misconduct.

14
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
15
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
16
               [A]lthough the Petition does establish that certain incidents took
17             place which demonstrate that the trial was not perfect, the law does
               not entitle the Defendant to a perfect trial, only a fair trial. . . .
18             [T]here is nothing in the petition that persuades the Court that
               petitioner received anything but a fair trial.
19

20   Lodg. Doc. 6, Order of Jan. 11, 2006.

21        B.  Court of Appeal's Decision

22             Defendant asserts the trial court abused its discretion in denying his
               motion for new trial based on juror misconduct. We conclude the
23             record does not support defendant's assertion.

24             Defendant filed declarations in support of his motion for new trial.
               Mark Delizio, a friend and former client of one of defendant's
25             attorneys, stated that at a class reunion on June 24, 2000, during the
               trial and before deliberations, one of his former classmates had
26             stated that her husband, Juror No. 3, was the jury foreman. The
               juror engaged in discussion concerning the case and expressed his
27             opinion that defendant was guilty. Defense counsel claimed, in a
               declaration, that Juror No. 3 told him in a telephone interview that
28             he had expressed an opinion after he had a couple drinks at the

                                                56

reunion that defendant was guilty. In his own declaration, however, Juror No. 3, who was the jury foreman, stated that he had told several people at the reunion that he was on the jury, but he did not recall stating that he felt defendant was guilty. He added that he was not introduced as the jury foreman because it "was not an issue at

the time," and he made his final decision concerning defendant's guilt during deliberations.

Alternate Juror No. 1 was seated on the jury late in the trial, taking Juror No. 5's place. A fellow juror signed a declaration stating that when Alternate Juror No. 1 was added to the jury he said: "This was God's will that I was placed on the jury so I can make sure that the verdict will go the right way." Later, during deliberations, Alternate Juror No. 1 said the jury "had to go down the right path" and made other comments that the declarant juror perceived to be of a religious nature. Alternate Juror No. 1 signed a declaration stating that his first comment merely meant he did not believe in coincidence and that it was by design that he had been chosen because he would be just in his decision, whether it was guilt or not. The second comment, during deliberations, was taken out of context and referred to people in general, not to the jury. It meant that some people go down the wrong path and that is why there is crime.

Defendant requested an evidentiary hearing concerning juror misconduct. He also requested discovery of all statements made by Juror No. 3 to law enforcement or the prosecution. The trial court, however, exercised its discretion and denied the requests. Concerning the allegation of misconduct against Juror No. 3, the court found more persuasive the declaration of Juror No. 3, which stated that he did not remember expressing an opinion concerning defendant's guilt at the reunion and was not introduced as the jury foreman. The court added that defendant was not prejudiced by the facts stated. With respect to Alternate Juror No. 1, the court simply stated that "defendant was not prejudiced based on the declarations...."

We will not disturb a trial court's denial of a motion for new trial unless the trial court manifestly and unmistakably abused its discretion. (*People v. Cox* (1991) 53 Cal.3d 618, 694, 280 Cal.Rptr. 692, 809 P.2d 351.) "'[W]hen a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact.' [Citation.] Also, a hearing 'should be only held when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties' evidence presents a material conflict that can only be resolved at such a hearing.' [Citation.]" (*People v. Hardy* (1992) 2 Cal.4th 86, 174,

5 Cal.Rptr.2d 796, 825 P.2d 781, fn. omitted.) Even assuming juror misconduct occurred, "[t]he presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm. [Citations.]" (*Ibid.*)

Here, the trial court did not abuse its discretion in denying the motion for new trial based on allegations of jury misconduct. The court also did not abuse its discretion in denying the requests for an evidentiary hearing and discovery. From the declarations, the court was able to determine that Juror No. 3's statement was more reliable. Accordingly, no misconduct occurred. Defendant argues that, since Juror No. 3 was introduced as the jury foreman, the jury improperly chose a foreman before deliberations began. We agree with the trial court's determination, however, that Juror No. 3's declaration was more reliable and a foreman had not been chosen because that "was not an issue" yet.

Even assuming Juror No. 3 was introduced as the foreman and expressed an opinion concerning defendant's guilt at the reunion, an examination of the entire record reveals there is no reasonable likelihood defendant suffered actual harm from the misconduct. (See *People v. Hardy, supra,* 2 Cal.4th at p. 174, 5 Cal.Rptr.2d 796, 825 P.2d 781.) Juror No. 3 declared he did not make his final decision concerning guilt until jury deliberations. Furthermore, there is no indication Juror No. 3 received outside evidence or was influenced by those to whom he may have expressed his opinion. The record does not show a substantial likelihood of juror bias. (See *In re Carpenter* (1995) 9 Cal.4th 634, 653, 38 Cal.Rptr.2d 665, 889 P.2d 985.)

As for Alternate Juror No. 1, we perceive no juror misconduct in his statement concerning why he was chosen for the jury. The statement did not indicate a bias toward a guilty verdict as opposed to a not guilty verdict. Defendant cites no authority, and we know of none, that disqualifies a person from jury service simply because that person believes in divine providence as to matters such as being selected to serve on a jury. Furthermore, the second statement about going "down the right path," no matter what interpretation is given to the statement, did not indicate an intent to rely on anything other than the evidence in arriving at a verdict.

Thus, the denial of the motion for new trial was not an abuse of discretion. Furthermore, the declarations did not present a strong possibility of prejudicial misconduct, which would have required an evidentiary hearing or further discovery.

Lodg. Doc. 4 at 98-101.

C.  The Right to an Impartial Jury

A criminal defendant has a Sixth Amendment right to be tried by an impartial jury that reaches a verdict on the basis of the evidence produced at trial, rather than on outside

58

1   influences.  *See Irvin*, 366 U.S. at 722; *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008);

2   *Davis v. Woodford*, 384 F.3d 628, 652 (9th Cir. 2004) (stating defendant's right to a fair trial is

3   violated by the presence of a single partial juror); *Bayramoglu v. Estelle*, 806 F.2d 880, 887

4   (9th Cir. 1986) (stating that jurors must consider only the evidence presented in open court).  "A

5   juror's communication of extrinsic facts implicates the Confrontation Clause."  *Sassounian v.*

6   *Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000).

7          Except in a very few circumstances, jury misconduct claims must be evaluated to

8   determine whether the misconduct had substantial and injurious effect or influence in determining

9   the jury's verdict.  *Cook v. LaMarque*, 593 F.3d 810, 827 (9th Cir. 2010); *cf. Remmer v. United*

10  *States*, 347 U.S. 227, 229 (1954) (prejudice presumed when there are third-party communications,

11  contact or tampering with a juror during trial).

12         D.  Jurors No. 2 and 12

13         These are the two jurors who told the others that based on their experience people

14  who die violent and traumatic deaths die with their eyes open.   Petitioner argues this extraneous

15  evidence, imparted to the other jurors with an aura of expertise, constituted prejudicial

16  misconduct, particularly in light of the fact that the jury reached unanimity shortly after Jurors

17  No. 2 and 12 said this.  ECF No. 58 at 81-82.  This claim is insubstantial.

18         The court need not consider whether these jurors' statements crossed the

19  permeable barrier between the permissible reliance on the jurors' experience and the improper

20  injection of extrinsic information into the deliberations.  *See, e.g., United States v. Navarro-*

21  *Garcia*, 926 F.2d 818, 821-22 (9th Cir. 1991) (a juror's personal experiences may constitute

22  extrinsic information "when a juror has personal knowledge regarding the parties or the issues

23  involved in the litigation that might affect the verdict" or "if the jury considers a juror's past

24  personal experience in the absence of any record evidence on a given fact, as personal

25  experiences are relevant only for purposes of interpreting the record evidence.").  Even assuming

26  this extrinsic evidence was improper, it was harmless:  whether Ronna slid off the snowmobile

27  and drowned or whether she was held under the water and drowned, she died a violent, traumatic

28  death.

1      Petitioner overstates the record by claiming the jury reached unanimity shortly

2  after this discussion.   Juror No. 4's declaration, the source of this argument, says only that Juror

3  No. 4 was one of the last holdouts and that she "reached [the] verdict of guilty shortly after this

4  discussion." Lodg. Doc. 6, Appendix 3 ¶ 10.   It appears this declaration is not admissible, *see*

5  *Warger v. Shauers*, ___ S. Ct. ___, 2014 WL 6885952, at *4 (S.Ct. Dec. 9, 2014), but even if this

6  court could consider it, the conclusory nature of the statement does not show the harmful and

7  injurious effect of the misconduct.  The state court did not unreasonably apply federal case law on

8  harmless error.

9      E.  Juror No. 4

10     Petitioner argues, somewhat obscurely, that the jury committed misconduct by

11  refusing to considering Juror No. 4's account of a drowning averted when it had in fact

12  considered the accounts from the other two jurors.  He has not cited to any cases, much less any

13  Supreme Court authority, holding that a jury's refusal to consider extrinsic allegedly favorable to

14  the defendant violates the defendant's rights.  His argument—that two wrongs would somehow

15  make a right—is completely unsupported.

16     F.  The Visit to Bucks Lake

17     Several jurors visited Bucks Lake once or twice during trial but before

18  deliberations, during summer months, but did not know whether they found the scene of the

19  accident.  Lodg. Doc. 6, Appendix 3.  Juror No. 4 said she "didn't know where the actual scene of

20  the accident/crime took place, but I did look around while driving there trying to see if I could

21  recognize it based on testimony I had thus far heard.  I don't know if I saw it or not."  *Id*.

22     The state court's conclusion that this was harmless did not violate clearly

23  established federal law.  Petitioner makes no attempt to demonstrate how a summer visit to Bucks

24  Lake could have impacted the trial, given the importance of the particular circumstances of the

25  winter landscape on the case.  Without citation to authority, he says "one of the reasons jurors are

26  instructed not to make informal scene visits is the likelihood of changed conditions and the

27  likelihood that the dissimilarity will create, not negate prejudice." ECF No. 58 at 85.  This is not

28  sufficient to meet his burden.

1       G.  Alternate No. 1

2               Petitioner argues Alternate No. 1 committed misconduct by referring to divine will

3   during jury deliberations.   Juror No. 4 said:

4           Once the jury was given the case to decide a vote was taken
            regarding how people viewed the evidence.  A number of jurors
5           expressed the opinion that Mr. Franklin was not guilty or they were
            undecided.  At that point       made a statement that "we (jury) had
6           to go down the right path of life and some of us were not going
            down the right path" and he made some general comments
7           regarding what I perceived to be his religious belief and/or dictates
            of God.  Some of the jurors told  they would not consider such
8           statements, however it appeared       put reliance in his religious
            beliefs regarding his statements.      expressed an opinion in the
9           guilt of Defendant almost immediately.[10]

10  ECF No. 1676-1677 ¶ 3.  Petitioner did not need an evidentiary hearing to provide a more

11  complete account of Alternate No. 1's statements through an expanded declaration from Juror

12  No. 4; instead he offered only this somewhat vague account, providing only Juror No. 4's

13  interpretation rather than an attempt at recreating what she actually remembered of Alternate

14  No. 1's words.  Juror No. 4's declaration does not establish what petitioner hopes it does nor does

15  it necessarily establish any misconduct, even assuming the court could consider it.  *See Warger*,

16  2014 WL at *7; *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006) (rejecting claim that juror

17  reading Bible passages to other jurors during capital sentencing deliberations violated the

18  defendant's Sixth Amendment rights).

19              The Court of Appeal agreed there was no need for a hearing, accepted Juror No.

20  4's account of what happened, and found no misconduct.  This court does not consider whether

21  any reference to religious beliefs in the jury room is misconduct, but rather turns to the question

22  of prejudice.  *See Fields v. Brown*, 503 F.3d 755, 781 (9th Cir. 2007) (declining to consider

23  whether juror's list of Biblical passage for and against the death penalty, shared with the jury,

24  constituted misconduct and finding no substantial and injurious effect).

25              Here petitioner has not attempted to address the substantial and injurious effect of

26  Alternate No. 1's beliefs on the verdict.   Juror No. 4 said only that it appeared Alternate No. 1

27

28      ---
        [10] The blanks are in the original, which must have referred to Alternate No. 1 by name.

1  was relying on his religious beliefs and provided no concrete example suggesting Alternate No. 1

2  relied on God rather than the evidence.  Moreover, the court instructed that the jurors "must

3  decide all questions of fact in this case from the evidence received in this trial and not from any

4  other source," CT 1566; the court presumes the jurors followed that instruction.  *Fields*, 503 F.3d

5  at 782.

6        H.  Juror No. 3

7           1.  Reading the Newspaper

8           In connection with the state habeas petition, Juror No. 3, Randall Beck, conceded

9  he may have said something about his belief that petitioner was guilty based on the testimony he

10  had heard so far.  Lodg. Doc. No. 6, Appx. 2; CT 1780-1781.  He also reported that he read

11  articles about the trial in the weekly publication, *Feather River Bulletin*.  *Id.*; CT 1780-1718.

12  Beck provided a different declaration in opposition to the state writ, claiming he only skimmed

13  the headlines and did not learn anything he had not heard during trial.  Lodg. Doc. 9, Ex. A.  The

14  trial court denied an evidentiary hearing on the question.

15           In supplemental briefing on the jury misconduct issue, respondent argues

16  petitioner has not shown Beck read any articles.  ECF No. 147 at 11.  Even assuming that Beck

17  read every word of every article during the trial, the court does not find the misconduct had a

18  substantial and injurious effect on the verdict.

19           Petitioner collected the articles appearing in the *Feather River Bulletin* during the

20  trial in 2000, attaching them as Appendix 6 to the state habeas petition.  The first, an editorial

21  dated May 17, 2000, praised the trial judge for denying the motion for a change of venue and said

22  Plumas County residents "can be trusted when it comes to justice."  An article from the same day,

23  on the same subject, summarized Dr. Bronson's testimony, counsels' arguments and the court's

24  ruling.   An undated article reported that the jury had been selected.

25           On May 31, the paper described the defense and prosecution theories of the case,

26  noted the publicity it had generated, and said 60 Minutes and Hard Copy were following the case.

27           The article from June 7 summarized the prosecutor's opening statement.  It did add

28  he had asked the court to order a jury view of the scene so "the jury [could] see the nearby cleft

1    that leads to a river stream," because he believed petitioner "planned to throw his wife into the

2    river" to cover up the death.

3            On June 14, an article presented highlights of Shelle Hill's testimony that

4    petitioner called her two weeks after Ronna's death and said the prosecution's case rests on

5    circumstantial evidence, "as jurors were already finding out."  Another article from that day said

6    the cost of petitioner's trial had exceeded $825,000, but the state would pay $717,000.  It added

7    that the costs of the defense were now added to the overall costs of the proceeding.

8            The article from June 21 recounted defense counsel's cross-examination of

9    Ronna's brother and discussed other testimony.

10           The headline for the article from June 28 was "Head trauma expert testifies," and

11   the article mentioned that Dr. Gean, the prosecution expert, "was recently placed in the national

12   spotlight when she was called by the defense in the highly publicized New England trial of

13   British au pair Louise Woodward."

14           On July 5, the paper reported Joe Blackwell's testimony it appeared that the

15   snowmobile had come around the corner, started downhill and just pulled over and parked on the

16   shoulder.  The article described other testimony about the snowmobile and Ronna's disinclination

17   to go to Bucks Lake and said petitioner had confided to a witness he had three wives.

18           The article in the July 12 edition described defense counsel's "blitz of questions"

19   discrediting Kost and testimony from a friend of petitioner's about petitioner's extra-marital

20   affairs.

21           On July 19, the *Feather River Bulletin* discussed Dr. Thibault's testimony, saying

22   the prosecutor "compensated" for the damage defense counsel had done to Kost's evidence by

23   calling Dr. Thibault.  It also reported the prosecution planned to call Christie Woodards to testify

24   petitioner told her he was beneficiary of nearly $2 million in life insurance.

25           The article from July 26 described Woodards' testimony and said the prosecution

26   called her at the end of its case because of her expected impact "on the credibility of its theory."

27   /////

28   /////

1          On August 2, the paper reported the court had denied the defense request to call

2  Jack Mitchell[11], whom the defense characterized as playing a role "in turning a tragic accident . . .

3  into a flimsy murder allegation."

4          On August 9, the paper described DeRosa's and Daily's testimony about the

5  snowmobile and other defense testimony about petitioner's finances.

6          Defense expert Eric Weiss's testimony about drowning and cold water shock was

7  the focus of the August 16 article.

8          On August 23, the *Feather River Bulletin* reported petitioner had been convicted.

9  This article identified Beck as the jury foreman.

10          The Ninth Circuit has said:

11          There is no bright line test for determining whether a defendant has
           suffered prejudice from an instance of juror misconduct. In
12          assessing prejudice claims in juror misconduct cases we place great
           weight on the nature of the extraneous information that has been
13          introduced into deliberations. Juror misconduct which warrants
           relief generally relates directly to a material aspect of the case.
14          However, the introduction of duplicative or cumulative extraneous
           material may render juror misconduct harmless.

15

16  *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997), *overruled in part on other grds. by*

17  *Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002), *vacated by* 538 U.S. 975 (2003) (citations &

18  internal quotations omitted).

19          Petitioner argues that Joe Blackwell's observation that it appeared the snowmobile

20  had just parked was stricken and so the information in the article was prejudicial.   However, the

21  prosecutor asked Blackwell about his observations; Blackwell said that based on the tracks, it was

22  as if they had just pulled over and stopped.   The court sustained defense counsel's objection that

23  "pulled over to a stop" lacked foundation and struck this testimony.  RT 6730.  Other testimony,

24  including Blackwell's observation that "[i]t appeared that they came around the corner, started

25  downhill, and just pulled over and parked on the shoulder" was not stricken and in fact drew no

26  /////

27

28  _____
   [11]  Mitchell represented Ronna's family in a wrongful death suit against petitioner.

1   objection.  RT 6729.  Petitioner misstates the record in attempting to establish prejudice.  The

2   article did not report evidence the jurors were instructed to ignore.

3           Petitioner also argues the July 19 article misstated Woodards' testimony:  she said

4   petitioner claimed to have received half of a $500,000 insurance payment.  RT 7868.   The figure

5   was indeed $500,000, but petitioner claimed to have kept only $250,000, giving the other half to

6   charity.  *Id*.   The fact that Woodards' testimony was slightly different than the article predicted

7   does not demonstrate prejudice.  What was important in Woodards' testimony, from the

8   prosecution's point of view, was petitioner's claim that he was living off the proceeds of his dead

9   wife's life insurance policies before Ronna was dead, which was the account the jury heard.  The

10  amount was not "a material aspect of the case."  *Rodriguez*, 125 F.3d at 744.

11          Petitioner says the article describing the prosecution's theory, that petitioner

12  planned to throw Ronna's body in the river, was prejudicial because the jurors never heard

13  evidence about this.  In closing, however, the prosecutor said:

14              Now, I don't know if he hadn't been interrupted whether Mr.
            Franklin would have used his strength to tip over the snowmobile
15          and fake an accident on site, or whether, instead, he would have
            driven the snowmobile with Ronna Franklin in front of him the
16          extra 100 or 150 feet down to this drop off into Grizzly Creek.

17  RT 9276-9277.  The objection to this argument was overruled, as noted in the discussion of issue

18  eight, *infra*.

19          Finally, neither the paper's characterization of Woodards as an important witness,

20  its account of Dr. Gean's testimony in another case nor its report that the court refused to allow

21  the defense to call Jack Mitchell, a "key witness," have little, if anything, to do with the merits of

22  the case or the questions the jury was called upon to decide.  This misconduct does not justify

23  grant of the writ.

24          2.  Beck's Expressing Belief In Petitioner's Guilt and Evidentiary Hearing

25          Over respondent's objections, discussed below, this court held an evidentiary

26  hearing on the issue of Beck's statements.  The parties submitted a number of exhibits, including

27  the series of declarations Beck and Delizio executed, and presented testimony from a number of

28  witnesses.

1        After considering the testimony, summarized below, the court finds Beck did not

2 introduce himself and was not introduced as the jury foreman and had not been elected foreman at

3 the time of the reunion.  It does find Beck said he believed petitioner was guilty.

4        In 2000, Mark Delizio attended his high school reunion.  EHRT 5.  He talked to

5 classmate Laurie Beck, née Williams, and met her husband Randall Beck.  *Id*.  Laurie Beck

6 introduced her husband as the jury foreman in the Franklin murder.  *Id.*  Beck said he thought

7 Franklin was guilty.  *Id*. at 6.  Delizio thought this was odd.  *Id*.

8        Either the night of the reunion or shortly thereafter, Delizio mentioned this

9 conversation to his then-wife and after trial, he recounted it to Robert Zernich, one of petitioner's

10 lawyers, who had represented Delizio in connection with a building code violation.  *Id*. at 7.  At

11 Zernich's behest, Delizio signed a declaration dated October 16, 2000, in which he averred Beck

12 said he believed petitioner was guilty. *Id*. at 8; Ev. Hrg. Ex. A.

13        Tana Stoy, Delizio's ex-wife, said that when Delizio returned home from his high

14 school reunion in 2000, he told her a person who claimed to be the foreman of the Franklin jury

15 said Franklin was guilty.  EHRT at 22.   She also signed a statement at Zernich's behest.  *Id*. at

16 24; Ev. Hrg. Ex. 3.

17        Zernich testified that shortly after the Franklin verdict, Delizio asked him when a

18 jury foreman was selected; when Zernich asked why he wanted to know, Delizio told him about

19 the encounter with Beck at his high school reunion.  EHRT at 96-97.

20        After the prosecution filed Beck's declaration disputing Delizio's claim, Zernich

21 called Beck, who agreed he had told Delizio he thought Franklin was guilty, but that he had had a

22 couple of drinks.  *Id*. at 98, 107, 116-117.   Zernich's declaration, filed in connection with the

23 new trial proceedings, reports Beck may have said something about his belief that petitioner was

24 guilty based on the testimony he had heard thus far. Lodg. Doc. No. 6, Appx. 2; CT 1780-1781.

25        Terrell Swofford, John Penick, and Stephen Thomas, all jurors, testified that

26 Alternate No. 1 nominated Beck to be foreman after the court had sent them to deliberate.  EHRT

27 at 44-45, 56, 64.  Before the jury retired for deliberations, Beck did not say his mind was made up

28 nor did he say it was right after they began to deliberate.  EHRT at 46-47, 53.  Beck performed

1    his duties as foreman.  *Id.* at 49, 58-59.  Thomas, who knew Beck from work, testified that during

2    the course of the trial, Beck never said he had already made up his mind that petitioner was

3    guilty.  *Id.* at 63.

4             David Keller reported on the Franklin trial for the *Feather River Bulletin* in 2000.

5    EHRT at 70-71.  After the verdict he interviewed Beck, who said the process of reaching a verdict

6    was time-consuming and difficult.  *Id.* at 75.  Beck never said he had made up his mind long

7    before deliberations.  *Id.* at 78.

8             Laurie Beck, Randall Beck's widow, testified she did not introduce her husband as

9    the foreman of the Franklin jury at any time during her high school reunion. EHRT at 83-84.  She

10   did not tell anyone that Beck thought Franklin was guilty or that they thought Franklin was guilty.

11   *Id.* at 85.  In fact, Beck refused to answer her questions about the trial.  *Id.*

12           The parties argue the credibility of their respective versions of the evidence at

13   some length.   The court agrees there were inconsistencies in Delizio's and Stoy's testimony, but

14   they were testifying about events fourteen years before.   None of the inconsistencies respondent

15   points to completely destroys a declarant's credibility.

16           As noted above, the court credits Delizio's account only insofar as he reports Beck

17   saying petitioner was or might be guilty.  Even though he delayed in bringing this information to

18   Zernich's attention, Delizio's account has been consistent and is corroborated by his then-wife, to

19   whom he repeated Beck's statement shortly after the conversation occurred.   It is also

20   corroborated by Beck himself, despite his attempts to distance himself from the admission.

21   Accordingly the court finds that early in the trial Beck told Delizio he believed petitioner was

22   guilty.

23           The court rejects any claim that Beck introduced himself or was introduced as the

24   jury foreman.  The court credits the testimony of former jurors Swofford, Penick and Thomas,

25   who all reported the foreman was not selected until the judge sent the jury to deliberate.

26   Petitioner argues, however that this testimony is not determinative and that Beck could have

27   claimed and did claim to be the foreman even though the selection had not been made.  He argues

28   this is supported by Zernich's testimony that Delizio questioned him about the selection process

1   and then revealed what Beck had said at the reunion.  Delizio did not corroborate Zernich's

2   account, however, but said only that he told the lawyer about Beck's comments after the verdict.

3   EHRT at 7-9.  Moreover, although Zernich supported the motion for a new trial with his

4   declaration, he did not include in his filings with the court his account, shared at hearing, of the

5   segue from questions to Zernich about procedure into questions about substance.  The court notes

6   that by the time Delizio approached Zernich, Beck had been identified as the foreman in the

7   newspaper article about the verdict.  That the court does not credit Delizio's current claim that

8   Beck introduced himself as the foreman does not otherwise destroy his credibility as to what Beck

9   said, supported as it is by Beck's own statements.

10          The court also credits the jurors' consistent testimony that Beck did not

11  immediately announce his belief in petitioner's guilt after the jury retired nor at any time before

12  the jury began deliberations.

13                          a.  The Propriety of the Evidentiary Hearing

14          In the first section of the post-hearing briefing, respondent discusses the

15  deferential AEDPA standard at length and then suggests the court should not have granted

16  petitioner's request for a hearing on this issue.  *See* ECF No. 147 at 18-23.  To the extent

17  respondent is seeking reconsideration, the request is not timely.  Moreover, as explained in the

18  order granting the hearing, the court had no other way to determine the credibility of the

19  competing declarations in the record and the state court's resolution of the claim solely on the

20  declarations was unreasonable within the meaning of section 2254(d).  *Earp v. Ornoski*, 431 F.3d

21  1158, 1169 (9th Cir. 2005).  Moreover, as the state court's determination of the facts was not

22  reasonable, the court considered this claim de novo.

23                          b.  Rule 606(b)

24          Respondent also argues that Delizio's and Stoy's accounts are inadmissible under

25  Rule 606(b) of the Federal Rules of Evidence, which provides, in pertinent part:

26              [d]uring an inquiry into the validity of a verdict . . ., a juror may not
                testify about any statement made or incident that occurred during
27              the jury's deliberations; the effect of anything on that juror's or
                another juror's vote; or any juror's mental processes concerning the
28

1    verdict . . . .   The court may not receive a juror's affidavit or
     evidence of a juror's statement on these matters.
2

3    Fed. R. Evid. 606(b).

4          "Rule 606(b) . . . prohibits the use of juror testimony to impeach a verdict when

5    that testimony relates to *intrinsic* matters—that is, the internal mental processes by which the

6    verdict was reached.  Whether the juror was literally inside or outside the jury room when the

7    irregularity occurred has no bearing on the determination that a particular influence was external

8    or internal."  *United States v. Hernandez-Escarcega*, 886 F.2d 1560, 1579 (9th Cir. 1989)

9    (emphasis in original; citation omitted).  Even when  it is proper for a juror to testify about

10   external influences, he cannot describe their impact on the verdict.  *See United States v. Paneras*,

11   222 F. 3d 406, 411 n.1 (7th Cir. 2000).

12         The external/internal divide referenced by Rule 606(b) is not clearly defined and

13   its construction is subject to some variation among the circuits.  *See Basham v. United States*, CR

14   No. 4:02-992 JFA, 2013 WL 2446104, at *99 (D. S. C. Jun. 5, 2013) (recognizing split)

15         A Seventh Circuit case has explored the intersection of Rule 606 and claims of

16   premature deliberation and says:

17         [W]hen a district court receives information after a verdict is
           returned that jurors engaged in premature deliberation or made pre-
18         deliberation statements indicating they had already made up their
           minds, Rule 606(b) does not prevent consideration of evidence of
19         the statements or conduct, but it does prevent consideration of
           evidence about whether and how much such statements or conduct
20         may have affected actual deliberations and verdicts.  In essence, the
           court must ignore any evidence about the supposed actual effects of
21         the statements or conduct on the jurors, and must rely instead on
           precedent, experience and common sense to gauge whether the
22         statements or conduct should be *presumed* prejudicial.

23   *United States v. Farmer*, 717 F.3d 559, 565 (7th Cir. 2013) (emphasis in original).

24         Very recently, the Supreme Court has said that Rule 606(b) prohibits a juror's

25   testimony, given at a hearing on a motion for a new trial, that another juror had concealed

26   information during voir dire that could have had an impact on her partiality  *Warger*, 2014 WL

27   6885952, at *6-7.  The Court did not directly address the external/internal question, however, for

28   in that case the juror had made the statements allegedly revealing her bias during the

                                                   69

1   deliberations.  The Court did say, "[e]ven if jurors lie in *voir dire* in a way that conceals bias,

2   juror impartiality is adequately assured by the parties' ability to bring to the court's attention any

3   evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the

4   verdict is rendered."  *Id*. at 10 (footnote omitted).  Although *Warger* suggests the accounts about

5   Beck's statement would be inadmissible because they describe his mental processes, the case

6   does not squarely address this issue.  Until the law is further clarified, this court will follow the

7   Seventh Circuit's approach.

8                                             c.  Analysis

9          Whether or not Beck's conversation with Delizio expressing his belief in

10  petitioner's guilt was misconduct, the court finds it did not have a substantial and injurious effect

11  on the verdict.  *Compare Davis*, 384 F.3d at 652-53 (premature deliberations are a form of bias

12  and misconduct) *with United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974) (declining to

13  consider whether premature discussion was misconduct; noting the claim that nine jurors

14  expressed premature conclusions about the defendant's guilt).

15         The court rejects petitioner's argument that a presumption of prejudice arises from

16  any such misconduct.  In *Davis*, the Ninth Circuit said, "[w]ere we to assume that premature

17  deliberations occurred, such an exchange, though not necessarily proper, is not as serious as

18  'private communication, contact, or tampering . . . with a juror during trial [or] . . . influences of

19  the press upon the jury,' nor does 'every incident of juror misconduct require[] a new trial.'"

20  384 F.3d at 653 (quoting *Klee*, 494 F.2d at 396) (alteration in original); *United States v. Morales*,

21  655 F. 3d 608, 630 (7th Cir. 2011) (no presumption of prejudice arises from premature

22  deliberations); *Szuchon v. Lehman*, 273 F.3d 299, 313 (3d Cir. 2001) (claims that jurors had

23  decided to convict by the third day of the prosecution's case and decided to impose death penalty

24  by the fourth or fifth day were troubling, but did not state a due process claim because there was

25  no reason to doubt the jury based its ultimate decision on the evidence presented at trial).

26         Jurors Swofford and Penick testified credibly that Beck did not tell the others

27  before deliberations that he had made up his mind and did not attempt to force the jury into a

28  guilty verdict soon after retiring to deliberate.  Beck did not tell Juror Thomas about his opinion

70

1   of petitioner's guilt, even though they shared both jury duty and a relationship from work.

2   Moreover, the record reflects Beck's report during trial that everybody was participating in

3   discussions about the case.  *See, e.g.,* RT 9408, 9387-9388.[12]  While it was not strictly proper or

4   appropriate for Beck to have expressed his views or begun to form them before the close of the

5   evidence, his statement to Delizio appears to be the product more of conviviality and, perhaps

6   alcohol, rather than an entrenched belief, in light of the other evidence presented at the hearing

7   before this court.  As petitioner has shown only that the statement was made, he has not shown he

8   is entitled to habeas relief.  *See Belmontes v. Brown,* 414 F.3d 1094, 1124-25 (9th Cir. 2005)

9   (concluding petitioner failed to show prejudice when he did not allege any facts "other than that

10  premature deliberations took place"), *rev'd on other grounds sub nom. Ayers v. Belmontes,*

11  549 U.S. 7 (2006).  The record does not show Beck's opinion, expressed early, persisted or was

12  firmly held throughout the deliberative process.

13          Petitioner also argues Beck's misconduct must be judged as a whole.  However,

14  because the court has found that his reading of the newspaper did not have a substantial and

15  injurious effect, it does not aid petitioner to consider the claims together.  Petitioner has not

16  shown he is entitled to relief on this claim.

17  X.  RECUSING THE PROSECUTOR'S OFFICE (Issue Six)

18      A.  Background

19          On  October 27, 1999, petitioner's counsel filed a motion to recuse the entire

20  Plumas County District Attorney's Office, alleging its impartiality was undercut by the

21  cooperation by the insurance companies that had issued policies on Ronna's life and a romantic

22  relationship between the District Attorney's investigator Kris Beebe and Paula O., who alleged

23  petitioner had raped her in San Jose.  CT 112-124, 374-378, 388-389.

24          After an evidentiary hearing, the Superior Court denied the motion.  RT 882-888.

25  Petitioner challenged the denial on direct appeal and the Court of Appeal affirmed:

26  _____

27          [12] These statements to the trial court, made before the verdict was reached, do not run
    afoul of Rule 606.  Before a verdict is reached, Rule 606 does not bar a juror's statements.
    *United States v. Sabadu,* 891 F.2d 1308, 1334 (7th Cir. 1989) ("The Rule, by its own terms, limits

28  inquiries into 'the validity of  the verdict . . . .'").

"The standard for a motion to disqualify the prosecutor is set forth in Penal Code section 1424: 'The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' [The Supreme Court] detailed the history of this statute and the associated legal principles in *Eubanks*, where [the court] explained that a 'conflict,' for purposes of section 1424, "'exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner."' (*Eubanks, supra*, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310, quoting *People v. Conner* (1983) 34 Cal.3d 141, 148, 193 Cal.Rptr. 148, 666 P.2d 5.) However, 'the conflict is disabling only if it is "so grave as to render it unlikely that defendant will receive fair treatment"' during all portions of the criminal proceedings. (*Eubanks, supra*, at p. 594, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The statute thus articulates a two-part test: '(i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?' ( *Ibid*.)" (*Hambarian, supra*, 27 Cal.4th at p. 833, 118 Cal.Rptr.2d 725, 44 P.3d 102.) On appeal, we determine whether substantial evidence supports the trial court's factual findings and whether, based on those findings, the trial court abused its discretion in denying the motion. (*People v. Breaux* (1991) 1 Cal.4th 281, 293-294, 3 Cal.Rptr.2d 81, 821 P.2d 585.) Here, the facts are largely undisputed.

Defendant relies primarily on *Eubanks* to assert the cooperation between the district attorney and the insurance companies created a conflict of interest. In *Eubanks*, the victim in a complex trade secrets theft prosecution contributed about $13,000 to the district attorney to fund the district attorney's investigation. The district attorney sent to counsel for the victim corporation the bill for services rendered by a technician who accompanied law enforcement in its search of the defendants' residences and offices. Counsel paid the technician on behalf of the district attorney. Additionally, the victim paid for transcription services on behalf of the district attorney. (14 Cal.4th at pp. 585-587, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The Supreme Court found this created a conflict of interest for the district attorney. It concluded that "financial assistance of the sort received may create a legally cognizable conflict of interest for the prosecutor.... The trial court did not err in concluding these circumstances evidenced a 'reasonable possibility' the prosecutor might not exercise his discretionary function in an evenhanded manner." (*Id*. at p. 598, 59 Cal.Rptr.2d 200, 927 P.2d 310 .)

The essential difference between *Eubanks* and this case is that, in *Eubanks*, the district attorney's acceptance of funds from the victim to finance the district attorney's own investigation and prosecution of the defendants made it appear the district attorney was beholden to the victim for that help. Here, the insurance companies did most of their investigation on their own and for their own benefit. When the district attorney learned of the work that had been done, he solicited access to the work product. Thereafter, the district attorney cooperated with the insurance companies and others in obtaining some of the evidence against defendant. This procedure did not

create the same appearance and relationship as existed in Eubanks. Although the district attorney obtained work product for which the insurance companies had paid, that work was done originally for the benefit of the insurance companies, not for the district attorney. Furthermore, *Eubanks* stated that financial help in the investigation from a victim may create a conflict of interest, not that it always does. Here, the trial court did not abuse its discretion in determining that the nature of the relationship between the district attorney and the insurance companies did not establish a reasonable possibility the district attorney would not exercise his discretionary functions in an evenhanded manner.

With respect to the romantic relationship between Paula O. and Beebe, defendant asserts the denial of the recusal motion was an abuse of discretion because the district attorney's decision to file murder charges in Plumas County caused the Santa Clara County officials to forego prosecution there in order to send him to Plumas County to face the more serious charges. This, defendant asserts, deprived him of his right to a speedy trial in Santa Clara County and resulted in Paula O. not being required to testify. As did the trial court, we find no effect, from these conditions, of rendering it unlikely defendant would receive a fair trial in Plumas County.

Finally, defendant contends the small office nature of the Plumas County District Attorney's office (10 employees) made it impossible to screen Beebe and Meads off the case. We conclude the facts support the trial court's remedy for the conflict caused by the relationship with Paula O. The conflict was of a minimal nature, having to do with a person who was not a victim in this case. The district attorney was under order of the court concerning how to proceed-that is, with the services of the Department of Justice or a private investigator. We will not conclude the district attorney was incapable of obeying this order, especially without any indication that obedience was problematic. Defendant fails to establish that the trial court's denial of his motion to recuse the district attorney was error.

Lodg. Doc. at 37-43.

Petitioner sought discovery of materials from the prosecutor's file documenting contacts with insurance companies, the decedent's family, and other law enforcement agencies, among other things; the court denied this request. ECF No. 76 at 27.

Petitioner says some of the factual findings made by the Court of Appeal are clearly erroneous in light of the evidence before the state court and argues that this court's review of its conclusions is *de novo* because the Court of Appeal addressed the issue only on state-law grounds. ECF No. 58 at 28, 88. Respondent argues these claims are entitled to AEDPA deference. ECF No. 59 at 17-18.

73

1       B.  The Standard of Review

2               Petitioner argues that because the state court relied exclusively on state authority

3    in resolving this claim, it did not reach the merits of the companion federal constitutional claim,

4    an omission that entitles him to *de novo* review.  He also argues that several of the Court of

5    Appeal's factual findings are clearly erroneous.

6               As noted above, when a state court reaches the merits of an argument made on

7    state law and federal constitutional grounds,  but discusses only the state law grounds, this court

8    presumes the state court reached the merits of the federal constitutional claim.  *Johnson*,

9    133 S. Ct. at 1096.  The Court of Appeal in this case relied on *People v. Eubanks*, 14 Cal. 4th 580

10   (1996), which cited federal cases, showing it recognized the federal constitutional dimensions of

11   the issue.  *Id*. at 596-97.   Moreover, in his opening brief, petitioner cited to both state and federal

12   authority throughout his argument, noting that "[t]he standard of *Eubanks* and section 1424 is

13   congruent with that of the due process clause. . . ."  Lodg. Doc. 21, at 72; *see Johnson*, 133 S. Ct.

14   at 1099 (stating that because the defendant "treated [the] state and federal claims as

15   interchangeable . . .it is hardly surprising that the state courts did so as well").   The presumption

16   that the state courts decided this issue on the merits has not been rebutted and so the claim is

17   reviewed under the deferential standard of the AEDPA.

18       C.  Impartial Prosecutor

19               There is little Supreme Court authority on the question of the due process

20   implications of prosecutorial partiality.   In *Marshall v. Jerrico, Inc*., the Court said, "we do not

21   suggest . . . that the Due Process Clause imposes no limits on the partisanship of administrative

22   prosecutors."  446 U.S. 238, 249 (1980).  It continued that "[a] scheme injecting a personal

23   interest, financial or otherwise, into the enforcement process may bring irrelevant or

24   impermissible factors into the prosecutorial decision and in some contexts raise serious

25   constitutional questions."  *Id*. at 249-50.  The Court declined to "say with precision what limits

26   there may be on a financial or personal interest of one who performs a prosecutorial function" and

27   declined to speculate "whether different considerations might be held to apply if the alleged

28   biasing influence contributed to prosecutions against particular persons, rather than to a general

1    zealousness in the enforcement process." *Id.* at 250 & n.12; *see also Young v. United States ex*

2    *rel. Vuitton et Fils*, 481 U.S. 787, 806 n.17, 809 (1987) (in a case based on its supervisory

3    powers, the Court said that while the appointment of a special prosecutor with an interest in

4    contempt proceedings was improper, that party's "familiarity with the proceedings may be put to

5    good use in *assisting* a disinterested prosecutor in pursuing the contempt action, but cannot justify

6    permitting counsel for the private party to be in control of the prosecution") (emphasis in

7    original).   In prosecutorial misconduct cases, the Supreme Court has said "the touchstone of due

8    process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

9    culpability of the prosecutor." *Smith*, 455 U.S. at 219; *see also Gill v. Martel*, No. 2:09–cv–748

10   JAM TJB, 2011 WL 2038712, at *11 (E.D. Cal. May 24, 2011) ("[A] petitioner claiming that a

11   prosecutor bore a personal bias against him must demonstrate that the fairness of his trial was

12   affected and that he was thus prejudiced by the prosecutor's involvement").

13            The lower federal courts recognize that a defendant in a criminal case has a due

14   process right to an impartial prosecutor who can make "unbiased use of all the options available

15   to the prosecutor's office." *See, e.g.*, *Jones v. Richards*, 776 F.2d 1244, 1247 (4th Cir. 1985).  In

16   *Jones*, private attorneys who were pursuing a civil case against the criminal defendant stemming

17   from the accident giving rise to manslaughter charges assisted in the prosecution.  The Court of

18   Appeals denied habeas relief, noting the prosecutor had retained control over the prosecution and

19   the civil lawyers did not use their involvement to exact a more favorable settlement in the civil

20   action.  776 F.2d at 1247.

21            The lower federal courts also have recognized that a prosecutor's personal or

22   emotional involvement in a case might lead to improper bias in violation of a criminal

23   defendant's due process rights.  *See, e.g., Gallo v. Kernan*, 933 F. Supp. 878, 885 (N.D. Cal.

24   1996), *aff'd,* 141 F.3d 1175 (9th Cir. 1998) (table).

25            Courts considering the question also have said, however, that review of claimed

26   due process violations in state court proceedings is narrow.  *Newman v. Frey*, 873 F.2d 1092,

27   1093 (8th Cir.1989).  A court may grant relief only if a prosecutor's misconduct affects the

28   fairness of the trial.  *Gallego,* 124 F.3d at 1079 (habeas petitioner "must allege and show resultant

1    prejudice, *i.e.*, he must demonstrate that his trial was rendered fundamentally unfair" by the

2    prosecutor's alleged pecuniary interest stemming from a book deal).

3            D.  Insurance Company Involvement

4            Petitioner takes issue with the Court of Appeal's conclusion the insurance

5    companies did most of their investigation on their own and for their own benefit.  ECF No. 58 at

6    90.

7            The record shows that Lariviere, the lawyer for the insurance companies, had paid

8    Exponent[13] approximately $55,000 for its analysis of the snowmobile incident.  RT 346.   Plumas

9    County District Attorney Reichle learned about Exponent's work either from reading a cross-

10   complaint Lariviere had filed in some of the civil litigation surrounding Ronna's death or from

11   talking to Lariviere.  RT 544.  At some point Reichle asked Lariviere for the information the

12   insurance companies had developed about petitioner's affairs and eventually Reichle hired

13   Exponent independently, after reviewing the report it had prepared for Lariviere's clients.   RT

14   358-359, 545.   Reichle said he did not have any contact with Exponent until after it had produced

15   an analysis of the incident for the insurance companies.   RT 325.  He said he asked Lariviere "if

16   she had an objection to my independently retaining them, but allowing them to make use of the

17   studies they had already done . . . and she said, yeah, after a lot of hesitation."  RT 326.

18           Petitioner says the Court of Appeal's finding is clearly erroneous because the

19   evidence showed the following:  Lariviere not only paid for the analysis by Exponent, but also

20   gave $450 to Plumas County Search and Rescue after a reserve sheriff's deputy accompanied her

21   to test a snowmobile; the Plumas County District Attorney's office gave the bed sheets from the

22   Franklins' hotel room to Jack Mitchell, a lawyer for Ronna's family, for testing and received the

23   results of the testing, as did Mitchell; Reichle invited Lariviere to a meeting in Sacramento with

24   representatives of the Sacramento County and Santa Clara County district attorneys' offices ("the

25   Michael Franklin task force") to discuss information about petitioner's affairs during the course

26   of his marriage; and Reichle provided her with a set of discovery documents;  Reichle learned

27   _____

28           [13] The company was previously called Failure Analysis; the court adopts petitioner's
     practice and calls it Exponent.

                                              76

1    about some of the women with whom Franklin was having affairs from materials provided by

2    Lariviere.  Petitioner also argues the factual finding was clearly erroneous because it omitted

3    Lariviere's attempt to conceal most of her contacts with the prosecution team from the defense.

4    *See* ECF No. 58 at 90-92.

5                    Petitioner is correct that the information he puts forth is supported by the record,

6    but he is not correct this information overcomes the presumption that the Court of Appeal's

7    finding is correct by clear and convincing evidence.  He does not explain how Lariviere's delayed

8    disclosure of her contacts with the prosecution, even if it rises to the level of an attempt to

9    conceal, becomes affirmative evidence that the insurance companies had taken control of the

10   prosecution's case or were acting solely as the prosecution's handmaiden.  Had the information

11   about the additional contacts shown this, petitioner should have provided it to the trial court and

12   to this court.  He did not.  The same can be said about Lariviere's attendance at the task force

13   meeting:  it is not affirmative evidence that the insurance companies controlled the prosecution,

14   only that the parties shared an interest.

15                   Second, the fact that the prosecutor accepted Exponent's analysis from Lariviere

16   and then retained Exponent, or that the civil lawyers and the Plumas County District Attorney's

17   Office shared some information does not undercut the state court's finding.  As petitioner himself

18   notes, Lariviere, on behalf of the insurance companies, had hired Exponent and pursued

19   information about petitioner's involvement in Ronna's death before she had any contacts with

20   Plumas County authorities.  He has not shown that the additional connections between Ronna's

21   family, the insurance companies, and the Plumas County District Attorney's office overcome the

22   presumption of correctness attached to the Court of Appeal's finding.  That finding, that the

23   insurance companies acted independently, without controlling the prosecution, supports the legal

24   conclusion that the contacts among those interested in the cause of Ronna Franklin's death did not

25   violate petitioner's right to due process.

26                   Third, petitioner suggests that the involvement of the insurance companies and the

27   lawyer representing Ronna's family "is particularly likely to taint the exercise of the prosecutor's

28   discretion *prior* to trial—whether to file charges, what charges to file, and the strategy for plea

77

1    negotiations." ECF No. 25 at 72 (emphasis in original).  Despite evidence in the record that

2    Plumas County's investigation had lagged, petitioner does not clearly tie the ultimate decision to

3    prosecute to prompting by the insurance companies, but rather only to the offer of assistance in

4    the form of Exponent's analysis.  Petitioner has not otherwise shown that plea bargaining or other

5    strategic decisions were influenced.  He has not borne his burden.

6         E. Paula O. and Kris Beebe and Size of the Office

7              Petitioner also takes issue with "the state court's finding that the conflict with

8    respect to Paula O. 'was of a minimal nature' because she was not a complaining witness in this

9    case." ECF No. 58 at 92.

10             The trial court said, "we know that Mr. Beebe had this relationship, and it's my

11   opinion that that constitutes a conflict . . . ." RT 886.   The court continued that there was no

12   "evidence that [petitioner's] prosecution is in any way affected by the Beebe-O[] relationship"

13   and he did not "see any prejudice or bias here in any fashion that's been created by the

14   relationships that existed between Miss [O.] and other members in the D.A.'s office." RT 888.

15   The trial court did say, however, that the prosecutor "need[ed] to find an independent

16   investigator." RT 888.

17             The Court of Appeal acknowledged the trial court finding, but in discussing

18   petitioner's challenge to the trial court's decision to wall off Beebe rather than recuse the entire

19   office, it said, "[w]e conclude the facts support the trial court's remedy for the conflict caused by

20   the relationship with Paula O. The conflict was of a minimal nature, having to do with a person

21   who was not a victim in this case." Lodg. Doc. 4 at 43.

22             Petitioner has cited nothing supporting his claim that the Court of Appeal's

23   conclusion is a finding of fact rather than a mixed question of law and fact.  *See Strickland v.*

24   *Washington*, 466 U.S. 668, 698 (1984) (stating that ineffective assistance of counsel is a mixed

25   question of law and fact, "like the question whether multiple representation in a particular case

26   gave rise to a conflict of interest"); *Skains v. California*, 386 F. App'x 620, 621 (9th Cir. 2010)

27   (unpublished) (finding that "the District Attorney had no unconstitutional conflict of interest

28   under clearly established federal law").

                                           78

1          Petitioner points to a number of facts in the record, apparently to argue the impact

2  of the relationship on the fairness of the prosecution against him.  He concedes that when Reichle

3  learned of Beebe's involvement with Paula O., he relegated Beebe to chasing paper.  ECF No. 58

4  at 95; *see* RT 193.  However, he notes that Reichle and Beebe did not disclose the relationship to

5  Joanne McCracken, who was handling the rape prosecution against petitioner in Santa Clara

6  County, and that when McCracken learned of it, she did not provide this information to

7  petitioner's counsel in the Santa Clara case.  ECF No. 58 at  93  Petitioner has not explained how

8  this affected the Plumas County proceedings and it is the fairness of these proceedings, not any

9  alleged denial of his rights in Santa Clara County, that this court must consider.

10          Petitioner also says that Reichle and Beebe allowed Ronna's father to put Paula O.

11  in telephonic contact with Shelle Hill, a potential witness in the Plumas County case, something

12  that "could only have been harmful to the credibility of Hill as a witness against [petitioner] in

13  Plumas County . . . ."  *Id*.; *see also* RT 806-807.  Petitioner does not explain how something that

14  could have damaged the credibility of a prosecution witness harmed his case.

15          Finally petitioner mentions Paula O.'s contacts with potential jurors, *see* Issue

16  One*, supra*, but has not explained how her independent actions show that Beebe and Reichle were

17  too emotionally entangled with Paula O. as to impact petitioner's right to a fair trial.    Moreover,

18  as petitioner said, Reichle was aware that Paula O. was "bad news," yet has failed to show that

19  this had an impact on Reichle's handling of the case.  That Paula O. was a loose cannon and may

20  have attempted to inject herself into the trial proceedings does not mean the prosecution was

21  similarly involved in unfairness:  petitioner has not shown Paula O.'s independent activities can

22  be traced back to the prosecutor's office or to Reichle personally.  To the extent the Court of

23  Appeal's characterization of the conflict as minimal is factual, petitioner has not shown the

24  finding was clearly erroneous.  To the extent the issue is one of law, he has not discussed how this

25  determination was an unreasonable determination of clearly established federal law.

26          Petitioner then turns to the inadequacy of the trial court's remedy, arguing that

27  because the office was so small, removing Beebe from any involvement in the Franklin case did

28  not insulate the office as a whole from any conflict.  ECF No. 58 at 96.  As noted, the trial court

1   directed that "only you, Mr. Reichle, will be involved in the case, and no one else in your office,

2   by using the Department of Justice or an investigator who will be segregated from the rest of the

3   staff . . . ." RT 896.  Reichle asked if Meads, who was the custodian of the evidence, could

4   communicate with somebody to transfer her duties and asked the court to allow him to rely on

5   clerical and investigative staff with no connection to Paula O.   RT 897.  The court agreed his

6   staff could "provide discovery and [do] clerical type [work]" and also permitted Reichle to

7   discuss legal strategy with Deputy District Attorneys Cunan and McGowan.  *Id.* at 897, 898.  The

8   Court of Appeal found the remedy appropriate.

9           Petitioner has cited no law on the appropriate remedy.  Lower federal courts have

10   recognized that "[t]he disqualification of Government counsel is a drastic measure and a court

11   should hesitate to impose it except when necessary." *Bullock v. Carver*, 910 F. Supp. 551, 559

12   (D. Utah 1995).  A finding that the improper conduct of two attorneys in a county attorney's

13   office "'negatively influenced others in this suit,'" was deemed "insufficient to support [the]

14   drastic remedy" of disqualifying the entire office.  *In re Harris Cnty., Tx.* 240 F. App'x 644, 646

15   (5th Cir. 2007).

16           Petitioner argues that the size of the office here—ten people—and the notoriety of

17   the crime insured that the incident "necessarily became the talk of the office and affected the

18   office as a whole. . . . ."  ECF No. 58 at 96.   However, his use of the adverb "necessarily" twice

19   in the same paragraph only highlights the lack of proof that the Franklin case was "necessarily . . .

20   an event in the life of that small office . . . ."  *Id.*   The only thing petitioner can point to is

21   Reichle's testimony that Beebe was sometimes out-of-sorts because of the difficulties of dealing

22   with Paula O.  ECF No. 25 at 74 ¶ 268.  Nothing in the record shows that Beebe's relationship

23   blues had anything to do with the overall fairness of the proceedings against petitioner.  Petitioner

24   has not shown that the refusal to recuse the entire Plumas County prosecutor's office was an

25   unreasonable application of clearly established federal law.

26   XI.  PROSECUTORIAL MISCONDUCT  (Issue Eight)

27           Petitioner identifies a number of instances of what he classifies as prosecutorial

28   misconduct during closing argument and rebuttal.  The court addresses them in turn.

1    A.  Prosecutorial Misconduct

2          In general, a prosecutor's actions will not be grounds for habeas relief unless they

3    "'so infected the trial with unfairness as to make the resulting conviction a denial of due

4    process.'"  *Darden v. Wainwright*,  477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*,

5    416 U.S. 637 (1974)).   This is a "very general" standard, "leaving courts 'more leeway . . . in

6    reaching outcomes in case-by-case determinations.'"  *Parker v. Matthews*, ___ U.S. ___, 132 S.

7    Ct 2148, 2155 (2012) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (alteration in

8    original).

9          "Comments intended to highlight the weaknesses in a defendant's case do not shift

10   the burden of proof to the defendant where the prosecutor does not argue that a failure to explain

11   them adequately requires a guilty verdict and reiterates that the burden of proof is on the

12   government."  *United States v. Tucker*, 641 F.3d 1110, 1120-21 (9th Cir. 2011) (quoting *United*

13   *States v. Vaandering*, 50 F.3d 696, 701-02 (9th Cir. 1995)).

14         Petitioner says this court must review these claims *de novo* because the Court of

15   Appeal addressed only the related state law claims.  ECF No. 58 at 98.  The court addresses the

16   standard of review in its discussion of each component of this claim analyzed below.

17   B.  Use of a Chart

18         Petitioner argues the prosecutor used a misleading chart plotting petitioner's

19   extramarital affairs in closing.  ECF No. 25 at 75-76.  A prosecutor has wide latitude in arguing

20   to a jury, but misstating the evidence may be deemed to be misconduct. *Gillard v. Mitchell*,

21   445 F.3d 883, 897 (6th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1485 (2007) (wide

22   latitude); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002); *cf Darden*, 477 U.S. at 181-82 (no

23   constitutional violation because the prosecutor did not manipulate or misstate the evidence).

24         The Court of Appeal rejected petitioner's assignment of error:

25         During closing argument, the prosecution, as a visual aid, used a
         chart that included the pictures of the women with whom there was
26       evidence defendant had extramarital affairs. The chart also showed
         a timeline of when defendant was involved with each woman.
27       Defendant asserts the chart was misleading because it showed
         continuous lines for relationships that were not continuous.
28

1
2
3
4
5

> Defendant did not object to the prosecutor's use of the chart during closing argument. Later, in a motion for new trial, he contended that use of the chart constituted prosecutorial misconduct. The motion for new trial did not cure the failure to object during closing argument and to request an admonition. (*See People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1145, 124 Cal.Rptr.2d 373, 52 P.3d 572 [requiring timely objection and request for admonition].) This contention is therefore waived.

6    Lodg. Doc. 4 at 81-82.

7          Respondent argues that petitioner has defaulted his claim because of his failure to

8    object at trial to the use of the chart.  ECF No. 36 at 98.

9          A federal court will not review a claim of federal constitutional error raised by a

10   habeas petitioner if the state court determination of the same issue "rests on a state law ground

11   that is independent of the federal question and adequate to support the judgment." *Coleman v.*

12   *Thompson*, 501 U.S. 722, 729 (1991).  This rule applies when the state court's determination is

13   based on the petitioner's failure to comply with procedural requirements, so long as the

14   procedural rule is an adequate and independent basis for the denial of relief. *Id.* at 730. For the bar

15   to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ]

16   purported default." *Fields v. Calderon*, 125 F.3d 757, 762 (9th Cir.1997).  For the bar to be

17   "independent," it must not be "interwoven with the federal law." *Michigan v. Long*, 463 U.S.

18   1032, 1040–41 (1983).  As respondent observes, the Ninth Circuit has held that the failure to

19   make a contemporaneous objection to prosecutorial misconduct raises an adequate and

20   independent procedural bar to such a claim on federal habeas.  *Rich v. Calderon*, 187 F.3d 1064,

21   1069-70 (9th Cir. 1999).

22          Petitioner argues the claim is not defaulted. ECF No. 58 at 99.  He cites to *People*

23   *v. Gutierrez*, the case relied upon by the Court of Appeal, which he characterizes as requiring

24   only a "timely" objection.  28 Cal. 4th 1083, 1145 (2002).  He then argues this requirement is

25   satisfied by his having raised the issue in a motion for a new trial under Penal Code section 1181,

26   which specifically lists prosecutorial misconduct as a ground for relief.  ECF No. 58 at 99.

27          Petitioner cites only selectively to *Gutierrez*, which requires "a timely objection *at*

28   *trial*" and a "request [for] an admonition."  *Id*. (emphasis added); *see also People v. Clair*, 2 Cal.

1    4th 629, 662 (1992) (identifying the "general rule" as "'a defendant cannot complain on appeal of

2    misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of

3    misconduct and requested that the jury be admonished to disregard the impropriety'" (quoting

4    *People v. Benson,* 52 Cal. 3d 754, 794 (1990)).   Raising a claim in a motion for a new trial does

5    not constitute a timely objection because there can be no admonishment to the jury.  A "timely"

6    objection sufficient to preserve the error thus must be made at trial.  That "prosecutorial

7    misconduct" is one of the enumerated grounds for a motion for a new trial does not dispense with

8    the requirement of a timely objection.  *See* Cal. Pen. Code § 1181(5); *see also Owens v. Scribner*,

9    No. CV 08-01287 JVS (AN), 2010 WL 429933, at *17 (C.D. Cal. Feb. 4, 2010) (rejecting claim

10   that raising a challenge to the admission of evidence in a motion for a new trial constitutes a

11   "timely" objection for purposes of a procedural bar); *Sutherland v. Woodford*, No. CIV S-05-

12   0532 MCE DAD P, 2009 WL 1751866, at *15 (E.D. Cal. Jun. 18, 2009) (same).

13               Petitioner then argues that there is a dual "cause" for his failure to make a timely

14   objection to the chart:  counsel was ineffective and/or there was further prosecutorial misconduct.

15   ECF No. 58 at 99.  A federal court may consider an otherwise barred claim if the petitioner can

16   demonstrate cause for the default and actual prejudice as a result of the alleged violation of

17   federal law.  *Coleman*, 501 U.S. at 749-50.  Counsel's neglect, ignorance or inadvertence that

18   does not rise to the level of ineffective assistance of counsel under the Sixth Amendment does not

19   constitute cause*, Murray v. Carrier*, 477 U.S. 478, 488 (1986), but ineffective assistance of

20   counsel may constitute cause so long as the ineffective assistance claim is itself not defaulted.

21   *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000).  Similarly, prosecutorial misconduct may

22   establish cause, again so long as this additional claim of misconduct is not itself defaulted.

23               As noted, petitioner challenged the use of the chart as part his motion for a new

24   trial, but did not argue any failure to object constituted ineffective assistance of counsel.  CT

25   1664-1666.  In state habeas proceedings, petitioner argued that trial counsel's failure to object

26   constituted ineffective assistance of counsel or that the prosecutor committed misconduct by

27   presenting the chart in a way that did not give counsel a chance to object.  *See, e.g.,* Pet. for a

28   Writ of Habeas Corpus, filed in the Court of Appeal, Lodg. Doc. 8.   In a declaration attached to

1    this petition, trial counsel Axup said only that "[p]rior to the jury actually viewing a chart of the

2    'other women' involved with Michael Franklin . . . I had not seen it, or was I informed of its

3    existence.  Had I seen the chart prior to the presentation to the jury, I would certainly have made

4    objects [*sic*] to it."  Lodg. Doc. 6, Appendix 13.  The Court of Appeal and the California

5    Supreme Court denied further writs without comment.  Lodg. Docs No. 8, 10.

6              Even though these ineffective assistance and prosecutorial misconduct claims are

7    not defaulted, petitioner has not borne his burden of showing they establish cause for the default.

8    S*ee Wainwright v. Sykes*, 433 U.S. 72, 91-92 (1977) (petitioner's burden to establish cause).

9    First, he cites no case law in support of his claim that the prosecutor's failure to show the chart to

10   trial counsel before argument was misconduct, much less misconduct that prevented trial counsel

11   from objecting.  *See* ECF No. 25 at 82-83; ELF No. 58 at 110-111; *see also John-Charles v.*

12   *California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (failure "to develop any argument on this

13   front" is a waiver of the argument).

14             Second, he has not cited and so certainly has not discussed the standard for finding

15   counsel to be effective, a showing he must make to excuse the procedural default.  *See* ECF No.

16   25 at 82-83; ELF No. 58 at 99-100, 109-110.   He has presented Axup's declaration, which says

17   only that he would have objected to the chart before argument if it had been shown to him, but

18   does not address the more pertinent question of why he did not object during argument, at the

19   time when the contemporaneous objection should have been made; nor does he suggest there was

20   an impediment to his objection when the prosecutor referred to the chart during closing.

21   Accordingly, petitioner has not overcome the presumption that counsel's failure to object was

22   reasonable, *see Iaea v. Sunn*, 800 F.2d 861, 864 (9th Cir. 1986) (a court must "indulge a strong

23   presumption" that counsel's conduct falls within the range of competence); *Ross v. Felker*,

24   669 F.  Supp. 2d 1135, 1149 (C.D. Cal. 2009) (trial counsel could reasonably have decided as part

25   of trial strategy not to object to prosecutor's misstatement of the evidence in rebuttal), and so has

26   not shown cause for the default.  In addition, petitioner's failure to cite authority constitutes a

27   waiver of this argument.  *Acosta–Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir.1993).

28   /////

1          C.  Shifting the Burden to Petitioner

2                    Petitioner argues that on multiple occasions during argument the prosecutor said

3     the defense had a burden of proof.   He argues, for example, that when the prosecutor said there

4     was no evidence that Ronna had gone into cardiac arrest as a result of her immersion in cold

5     water, the prosecutor was arguing the defense had a burden of proof.  *See* ECF No. 25 at 76-77;

6     ELF No. 58 at 100-101.  Respondent argues the issue is barred, noting the Court of Appeal said

7     that none of the statements "prompted an objection or request for an admonition" and petitioner

8     "has waived a claim of prosecutorial misconduct concerning them."   Lodg. Doc. 4 at 84.

9                    Petitioner argues respondent has not adequately pleaded the procedural bar.  It is

10    true respondent bears the initial burden of demonstrating a particular procedural bar is applicable.

11    In *Bennett v. Mueller*, the Ninth Circuit said "[o]nce the state has adequately pled the existence of

12    an independent and adequate state procedural ground as an affirmative defense, the burden to

13    place that defense in issue shifts to the petitioner," who "may satisfy this burden by asserting

14    specific factual allegations that demonstrate the inadequacy of the state procedure . . . .  Once

15    having done so, however, the ultimate burden is the state's." 322 F.3d 573, 586 (9th Cir. 2003).

16    Here, respondent has cited to several cases, among them *Rich*, 187 F.3d at 1070, which says that

17    California's requirement of a timely objection to prosecutorial misconduct was an adequate and

18    independent state ground barring review.  ECF No. 36 at 99.

19                    Petitioner argues the prosecutor argued once that the defense had the burden of

20    proving accident, an objection was sustained, but the prosecutor returned to the theme of the

21    defendant's burden, "as part of a pattern along with the one instance of misconduct which was

22    objected to." ECF No. 58 at 101.  He acknowledges, as he must, that *Rich* involved several

23    instances of improper argument, but suggests the bar does not apply in that case because the

24    arguments were not part of a pattern.  Even if this distinction made a difference, petitioner has not

25    established any pattern, apart from his saying a pattern exists.  Moreover, it does not make a

26    difference: to preserve the issues of prosecutorial misconduct, petitioner must object.  *See Watson*

27    *v. Beard*, No. 13cv277-WQH-DHB, 2014 WL 3695401, at *10-11 (S.D. Cal. July 22, 2014)

28    (finding numerous claims of prosecutorial misconduct, including that the prosecutor had "act[ed]

1   as a witness on behalf of the prosecution throughout the trial," to be defaulted because of failure

2   to object").   Respondent has borne its initial burden, which petitioner has not overcome.  This

3   claim is barred.

4       D.  Prosecutor's Personal Opinion and Speculation; *Griffin*[14] Error

5       Petitioner challenges the prosecutor's statement that "in my opinion, there has

6   been no credible evidence presented to support the very cornerstone of the Defense theory of

7   accident," RT 9232, arguing that it not only was personal opinion but was *Griffin* error because it

8   called attention to things uniquely within petitioner's knowledge.  Trial counsel's objection that it

9   was improper to argue personal belief was overruled.  *Id.*  The prosecutor also said, "I think one

10  of the reasons this occurred at Bucks Lake is the Defendant was counting on a rural law

11  enforcement establishment, with a lack of resources and sophistication to do the job, to look at

12  what was really happening here."  RT 9294-9295.  The defense again objected.  RT 9295; *see*

13  ECF No. 25 at 77.   Finally, the prosecutor mused, "I don't know if he hadn't been interrupted

14  whether Mr. Franklin would have used his strength to tip over the snowmobile and fake an

15  accident on site, or whether he would have driven the snowmobile with Ronna Franklin in front

16  of him the extra 100 or 150 feet to this drop off into Grizzly Creek."  RT 9276-9277.   The

17  defense objection to this statement was overruled.  RT 9277.

18      The Court of Appeal rejected these claims:  "We disagree with defendant that this

19  was improper vouching:  instead, '[r]ead in context, the challenged comments urged the jury to

20  credit witnesses' testimony based on matters within the record, not matters within the

21  prosecutor's own personal knowledge."  Lodg. Doc. 4 at 85.  It continued that the former

22  statement was included within "the wide latitude to argue inferences to be drawn by the jury. . . .

23  Defendant convinced Ronna to go to Bucks Lake with him, even though she did not want to go.

24  He knew they would be at a remote, sparsely populated location.  Accordingly, the prosecutor's

25  argument concerning defendant's intent to take advantage of a rural location with less resources

26  /////

27

28      [14] *Griffin v. California*, 380 U.S. 609 (1965).

86

1 and sophistication was a reasonable argument, given the evidence." *Id*. at 86.  It did not address

2 the claimed *Griffin* error.

3        Respondent echoes the Court of Appeal's conclusions and argues the comment

4 about the lack of credible evidence was not *Griffin* error.  ECF No. 36 at 99-100, 101-102.

5        1.  Standard of Review

6        Although *Griffin* prevents a prosecutor's comment on a defendant's failure to

7 testify, *Griffin,* 380 U.S. at 615, a prosecutor "may comment on the defendant's failure to present

8 exculpatory evidence, provided that the comments do not call attention to the defendant's own

9 failure to testify." *United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991).

10        This court reviews the *Griffin* error claim *de novo* because the Court of Appeal did

11 not address it.  It did address the other claimed errors, relying on California law governing the

12 prosecutor's latitude to argue and draw inferences from the evidence.  *See People v. Lucas*,

13 12 Cal. 4th 415, 473 (1995).   The court need not determine whether petitioner has overcome the

14 presumption the state appellate court reached the merits of his claim because even under *de novo*

15 review, the claim fails.

16        2. *Griffin* Error

17        "While a direct comment about the defendant's failure to testify always violates

18 *Griffin*, a prosecutor's indirect comment violates *Griffin* only if it is manifestly intended to call

19 attention to the defendant's failure to testify, or is of such a character that the jury would naturally

20 and necessarily take it to be a comment on the failure to testify." *Hovey v. Ayers*, 458 F.3d 892,

21 912 (9th Cir. 2006) (citation, internal quotation omitted).  In *Hovey*, the Ninth Circuit found the

22 prosecutor's indirect comments—the defendant never said anything about why he did these things

23 and never told the jury anything different—to violate *Griffin*.  In this case, in contrast, the defense

24 presented considerable evidence in support of the defense theory of the accident, from DeRosa's

25 testimony about the peculiar properties of the snowmobile to Weiss's about concussion and

26 drowning.  The prosecutor's comment in this case did not "naturally and necessarily" point to

27 petitioner's failure to testify but rather only to the believability of the witnesses he called to

28 support his defense.  This is not *Griffin* error.  *Mares*, 940 F.3d at 461.

1          3.  Prosecutor's Opinion and Speculation

2                "The prosecutor's vouching for the credibility of witnesses and expressing his

3     personal opinion concerning the guilt of the accused pose two dangers: such comments can

4     convey the impression that evidence not presented to the jury, but known to the prosecutor,

5     supports the charges against the defendant and can thus jeopardize the defendant's right to be tried

6     solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with

7     it the imprimatur of the Government and may induce the jury to trust the Government's judgment

8     rather than its own view of the evidence."  *United States v. Young*, 470 U.S. 1, 19-20 (1985).

9     Although a prosecutor may not suggest he is relying on facts outside the record, *see Duckett v.*

10    *Godinez*, 67 F.3d 734, 742 (9th Cir. 1995),  he may argue reasonable inferences from the

11    evidence.  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996); *see also Weatherspoon v.*

12    *Sandor*, No. ED CV 08-1918 VBF (PJW), 2011 WL 5554713, at *15 (C.D. Cal. Aug. 25, 2011)

13    (prosecutor's use of "I think" in argument not necessarily improper if a permissible inference

14    from the evidence), *recommendation adopted by* 2011 WL 5554536. (C.D. Cal. Nov. 11, 2011).

15    Even if a prosecutor's musings go "beyond reasonable inferences made from the evidence,

16    reversal is proper only if they were likely to have prejudiced the defendant." *United States v.*

17    *Feldman*, 853 F.2d 648, 665 (9th Cir. 1988).

18                The prosecutor's suggestion that petitioner may have done more to stage the

19    snowmobile scene had he not been interrupted was a reasonable inference from the evidence. RT

20    9276.  The evidence showed that when Deborah Ingvoldsen came around a curve in the road and

21    saw the Franklins' snowmobile, petitioner was sitting in the water close to the snowmobile, with

22    his back toward the bank of the ditch where the snowmobile was resting.   RT 5059-5060.

23    Petitioner's skin was flushed, yet his eyes were closed and he appeared to be unconscious.  RT

24    5061, 5087, 5805.  Ronna was floating in the water, eyes open and face blue.  RT 5067.  The

25    snowmobile itself was in the water, engine running; its tracks went straight from the roadway

26    through the slushy area into the ditch.  RT 5083, 6226-6227.  Other witnesses testified that based

27    on petitioner's brain scan, it was unlikely he had been rendered unconscious by whatever had

28    happened to the snowmobile and that an unconscious person submerged in cold water up to his

88

1   chest would not be able to hold his head upright. RT 6512, 6514, 7408, 7687.  From these facts,

2   the prosecutor could argue the inference that petitioner had not had sufficient time in which to

3   stage a more believable scene.  This was not error.

4          On the other hand, the prosecutor's speculation that petitioner selected Bucks Lake

5   because of its rural lack of sophistication is not a reasonable inference.  The  Court of Appeal

6   suggested this argument flowed from evidence that petitioner convinced Ronna to go to Bucks

7   Lake despite her reluctance, but the fact that petitioner overcame Ronna's reluctance says nothing

8   about his reason for selecting Bucks Lake.  Nevertheless, this misconduct was "not likely to have

9   prejudiced" petitioner. *See United States v. Reece*, 555 F. App'x 690, 691 (9th Cir. 2014)

10  (unpublished) ("No matter the standard of review, prejudice is key to the analysis of prosecutorial

11  misconduct challenges to conviction under the due process clause.).

12         Petitioner contends the Bucks Lake statement was an appeal to passion or

13  prejudice because it portrayed petitioner as an outsider.  ECF No. 58 at 102.  The  prosecutor

14  should not have appealed to passion, but this is an isolated incident in the course of a lengthy trial

15  and a long argument.  *See Comer v. Schriro*, 480 F.3d 960, 989 (9th Cir 2007).   Petitioner has not

16  borne his burden of showing it rendered his trial unfair.

17     E.  Disparaging Defense Counsel

18         Petitioner contends the prosecutor committed misconduct by disparaging defense

19  counsel on two occasions.  First, when a defense objection to a portion of argument was

20  overruled, the prosecutor said, "Jesus.  Thank you for illuminating your objection."  RT 9228.

21  Then the prosecutor responded to a defense objection by saying, "I can't help it if you didn't ask

22  the right questions."  RT 9302.

23         The Court of Appeal rejected any claim of error:  "The assertion as to the first

24  comment is waived because defendant did not object or ask the court to admonish the jury on this

25  ground.  . . . As for the second comment, about asking 'the right questions,' the record reflects

26  petty bickering, not the type of disparaging that would turn the jury against defendant or his

27  attorney."  Lodg. Doc. 4 at 87.

28  /////

1    Respondent argues the challenge to the first comment is waived by petitioner's

2    failure to object and the rejection of the second claim is consonant with *Darden*.   ECF No. 36 at

3    102-103.  Petitioner challenges the procedural bar, arguing that under *People v. Hill*, his failure to

4    object was excused because an objection would have been futile.  17 Cal. 4th 800, 820-21 (1998).

5    The court need not resolve whether petitioner has raised a sufficient challenge to the adequacy of

6    the bar, because the claim fails on the merits.

7    It is true that "[a]ttacks on counsel can at times constitute prosecutorial

8    misconduct," particularly when the prosecution suggests the defense is not being truthful.  *Wilson*

9    *v. Sirmons*, 536 F.3d 1064, 1119 (10th Cir. 2008).   However, even argument that is not "a model

10    of polite professionalism" does not necessarily render a trial unfair.  *United States v. Del Toro-*

11    *Barboza*, 673 F.3d 1136, 1151 (9th Cir.), *cert. denied*, 133 S.Ct. 588 (2012)   Neither of the

12    challenged comments impugned counsel's truthfulness or otherwise suggested counsel was

13    attempting to fool the jury.  These were two instances of brief nastiness between the lawyers that

14    did not reflect on petitioner or on the defense presentation.  They do not justify habeas relief.

15    F.  Reading Stricken Testimony

16    Petitioner argues the prosecutor twice read a portion of Christi Woodards'

17    testimony that had earlier been stricken.  ECF No. 58 at 105.  He does not quote the offending

18    testimony nor explain how he was prejudiced by the jurors' exposure to it.  ECF No. 25 at 79-80;

19    ECF No. 58 at 105.  He has therefore not addressed the crucial inquiry in a claim of prosecutorial

20    misconduct, the impact of the actions on the fairness of the proceedings.  The claim is waived.

21    *See, e.g., United States v. Villalobos*, 567 F. App'x 541, 543 (9th Cir. ) (unpublished)

22    (defendant's failure to identify the specific testimony subject to objection waives the argument),

23    *cert. denied*, 135 S.Ct. 218 (2014); *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (finding

24    an issue waived when the party did not address prejudice).

25    XII.  INEFFECTIVE ASSISTANCE OF COUNSEL (Issue Nine)

26    Petitioner argues trial counsel's failure to object to the chart used in closing,

27    discussed above, constitutes ineffective assistance of counsel.

28    /////

90

1       A.   Proceedings in the State Courts

2              Petitioner raised this issue in the writ of habeas corpus filed in Plumas County

3    Superior Court.  Lodg. Doc. 6.  The Superior Court did not directly address the issue as one of

4    counsel's performance, but rejected any challenge to the use of the chart, finding it "inherently

5    unreasonable to think that the outcome of the trial might have been affected by the prosecutor's

6    chart."  *Id.*

7       B.   Analysis

8              Whether reviewed deferentially or *de novo*, this claim is pleaded in too conclusory

9    a fashion to justify relief.   Without citation to authority or to the record, petitioner argues that had

10   a timely objection been made, it is reasonably probable the judge would not have permitted the

11   prosecutor to use the chart and also reasonably probable the outcome of the case would have been

12   different.  ECF No. 25 at 83; ECF No. 58 at 111.  A "cursory and vague claim" that counsel was

13   ineffective cannot support habeas relief.  *Greenway v. Schriro*, 653 F.3d 790, 804 (9th Cir. 2011).

14   XIII.  FOUNDATIONAL OBJECTIONS TO PROSECUTION'S EXPERTS (Issue Ten)

15             Petitioner argues his due process right to a fair trial was violated by the admission

16   of expert testimony for which an insufficient foundation had been laid.  ECF No. 25 at 84.

17             Specifically, he argues that Garrison Kost used a dissimilar snowmobile on hard-

18   packed and powder snow, different from the slushy conditions at Bucks Lake on December 28,

19   1996, and then testified the snowmobile had not been traveling very fast and so G forces on the

20   riders as a result of deceleration were not large.  *Id.*  He also argues that Lawrence Thibault used

21   Kost's work to testify that if petitioner had fallen off the snowmobile and struck his head, the

22   impact would not have been strong enough to cause a concussion.  *Id.*  He contends, "[t]hus

23   detached from the issues being tried, the expert testimony was inadmissible," and undermined the

24   fairness of the trial.

25      A.   Proceedings in the Trial Court

26             Among the prosecution's experts were Garrison Kost, a specialist in accident

27   reconstruction, and Lawrence Thibault, a biomechanical engineer, both of whom worked for

28   Exponent.  After Rajeev Kelkar, another Exponent employee, had testified at the preliminary

91

1   hearing, the defense filed a motion to exclude any testimony from either Kelkar, or any other

2   Exponent employee, arguing that "the sum total of Kelkar's testimony was that he could not

3   explain how two people riding a snowmobile could be found in the position they were in."  CT

4   1219.

5          Before the prosecution called Kost as a witness, defense counsel raised several

6   objections to the proposed testimony.  RT 5952-5954.  The court conducted a hearing on

7   admissibility under California Evidence Code section 402 outside the presence of the jury.  RT

8   6042.  Kost described generally the method for calculating a deceleration rate, noting the "same

9   basic formula" applies to a snowmobile or a motorcycle rider.  RT 6045-6047.  Kost added he

10  had been provided a number of photographs of the scene and had measured the dimensions of

11  petitioner's snowmobile and from this information was able to calculate the length of the

12  disturbed area behind the snowmobile.  RT 6047-6048.  Kost also had let a snowmobile coast to

13  a stop without braking (a coasting roll-down test) and conducted a braking test on an area that

14  was groomed, fairly level and hard packed.  RT 6053-6054.  Kost also relied on the literature for

15  snowmobile deceleration rates.  RT 6059, 6064.

16         Kost did not use petitioner's snowmobile for his calculations.  RT 7029.  He said,

17  however, the weight of the snowmobile has no appreciable effect in determining deceleration rate.

18  RT 6054.  Kost said the deceleration of the snowmobile would be different on slushy snow, but

19  he did not know how much different.  RT 6074.  He noted, however, that the photographs of

20  petitioner's snowmobile where Ronna and petitioner were found showed it had travelled on snow,

21  because only one runner was in the water.  RT 6072.

22         Throughout Kost's testimony defense counsel argued that all of the testimony was

23  not relevant "unless they duplicate exact conditions that were present at the scene."  RT 6058; *see*

24  *also, e.g.*, RT 6052, 6054, 6056.  The prosecutor described the purpose of Kost's testimony:  "I

25  am just trying to establish that this accident could not have happened, assuming it was an

26  accident, at a significantly high speed."  RT 6068.  He continued:  "I didn't ask the gentleman

27  how fast was this snowmobile going.  [¶]  What I asked him was, what are the range of values in

28  this kind of condition under varying circumstances to establish the parameters to show that these

1  facts are inconsistent with the claim that they were going 50 miles an hour, or some other speed

2  that would be consistent with this injury." *Id*.  The court overruled the defense objection.

3  RT 6102.

4         The second of the prosecution's experts, Dr. Lawrence Thibault, addressed the

5  amount of head trauma a person might sustain in a fall or in other traumatic situations. RT 7382.

6  Thibault testified that a fall from the snowmobile under circumstances similar to those present in

7  the case would create an impact velocity of 20g's.[15] RT 7388. A lateral force to the head of 80g's

8  would create stupor, disorientation and confusion and a purely lateral force of 150g's to the head

9  would create unconsciousness. RT 7385.  If the force was applied to the forehead, it would take

10  320g's to cause unconsciousness. RT 7440.   A force sufficient to cause unconsciousness would

11  also produce other injuries to the body. RT 7393-7394.

12         On cross-examination, Dr. Thibault testified he had reviewed computer

13  simulations prepared by Exponent and that he relied on "facts and figures and conclusions

14  presented to [him] by Dr. Kelkar and Dr. Kost." RT 7396, 7405.  Thibault testified that these

15  figures related to "snowmobile velocity," not to head impact. RT 7406.  He also testified that he

16  accepted the opinions of Kelkar and Kost, that he himself did not perform any accident

17  reconstruction, and would not offer "any opinion whatsoever to reconstruct the dynamics" of the

18  snowmobile event. RT 7409.  Instead, he testified all he was relying on was a "fall from a seat,

19  the height, into either snow or water." RT 7410. He said his "handwritten calculations agreed

20  completely with those by Doctors Kelkar and Kost, agreed completely with those that he

21  [petitioner] fell off one side." RT 7413.

22         As with Kost, the defense objected to Thibault's testimony, again arguing that

23  because Thibault's testimony did not purport to describe what happened on December 28, 1996, it

24  was inadmissible.  The trial court denied the objections, noting that the admissibility of Thibault's

25  testimony, based as it was on Kost's calculations, depended on the foundation for Kost's

26  testimony.  RT 4626.   As with Kost's testimony, the prosecutor said the testimony was not "in

27

---

[15] "G's," or g-force, is the measurement of a type of acceleration caused by mechanical contact.
28  RT 7384-7385.

1  the realm of experimental evidence here.  We're simply talking about the biomechanics of the

2  human body under different circumstances."  RT 7353.   Once again, the court overruled the

3  objections to Thibault's testimony.  RT 7355.

4       B.  The Court of Appeal's Decision

5           The Court of Appeal issued the last reasoned decision on this question:

> Defendant objected to the testimony of two expert witnesses, Garrison Kost, a specialist in accident reconstruction, and Lawrence Thibault, a biomechanical engineer. Kost testified concerning the speed the snowmobile had been traveling and the G-forces applied to the riders. The significance of Kost's testimony was that, considering the evidence gathered at the scene of Ronna's death and experiments conducted by Kost using a snowmobile to measure distances to slow down and stop, defendant and Ronna were not traveling very fast before the snowmobile came to a stop next to the slushy water. Thibault testified concerning the force of the impact applied to defendant and Ronna and, building on Kost's conclusions, determined that the force of impact from falling from the snowmobile would have been insufficient to render a person unconscious.

> Because defendant does not assert Kost and Thibault lacked qualifications to testify as experts, we need not discuss their background and experience. Instead, defendant claims Kost's testimony should have been excluded because the conditions under which he performed the tests were too dissimilar to the conditions prevailing at the time of Ronna's death. He further contends Thibault's testimony should not have been admitted because it relied, for a foundation, on the conclusions of Kost. As was established at the Evidence Code section 402 hearing concerning admissibility of Kost's testimony, the experiments he performed were done with a snowmobile other than defendant's. Also, while the experiments were done in the vicinity of the site of Ronna's death and approximately the same time of year, they were done when the snow was not wet from rain.

> "'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid.Code,§ 720, subd.(a).) An expert witness's testimony in the form of an opinion is limited to a subject 'that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact....' (Evid.Code, § 801, subd. (a).) A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion. [Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 131, 109 Cal.Rptr.2d 31, 26 P.3d 357.)

> Defendant relies primarily on *People v. Roehler* (1985) 167 Cal.App.3d 353, at pages 385, 213 Cal.Rptr. 353 to 391. In *Roehler*, the prosecution presented evidence of an experiment done by an expert to establish that a death was not accidental. The Court

94

of Appeal upheld the admission of the results of the experiment because it was done under "substantially similar conditions" and, therefore, was relevant to the issue presented in the case. ( Id. at pp. 386-387, 213 Cal.Rptr. 353 .) The *Roehler* court cautioned that " '[s]ubstantially similar' does not mean precise duplication." ( Id. at p. 387, 213 Cal.Rptr. 353.) From *Roehler*, we see that the requirement that an experiment be done under substantially similar circumstances is based on the requirement that evidence be relevant to be admissible. An experiment not done under substantially similar conditions is not relevant because it does not have a tendency to prove or disprove a disputed fact. ( *Id.* at p. 386, 213 Cal.Rptr. 353; see also Evid.Code, § 210 [defining relevant evidence].)

When questioned concerning the dissimilarity between the snow conditions when the experiment was done and the wet snow when Ronna died, Kost replied that the presence of water in the snow would not have a significant effect on the calculations he presented. Even though the snow conditions were different and a different snowmobile was used for the experimentation, the conditions were not sufficiently dissimilar as to make the results of the experimentation irrelevant; instead, the difference went to the weight of the evidence, a matter that was argued to the jury.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Other than the use of Kost's testimony as a foundation for Thibault's conclusions concerning the likelihood that the impact of falling off the snowmobile resulted in unconsciousness, defendant makes no further argument in his opening brief that Thibault's testimony should have been excluded. Accordingly, since Kost's testimony was properly admitted, Thibault's testimony likewise was properly admitted.

Lodg. Doc. 4 at 67-70.

C.   Standard

Petitioner again argues the court must review this issue *de novo* because the Court of Appeal resolved only the state law aspect of his claim.   ECF No. 58 at 113.   As with his prosecutorial misconduct issue, petitioner included his federal constitutional argument in a single paragraph of a lengthy state law challenge to the admission of the evidence.   Lodg. Doc. 21 at 126.   As noted earlier, this court may presume that the Court of Appeal reached the merits of the briefly-raised federal claim, a determination entitled to deference.   *Johnson*, 131 S. Ct. at 1096. Even applying *de novo* review, however, this claim fails.

/////

95

1            D.  Due Process and the Admission of Evidence

2                   In *Estelle v. McGuire*, the Supreme Court considered a due process challenge to

3     the admission of evidence of battered child syndrome.  502 U.S. 62 (1991).  It rejected the claim

4     the evidence was irrelevant, saying that it "need not explore further the apparent assumption by

5     the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth

6     Amendment for evidence that is not relevant to be received in a criminal trial," and held the

7     habeas petitioner's "due process rights were not violated by the admission of the evidence."  *Id*. at

8     70.   Since *Estelle*, the Court "has not yet made a clear ruling that admission of irrelevant or

9     overtly prejudicial evidence constitutes a due process violation."  *Holley v. Yarborough*, 568 F.3d

10    1091, 1101 (9th Cir. 2009) (even though admission of irrelevant pornographic evidence was

11    fundamentally unfair under circuit precedent, its admission was not contrary to or clearly

12    established federal law); *see also United States v. LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001)

13    ("The admission of relevant evidence, by itself, cannot amount to a constitutional violation.").

14    Moreover, "for purposes of AEDPA review, there is no 'clearly established' federal law regarding

15    the admissibility of expert witness testimony."  *Suong v. Cato*, No. 1:11-cv-01480-LJO-JLT,

16    2014 WL 727138, at *7 (E.D. Cal. Feb. 24, 2014);  *Farmer v. Lackner*, No. 2:13-cv-996 MCE

17    KJN P, 2014 WL 1272802, at *7 (E.D. Cal. Mar. 27, 2014) (Supreme Court "has not ruled on the

18    issue of appropriate qualifications of expert witnesses and the limits of their testimony as a matter

19    of constitutional law.  Instead, the Supreme Court's rulings on these issues involve interpretations

20    of the Federal Rules of Evidence.").

21                   In his amended petition, petitioner argues that the prosecution never established

22    the proper foundation for Kost's and Thibault's evidence, which therefore was improperly

23    admitted.  ECF No. 25 at 85.  In his traverse, petitioner says that respondent had not "adequately

24    confront[ed] the basic relevancy and foundational issues."  ECF No. 58 at 117.  However, the

25    state courts overruled petitioner's relevance and foundation objections; whether the evidence was

26    admissible is thus a question of state law, not subject to review in this court.  *See Rhoades v.*

27    *Henry*, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011) (stating that "evidentiary rulings based on state

28    law cannot form an independent basis for habeas relief"); *Farmer*, 2014 WL 1272802, at *7

1   (noting the absence of clearly established federal law on the limits of expert testimony foreclosed

2   any claim on that ground).

3           Petitioner also argues the admission of this evidence rendered his trial

4   fundamentally unfair.  ECF No. 58 at 118.  Once again, as the Ninth Circuit recognizes, the

5   absence of Supreme Court authority forecloses this claim.  *Holley*, 568 F.3d at 1101.  However,

6   even if the court considers the issue *de novo*, it does not find the admission of the evidence was

7   fundamentally unfair.   In a pre-AEDPA case, the Ninth Circuit said evidence often raises more

8   than one inference, but a properly instructed jury is trusted "to sort them out." *Jammal v. Van de*

9   *Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).  It is "only if there are *no* permissible inferences the

10  jury may draw from the evidence can its admission violate due process." *Id.* (emphasis in

11  original); *see also Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.) ("A habeas petitioner bears a

12  heavy burden in showing a due process violation based on an evidentiary decision."), *amended on*

13  *denial of rehr'g*, 421 F.3d 1154 (9th Cir. 2005).  Petitioner simply has not shown the jury was

14  unable to draw permissible inferences from expert testimony based on general biomechanical

15  principles rather than on a reconstruction of the events of December 28.

16          Petitioner argues that Kost's and Thibault's testimony gave an aura of reliability to

17  theories at odds with the physical testimony.   In arguing prejudice, he contends that Thibault's

18  credentials in particular—a consultant to the National Football League and the Joint Chiefs of

19  Staff on the issue of head trauma—gave a false aura of reliability to his testimony that ejection

20  from a snowmobile going at speeds estimated by Kost would not cause unconsciousness, which

21  contradicted the many witnesses who "testified that [petitioner] had been rendered unconscious."

22  ECF No. 58 at 118.   But neither Thibault nor the witnesses could testify that petitioner was in

23  fact unconscious:  the lay witnesses could and did say only that petitioner appeared to be

24  unconscious, *see, e.g.,* RT  5805 (Ingvoldsen says petitioner "appeared to be unconscious").  He

25  has not explained how Thibault's expertise rendered the trial fundamentally unfair or had a

26  "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

27  *Abrahamson*, 507 U.S. 619, 623 (1993).

28  XIV.  CHALLENGES TO DR. THIBAULT'S TESTIMONY (Issue 11)

1      A.  Background

2              In claim eleven of the amended petition, petitioner argues that the prosecution's

3  failure to disclose Dr. Thibault's publications and defense counsel's failure to obtain the

4  publications for use in cross-examination violated petitioner's rights.  Specifically he argues that

5  counsel failed "to adequately inform himself of the relevant science. . . and to understand the DAI

6  [Diffuse Axonal Injury] tolerance tests that could have been done and the possible inferences. . .

7  ."  ECF No. 25 at 94.  He also argues that this failure "to read and grasp the significance of  Dr.

8  Thibault's publications . . . prevented him from properly preparing Dr. Sean Shimada. . . ."  *Id.* at

9  95.

10             In his traverse, petitioner expands on these arguments and adds that his expert,

11  Dr. Devinder Grewal, said "'both Dr. Thibault and Dr. Kelkar opine that riders falling from a

12  snowmobile at 11 mph onto snow while helmeted cannot sustain a loss-of-consciousness (LOC).

13  They support this opinion by various mathematical calculations and anecdotal examples from

14  Dr. Thibault's research.  Unfortunately, the assumptions for the calculation are incorrect and there

15  are contradictions in Dr. Thibault's testimony and previous published research.'" ECF No. 58 at

16  109.  Later, he argues that trial counsel could have more "effectively confront[ed] the

17  prosecution's expert testimony" had he secured the raw data underlying the prosecution's

18  MADYMO[16] computer simulations," among other things.  ECF No. 58 at 117.

19             Petitioner sought discovery of the MADYMO material and other computer

20  simulations in this court.  Mot. for Disc., ECF No. 59 at 11 & Appx. 25.  The court granted the

21  request for the computer simulations.  ECF No. 76.

22             Subsequently, petitioner filed a motion for an evidentiary hearing on a number of

23  issues, including the question whether counsel had been ineffective in failing to undertake the

24  necessary investigation to allow him to cross-examine Dr. Thibault effectively.  ECF No. 59.  He

25  supported this request with another declaration from Dr. Grewal, who described his analysis of

26  records of snowmobile accidents from Wisconsin from a period of 2005 through 2010, which

27

28         [16] MADYMO, or Mathematical Dynamic Modeling, is a computational program, used in this case to determine the forces generated on a body.  ECF No. 59 at 32.

1   yielded information about seven snowmobile accidents in which a helmeted rider or passenger

2   lost consciousness and opines that records from 1996 through 1999, which would have been

3   available to trial counsel, would have produced similar results.  This information, petitioner

4   argues, would have undercut Dr. Thibault's testimony that petitioner would not have lost

5   consciousness in any fall from the snowmobile. ECF No. 59 at 5-6.  The court denied the request

6   for a hearing on the question of counsel's ineffectiveness.  ECF No. 109 at 9-19.

7        B.  Dr. Thibault's Testimony

8            At trial, the prosecution and defense presented expert witnesses on the question

9   whether the snowmobile incident could have occurred in the manner described by petitioner and

10  whether petitioner could have been injured in the manner he described by a snowmobile accident.

11  As noted, the prosecution relied on testimony from Dr. Kost, an accident reconstruction specialist,

12  and Dr. Thibault, a biomechanical engineer.  Dr. Kost conducted some braking and coast-down

13  tests with a snowmobile from the Plumas County Sheriff's fleet.  RT 7002-7005.  He did not use

14  the Franklins' snowmobile because it had been sitting for some time and "we could not be certain

15  that we wouldn't somehow alter the machine."  RT 7029.  He also reviewed studies of

16  snowmobile accidents as reported in a number of publications.  RT 7163.

17           The second of the prosecution's experts, Dr. Thibault, addressed the amount of

18  head trauma a person might sustain in a fall or in other traumatic situations.  RT 7382.  At the

19  402[17] hearing on the admissibility of Dr. Thibault's testimony, the prosecutor said he had asked

20  the witness "to bring his CV, and a number of articles," but Dr. Thibault had not done so.  RT

21  4517.  The prosecutor added that the articles "are being faxed and e-mailed to us and being

22  printed."  *Id.*  He continued that he would "not have here today every publication [Dr. Thibault

23  has] relied on, but, we will have outlines . . . ," but Dr. Thibault could identify those articles

24  underlying his opinions, which could be "fashion[ed] . . . into an order for production."  RT 4518.

25           During this hearing, Dr. Thibault agreed that "his sole opinion in this case" was

26  that a person would not be rendered unconscious if he suffered a 20g force to his head.  RT 4597.

27  _____

28           [17] Under California Evidence Code § 402, a court may hold a hearing to determine the
    admissibility of evidence.

1   He based his opinion on his years of research on head injury and hundreds of publications.

2   When counsel asked about the publications, Dr. Thibault said "you have my CV, I'm relying on

3   those . . . ." *Id.*  Counsel inquired whether "most things in your CV are written by you" and Dr.

4   Thibault agreed.  Later in the cross-examination, trial counsel mentioned the prosecutor had

5   provided cover pages from articles mentioned in Dr. Thibault's CV.  RT 4601.  Dr. Thibault said

6   these were a sample, but his CV "contains, obviously, many more papers.  If you need full length

7   copies of issues, you could obtain them because they are all cited."   He added he could make

8   copies of the more obscure papers if trial counsel gave him a list.  RT 4601-4602.  Either counsel

9   never made a list or Dr. Thibault never provided the materials.  *See* Decl. of Mark Axup, ECF

10   No. 108-2 at 24 (stating he did not have any of Dr. Thibault's articles before cross-examination).

11           According to Dr. Thibault, brain injury is caused by lateral movement of the head,

12   which stretches the axons, or white membranes that allow for cellular communication, and causes

13   calcium to flood the cells, inhibiting or preventing electrical activity.  RT 4540-4541, 7376-7377.

14   Dr. Thibault called this type of harm Diffuse Axonal Injury (DAI) and said it can range from

15   confusion to persistent vegetative state.  RT 7380, 7445, 7449.  DAI is the outcome from lateral

16   movement of the brain.  RT 7445.

17           Dr. Thibault testified that a fall from the snowmobile under circumstances similar

18   to those present in the case would create an impact velocity of 20g's.  RT 7388.  A lateral force to

19   the head of 80g's would create stupor, disorientation and confusion and that a purely lateral force

20   of 150g's to the head would create unconsciousness.  RT 7385.  If the force was applied to the

21   forehead, it would take 320g's to cause unconsciousness.  RT 7440.  A force sufficient to cause

22   unconsciousness would also produce other injuries to the body.  RT 7393-7394.  Dr. Thibault

23   agreed he could not say it was impossible that petitioner could have suffered a concussion, but

24   said "the probability is enormously high" that he did not.  RT 7049.

25           On cross-examination, Dr. Thibault testified that he reviewed computer

26   simulations prepared by Exponent and that he relied on "facts and figures and conclusions

27   presented to [him] by Dr. Kelkar and Dr. Kost."  RT 7396, 7405.  Dr. Thibault testified that these

28   figures related to "snowmobile velocity," not to head impact.  RT 7406.  He also testified that he

1  accepted the opinions of Drs. Kelkar and Kost, that he himself did not perform any accident

2  reconstruction, and would not offer "any opinion whatsoever to reconstruct the dynamics" of the

3  snowmobile "event." RT 7409.  Instead, he testified all he was relying on was a "fall from a seat,

4  the height, into either snow or water." RT 7410.  He said his "handwritten calculations agreed

5  completely with those by Doctors Kelkar and Kost" and he agreed completely with their

6  conclusion petitioner had fallen off the side of the snowmobile.  RT 7413.

7       C.  Proceedings in the State Courts

8              Petitioner raised this issue in a petition for a writ of habeas corpus, filed initially in

9  Plumas County Superior Court.  *See* Lodg. Doc. 6.

10             The Superior Court denied the writ, saying it found "unpersuasive Petitioner's

11  argument that he was denied a fair trial as the result of rulings made by the trial court with regard

12  to the admissibility of evidence testified to by expert witness Dr. Lawrence Thibault.  Again, this

13  Court finds that these alleged errors are speculative at best.  Likewise, it appears that these

14  arguments were addressed and rejected by the Court of Appeals [*sic*]." Lodg. Doc. 8, Appendix

15  20.             Petitioner pursued these issues in his habeas petition in the state Court of

16  Appeal.  In support of that petition, current counsel Robert Bacon averred he had asked the

17  Innocence Project to assist him in finding some of the articles mentioned in Dr. Thibault's CV

18  and a student from the Innocence Project located nine of twelve articles sought.  Lodg. Doc. 8,

19  Appendix 24.   Bacon located an additional two articles himself.  *Id*.  These are included as

20  Appendix 14 to the writ petition filed in the Court of Appeal.  As part of its informal opposition

21  to the writ filed in the Court of Appeal, respondent provided the declaration of Kathie Meads,

22  who was the discovery clerk for the Plumas County District Attorney's Office during petitioner's

23  trial; Meads avers that she searched their files and could not find any full length articles from

24  Dr. Thibault.  Lodg. Doc. 9, Ex. C.

25             The Court of Appeal and the California Supreme Court denied the subsequent

26  petitions without comment.

27             While these proceedings were pending, petitioner filed another petition in the

28  California Supreme Court, alleging counsel was ineffective for failing to secure Exponent's raw

1    data for use in cross-examining the prosecution's experts; as he argues in this court, he argued to

2    the California Supreme Court that although "Thibault testified that he relied on simulations

3    conducted by Exponent, Inc. . . . [t]he raw data which Exponent produced in 2010 does not

4    adequately support the conclusions to which the experts testified at trial." ECF No. 108-1 ¶ 51.

5    He also argued that counsel's failure to secure Dr. Thibault's publications, some of which

6    appeared to contradict his testimony regarding a fall from the snowmobile and unconsciousness,

7    undercut his ability to examine the expert effectively. *Id.* Petitioner supported the state petition

8    with several declarations from his expert, Dr. Grewal. ECF No. 108. Dr. Grewal described his

9    analysis of snowmobile date from Wisconsin from 2005 to 2010, eliminating those involving

10   impact with an object other than the ground, and found twenty involving a fatality or loss of

11   consciousness to a helmeted rider. ECF No. 108-4 at 30. Finally, Dr. Grewal said that he

12   received the material counsel received from Exponent in discovery and that "[t]hese documents

13   do not include the input variables and assumptions supporting the calculations and computer

14   modeling relied on at trial. They do not include the data . . . that I would need to test the analysis

15   and opinions of these experts." ECF No. 108-4 at 31.

16           The state court issued a postcard denial of this petition. ECF No. 107 at 4.

17       D.  Standard of Review

18           Petitioner argues that the state courts' decisions on the original state habeas

19   petitions are subject to independent review because of the cryptic nature of the Plumas County

20   decision and the subsequent denials without explanation. ECF No. 58 at 120. As noted

21   throughout, a denial on the merits, however brief or cryptic, is entitled to deference under the

22   AEDPA. Moreover, the California Supreme Court's latest denial of petitioner's claims of

23   ineffective assistance of counsel is also entitled to deference, even on independent review.

24       E.  *Brady*

25           A prosecutor's suppression of evidence favorable to an accused violates due

26   process "where the evidence is material either to guilt or punishment, irrespective of the good

27   faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty to

28   disclose arises even in absence of a defense request, *Strickler v. Greene*, 527 U.S. 263, 280

1    (1999), and extends to impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154-55

2    (1972). "Favorable evidence is material, and constitutional error results from its suppression by

3    the government if there is a 'reasonable probability' that, had the evidence been disclosed to the

4    defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419,

5    433  (1995). "A 'reasonable probability' of a different result is accordingly shown when the

6    government's evidentiary suppression 'undermines confidences in the outcome of the trial.'" *Id.* at

7    434 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

8              "There are three components of a true *Brady* violation:  The evidence must be

9    favorable to the accused, either because it is exculpatory, or because it is impeaching; that

10   evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

11   must have ensued." *Strickler*, 527 U.S. at 281-82 .   Petitioner cannot show a *Brady* violation

12   because he cannot show the prosecution suppressed the articles by Thibault.

13             Respondent argues there was no *Brady* violation because petitioner could have

14   sought the material through discovery.  ECF No. 36 at 119.  Petitioner recasts this as a claim his

15   trial counsel was not diligent and argues that defense counsel's lack of diligence is not an element

16   of a *Brady* claim.  ECF No. 58 at 122-23.   He cites *Gantt v. Roe*, a case in which the Ninth

17   Circuit said that even though defense counsel "could have been more diligent" in investigating,

18   this "does not absolve the prosecution of its *Brady* obligations."  389 F.3d 908, 912-13 (9th Cir.

19   2004).  In *Gantt*, however, the evidence at issue was information from the police investigation of

20   a piece of evidence in police custody and the prosecution assured defense counsel it was keeping

21   the defense abreast of the results of the investigation. *See Lisker v. City of Los Angeles*, No.

22   CV09-09374, 2013 WL 1276047 (C.D. Cal. Feb. 4, 2013) (recognizing that *Gantt* suggested the

23   defense did not need to dig for exculpatory evidence, but noting that the prosecutor had assured

24   the defense it was sharing information).

25             Petitioner simply ignores the cases cited by respondent.  In *Raley v. Ylst*, for

26   example, the Ninth Circuit said "'where the defendant is aware of the essential facts enabling him

27   to take advantage of any exculpatory evidence, the Government does not commit a *Brady*

28   violation by not bringing the evidence to the attention of the defense.'"  470 F.3d 792, 804 (9th

1   Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978)); *see also United*

2   *States v. Todd*, 920 F.2d 399, 450 (6th Cir. 1990).   As these cases say, there is no suppression if

3   the material is equally available to the defense.  And in this case, Dr. Thibault provided his CV

4   listing his publications and the cover pages of several articles, making the defense "aware of the

5   essential facts."  Moreover, no Supreme Court case discussing the prosecutor's *Brady* obligations

6   has found a violation when the defense was "aware of the essential facts."  *See Brady*, 373 U.S. at

7   84 (prosecution withheld confederate's extra-judicial statements); *United States v. Agurs*, 427

8   U.S. 97, 101-102 (1976) (defense sought the victim's criminal record); *United States v. Bagley*,

9   43 U.S. 667, 669-70 (1985) (defense sought criminal records of and deals made with witnesses);

10   *Strickler*, 527 U.S. at 273-74 (material suppressed where police interviews with eyewitness and

11   witness's notes to police); *Kyles*, 514 U.S. at 428-29 (prosecution failed to release interview with

12   chief prosecution witness, among other results of its investigation); *cf. Amado v. Gonzalez*,

13   758 F.3d 1119, 1136-37 (9th Cir. 2014) (stating that even though a "due diligence" requirement

14   "would flip [the *Brady*] obligation on its head," the defense cannot ignore information of which

15   he is otherwise aware).

16             Even if Dr. Thibault's failure to provide the articles as promised could somehow

17   be deemed suppression, petitioner's *Brady* claim still fails.   It is true that the *Brady* obligation

18   extends to the prosecutor and to "others acting on the government's behalf in the case."  *Kyles*,

19   514 U.S. at 437.   But the Supreme Court has never held this extends to third parties, even those

20   called as witnesses by the prosecution.  *See Jones v. Ryan*, 733 F.3d 825, 837-38 (9th Cir.)

21   (rejecting *Brady* claim because the tracking information for electronic ankle bracelet was

22   maintained by a private company and the material was not in the government's possession; the

23   company "was merely in a contract with the state to provide monitoring equipment . . . ."), *cert.*

24   *denied*, 133 S.Ct. 2831 (2013); *Sleeper v. Spencer*, 453 F. Supp. 2d 204, 213 (D. Mass. 2006)

25   ("Petitioner cites no well-established law to show that a private vendor, no matter how much

26   business he conducts with the state, is a member of the prosecution team to whom a duty to

27   disclose extends.").

28   /////

F.  Ineffective Assistance of Counsel

Petitioner argues counsel was ineffective for failing to obtain copies of Dr. Thibault's articles for use as impeachment, for impeaching Alisa Gean, a radiologist, and for preparing his own expert, Sean Shimada.   ECF No. 25 at 92-95.  In the amended petition he says trial counsel failed adequately to inform himself of the relevant science and faults counsel for eliciting Dr. Thibault's assertion that he could "with reasonable engineering and by biomedical certainties tell you there was no injury to Mr. Franklin."  ECF No. 25 at 94-95

Petitioner expands his argument somewhat in the traverse, saying that the two declarations of Dr. Grewal, his expert, "outline additional areas of inquiry which could have assisted Mr. Franklin's counsel in effectively confronting the prosecution's expert testimony," including an analysis of the raw data for MADYMO simulations, an exploration of databases of snowmobile accident data, and, somewhat cryptically, "the tools available to confront opinions of absolute or near-absolute impossibility such as the one Mr. Axup elicited from Dr. Thibault. . . . " ECF No. 58 at 136.

1.  Standard

The federal law on claims of attorney ineffectiveness is clear:

First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland*, 466 U.S. at 687.  "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  *Id*. at 688.

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments supported the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id*. at 690-91.  The court must presume that counsel acted effectively and evaluate strategic decisions to determine whether they were "reasonable at the time."  *Harrington,* 131 S. Ct. at 788,

105

1    789.   A court need not determine whether counsel's actions were reasonable if it determines the

2    petitioner was not prejudiced.  *Hein v. Sullivan*, 601 F.3d 897, 918 (9th Cir. 2010).

3         It also is petitioner's burden to establish prejudice:  "A defendant must show that

4    there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

5    proceeding would have been different.  A reasonable probability is a probability sufficient to

6    undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Conversely, a court need

7    not address prejudice if it determines counsel acted reasonably.  *Siripongs v. Calderon*, 133 F.3d

8    732, 737 (9th Cir. 1998).

9         In *Harrington*, the Supreme Court emphasized the deference *Strickland* requires,

10   noting that a court must presume that counsel acted effectively and reiterating that "[t]he question

11   is whether an attorney's representation amounted to incompetence under 'prevailing professional

12   norms,' not whether it deviated from best practices or most common custom."  131 S.Ct. at 788.

13   The Court stated further that when a district court considers a claim of ineffective assistance of

14   counsel under section 2254(d), the combination of the two deferential standards renders review

15   doubly deferential.  *Id.*

16        *Harrington* further instructs that when a claim has been decided on a summary

17   denial:

18
19
20
> a  habeas  court  must  determine  what  arguments  or  theories
> supported or, as here, could have supported, the state court's
> decision; and then it must ask whether it is possible fairminded
> jurists  could  disagree  that  those  arguments  or  theories  are
> inconsistent with the holding in a prior decision of this Court.

21   *Id.* at 786.  In the context of claims of attorney ineffectiveness, "[w]hen § 2254(d) applies, the

22   question is not whether counsel's actions were reasonable.  The question is whether there is any

23   reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.* at 788.

24        2.  Computer Simulations; Accident Data

25        Both the prosecution and defense presented expert witnesses on the question

26   whether the snowmobile incident could have occurred in the manner described by petitioner and

27   could have caused petitioner's apparent and claimed injuries.  As noted above, Dr. Thibault

28   addressed the amount of head trauma a person might sustain in a fall or in other traumatic

1   situations and concluded that the snowmobile event could not have created sufficient force.  RT

2   7382, 7393-7394.

3          Trial counsel cross-examined Dr. Thibault about the bases for his conclusions,

4   which included Exponent's computer simulations as well as calculations and information from

5   Dr. Kelkar and Dr. Kost relating to snowmobile velocity, as well as his own calculations.  RT

6   7396, 7405, 7406, 7413.

7          Trial counsel did not rely solely on cross-examination of Dr. Thibault, however,

8   but also presented his own expert, Dr. Sean Shimada, who criticized Dr. Thibault's conclusions

9   about the head acceleration of someone falling from a snowmobile, saying there are "numerous

10  variables that go into determining the acceleration, deceleration or force a person [is] exposed to

11  in an instance like this.  And again, how they all interact would be, you know, a limitless amount

12  of answers to this question," all of which means it would be "very, very difficult" to give an

13  opinion on "how much force acceleration Mr. or Mrs. Franklin was exposed to in this accident."

14  RT 8767-8768.   He also presented testimony from John Daily, the accident reconstruction

15  specialist, who had consulted with Shimada and who said Kost's coast-down studies should have

16  been conducted under similar circumstances "because there are a lot of variables. . . when we're

17  dealing with snow surfaces."  RT 8539, 8581.

18         In light of trial counsel's extensive examination of Dr. Thibault, Dr. Thibault's

19  testimony that he relied on his own calculations as well as Exponent's MADYMO material, and

20  Dr. Shimada's testimony about the "limitless amount of answers" to the question of the force with

21  which petitioner's head could have struck the ground, the state court could have accepted

22  Dr. Grewal's conclusion that Exponent's raw data was essentially meaningless as a way to

23  measure the testimony derived from Exponent's tests; at the same time, the court could have

24  found that counsel's failure to obtain this information, whether as a matter of strategy or

25  negligence, was not ineffective in light of Dr. Shimada's testimony that the large number of

26  variables that could have been used rendered Dr. Thibault's testimony meaningless, testimony

27  which echoes Dr. Grewal's conclusions about the problems with the simulations.  This also could

28  have led the court to conclude that any failure to secure the raw data was not prejudicial in light

1   of the concerted attack on Dr. Thibault's conclusions.  The court also could have concluded that

2   had counsel secured the raw data and used it to examine the prosecution's experts, the

3   prosecution would have been able to rehabilitate and strengthen its expert testimony through

4   evidence about the manner in which the MADMYO simulation was undertaken in this case.

5            Relying on Dr. Grewal's declarations, petitioner also claims that counsel was

6   ineffective for failing to research snowmobile accidents involving loss of consciousness recorded

7   in Wisconsin's database of snowmobile accidents.  In finding that petitioner had not established a

8   prima facie case of ineffectiveness in failing to seek information from the Wisconsin database, the

9   state court could have relied on the fact that petitioner had provided no information from 1999,

10  the relevant time period, showing helmeted riders' loss of consciousness or death from

11  snowmobile accidents; the court could have concluded that petitioner's argument about the

12  unchanging nature of snowmobile accidents suggested that even if such data existed it was an

13  insufficient basis for his claim.

14           This court cannot conclude that fairminded jurists would find these reasons

15  supporting the state court's conclusion inconsistent with federal law.  First, even if obtaining the

16  material from Exponent would have allowed counsel to frame a different attack on Dr. Thibault,

17  using it might have given the prosecution's experts an opportunity to explain the basis of their

18  conclusions in greater depth, which might have buttressed rather than undercut Thibault's

19  testimony.  Dr. Grewal's brief paragraph about the paucity of data does not foreclose such a

20  possibility.  *See Harrington*, 131 S.Ct. at 789 (noting the possibility that using forensic testimony

21  might undercut the defense case).  Second,

22           > [r]are are the situations in which the 'wide latitude counsel must
             > have in making tactical decisions' will be limited to any one
23           > technique or approach.  It can be assumed that in some cases
             > counsel would be deemed ineffective for failing to consult or rely
24           > on experts, but even that formulation is sufficiently general that
             > state courts would have wide latitude in applying it.
25

26  *Id.* (quoting *Strickland*, 466 U.S. at 689).  The state court's rejection of petitioner's attack on his

27  lawyer's handling of expert witnesses does not run afoul of this broad principle.   Second,

28  petitioner presented nothing but Dr. Grewal's speculation that the Wisconsin data would have

1   yielded useful comparisons; denying a speculative claim does not offend Supreme Court

2   authority.  *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (improper to grant a habeas petition "on

3   the basis of little more than speculation").

4               3.  Dr. Thibault's Publications

5               Petitioner also claims that trial counsel was ineffective for failing to secure

6   Dr. Thibault's publications and use them in cross-examination; he appended a number of those

7   publications to the latest state habeas petition, as he had with the original state habeas petition.

8   *See* Lodg. Doc. No. 108-2 at 2.   In both state petitions, petitioner quoted several of Dr. Thibault's

9   articles suggesting that a loss of consciousness might result from the fall petitioner allegedly

10  sustained without leaving observable injury in the brain and that more complex models were

11  available for determining the force necessary to cause unconsciousness.  ECF No. 108 ¶¶ 67-76.

12  He says, "[i]n short, [Dr. Thibault's] testimony was impeachable on many grounds by reference

13  to his publications."  *Id.* ¶ 76.  Petitioner also presented trial counsel's declaration stating he "did

14  not have available  . . . to read any of Dr. Thibault's articles prior to my cross-examination of him

15  in front of the jury."  ECF No. 108-2 at 24 ¶ 13.  He presents the same arguments in the traverse,

16  citing to four articles in particular.

17              The state court's rejection of this claim could have been based on the same or

18  similar conclusions about counsel's alleged failure to secure the MADYMO or snowmobile

19  accident data:  counsel had his own experts who rejected Thibault's conclusion, noting the

20  number of variables Thibault failed to consider.

21              The state court could also have concluded that the articles were not significantly

22  impeaching.  Petitioner cites to four of the articles in the traverse, suggesting they contain

23  "potent" impeachment material.  ECF No. 58 at  130-131.  For example, petitioner cites to

24  "Rotational Brain Injury Tolerance Criteria as a Function of Vehicle Crash Parameters" as

25  showing that the simplified model Dr. Thibault used to reach his conclusions in this case was

26  incompatible with a more complex model outlined in the article.  However, that article also

27  discusses, and petitioner even quotes, the velocities needed to produce DAI, velocities higher than

28  the eleven miles per hour Dr. Thibault estimated for petitioner's fall from the snowmobile.  Lodg.

1  Doc. 8,  Appendix 14, Rotational Brain Injury Tolerance at 59.   Similarly, petitioner cites to

2  "Diffuse Axonal Injury and Traumatic Coma in the Primate," and says its recognition of brief

3  periods of unconsciousness followed by quick recovery matched the evidence of petitioner's

4  situation and could have been used to attack Dr. Thibault's conclusion that petitioner could not

5  have been rendered unconscious.  However, this article discusses the force applied to the

6  primates' heads without translating that into the g-force generated by the manipulations, while

7  Dr. Thibault determined that petitioner's fall from the snowmobile would not generate a sufficient

8  g-force to produce DAI.  Petitioner then argues two other articles suggested more complex

9  modeling was required to determine the likelihood that petitioner had been rendered unconscious

10  by the fall; one of these recognized that lateral force was most likely to create DAI, something

11  Dr. Thibault described during his testimony.  *See* ECF No. 108-3 at 1,"A Proposed Tolerance

12  Criterion for Diffuse Axonal Injury in Man" at 917.  Another, "An Analytical Model of

13  Traumatic Diffuse Brain Injury," recognized that given the variability of size, age and health of

14  brains, the "injurious loads" might have to be scaled.  *Id*. at 246.  However, the article did not

15  clearly tie its conclusions to the specific g-force necessary to produce DAI.   Petitioner has not

16  shown that counsel's failure to use these articles for cross-examination resulted in prejudice.

17      The state court could reasonably have determined that counsel's failure to use

18  these articles either was reasonable, in light of his attack on Dr. Thibault through his own experts,

19  or was not prejudicial in light of the less-than-potent nature of their impeachment value.

20      4.  Cross-Examination of Dr. Gean

21      Petitioner argues that trial counsel's failure to review Dr. Thibault's publications

22  prevented him from appropriate cross-examination of Alisa Gean, a radiologist who had testified

23  that DAI caused serious long-term disability, which petitioner did not suffer.  *See* RT 6521-6522

24  ("[T]hese people are devastated, they're comatose, and they come in and they don't recover right

25  away, either.  They are often in rehab centers forever.  . . . There are different levels of severity,

26  but I have never seen a DAI patient come in that hasn't been, at least had severe clinical sequel in

27  terms of when they present.").  When counsel asked Dr. Thibault if he agreed with Dr. Gean's

28  conclusions, he said "she is referring to severe DAI."  RT 7447.   Petitioner has not explained

1   how any familiarity with Dr. Thibault's papers would have permitted trial counsel to challenge

2   Dr. Gean's opinion; his conclusory claim that this would have been possible is not sufficient for

3   habeas relief.  *Greenway*, 653 F.3d at 804 ("cursory and vague claim" that counsel was

4   ineffective cannot support habeas relief).

5   XV.  ACCESS TO THE SNOWMOBILE  (Issue Twelve)

6          In claim twelve, petitioner challenges the trial court's refusal to give the defense

7   access to the snowmobile to restore it to running condition and then to attempt to replicate the

8   incident. Am. Pet. ¶¶ 356–377.  He also alleges that if the motion was not made in a proper

9   manner in the trial court, then counsel was ineffective in failing to pursue it.  *Id*.   Respondent

10  argues that the prosecution did not act in bad faith in failing to store the snowmobile under better

11  conditions and that denying access for testing did not violate petitioner's constitutional rights.

12  ECF No. 36 at 121-130.

13         A.  Proceedings in the State Courts

14         In support of the habeas petition filed in Plumas County Superior Court, petitioner

15  presented the declaration of trial counsel Axup, who averred that he and co-counsel Zernich made

16  "several requests" in chambers to be permitted "to perform dynamic testing on the subject

17  snowmobile."  Lodg. Doc. 6, Appendix 13 (Decl. of Mark Axup) ¶ 9.  Axup regretted that he

18  never put the requests on the record or offered testimony from Richard DeRosa, who had built the

19  snowmobile, or  John Daily, an expert on snowmobiles, to describe why testing was necessary

20  and how it could be done.  *Id*.  According to Axup, the trial judge denied the requests "because

21  the manner in which it had been stored by Plumas County—deteriorated through no fault of the

22  defense—to such a degree  that there was no assurance that its condition of December 28, 1996

23  could be replicated or re-created."  *Id*.  ¶ 10.

24         After obtaining an informal response from the prosecution on this issue, the

25  superior court denied the petition, issuing the only reasoned ruling on the merits:

26         Factual background.  The victim died in 1996.  The District
        Attorney's Office brought charges against the Defendant in the year
27      2000.  In the over three years that it took for the matter to come to
        court, the snowmobile was stored apparently both outside under a
28      tarpaulin as well as inside a special container.  At the time of trial,

the snowmobile condition had deteriorated sufficiently that the Trial Court denied the Petitioner's request to have testing done on the snowmobile.   There were several reasons given for that decision; one of them was that the vehicle's condition had deteriorated during that intervening time.  The Petitioner argues that that had the snowmobile been properly stored he would have been able to have his experts conduct tests on the snowmobile.  . . .

There are three cases of particular significance to this issue.  They are *Arizona vs. Youngblood* (1988) 488 U.S. 51; *People vs. Farnum* (2002) 28 Cal4th 107; *People vs. Carter* (2005) 36Cal4th 1215.

Of these cases, the one that seems to be the most on point is *People vs. Carter*.  In that case, the California Supreme Court held that a State's failure to preserve evidence does not in and of itself establish error; rather, the Petitioner must show that the damaged evidence might have potential exculpatory value.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

In his trial, Petitioner in this action had the opportunity to have an expert testify thoroughly as to his opinion with regard to the snowmobile.  Even if the snowmobile had been stored under ideal conditions, it is certainly speculative that the machine would have operated in as good a condition as when it was first received by law enforcement.  In addition, assuming the testing of the snowmobile proved helpful, it would not exonerate the Defendant . . . but would simply corroborate the testimony of the expert witness.

There is certainly every indication to believe that the jury fully understood the defense argument.   The defense argument was supported by its own expert.  The jury however, after evaluating all the evidence, chose not to believe that the victim's death was the result of a snowmobile accident.

Lodg. Doc. 6, Order of July 12, 2006.  The Court of Appeal and the Supreme Court denied further petitions without comment.

## B.  Standard of Review

Petitioner argues this claim must be reviewed *de novo* because the superior court applied the wrong body of law, analyzing the claim under the case law relating to the preservation of evidence but not addressing the claim that the refusal to grant access for testing denied petitioner the right to present a defense or the ineffective assistance of counsel.  The court did address petitioner's claim that the denial harmed him, a ruling entitled to deference.

/////

112

C.  Substantial and Injurious Effect

Both of the claims arising from the denial of petitioner's request to test the snowmobile—that the trial court denied him his Sixth Amendment right to present a complete defense or that counsel was constitutionally ineffective in failing to make an adequately supported motion for access to the snowmobile—have prejudice components.

When a claim of ineffectiveness rests on the argument that counsel failed to litigate a motion competently, a petitioner must show not only that the motion was meritorious but also that "there is a reasonable probability that the verdict would have been different" had the motion been granted. *Kimmelman v. Morrison*, 477 U.S. 365, 375  (1987).  When a petitioner alleges that a ruling infringed upon his right to present a complete defense, he must show not only that the rules excluding evidence are "'arbitrary' or 'disproportionate to the purposes they are designed to serve,'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998), but also that the exclusion of the evidence had a "substantial and injurious effect on the verdict."  *Brecht,* 507 U.S. at 637.

At petitioner's trial, the defense presented the testimony of Richard DeRosa who had custom-built the Franklins' snowmobile, dubbed the Yamalaris because it was created from Yamaha and Polaris parts. RT 8316.  With the jury gathered around the snowmobile in the parking lot, DeRosa explained how he assembled the machine and described the parts he had created himself and the modifications he made to the ready-made components. RT 8333–8334.

In addition to building the snowmobile, DeRosa, a snowmobile racer, had ridden the machine and had "a pretty good idea how fast" it could go. RT 8320, 8325.  He knew that the Yamalaris was as fast or faster than the newest snowmobiles, which can run at speeds up to 120 to 130 miles per hour.  RT 8329–8330.  De Rosa told the jury he had designed the snowmobile as a racing sled and so designed it to carry one person. RT 8336.   He also built it with wider skis "so it had better flotation" and with carbide runners, which improved the steering. RT 8334.  With the jury watching, De Rosa manipulated the snowmobile and explained he had designed it so it would not tip over on its side, even at high speeds. RT 8337.

/////

113

DeRosa had been able to weigh the Yamalaris and found the weight still fairly well balanced among the skis.  RT 8367.  He then weighed it with people approximating the size of the Franklins seated on the snowmobile and found "it went from having almost perfect 1 to 1 balance to a 3 to 1 balance," with the majority of the weight on the back.  RT 8369.  In that situation, "if you gave it the throttle, [it] would want to kick the skis off the ground and go straight.  It would be very difficult to turn."  RT 8370.  In addition, with too much weight on the back of the snowmobile, it would not steer well. RT 8345.  With two riders, if one "snapped the throttle quickly, chances are they would fall off the back." RT 8335–8336, 8427.  It would have been better to have the heavier person in front because the more weight on the back, "the more unbalanced the sled is." RT 8388.

DeRosa had inspected the snowmobile a year before petitioner bought it and it was "in perfect shape." His inspection of the machine after it was in police custody showed that the wear bar was bent outward and there was "a tremendous amount of play in this front end," which would have made driving the snowmobile difficult.  RT 8414, 8338.  In addition, the front ski was cracked, like it "hit something real hard. . . ," and a lot of the "hooker plates"[18] were broken off, probably from running on asphalt.  RT 8339–8340.  There were indications that the studs had hit the bottom of the snowmobile, probably from too much weight on the back.  RT 8340.

Petitioner also presented the testimony of John Daily, a deputy sheriff from the Teton County Sheriff's Department in Jackson, Wyoming involved in search and rescue and an accident reconstruction specialist, who had undertaken reconstruction of snowmobile accidents.  RT 8529, 8531, 8533.  He talked to DeRosa and inspected the Yamalaris.  RT 8535-8536.  He noted that the front steering was loose, the skags[19] were worn and one was bent, one of the back tracks had been put on backward.  RT 8537.   He agreed with DeRosa that the machine was designed for one rider to go very fast.  RT 8540.

/////

---

[18]  These are welded to the snowmobile tracks to get it to "hook up," or get sufficient traction to move.  RT 8339.  Studs are also used to get the snowmobile to hook up.  RT 8335.
[19]  This component is not defined in the record.

114

1   Daily had two people sit on the Yamalaris, approximating the weight of petitioner

2   and his wife and weighed it.  He concluded the snowmobile had been "grossly overloaded" and

3   could not have been steered well because there was not sufficient weight on the front.   RT 8541-

4   8542, 8554, 8598.

5   Daily outlined what he believed happened on December 28, 1996:  the Yamalaris

6   was drifting down toward the ditch but because of the weight distribution and other problems, the

7   driver was not able to steer out of the slush.  RT 8569-8571.  The driver then "put in an

8   appropriate amount of throttle," which made "the machine accelerate out from under the

9   occupants."  RT 8571, 8576.  If the front ski of the machine had lifted off the snow, it would

10   increase the likelihood that petitioner and Ronna fell off the back.  RT 8577.   He also said if

11   petitioner had   been leaning a little to the right and the snowmobile hit an undulation petitioner

12   could "come off, and if he did, he would probably take his wife with him."  RT 8607.

13   Petitioner thus presented testimony from the person who knew the Yamalaris

14   better than any of the experts, prosecution or defense, and who described more than theoretical

15   snowmobile dynamics: that person's unshakeable opinion was that the snowmobile had become

16   unbalanced by petitioner's riding behind his wife and that under these conditions, acceleration

17   would have caused the front of the machine to rise into the air and the passengers to tumble off

18   the back.  He also presented testimony from Daily, who used the Yamalaris for his calculations

19   and who echoed DeRosa's opinions.   While a videotaped recreation using the Yamalaris may

20   have added to this testimony, petitioner has not made a sufficient showing that its absence had a

21   substantial and injurious effect on the verdict and so has not shown the denial of access to the

22   snowmobile or the failure to make a proper motion for access had a substantial injurious effect on

23   the verdict.

24   XVI.  REDACTION OF DEFENSE VIDEO (Issue Thirteen)

25   Petitioner argues his rights to a fair trial and to present a complete defense were

26   violated when the trial court unreasonably applied rules regarding experiments to redact a video

27   showing people riding a snowmobile.

28   /////

1      A.  Proceedings in the Superior Court

2            According to the settled statement, *see* Cal. Rules of Ct. 8.137,

3            defense counsel proffered a video tape of snowmobile acceleration tests done by Dick DeRosa, the builder of the snowmobile on which Michael and Ronna Franklin were riding at the time of the incident. The proffered video tape was marked Defendant's Exhibit YX5 at the hearing on August 17, 2001.  The Court allowed the defense to play only a portion of the video tape for the jury.  The portion played for the jury is marked Defendant's Exhibit VX5.  The portion not played for the jury included a section showing the snowmobile being operated with two riders, one of them a very large man, similar to the weighting of the Franklin snowmobile at the time of the incident.

9  CT 6828-6829.

10      B.  Court of Appeal's Decision

11            Defendant proffered as evidence a videotape of two people riding a snowmobile to show that having a large person on the back of the snowmobile can cause the snowmobile to tip back, under which circumstances it is more difficult to control the machine. The trial court allowed admission only of a portion of the videotape. On appeal, defendant asserts the redaction of the videotape constituted prejudicial error. We disagree.

The unredacted videotape shows, in addition to what the jury saw, more extensive footage of the workings of the snowmobile, views of the golf course, and two men riding the snowmobile. The man riding on the back is a bigger man and weights are bound at his waist to make him heavier. As they rapidly accelerate, the front skis of the snowmobile lift off the ground. This activity, however, does not cause the riders to fall off. A person on the tape shows that, even though the front skis lifted off the ground during acceleration, there was no damage to the grass.

The only indication that the videotape was redacted by the trial court appears in a settled statement after trial, as follows: "During the defense case in chief, defense counsel proffered a video tape of snowmobile acceleration tests done by Dick DeRosa, builder of the snowmobile on which [defendant and Ronna] were riding at the time of the incident.  The proffered video tape was marked Defendant's Exhibit YX5 at the hearing on August 17, 2001. The Court allowed the defense to play only a portion of the video tape for the jury. The portion played for the jury is marked Defendant's VX5. The portion not played for the jury included a section showing the snowmobile being operated with two riders, one of them a very large man, similar to the weighting of the Franklin snowmobile at the time of the incident." Neither the record nor the settled statement gives us any clue as to why the redaction took place. Indeed, it is not even clear that the court did not allow the defense to play for the jury the portion of the videotape with two riders on the snowmobile.

116

On appeal, we review the trial court's ruling concerning admission of evidence for abuse of discretion only. (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718, 94 Cal.Rptr.2d 396, 996 P.2d 46.) Assuming, for the purpose of argument, that the trial court did not allow the defense to show the portion of the tape showing two riders on the snowmobile, the redaction did not constitute an abuse of discretion.

The demonstration on the videotape took place in the summer on grass in Sacramento, not in snow. While it shows the front skis lifting off the ground when the driver, with a passenger, accelerates rapidly, the front skis also lifted off the ground under conditions of rapid acceleration with only one rider. Furthermore, the demonstration does not show the riders falling off the snowmobile as a result of rapid acceleration or any other circumstance.

The jury had ample evidence to credit defendant's theory of an accident if it had found that theory creditable considering all of the evidence. The man who built the Franklins' snowmobile and prepared the videotape testified that when there is extra weight in the back, acceleration causes the front skis to lift. Accordingly, since the demonstration was done under conditions grossly dissimilar to those prevailing at the time of Ronna's death and the videotape would have been merely cumulative on the point defendant sought to make, the trial court did not abuse its discretion in redacting the videotape

Lodg. Doc. 4 at 70-72.[20]

C.  Analysis

In general, a state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal*, 926 F.2d at 919-20.

A criminal defendant has a right to present a defense, grounded in the Sixth Amendment right to compulsory process and the due process right to a fair trial. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).   The Supreme Court has said that "[o]nly rarely have we

---

[20] The court has watched the video, which has been lodged with the court; the Court of Appeal's order accurately describes the video.  Petitioner faults the Court of Appeal for noting that in the unredacted video the riders do not fall off the back of the snowmobile and explains the riders in the video knew what was coming and held on tightly so as not to fall off.  ECF No. 58 at 145.  This claim is not supported by the record.  DeRosa did not testify that the riders in the demonstration video were prepared for the "kick" when the skis lifted off the ground, but rather testified only generally that if people are not "holding on tight enough," they would be pulled backward.

117

1   held that the right to present a complete defense was violated by the exclusion of defense

2   evidence under a state rule of evidence." *Nevada v. Jackson*, ___ U.S. ___, 133 S.Ct. 1990, 1992

3   (2013) (per curiam).   Even so,  in some circumstances, state rules of evidence cannot be used to

4   prevent a defendant from presenting reliable evidence crucial to his defense. *Washington v.*

5   *Texas*, 388 U.S. 14, 22 (1967); *Chambers* 410 U.S. at 302; *Rock v. Arkansas*, 483 U.S. 44, 55-56

6   (1987).

7            In *Rock* and in *United States v. Scheffer*, the Court examined the accommodation

8   between a defendant's right to present a defense and the government's interests in ensuring that

9   reliable evidence is presented and avoiding litigation collateral to the purpose of the trial.

10   *Scheffer*, 523 U.S. 303, 308-09 (1998).   The Court observed that rules excluding evidence "do not

11   abridge an accused's right to present a defense so long as they are not 'arbitrary' or

12   'disproportionate to the purposes they are designed to serve.'" *Id.* at 308 (citing to *Rock*, among

13   other cases); *Rock*, 483 U.S. at 55-56 ("The right [to present a defense] 'may, in appropriate

14   cases, bow to accommodate other legitimate interests in the criminal trial process.'"); *Wood v.*

15   *State of Alaska*, 957 F.2d 1544, 1551 (9th Cir. 1992) ("Even though the evidence is relevant, it

16   may properly be excluded if its probative value is outweighed by other legitimate interests.").[21]

17            At issue in *Scheffer* was Military Rule of Evidence 707, which precluded the

18   admission of polygraph evidence.  523 U.S. at 307.   The defendant wanted to introduce

19   polygraph evidence to support his claim that he had not knowingly taken methamphetamine.  The

20   military tribunal denied his request, citing the rule that categorically prohibited its introduction.

21   The court said:

22   /////

---

23            [21] After petitioner's conviction became final in 2005, the Court again examined a
24   defendant's right to present a defense, in *Holmes v. South Carolina*, 547 U.S. 319 (2006). In that
     case, the South Carolina court had excluded evidence that another person had committed the
25   murder with which Holmes was charged because the strength of the prosecution's forensic
     evidence meant, in its view, that the proffered third party culpability evidence did not raise a
26   reasonable inference as to Holmes' innocence. The Court acknowledged that "well-established
     rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by
27   certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the
     jury." *Id.* at 326. The Court ultimately found the trial court erred in relying only on the
28   prosecution's evidence to gauge the relevance of the proffered defense testimony.  *Id.* at 329–31.

118

1
2
3
4
5
6
7
8

> *Rock*, *Washington*, and *Chambers* do not require that Rule 707 be
> invalidated, because, unlike the evidentiary rules at issue in those
> cases, Rule 707 does not implicate any significant interest of the
> accused. Here, the court members heard all the relevant details of
> the charged offense from the perspective of the accused, and the
> Rule did not preclude him from introducing any factual evidence.
> Rather, respondent was barred merely from introducing expert
> opinion testimony to bolster his own credibility. Moreover, in
> contrast to the rule at issue in *Rock*, Rule 707 did not prohibit
> respondent from testifying on his own behalf; he freely exercised
> his choice to convey his version of the facts to the court-martial
> members. We therefore cannot conclude that respondent's defense
> was significantly impaired by the exclusion of polygraph evidence.
> Rule 707 is thus constitutional under our precedents.

9   *Id*. at 317 (footnote omitted).

10          In a footnote petitioner argues that the concurring and dissenting justices read

11   *Rock* more expansively than the plurality opinion, thus suggesting the more crabbed rule in the

12   plurality cannot be clearly established federal law.  ECF No. 58 at 146 at n.74; *see, e.g.*, *Marks v.*

13   *United States*, 430 U.S. 188, 192 (1977) ("When a fragmented Court decides a case and no single

14   rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be

15   viewed as that position taken by those Members who concurred in the judgment on the narrowest

16   grounds . . . .'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart,

17   Powell, and Stevens, JJ.).    The Ninth Circuit has recognized plurality decisions are "clearly

18   established federal law."  *See Forn v. Hornung*, 343 F.3d 990, 995 n.4 (9th Cir. 2003) (stating

19   that the plurality decision in *Lilly v. Virginia*, 527 U.S. 116 (1999) constitutes "clearly established

20   federal law" for AEDPA purposes); *see also Stevens v. Ortiz*, 465 F.3d 1229, 1237-38 (10th Cir.

21   2006) (stating it would "take into account the[] concurrences" but still adopting the narrower

22   standard of the *Lilly* plurality as clearly established federal law).   Moreover, the concurring

23   justices in *Scheffer* joined Justice Thomas's decision as to section II D, which contains the

24   passage quoted above.  *See Scheffer*, 523 U.S. at 318.  Scheffer as well as *Rock* provides the rules

25   for decision of this case.

26          The Court of Appeal's rejection of this claim of error does not offend this Supreme

27   Court authority.  As noted in connection with issue twelve, *supra*,  DeRosa, who had built the

28   snowmobile, testified that with people approximately the size of the Franklins seated on the

1    snowmobile, the machine's balance "went from having almost perfect 1 to 1 balance to a 3 to 1

2    balance," with the majority of the weight on the back.  RT 8369.  In that situation, "if you gave it

3    the throttle, [it] would want to kick the skis off the ground and go straight. It would be very

4    difficult to turn." RT 8370.  With two riders, if one "snapped the throttle quickly, chances are

5    they would fall off the back." RT 8335–8336, 8427.

6         As in *Scheffer*, but unlike *Rock*, the redaction of the video did not prevent

7    petitioner from presenting evidence crucial to his defense, but rather only evidence that would,

8    perhaps only marginally, bolster his presentation.  This does not justify grant of the writ.

9    XVII.   EVIDENCE OF COLD-WATER SUBMERSION (Issue Fourteen)

10        Petitioner argues his right to a fair trial was violated when the court allowed the

11   prosecution to elicit testimony from Walter Goedecke, an organizer of the Polar Bear Club, a

12   group whose members swim in icy water during the winter, and to show a tape of Club members

13   jumping into icy water.  ECF No. 25 at 103-104.

14        A.  Proceedings in the Trial Court

15        During the defense case, trial counsel called Dr. Eric Weiss, a professor of

16   emergency medicine, who testified that a person's physiological reactions to sudden immersion

17   can cause death quickly because of a phenomenon he called "cold shock."  RT 8891, 8902.   The

18   defense then showed clips of films Weiss had made, among others, to illustrate his points about

19   cold shock.  RT 8901-8902, 8931.  He explained that a person dropped in cold water will begin to

20   hyperventilate, which decreases the amount of blood going to the brain and can lead to

21   unconsciousness.  RT 8903.   The person quickly submerged in cold water can develop heart

22   irregularities, which can also lead to unconsciousness.  RT 8904.  Weiss explained that the person

23   will shiver uncontrollably, not necessarily because of hypothermia, but because of the skin

24   temperature and will not stop shivering unless there is some alteration in his or her level of

25   consciousness.   RT 8907-8908.

26        In rebuttal, and over defense objection, the prosecution called Walter Goedecke,

27   the events organizer of the Boulder Polar Bear Club.  RT 9104, 9105.  Goedecke, who had

28   attended a number of such jumps, said that people generally left the water under their own power.

1   RT 9107, 9109.   The jury saw a videotape of one of the events.   RT 9104-9115.   Trial counsel's

2   objections were overruled.   *See, e.g.*, RT 9109.

3         Before the prosecutor called Goedecke, however, he showed the Polar Bear video

4   to Weiss during cross examination.   RT 9032.   Weiss suggested that people who make a practice

5   of jumping into cold water might have their response to the immersion blunted.   RT 9034.

6       B.   The Court of Appeal's Decision

7         The Court of Appeal rejected petitioner's claim of error:

> Defendant asserts the trial court abused its discretion by allowing the prosecution, on rebuttal, to show the jury a videotape of people voluntarily jumping into cold water. He asserts the evidence should not have been admitted because it showed circumstances too dissimilar to Ronna's death, "violated section 352 of the Evidence Code," and lacked scientific reliability under *Kelly-Frye*. We disagree.

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> Defendant's contention the circumstances shown in the videotape were too dissimilar to Ronna's death is based on the fact that the participants on the videotape immersed themselves voluntarily. Whether the circumstances are too dissimilar is a matter of trial court discretion, and we will not disturb that exercise of discretion absent abuse. (See *People v. Waidla, supra*, 22 Cal.4th at pp. 717-718, 94 Cal.Rptr.2d 396, 996 P.2d 46 [admissibility of evidence subject to trial court discretion].) In light of the defense expert's testimony concerning cold water immersion, it was not an abuse of discretion to allow the prosecution to present evidence of examples of cold water immersion without injurious effects. That the immersion examples in the videotape were voluntary goes to the weight, not to the relevance and admissibility, of the evidence.

> Defendant argues that "even if [the evidence] had minimal probative value, that value was far outweighed by the probability that it would confuse the issues and mislead the jury into believing that it actually did shed significant light on the circumstances of Ronna's demise." To the contrary, the videotape was unlikely to confuse or mislead the jury. It simply served to rebut the defense expert's testimony.

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

26   Lodg. Doc. 4 at 73-76.

27   /////

28   /////

1          C.  Standard

2                 Petitioner again argues he is entitled to *de novo* review of this claim because the

3    Court of Appeal decided the claim on state law grounds only.  Once again, he has not attempted

4    to rebut the presumption that this decision, discussing the merits of his claim, addressed the

5    related federal issue, raised in a single line by cross-referencing another argument in the opening

6    brief.  Lodg. Doc. 21 at 132; *Johnson*, 133 S.Ct. at 1096.  Whether the issue is analyzed under

7    AEDPA's  standard or *de novo*, the claim does not warrant habeas relief.

8          D.  Analysis

9                 Petitioner "cites no Supreme Court decision finding a due process violation based

10   on the improper admission of evidence; absent such authority, under AEDPA, federal courts are

11   without power to grant the writ."  *Pierce v. Adams*, 506 F. App'x 581, 583 (9th Cir. 2013)

12   (unpublished); *Holley*, 568 F.3d at 1101 ("Under AEDPA, even clearly erroneous admissions of

13   evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

14   corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

15   Court.").

16                Even on *de novo* review, "[h]abeas relief is available for wrongly admitted

17   evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate

18   federal due process."  *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993); *see also Coleman v.*

19   *Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001) ("State court evidentiary rulings do not rise to the

20   level of due process violations unless they 'offend . . . some principle of justice so rooted in the

21   traditions and conscience of our people as to be ranked as fundamental.'") (quoting *Patterson v.*

22   *New York*, 432 U.S. 197, 202 (1977)).

23                The admission of the cold water submersion evidence did not render petitioner's

24   trial fundamentally unfair:  his expert saw and commented on the differences between the

25   reactions of people who have prepared for their immersion and the reaction of someone plunged

26   unexpectedly in cold water.  *See* RT 9034.  Nor was the evidence inflammatory or difficult to

27   rebut; indeed it was rebutted by petitioner's expert.  Whether considered deferentially or *de novo*

28   the admission of this evidence does not justify habeas relief.

1    XVIII.  EXCLUSION OF EVIDENCE OF SHALLOW WATER DROWNING (Issue Fifteen)

2            Petitioner argues the state courts' rejection of his expert's testimony about

3    drowning and near drownings in shallow water violated his right to present a defense.

4        A.  Proceedings in the Superior Court

5            The settled statement provides:

6            In chambers, defense counsel made an offer of proof that Dr. Eric
             Weiss would testify to various specific instances in which people
7            either drowned or nearly drowned in shallow or shallow and cold
             water.  One such instance involved a friend of Dr. Weiss who was
8            participating in a kayak race attended by Dr. Weiss; Dr. Weiss
             eventually testified to this incident on cross-examination.
9            Dr. Weiss also proposed to testify about a number of other such
             incidents which had been discussed at professional conferences
10           which he had attended, with the discussion based on sources of
             information other than official reports.   The District Attorney
11           objected to this evidence as multiple hearsay, and because it was
             not based on information of a type reasonably relied upon by
12           experts.  The Court sustained the objection.

13   ACT 6829.  Dr. Weiss did describe the death of the kayaker, who had been floating in calm

14   water but then suddenly flipped over and did not roll back up, noting the man had been healthy

15   except for diabetes.  RT 9017-9018.  He also said that diabetics are six times more likely to

16   drown than other people.  RT 9018.

17       B.  The Court of Appeal's Decision

18           Defendant asserts the trial court erred by excluding evidence from
             Dr. Weiss concerning instances in which people drowned or nearly
19           drowned in shallow water. The contention is without merit because
             the evidence was hearsay and was not shown to be of a type
20           reasonably relied on by experts in forming an opinion.

21           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

22           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

23            "Expert testimony may ... be premised on material that is not
             admitted into evidence so long as it is material of a type that is
24           reasonably relied upon by experts in the particular field in forming
             their opinions. (Evid.Code, § 801, subd. (b); [citations].) Of course,
25           any material that forms the basis of an expert's opinion testimony
             must be reliable. [Citation.] For 'the law does not accord to the
26           expert's opinion the same degree of credence or integrity as it does
             the data underlying the opinion. Like a house built on sand, the
27           expert's opinion is no better than the facts on which it is based.'
             [Citation.] [¶] So long as this threshold requirement of reliability is
28           satisfied, even matter that is ordinarily inadmissible can form the

                                      123

proper basis for an expert's opinion testimony. [Citations.] And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618-619, 59 Cal.Rptr.2d 356, 927 P.2d 713, italics in original.)

Here, nothing in the record establishes that discussion concerning instances of shallow water drowning is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. The settled statement does not so state. Instead of showing that the trial court abused its discretion in excluding the evidence by bringing our attention to where in the record this is established, defendant states: "The only evidence in the record concerning the reasonable sources of information for experts on cold-water immersion was the proffer that Dr. Weiss and his colleagues in fact relied on this information. The judge found Dr. Weiss qualified to testify as an expert; implicit in that finding is a belief that the doctor knows what is and is not reasonable to rely upon in forming and rendering opinions in the area of his expertise." (Citation omitted.)

This argument overstates the record. The settled statement avers only that the evidence was being proffered, not that Dr. Weiss believed it to be a reasonable basis for expert conclusions. Furthermore, while the settled statement reflects that Dr. Weiss proposed to testify concerning the shallow water drowning incidents he heard about, we will not presume the doctor was aware of the rules of evidence and had in mind the legal threshold for reliance on the hearsay evidence to form an expert opinion. Accordingly, the record does not support defendant's argument the hearsay evidence concerning instances of shallow water drowning was improperly excluded.

Lodg. Doc. 4 at 76-78.

C.  Analysis

Petitioner argues the exclusion of this evidence violated his right to present a defense.  It is true that the exclusion of highly reliable evidence, relevant to the defense, may violate due process.  *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam).  Here petitioner has not shown that the hearsay accounts Dr. Weiss proposed to describe were sufficiently reliable so as to render their exclusion arbitrary or disproportionate and thus violative of his constitutional rights.  Moreover, the Supreme Court has not "squarely address[ed] whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence."  *Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009).  The state courts'

rejection of Weiss's testimony because it was not based on material relied upon by experts does not violate clearly established federal law. *Cantrell v. McEwen*, 449 F. App'x 698, 700-01 (9th Cir. 2011) (unpublished), *cert. denied* 132 S.Ct. 1106 (2012).   Finally, Dr. Weiss described an account with relevance to petitioner's case, the drowning of an otherwise healthy but diabetic kayaker.   He has not shown how the exclusion of other incidents, not defined, had a substantial and injurious impact on the verdict.

## XIX.  ADMISSION OF EVIDENCE OF EXTRAMARITAL AFFAIRS (Issue Sixteen)

Petitioner argues his right to a fair trial was violated by the admission of evidence of twelve extramarital affairs and other evidence of bad character.

### A.  Proceedings in the Superior Court

The prosecutor presented testimony from twelve women with whom petitioner had had affairs between 1993 when petitioner began living with Ronna and 1996, when she died.

### B.  Court of Appeal's Decision

Defendant asserts the evidence of his extramarital affairs was improperly admitted. We conclude the evidence was relevant to defendant's motive and served to impeach defendant's pretrial statements and show his consciousness of guilt. We further conclude the trial court did not abuse its discretion pursuant to Evidence Code section 352 and gave a proper limiting instruction to the jury concerning the evidence. Accordingly, defendant's assertion of error is without merit.

We review the trial court's admission of evidence only for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201, 58 Cal.Rptr.2d 385, 926 P.2d 365.)

A. Motive

"[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid.Code, § 1101, subd. (a).) However, this section does not prohibit "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ... ) other than his or her disposition to commit such an act." (Evid.Code, § 1101, subd. (b).)

Here, the evidence of defendant's extramarital affairs was introduced, in part, to show defendant had a motive to murder Ronna. Defendant's lifestyle included multiple affairs, to which he

devoted considerable time and money. Ronna represented an impediment to that lifestyle because she wanted to quit work, which accounted for a significant amount of the couple's income. Alternatively, there was evidence that Ronna was contemplating divorce, which also would have deprived defendant of funds to maintain his lifestyle. Together with the evidence of the large life insurance policies purchased on Ronna's life, the evidence of defendant's affairs tended to show defendant's motive of killing Ronna to obtain the insurance proceeds and maintain his lifestyle. This is the motive theory on which the trial court allowed admission of the evidence.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## B. Impeachment

While Evidence Code section 1101 does not prohibit evidence of bad acts to show motive, as discussed above, it also does not prohibit evidence of bad acts to attack defendant's credibility. (See Evid.Code, § 1101, subd. (c).) Defendant, in his statement to an investigator just three days after Ronna died, asserted he loved his wife, their relationship was special, and he was not involved with other women. The trial court admitted evidence of the extramarital affairs, in part, to impeach defendant's credibility and establish that the false statements he made to the investigator showed a consciousness of guilt.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Defendant continues, however, that admission of evidence of his extramarital affairs could not be based on his contrary pretrial statement because his answers to the investigator's questions did not clearly establish he was denying extramarital affairs. This argument is incomplete and contrary to the text of the statement. Furthermore, the evidence of his extramarital affairs also showed, contrary to his statements, that he did not love his wife and their relationship was not "special."

/////

During the interview, defendant told the investigator he loved his wife. When asked to describe his marriage, defendant responded: "[W]e were special, she's the best thing that ever happened to me." Later in the interview, the following exchange took place:

"[Investigator]: ... Please, don't be mad at me when I suggest this. Ok. One could look at this and say this happened. People are sitting there in the water. There was a large insurance policy. Is there a possibility that there was anyone else in your life that um,

"[Defendant]: No.

"[Investigator]: Ok. The one reason I suggest that-I come from all bases. And without being tacky, but I think that if I don't ask you this question ----certain things -----for everyone that is concerned about this investigation. That there has been a suggestion that there was a possibility of another female. You had said emphatically that there is not.

"[Defendant]: There was nobody.

"[Investigator]: No, no affairs or anything that would cause your attention to go elsewhere?

"[Defendant]: I loved my wife. . . ."

We have no trouble concluding, as did the trial court, that this was a denial of involvement in extramarital affairs. In addition, his statements he loved his wife and that their relationship was "special" were shown to be false by the evidence of his extramarital affairs.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Within his argument concerning abuse of discretion pursuant to Evidence Code section 352, defendant claims "the prosecutor elicited far more inadmissible bad character evidence from these witnesses than the mere fact of [defendant's] adultery." We need not consider this further claim because it does not appear that a separate objection was made to the evidence on this ground (See Evid.Code, § 353, subd. (a) [no verdict set aside if no objection to evidence] ), defendant provides no authority for the claim ( *People v. Callegri* (1984) 154 Cal.App.3d 856, 865, 202 Cal.Rptr. 109 [argument without authority deemed waived], disapproved on another point in *People v. Bouzas* (1991) 53 Cal.3d 467, 279 Cal.Rptr. 847, 807 P.2d 1076), and this contention is not a part of the Evidence Code section 352 contention of error, under which heading it appears. (See *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4, 41 Cal.Rptr.2d 263 [contentions must be separately headed].)

D. Federal Due Process

Defendant contends the admission of the extramarital affair evidence violated his federal due process rights. We disagree. The evidence was probative of motive and for impeachment and not unduly prejudicial. Defendant's reliance on *McKinney v. Rees* (9th Cir.1993) 993 F.2d 1378, a federal habeas corpus case, is unhelpful. In that case in which the victim's throat was slit, the trial court admitted evidence that defendant, prior to the crime, possessed knives that were not involved in the crime. The federal court concluded the evidence only went to the issue of defendant's character and that admission of this prior "bad act" evidence resulted in an unfair trial. ( *Id.* at pp. 1381-1385.) Here, unlike in *McKinney*, the extramarital affair evidence was probative of both

1    motive and consciousness of guilt. Accordingly, defendant's claim
     of an unfair trial, relying on *McKinney*, fails.

2

3  Lodg. Doc. 4 at 50-57.

4       C.  Analysis

5       First, to the extent petitioner challenges the admission of evidence other than the

6  testimony about the adultery itself, this claim is barred.  Petitioner says the prosecutor elicited

7  evidence that petitioner told Shelle Hill that he got a woman pregnant during a one-night stand

8  and described the woman as an unfit mother, *see* RT 5442, 5451, and that petitioner told Hill he

9  could not spend July 4, 1994, his wedding day, with her because he had plans with friends.  RT

10  5427-5429, 6303.  He also challenges admission of evidence of a number of instances when

11  petitioner lied to his various women friends.  ECF No. 58 at 161.[22]  As noted above, the Court of

12  Appeal rejected the claims because no objection had been made on these grounds.   The Ninth

13  Circuit has held that the failure to make a contemporaneous objection raises an adequate and

14  independent procedural bar to such a claim on federal habeas.  *Rich*, 187 F.3d at 1069-70.

15       Second, as discussed throughout this order, "[u]nder AEDPA, even clearly

16  erroneous admissions of evidence that render a trial fundamentally unfair may not permit the

17  grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid

18  out by the Supreme Court."  *Holley*, 568 F.3d at 1101.  This court need not decide whether the

19  evidence was improperly admitted for the theories offered, as petitioner has not shown its

20  admission violated clearly established federal law.  He cites to *Michelson v. United States*,

21  335 U.S. 469 (1948) and *Brinegar v. United States*, 338 U.S. 160 (1949), but these cases discuss

22  propensity evidence not as a matter of federal constitutional law but rather as a matter of federal

23  evidentiary law.  These cases do not help him.

24  /////

25  /////

26  _____

27       [22] It is somewhat puzzling that in an argument challenging the admission of evidence of
     petitioner's adulterous relationships with women, petitioner also argues that testimony from
     business associate Donald Napravnik about petitioner's dishonesty was improperly admitted.  *See*

28  ECF No. 25 at 110.

1    XX.   EVIDENCE OF RONNA'S STATE OF MIND (Issue Seventeen)

2          Petitioner contends the admission of evidence of Ronna's state of mind violated

3    both his right to confrontation and his right to a fair trial.

4          In his amended petition and traverse, petitioner contends the trial court improperly

5    allowed the presentation of evidence that Ronna seemed unhappy in her marriage, believed

6    petitioner treated her badly, and did not want to go to Bucks Lake in December 1996.  ECF

7    No. 25 at 113; ECF No. 58 at 165.  In the traverse, he identifies the challenged evidence as that

8    summarized in paragraph 31 of the amended petition.  *Id*.  Paragraph 31 of the amended petition,

9    however, says only that Ronna told family members she was not eager to go to Bucks Lake, that

10   she did not like to go on vacation in cold climates, and that she was on her period and was not

11   feeling well.  Because petitioner has not summarized any testimony about Ronna's unhappiness

12   with her marriage or her belief petitioner treated her badly, or otherwise pointed to record

13   citations for such evidence, he was waived any claim challenging its admission.  *See Alaskan*

14   *Independence Party v. Alaska*, 545 F.3d 1173, 1181 (9th Cir. 2008) (issue waived when party

15   provided no citation to the record).

16      A.  Proceedings in the Superior Court

17          Petitioner filed a motion to exclude evidence of Ronna's state of mind, arguing her

18   state of mind was not at issue and the admission of this hearsay evidence would violate the right

19   to confront witnesses.  CT 1033-1046.  The trial court denied the motion, saying petitioner's

20   statement about an idyllic marriage and Ronna's satisfaction with the marriage put Ronna's state

21   of mind in issue.   CT 4914-4915.

22          The trial court was referring to the statement petitioner gave to a Plumas County

23   Sheriff's deputy on December 31, 1996.  RT 6881.  Petitioner said Ronna had been looking

24   forward to the trip to Bucks Lake, and although they were having a good time, they decided to go

25   home a day early because they missed their son.  RT 6886.   On their last day, they returned to

26   their cabin after lunch, played a board game called "For Lovers Only," made love, and then left

27   for a last snowmobile ride.  RT 6887.

28   /////

1    The jury then heard evidence from Ronna's friends and family that she was not

2  looking forward to the excursion to Bucks Lake because she preferred to go to warmer places.

3  *See, e.g.,* RT 5774 (the night before the trip Ronna told a friend she did not want to go to Bucks

4  Lake), 6809 (Ronna told a co-worker at Raley's she did not like the cold and did not want to go to

5  Bucks Lake), 7480-7481 (Ronna told her mother she did not want to go to Bucks Lake and she

6  did not feel well, because she had a yeast infection and she was having her period; Ronna also

7  called her mother from Bucks Lake and said she was not feeling well and wanted to come home).

8       B.  The Court of Appeal Decision

9       The Court of Appeal issued the last reasoned decision on this issue:

> . . . [T]he evidence of Ronna's state of mind was introduced to impeach defendant's pretrial statements concerning the state of his marriage and Ronna's desire to go to Bucks Lake. Defendant, himself, put Ronna's state of mind at issue by making the pretrial statements. The evidence of Ronna's state of mind was both relevant and admissible.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> C.  Violation of Confrontation and Due Process Rights
>
> Defendant contends admission of the evidence of Ronna's state of mind violated his federal confrontation and due process rights because the hearsay exception for state of mind is not a firmly rooted hearsay exception. (See *Ohio v. Roberts* (1980) 448 U.S. 56, 65-56 [65 L.Ed.2d 597, 607-608 [firmly rooted hearsay exceptions do not violate confrontation clause]. The California Supreme Court has rejected this contention. *People v. Majors* (1998) 18 Cal. 4th 385, 405 [state of mind exception firmly rooted].) Accordingly, we may infer the hearsay statements were reliable and their admission did not violate defendant's confrontation and due process rights. (*Ohio v. Roberts, supra,* at pp. 65-66).
>
> D.  Prejudice
>
> Under the heading "Prejudice," . . . defendant asserts the trial court failed to give a mandatory limiting instruction concerning this evidence. Since we find no error, we need not consider whether the asserted error in admitting the evidence was prejudicial.
>
> The evidence of Ronna's state of mind was admissible to prove her state of mind on the poor status of her marriage and relationship with defendant and her desire not to go to Bucks lake because defendant made her state of mind an issue by claiming they were happily married and that she wanted to go to Bucks Lake. Her

statements concerning her state of mind could be considered for the truth of the matter stated. (Evid. Code, § 1250, subd. (a)). Other statements Ronna made that were not direct declarations of her state of mind (for example, her statement that she did not want to try on the helmet defendant gave her for Christmas, as circumstantial evidence she did not want to go to Bucks Lake) could not be considered for the truth of the matter asserted.

Defendant requested a limiting instruction concerning the state of mind evidence. While the court and the prosecutor agreed it would be appropriate, no instruction was given. . . . Nevertheless, the failure to give the instruction was harmless because it is not reasonably probable that a result more favorable to defendant would have occurred if the limiting instruction had been given. (See *People v. Wade* (1996) 48 Cal. 4th 460, 470, 55 Cal. Rptr. 855).

. . . While the evidence introduced concerning Ronna's state of mind tended to cast defendant in a bad light as, perhaps, an insensitive or inattentive husband, it did not brand him a murderer. There is no reason to believe the jury did as defendant speculates and disregarded the evidence of what happened at Bucks Lake, convicting defendant instead because of its opinion concerning his character. Admission of the state of mind evidence was proper, and the failure to give a limiting instruction was harmless.

Lodg. Doc. 4 at 59-64.

C. Fair Trial

As noted in the discussion of earlier claims for relief, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation." *Holley*, 568 F.3d at 1101. Petitioner has not shown the Court of Appeal unreasonably applied clearly established federal law when there has been no clear ruling from the Supreme Court.

D. Confrontation Clause

The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides in part that, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause precludes admission of hearsay evidence against a criminal defendant unless the prosecution can demonstrate that the statement contains adequate indicia of reliability. *Ohio v. Roberts*, 448 U.S. 56, 66 (1980) . Reliability may be inferred, without more, if

/////

131

1    the evidence is admitted based on a firmly rooted hearsay exception. *White v. Illinois*, 502 U.S.

2    346, 356-57 (1992).[23]

3            A hearsay exception is firmly rooted "if, in light of longstanding judicial and

4    legislative experience, it rest[s] [on] such [a] solid foundation[n] that admission of virtually any

5    evidence within [it] comports with the substance of the constitutional protection." *Lilly*, 527 U.S.

6    at 126 (citations, internal quotations omitted; alterations in original).  Federal courts have held

7    that the state of mind exception to the hearsay rule is firmly rooted, so that admission of

8    statements meeting the requirements of the rule do not violate the Confrontation Clause.

9    *Terrovona v. Kincheloe*, 852 F.2d 424, 427 (9th Cir. 1998) (rejecting claim that the admission of

10   state of mind evidence violated the Confrontation Clause); *Horton v. Allen*, 370 F.3d 75, 85 (1st

11   Cir. 2004) ("The state-of-mind exception has been recognized by the Supreme Court . . . for over

12   a century.") (citing *Mut. Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295-96 (1892) (admitting letter

13   stating that declarant intended to travel to a certain destination with another)); *Hayes v. York*,

14   311 F.3d 321, 325 (4th Cir. 2002) (state of mind exception exists in every jurisdiction, whether by

15   statute, court rule, or common law tradition).

16           As a general matter, the admissibility of evidence is a question of state law, not

17   reviewable on federal habeas.  *See, e.g., Wood v. Schriro*, No. CV-980053 TUC JMR, 2007 WL

18   3124451, at *18 (D. Ariz. Oct. 24 2007), *aff'd*, 693 F.3d 1104 (9th Cir. 2012).  However, "where

19   a Confrontation Clause violation is alleged, federal courts can go beyond a state court's

20   characterization and analyze whether a factual basis supports the state court's decision." *Winzer*

21   *v. Hall*, 494 F.3d 1192, 1198 (9th Cir. 2007); *see also Lilly*, 527 U.S. at 125 ("[T]he question

22   whether the statements fall within a firmly rooted hearsay exception for Confrontation Clause

23   purposes is a question of federal law").  Petitioner argues the statements about Ronna's unease

24   about the Bucks Lake trip do not fall with the state of mind exception because they are not

25           [23] The Supreme Court's decision in *Crawford v. Washington* substantially changed
26   Confrontation Clause analysis, shifting analysis away from indicia of reliability and focusing
     instead on whether a statement is "testimonial." 541 U.S. 36, 59 (2004). However, *Crawford* is
27   not retroactive to cases final before it was decided. *Whorton v. Bockting*, 549 U.S. 406  (2007),
     and was decided after the events in this case took place. Thus, the court engages in pre- *Crawford*
28   analysis in considering petitioner's claim.

1    trustworthy.   ECF No. 58 at 166.  This raises a question of federal law.  Petitioner also argues

2    that Ronna's state of mind was not at issue—indeed, he spends more time on this question than he

3    does on the confrontation aspect--but does not discuss whether this question is also one of federal

4    law for Confrontation Clause purposes.

5             The court need not reach the questions whether this particular testimony is state of

6    mind evidence as a matter of federal law or the related issue of whether Ronna's state of mind

7    was at issue is a question of federal law, because petitioner has not demonstrated that the

8    admission of evidence that Ronna did not want to go to Bucks Lake had a substantial and

9    injurious impact on the verdict.

10            Petitioner's argument on prejudice is brief:  he says only that "a juror would find it

11   far easier to decide the case based on, for instance, the irrelevant videotape image of a distraught

12   Ronna lying in a hospital bed two years earlier, complaining to her father that Michael didn't visit

13   her very often, and when he did he was suntanned and wearing new clothes. . . . Ronna was no

14   longer offstage, being described from the witness stand in the past tense.  In this evidence, Ronna

15   was a real person with a face and a voice, speaking to the jury, and doing so about a subject and

16   in a manner which made it reasonably probable that they decided the case against Michael upon

17   improper and irrelevant grounds."  ECF No. 58 at 171.  Petitioner has not addressed how the

18   evidence of Ronna's disinclination to visit Bucks Lake made it probable the jury's verdict was

19   based on "improper and irrelevant grounds," but rather focused his prejudice argument on the

20   evidence of Ronna's discontent with her marriage, the challenge to which petitioner has waived.

21   He has not borne his burden of demonstrating prejudice necessary to justify habeas relief.

22   XXI.  EXCLUSION OF TESTIMONY ON ADULTERY AND HOMICIDE (Issue Eighteen)

23            Petitioner argues the state court violated his right to present a defense when it

24   excluded the expert testimony of Dr. Deborah Davis, who proposed to testify that adultery is not a

25   predictor of spousal homicide.  He says the decision to allow the presentation of evidence of

26   petitioner's adultery cannot be squared with the admission of the evidence of petitioner's affairs,

27   addressed above, in connection with issue sixteen.

28   /////

                                                    133

A.  Proceedings in the State Court

Outside the presence of the jury, Dr. Davis testified that 24 to 26 percent of men are unfaithful at least once during marriage, RT 8797, and that every year, four out of a million husbands murder their wives, RT 8804; using these numbers a prediction that an unfaithful husband would murder his wife would be wrong 65,000 times.  RT 8807.  The trial court found any probative value of this evidence to be outweighed by the confusion it would introduce and the real possibility of prolonging the trial.  RT 8823-8824.

B.  The Court of Appeal's Decision

As noted . . . the trial court properly admitted evidence of defendant's extramarital affairs to show his motive to kill Ronna for financial gain and to impeach his pretrial statements about having a happy marriage, thus showing his consciousness of guilt. Defendant, for his part, proffered expert testimony that adulterous husbands generally do not kill their wives. He claims this evidence was necessary to rebut the prosecution's argument that defendant's extramarital affairs constituted circumstantial evidence he killed Ronna. Not only does he assert that exclusion was an abuse of discretion, he also claims it violated his constitutional due process rights. We conclude that, if the expert testimony was relevant at all, the trial court did not abuse its discretion or violate defendant's constitutional due process rights by excluding it under Evidence Code section 352.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The prosecution neither presented evidence nor argued to the jury that, because defendant was an adulterer, it was more likely that he killed his wife. That, however, was the only issue concerning which defendant's proffered expert testimony was relevant. Instead of rebutting prosecution evidence or arguing the evidence, at most, would have tended to show only that defendant's adultery was not a predictor of whether he was also a wife murderer. There is no basis in the evidence or in reason, however, for believing that, without the evidence, the jury made the contrary presumption and convicted defendant merely because he was an adulterer. Thus, defendant's proffered expert testimony was no more relevant than any statistic showing that only a certain percentage of the population or a segment of the population commits any particular crime. Furthermore, the trial court instructed the jury it could not use the evidence to conclude defendant was a person of bad character or had a disposition to commit crimes.

Defendant also asserts the evidence would have tended to refute what he asserts was the prosecution's implication that defendant's philandering lifestyle was uncommon. Whether his lifestyle was

134

1    uncommon, however, was completely irrelevant to the issues tried.

2    The trial court considered defendant's proffer and excluded it
     pursuant to Evidence Code section 352. Even assuming the expert
3    testimony had some relevance to the issues being tried, the court
     concluded (1) it lacked sufficient scientific certainty to be
4    probative, (2) the undue confusion of the jury and consumption of
     time substantially outweighed its probative value, and (3) the
5    evidence was misleading.

6    We need not delve into the scientific certainty of the evidence
     because it is readily apparent that the probative value was so
7    minimal, if it existed at all, that the undue risk of confusing and
     misleading the jury and consuming undue time in an already
8    lengthy trial by far outweighed any probative value. Since the
     prosecution rightfully did not argue that adultery is a predictor of
9    spousal homicide, the jury would only have been perplexed by
     rebuttal evidence on that issue.

10
     Defendant's constitutional argument fails for the same reasons.
11   While we cannot disagree with defendant that evidence that is
     relevant to the prime theory of the defense cannot be excluded in
12   wholesale fashion (See *People v. Walker* (1986) 185 Cal.App.3d
     155, 163-166, 229 Cal.Rptr. 591, and cited cases), this proffered
13   expert testimony that adultery is not a predictor of spousal homicide
     was not critical to the defense that Ronna died in an accident.

14

15   Lodg. Doc. 4 at 78-81.

16        C.  Analysis

17        In general, a state court's evidentiary ruling is not subject to federal habeas review

18   unless the ruling violates federal law, either by infringing upon a specific federal constitutional or

19   statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

20   process. *See Pulley,* 465 U.S. at 41; *Jammal*, 926 F.2d at 919-20.

21        As noted in connection with issue thirteen above, a criminal defendant has a right

22   to present a defense, grounded in the Sixth Amendment right to compulsory process and the due

23   process right to a fair trial.  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  Also as noted in

24   *United States v. Scheffer*, the Supreme Court said:

25        *Rock*, *Washington*, and *Chambers* do not require that Rule 707 be
          invalidated, because, unlike the evidentiary rules at issue in those
26        cases, Rule 707 does not implicate any significant interest of the
          accused. Here, the court members heard all the relevant details of
27        the charged offense from the perspective of the accused, and the
          Rule did not preclude him from introducing any factual evidence.
28        Rather, respondent was barred merely from introducing expert

                                      135

1

2

3

4

> opinion testimony to bolster his own credibility. Moreover, in contrast to the rule at issue in *Rock*, Rule 707 did not prohibit respondent from testifying on his own behalf; he freely exercised his choice to convey his version of the facts to the court-martial members. We therefore cannot conclude that respondent's defense was significantly impaired by the exclusion of polygraph evidence. Rule 707 is thus constitutional under our precedents.

5    523 U.S. at 317 (footnote omitted). As in *Scheffer*, the excluded evidence here had nothing to do

6    with the relevant details of the charged offense. *See Moses,* 555 F.3d at 758 (9th Cir. 2009)

7    (Supreme Court cases that found infringement of right to present a defense considered rules that

8    required a trial court to exclude crucial evidence with little or no justification).

9          Petitioner  suggests that a rule is arbitrary if it "takes the evaluation of credibility

10   and weight of the defense evidence out of the hands of the jury." ECF No. 58 at 174. He cites

11   only law review articles for this proposition. *Id.*  In this case, the court applied California

12   Evidence Code section 352, which gives a court the discretion to exclude evidence that might

13   require an "undue consumption of time" or create jury confusion. The U.S. Supreme Court has

14   approved "well-established rules of evidence [that] permit trial judges to exclude evidence if its

15   probative value is outweighed by certain other factors such as unfair prejudice, confusion of

16   issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326.

17          Despite petitioner's attempts to distinguish *Scheffer*, that case is the closest to this

18   one:  the court did not exclude factual information, but rather only expert testimony about the

19   common-sense conclusion that most men who commit adultery do not murder their wives.

20   Moreover, as the prosecution's theory was not that the adultery itself was the reason for the

21   murder, the probative value of the evidence was slight.  Excluding this evidence did not deny

22   petitioner the right to present his defense.

23          Petitioner next relies on *Wardius v. Oregon*, 412 U.S. 470 (1973), to argue that the

24   constitutional principles of reciprocity mean the trial court could not admit evidence of

25   petitioner's extramarital affairs but then exclude the evidence that his dalliances did not

26   predispose him to murder. ECF No. 58 at 177. *Wardius* addressed reciprocal discovery, not

27   parity of evidence; it does not clearly establish any rule applicable to this case.

28   /////

1    In another attack on what petitioner views as skewed application of evidentiary

2  principles, he argues that the Court of Appeal's different application of "the logical relevance

3  question" constitutes an unreasonable determination of fact.  He cites nothing suggesting that

4  relevance is a factual, rather than a legal question.  *See*, *e.g.*, *People v. Lucas*, 60 Cal. 4th 153

5  (2014) (generally determining relevance of other acts evidence is question of law).

6    Ultimately, excluding the evidence did not have a substantial and injurious effect

7  on the verdict.  Petitioner argues briefly that had this evidence been introduced, the prosecution's

8  "circumstantial evidence would not look nearly so strong,"  ECF No. 58 at 180, but he focuses on

9  the wrong thing.  The prosecution did not argue that petitioner's infidelity drove him to murder,

10  but rather it was one piece of a complex motivation behind his actions.  Dr. Davis's unremarkable

11  testimony would have done nothing to undercut the prosecution's case.

12  XXII.  FAILURE TO GIVE INSTRUCTIONS ON EXPERT TESTIMONY (Issue Nineteen)

13    Petitioner argues his right to a fair trial was violated when the trial court refused to submit

14  to the jury the question whether the prosecution had laid a proper foundation for testimony given

15  by Dr. Kost and Dr. Thibault and refused to instruct that expert testimony based on speculation

16  was insufficient to support the verdict.  ECF No. 25 at 119-120;  ECF No. 58 at 181-183.

17  Respondent argues the first claim of instruction error is defaulted, while any error from the

18  second claim is harmless.  ECF No. 36 at 150.

19    A.  Proceedings in the Trial Court

20    Petitioner proposed the following instructions:

21    As stated earlier, an opinion is as good as facts and reasons on
     which it is based.

22

23    An opinion based in whole or in part upon [an] experiment shall be
     rejected by the jury unless you find all of the following to have
     been proven to you by a preponderance of the evidence.

24

25    1.  The experiment was conducted under the same of [*sic*] similar
     conditions as those existing when the incident took place; and

26    2.  The proponent of the evidence must demonstrate that the correct
     scientific procedures were used.

27

28  ACT 6624.

137

An opinion based in whole or in part upon experiment shall be rejected by the jury unless you find all of the following to have been proven to you by a preponderance of the evidence.

1.   The experiment was conducted under the same or similar conditions as those existing when the incident took place; and

2.   The proponent of the evidence must demonstrate that the correct scientific procedures were used.

ACT 6625.

You are the exclusive judges of whether expert witness testimony should be accepted.  Where you find that the expert witness opinion is based merely upon conjecture and/or speculation, you may reject it entirely, or give it what little weight you believe it is entitled.

However, such evidence may not be based on conjecture and speculation in order for you to render a guilty verdict.

ACT 6626.

The court did instruct the jury:

Witnesses who have special knowledge, skill, experience, training or education in a particular subject have testified to certain opinions.  Any such witness is referred to as an expert witness.  In determining what weight to give any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion.

An opinion is only as good as the facts and reasons on which it is based.  If you find that  any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion.  Likewise, you must consider the strengths or weaknesses of the reasons on which it is based.

You are not bound by an opinion.  Give each opinion the weight you find it deserves.  You may disregard any opinion if you find it to be unreasonable.

CT 1585.

The court also told the jury:

In resolving any conflict that may exist in the testimony of expert witnesses, you should weigh the opinion of one expert against that of another.  In doing this, you should consider the qualifications and believability of the expert witnesses, as well as the reasons for each opinion and the facts and other matters upon which it was based.

CT 1588.

138

B.  The Court of Appeal's Decision

Instructions Concerning Expert Testimony

Defendant proposed two jury instructions concerning the use of expert testimony. The first would have instructed the jury concerning the foundation for expert opinion, as follows: "An opinion based in whole or in part upon experiment shall be rejected by the jury unless you find all of the following have been proven to you by a preponderance of the evidence. [¶] 1. The experiment was conducted under the same of [ sic ] similar conditions as those existing when the incident took place; and [¶] 2. The proponent of the evidence must demonstrate that the correct scientific procedures were used." Defendant asserts on appeal that this instruction was improperly refused because, with respect to prosecution experts Garrison Kost and Lawrence Thibault, the jury had to determine whether a preliminary fact existed before relying on the expert opinion. Specifically, defendant asserts the jury had to find that the experiments conducted by Kost and Thibault to establish the amount of force that was likely applied to defendant and Ronna if they fell from the snowmobile were done under similar conditions to those prevailing at the time of Ronna's death.

Evidence Code section 403 requires a party proffering evidence that relies for its existence on a preliminary fact to produce evidence sufficient to establish the preliminary fact. (Subd. (a)(1) .) If the trial court admits the proffered evidence upon a finding that the proffering party has produced sufficient evidence to establish the preliminary fact, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." (Evid.Code, § 403, subd. (c)(1).)

Whether the conditions were similar during the experiment and when Ronna died was a preliminary fact concerning which the prosecution, pursuant to Evidence Code section 403, had to produce evidence before it could introduce evidence concerning the results of the experiments; therefore, defendant was entitled to the instruction he requested concerning the jury's rejection of the experiments if the conditions were not similar. (See *People v. Roehler, supra*, 167 Cal.App.3d at p. 385, 213 Cal.Rptr. 353 [admissibility of experiment dependent on preliminary fact of similarity of conditions pursuant to Evid.Code, § 403].) Since Evidence Code section 403 applied to the conclusions reached as a result of the experiments, the trial court should have given the instruction requested by defendant or a similar instruction.

Any error, however, in refusing the instruction was harmless because it is not reasonably probable defendant would have obtained a more favorable result had the instruction been given. (See *People v. Wharton* (1991) 53 Cal.3d 522, 571, 280 Cal.Rptr. 631, 809 P.2d 290 [erroneous failure to give instruction only warrants reversal if more favorable result was reasonably probable].) The trial court, by admitting the results of the experiments, found that the preliminary fact of the similarity of the

conditions had been shown. Even though the conditions were not identical, the results, according to Kost, were reliable because having wet snow would not have altered the results significantly. . . .

Furthermore, the trial court instructed the jury generally concerning expert testimony, as follows: "In determining what weight to give to any opinion expressed by an expert witness, you should consider ... the facts or materials upon which the opinion is based .... [¶] An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion...." (Italics added.) While the trial court should have given a more specific instruction pursuant to Evidence Code section 403, subdivision (c)(1), we conclude that any error was harmless due to the similarity of the conditions under which the experiments were conducted to those prevailing when Ronna died, the trial court's determination of that fact, and the instruction to the jury, generally, that it was to consider the basis of an expert's opinion in evaluating the opinion.

Defendant asserts that, in addition to violating his right pursuant to Evidence Code section 403, subdivision (c)(1), the trial court's refusal to give his requested instruction also violated his due process and fair trial rights. This contention is made merely as a conclusion, however, with no supporting analysis. Accordingly, we need not consider it. Issues mentioned but not developed as discrete contentions of error are not properly raised and may be rejected on that basis. ( *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2, 34 Cal.Rptr.2d 558, 882 P.2d 249.)

Defendant proffered another instruction similar to the one we just considered, as follows: "You are the exclusive judges of whether expert witness testimony should be accepted. Where you find that the expert witness opinion is based merely upon conjecture and/or speculation you may reject it entirely, or give it what little weight you believe it is entitled. [¶] However, such evidence may not be based on conjecture and speculation in order for you to render a verdict of guilty."

The last sentence of this instruction is misleading because it directs the jury to find defendant not guilty if it finds there is an insufficient basis for an expert's conclusions. In any event, the gist of this instruction was captured in an instruction given to the jury, as noted above, following CALJIC No. 2.80, that directed the jury to disregard the expert's opinion if it is not based on proven facts. The trial court did not err in refusing this second instruction.

Lodg. Doc. 4 at 89-93.

C.  Procedural Default; Standard of Review

The court declines to determine whether petitioner has defaulted his first claim of instructional error. *Flournoy v. Small*, 681 F.3d 1000, 1004 n.1 (9th Cir. 2012) (a court need not

1   resolve a default question "when a petition clearly fails on the merits"), *cert. denied*, 133 S. Ct.

2   880 (2013).  Moreover, whether viewed deferentially or *de novo*, petitioner has not shown the

3   omission of these instructions had a substantial and injurious effect on the verdict.

4          D.   Analysis

5                  Claims of error in state jury instructions are generally a matter of state law and

6   generally do not raise a constitutional question.  *Owens v. Runnels*, 317 F. App'x 596, 597 (9th

7   Cir. 2008) (unpublished). It is not the province of a federal habeas court to reexamine state court

8   determinations of state law questions.  *Gilmore v. Taylor*, 508 U.S. 333, 348-49 (1993).

9                  An improper jury instruction may implicate a criminal defendant's right to a fair

10  trial.  However, because the omission of an instruction is less likely to be prejudicial than a

11  misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular

12  instruction bears an especially heavy burden.  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

13  "Whether a constitutional violation has occurred will depend on the evidence in the case and the

14  overall instructions given to the jury." *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).   If

15  the court does find constitutional error, the court must also find that the error had a substantial

16  and injurious effect or influence in determining the jury's verdict before granting relief in habeas

17  proceedings.  *See Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

18                  As noted, the trial court instructed the jury that it should consider the strengths and

19  weaknesses of the expert testimony and should weigh the expert opinions against each other.

20  Petitioner argues this does not go far enough, because the jury was not told it could and should

21  reject speculative expert testimony.  He argues that the foundational problems with the testimony,

22  raised in connection with issue ten, show that the injurious impact of the failure to give this

23  instruction.   ECF No. 58 at 183-184.  As noted in connection with issue ten, the state court's

24  determination that the testimony from the prosecution's experts was properly supported is not

25  subject to habeas review; in light of that conclusion, petitioner has not shown the omission of this

26  instruction to be erroneous, even on *de novo* review.

27  /////

28  /////

1    XXIII.  SUFFICIENCY OF THE EVIDENCE (Issue Twenty)

2            Petitioner challenges the sufficiency of the evidence of homicide, suggesting that

3    the prosecution's theory of the homicide is based on the doctrine of "res ipsa loquitur, which has

4    no application in a criminal case."  ECF No. 25 at 123; ECF No. 58 at 188 (repeating the

5    reference to res ipsa loquitur).

6            A.  The Court of Appeal's Decision

7                "In reviewing the sufficiency of evidence on appeal, the court must
                review the 'entire record in the light most favorable to the judgment
8                to determine whether it contains substantial evidence-that is,
                evidence which is reasonable, credible, and of solid value-that
9                would support a rational trier of fact in finding the [defendant
                guilty] beyond a reasonable doubt.' (*People v. Lewis* (2001) 25
10               Cal.4th 610, 642, 106 Cal.Rptr.2d 629, 22 P.3d 392; *see People v.
                Johnson* (1980) 26 Cal.3d 557, 578, 162 Cal.Rptr. 431, 606 P.2d
11               738.)" (*People v. Michaels* (2002) 28 Cal.4th 486, 515, 122
                Cal.Rptr.2d 285, 49 P.3d 1032, brackets in original.) "The
12               substantial evidence rule is generous to the respondent on appeal
                and permits a trier of fact to draw reasonable inferences from the
13               evidence." (*People v. Small* (1988) 205 Cal.App.3d 319, 325, 252
                Cal.Rptr. 41.)
14
                The evidence supports the following inferences: Defendant desired
15               to take Ronna's life and, in the process, benefit financially from the
                large amount of insurance bought on her life. He planned a trip to
16               the mountains to go snowmobiling. While there, he isolated Ronna
                from others by taking her out for a ride in foul weather. When they
17               were away from others, he saw his opportunity and stopped the
                snowmobile next to a three-foot deep puddle of slushy water. From
18               there, it was not difficult for this large and powerful man to
                submerge Ronna in the water until she died. He removed her helmet
19               to make this easier. To cover up his crime, he sat down in the water,
                probably when he heard snowmobiles approaching. He feigned
20               unconsciousness when the Ingvoldsens arrived, actually suffering
                some symptoms from the extreme cold of the water but no other
21               injury.

22               Defendant asserts some of these inferences are unreasonable. For
                example, he focuses on the testimony of those who discovered
23               defendant and Ronna and others who responded to the call for
                assistance, to the effect that defendant appeared to be unconscious
24               and in need of CPR. There was conflicting evidence, however.
                Defendant's color was good; steam was rising from his chest; he
25               was sitting upright in the water; his physical condition was
                inconsistent with a concussion and unconsciousness; he responded
26               rapidly to revival efforts. Defendant argues that there was evidence
                that an injury resulting in unconsciousness does not necessarily
27               result in physical changes visible in a CAT scan. This statement,
                along with others, portrays the problem with defendant's argument.
28               He asks us to draw an inference in his favor, which we cannot do

when an inference to the contrary is reasonable. The evidence concerning whether defendant was actually unconscious is conflicting. We must draw the inference in favor of the judgment that defendant was not unconscious.

Defendant attacks the conclusions of an expert accident reconstruction witness, arguing his tests were conducted under conditions different from those existing at the time of Ronna's death. This argument, however, did not preclude the jury from relying on the expert testimony to the extent it showed what may have happened or what likely did not happen on the day in question. A difference between the condition of the experiments and those prevailing at the time of Ronna's death does not require us to disregard completely the expert's testimony. It was merely a matter for the jury to consider in deciding the value of the accident reconstruction expert's testimony.

Defendant claims the condition of Ronna's body was not inconsistent with accidental drowning. Again, he seeks to draw an inference favorable to himself that, because the condition of the body was not inconsistent with accidental drowning, Ronna's death was accidental.

Defendant asserts we must conclude Ronna was driving the snowmobile just before her death because the only direct evidence on the issue was defendant's statement that she was driving at the time. Defendant's statement, however, is contradicted by the inference to be drawn from the testimony of others who saw only defendant driving when they observed the couple snowmobiling earlier. It is reasonable to infer that, if defendant was driving earlier, he was also driving just before Ronna's death.

During discussion between court and counsel and during closing argument, the prosecutor proffered the theory defendant intended to pull Ronna's body out of the water and push her and the snowmobile over an embankment but was thwarted in his plan by the arrival of the Ingvoldsens. Defendant asserts this theory was unreasonable and, therefore, the judgment was unsupported. This assertion is without merit because we review the evidence to determine whether it supports the homicide conviction, not whether it supports a theory of the prosecutor.

Finally, with respect to the sufficiency of the evidence to support a homicide conviction, defendant claims the doctrine of res ipsa loquitur-"that what happened to Ronna is the kind of occurrence which ordinarily does not happen in the absence of someone's fault"-cannot be applied to conclude Ronna's death was a homicide or that defendant was the perpetrator. Our analysis does not invoke the res ipsa loquitur doctrine. Instead, it is based on the authorities defining the sufficiency of evidence test, as stated above, to criminal prosecutions.

/////

/////

1   Defendant's contention the evidence was insufficient to support a
2   homicide conviction fails in the face of the reasonable inferences
    drawn in favor of the judgment.

3   Lodg. Doc. 4 at 45-49.

4       B.   Analysis

5           The Due Process Clause of the Fourteenth Amendment "protects the accused

6   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

7   constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is

8   sufficient evidence to support a conviction if, "after viewing the evidence in the light most

9   favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

10  the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis

11  in original); *see also Prantil v. California*, 843 F.2d 314, 316 (9th Cir.1988).  "The fact that

12  petitioner can construct from the evidence alternative scenarios at odds with the verdict does not

13  mean the evidence was insufficient, i.e., that no reasonable trier of fact could have found the

14  conviction scenario beyond a reasonable doubt." *Lewis v. Woodford*, No. CIV–S–02–0013 FCD

15  GGH DP, 2007 WL 196635, at *18 (E.D. Cal. Jan. 23, 2007), *recommendation adopted by* 2008

16  WL 115099 (E.D. Cal. Jan. 11, 2008).

17          A petitioner in a federal habeas corpus proceeding "faces a heavy burden when

18  challenging the sufficiency of the evidence used to obtain a state conviction on federal due

19  process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005.)  Indeed, because of the

20  "'deference owed to the trier of fact,'" review of evidentiary sufficiency under the constitution is

21  "sharply limited." *Id*. at 1275 (quoting *Wright v. West*, 505 U.S. 277, 296-97 (2005)).   In order

22  to grant the writ, the habeas court must find that the decision of the state court reflected an

23  objectively unreasonable application of *Jackson* and *Winship* to the facts of the case.  *Id.* at 1275.

24          As he did in the state courts, petitioner focuses on several categories of evidence

25  rather than confront the entirety of the prosecution's case and urges the court to draw inferences

26  in his favor.  For example, he claims that "every witness at the scene testified that Michael was

27  unconscious when found."  ECF No. 58 at 185.  However, petitioner is not only avoiding the

28  inferences in favor of the prosecution, he is overstating the record.  Several of the witnesses said

1    that petitioner appeared to be unconscious or they believed him to be unconscious; they were not

2    categorical.   RT 5087-5088 ("Q:  He appeared unconscious to you, didn't he?  A:  He did."),

3    5418 (witness believed petitioner to be fully unconscious), 5805 (petitioner appeared to be

4    unconscious), 5847 (remembers petitioner was conscious when he arrived but then "he must have

5    gone unconscious, or inattentive), 6208 (Grubbs thought petitioner was unconscious, but there

6    was some indication petitioner moved a hand as he was being pulled from the ditch), 6227

7    (Wisecarver believed petitioner to be unconscious).   As these witnesses could not and did not say

8    categorically that petitioner was unconscious, it was not unreasonable for the jury to conclude

9    otherwise based on petitioner's color, the steam rising from his body, his immediate reaction to

10   the sternum rub, and the treating physicians who could find nothing to account for petitioner's

11   complaints. *See, e.g.*, RT 5061, 5074, 5197, 5278.  As one of the witnesses said, his first thought

12   had been to give petitioner CPR, but then "[i]f I could set there and analyze it, maybe I would

13   have realized he was alive, just by his color.  But when you're in a situation like that, you don't

14   think, your mind works that way.  So I proceeded giving him CPR."  RT 5806.  That the

15   witnesses reacted to the appearance of petitioner's unconsciousness does not mean it was

16   unreasonable for the jury and the state courts to conclude petitioner had been dissembling. *See*

17   *Coleman v. Johnson*, ___ U.S. ___, 132 S. Ct. 2060, 2064 (2012)  ("*Jackson* leaves juries broad

18   discretion in deciding what inferences to draw from the evidence presented at trial, requiring only

19   that jurors 'draw reasonable inferences from basic facts to ultimate facts.'") (quoting *Jackson*,

20   443 U.S. at 319).

21            Petitioner then turns to the expert testimony, arguing as he did in earlier

22   assignments of error, that the testimony of the prosecution's experts, which ignored the

23   observations of the first witnesses on the scene and based their conclusions on dissimilar

24   experiments and calculations, could not give rise to reasonable inferences supporting the

25   prosecution's theory.  However, the jury heard the competing experts and evaluated their

26   credentials.  The State's experts opined that the physical evidence was not consistent with the

27   accident petitioner described; despite the deficiencies petitioner believes undercuts their

28   conclusions, the jury was entitled to believe them.

1    Finally, petitioner focuses on the medical examiner's inability to distinguish a

2  victim of accidental drowning from a victim of forcible drowning.   ECF No. 25 at 122.   It is true

3  the medical examiner did not find any trauma to Ronna's head or anything suggesting she had

4  been held down and drowned.  RT 7186.   However, petitioner has pointed to nothing in the

5  record suggesting Ronna's body showed any signs of trauma from being thrown some distance

6  from a snowmobile.  In light of the other evidence petitioner does not address, it was not

7  unreasonable for the jury to find Ronna had been murdered and for the Court of Appeal to uphold

8  this finding.  The state court did not unreasonably apply *Jackson*.

9  XXIV.  REDUCTION OF THE VERDICT (Issue Twenty-One)

10    Petitioner argues his right to due process was violated when the state courts

11  refused to reduce his verdict to second degree murder.

12    A.  Proceedings in the State Court

13    Petitioner was charged with murder, Cal. Penal Code § 187, and was alleged to

14  have committed the murder for financial gain and while lying in wait.  Cal. Penal. Code § 190,

15  sub. (a)(1),(15).  CT 1901.

16    The jury's verdict on the murder charge reads:

17    We, the jury in the above-entitled cause, find the defendant,
   MICHAEL  ELLISON  FRANKLIN,  GUILTY  of  the  crime  of
18    MURDER, a violation of Penal Code § 187(a), a Felony, as charged
   in the Information.

19

20  CT 1383.  The jury also found both special circumstances to be true.  CT 1381-1383.

21    B.  The Court of Appeal's Decision

22    The jury convicted defendant of murder, without a specification of
   the  degree.  The  jury,  however,  also  found  true  the  special
23    circumstance of lying in wait, which converts any murder into
   murder in the first degree. "All murder which is perpetrated by
24    means of ... lying in wait ... is murder of the first degree." (Pen.
   Code, § 189.) Defendant contends that because the degree of
25    murder was not specified we must reduce his conviction to second
   degree murder. He is wrong.

26

27    Penal Code section 1157 provides: "Whenever a defendant is
   convicted of a crime or attempt to commit a crime which is
   distinguished into degrees, the jury, or the court if a jury trial is
28    waived, must find the degree of the crime or attempted crime of

which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

In *People v. Mendoza* (2000) 23 Cal.4th 896, 98 Cal.Rptr.2d 431, 4 P.3d 265 ( *Mendoza* ), a jury convicted the defendants of murder without specifying the degree but also found true the special circumstance that it was committed during a robbery. (*Id.* at pp. 903-904, 98 Cal.Rptr.2d 431, 4 P.3d 265.) On appeal, the defendants, citing Penal Code section 1157, contended their convictions had to be reduced to second degree murder because the jury did not specify the degree. The Supreme Court held: "[W]e conclude that defendants were not 'convicted of a crime ... which is distinguished into degrees' within the plain and commonsense meaning of section 1157.... When the prosecution establishes that a defendant killed while committing one of the felonies section 189 lists, 'by operation of the statute the killing is deemed to be first degree murder as a matter of law.' [Citations.] Thus, there are no degrees of such murders; as a matter of law, a conviction for a killing committed during a robbery or burglary can only be a conviction for first degree murder." (*Id.* at p. 908, 98 Cal.Rptr.2d 431, 4 P.3d 265, italics in original.)

The same is true of murder committed by means of lying in wait; there are no degrees of such murders. Accordingly, judgment of conviction for first degree murder was properly entered.

Defendant argues that, even though the contemporaneous commission of a robbery and lying in wait are both circumstances that make any murder a murder in the first degree, we cannot rely on *Mendoza* because in that case the circumstance was the contemporaneous commission of a robbery while in this case it was lying in wait. He claims this is so because *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 2 Cal.Rptr.2d 389, 820 P.2d 613, a case decided by the Supreme Court before *Mendoza*, held that an unspecified murder was second degree murder despite a jury finding that the murder was committed for financial gain. (See also *People v. Beamon* (1973) 8 Cal.3d 625, 629, fn. 2, 105 Cal.Rptr. 681, 504 P.2d 905 [specification of degree of robbery].) *Marks*, however, relied on *People v. McDonald* (1984) 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, which the court in *Mendoza* expressly overruled. (*Mendoza, supra*, 23 Cal.4th at p. 914, 98 Cal.Rptr.2d 431, 4 P.3d 265.) Accordingly, *Marks* is no longer authority for the proposition defendant tenders. The judgment, here, was proper.

Lodg. Doc. 4 at 43-45.

Relying on *Hicks v. Oklahoma*, petitioner argues he has a state created liberty interest in having his conviction reduced to second degree murder. ECF No. 58 at 190 (citing 447 U.S. 343 (1980). He takes issue with the Court of Appeal's interpretation of the relevant California case law, arguing that *Marks*, upon which he relied, was not disapproved in *Mendoza*.

147

1    *Id*. at 190.  However, "a state court's interpretation of state law . . . binds a federal court sitting in

2    habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Lewis v. Jeffers*, 497 U.S.

3    764, 780 (1990) (refusing to consider a claim the state court improperly applied its law on

4    aggravating circumstances).   Here, the state court concluded petitioner was not convicted of an

5    offense divided into degrees, a conclusion this court cannot review in these habeas proceedings.

6    Even assuming Penal Code section 1157 gives defendants a state created right protected by due

7    process, the state court applied its own law in determining the section did not apply to petitioner

8    because he was not convicted of an offense divided into degrees.

9    XXV.  CUMULATIVE PREJUDICE (Issue Twenty Two)

10               Petitioner argues that the cumulative prejudice from the errors in this case entitles

11   him to relief.   ECF No. 58 at 193-194.   He made a similar argument in the Court of Appeal,

12   which also rejected it:

13               Defendant asserts that errors in his trial, although harmless
              individually, resulted in a fundamentally unfair trial when
14               considered cumulatively. We have found no significant error in the
              proceedings. While we concluded the trial court erred by not giving
15               a limiting instruction concerning the state of mind evidence and an
              instruction concerning the foundation for expert testimony, we have
16               found no prejudice to defendant. Even considered together, these
              errors were harmless. They did not render the trial fundamentally
17               unfair.

18   Lodg. Doc. 4 at 102.   The state court did not apply *Brecht v. Abrahamson*, unreasonably.  507

19   U.S. 619, 623 (1993).  Although this court has found a few additional errors, it also has found that

20   none of them had a substantial and injurious effect on the verdict.   Combining non-prejudicial

21   errors in this case does not entitle petitioner to habeas relief.

22   XXVI.  CERTIFICATE OF APPEALABILITY

23               Under Rule 11 of the Rules Governing § 2254 Cases, this court "must issue or

24   deny a certificate of appealability when it enters a final order adverse to the applicant."   The

25   standard for issuing a certificate of appealability (COA) is whether the petitioner has "made a

26   substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   A COA

27   should issue only when "reasonable jurists would find the district court's assessment of the

28   /////

1  constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The

2  court finds this standard met only as to petitioner's forth claim, his *Batson* claim.

3       Accordingly, IT IS THEREFORE ORDERED that:

4       1.  The amended petition for a writ of habeas corpus is denied; and

5       2.  The court grants a certificate of appealability on the question whether the

6  prosecutor used his peremptory challenges to challenge men based on their group association.

7  DATED:  December 30, 2014.

8

9  _____

10  UNITED STATES DISTRICT JUDGE